UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

RENDELL ROBINSON,

                              Plaintiff,

                                                        9:13-CV-01213
v.                                                      (TJM/TWD)

LORENZO A. BALLARD, et al.,

                              Defendants.

_____


APPEARANCES:                          OF COUNSEL:

RENDELL ROBINSON
07-A-6175
Plaintiff pro se
Five Points Correctional Facility
Caller Box 119
Romulus, New York 14541


HON. ERIC T. SCHNEIDERMAN          AIMEE M. PAQUETTE, ESQ
Attorney General for the State of New York    Assistant Attorney General
Counsel for Defendants
The Capitol
Albany, New York 12224

**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge

**<u>ORDER AND REPORT AND RECOMMENDATION</u>**

## I.       INTRODUCTION

        Pro se Plaintiff Rendell Robinson has commenced this civil rights action under 42 U.S.C.

§ 1983, arising out of an alleged incident of excessive force that occurred while he was an

inmate-patient in the Marcy Residential Mental Health Unit ("RMHU") at the Marcy

Correctional Facility ("Marcy") on July 14, 2010.  (Dkt. No. 1.)  Claims remaining following

initial review of Plaintiff's complaint are for excessive force and failure to intervene in violation of his rights under the Eighth Amendment. (Dkt. No. 7.)

Remaining Defendants are Marcy Corrections Officers Lorenzo A. Ballard ("Ballard"), Timothy Holmes ("Holmes"), Michael J. Wojtanowski ("Wojtanowski"), Eric Onyan ("Onyan"), and Arduino A. Cacciotti, Jr. ("Cacciotti"); Marcy Sergeant Stephen J. Strassberger ("Strassberger"); Marcy Superintendent Joseph Bellnier ("Bellnier"); Marcy Captain J.E. Harper ("Harper"); Marcy Lieutenant Timothy P. Corey, incorrectly sued as John Doe Cory ("Corey"); Marcy Deputy Superintendent of the Office of Mental Health Brian Hilton ("Hilton"); Office of Mental Health Chief Lisa Kalies ("Kalies"); and Marcy Deputy Superintendent Barry McArdle ("McArdle"). *Id.* The Defendants have now moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. (Dkt. No. 51.)

Defendants seek summary judgment on the following grounds: (1) Plaintiff's claims are barred by the statute of limitations; (2) Plaintiff has failed to exhaust his administrative remedies under the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e; (3) Plaintiff has failed to establish the requisite personal involvement on his supervisory liability claims; and (4) the supervisory defendants are entitled to qualified immunity. (Dkt. No. 51-12 at 2.[1]) Plaintiff has opposed Defendants' motion. (Dkt. Nos. 58 and 59.)

For reasons explained below, the Court recommends that Defendants' motion for summary judgment be granted in part and denied in part.

---

[1] Page references to documents identified by docket number are to the numbers assigned by the CM/ECF docketing system maintained by the Clerk's Office.

2

## II.    FACTUAL BACKGROUND

### A.    Plaintiff's Deposition Testimony Regarding the Alleged Assault by Corrections Officers on July 14, 2010

On July 14, 2010, Defendant Ballard escorted Plaintiff, who was in handcuffs and had a waist chain, to a classroom where a group called "Bad Boys," for inmates who had displayed lewd conduct towards the female staff, was meeting. (Dkt. No. 51-3 at 16, 23.)  Plaintiff sat down at a desk and told Defendant Onyan, who was putting leg irons on him, that the leg irons were too tight, and he needed "big boys," which were larger leg irons.  *Id*. at 17.  Onyan asked Ballard if he could use big boys for Plaintiff, and Ballard said no.  *Id*.  Plaintiff was six feet tall and weighed two-hundred twenty-five to two-hundred fifty pounds at the time, and it was the first time he had not been allowed to use big boys.  *Id*. at 27.

Plaintiff told Onyan he was not going to lock his legs in leg irons that were too tight for two hours.  *Id*.  Ballard and Wojtanowski came over to Plaintiff, and Ballard told him he was going back to his cell for refusing to be locked in.  *Id*.  Plaintiff asked to speak to Defendant Strassberger, who also refused Plaintiff's request for big boys and told Plaintiff he was going back to his cell.  *Id*. at 18-19.  Before the issue with the leg irons, Defendant Ballard had told Plaintiff to tuck his handkerchief into his pocket, and Plaintiff had not done so.  *Id*. at 20.  As he was leaving the classroom, Ballard pushed the handkerchief down, and, according to Plaintiff, as he stepped around Ballard to exit the classroom, Ballard pushed him into the Plexiglass window, and when Plaintiff turned around, tried to push him to the floor.  *Id*.  Plaintiff stood his ground, and Ballard was unable to slam Plaintiff down by himself.  *Id*. at 20-21.  Ballard, Wojtanowski,

and Onyan together were able to push Plaintiff to the ground and then began hitting him with nightsticks for what Plaintiff described as a few minutes, with Plaintiff's head being pushed into the floor and his hands and legs twisted in pain. (Dkt. No. 51-3 at 21.)

When Strassberger said enough, the corrections officers brought Plaintiff to his feet and took him into the hall where they ran him into a sliding glass door, hitting his face. *Id*. at 21-22. During the assault on Plaintiff that occurred at the sliding glass door, he was slammed to the floor a second time. *Id*. at 42, 49-50, 54-55. While Plaintiff was on the ground, Holmes jumped on his back and punched him in the head. *Id*. at 65-66, 68. Wojtanowski hit him in the ribs with a baton. *Id*. at 66. Plaintiff grabbed the baton to stop Wojtanowski from hitting him. *Id*. at 67. Ballard told Wojtanowski to keep hitting Plaintiff, and Strassberger told Plaintiff to let go of the baton, which he did. *Id*. at 67-68. During the assault, Plaintiff was kicked by Cacciotti. *Id*. at 69-70. The assault lasted about two minutes. *Id*. at 50.

According to Plaintiff, Strassberger stood watching as the corrections officers beat him. *Id*. at 58. After the assault, Strassberger told the corrections officers to take Plaintiff to medical. *Id*. at 75. Holmes forced Plaintiff to walk towards medical, manhandling him and pushing him into the wall, with Plaintiff offering no resistance. *Id*. at 77-78. As Strassberger, Holmes, Cacciotti, Ballard, Wojtanowski, and Onyan walked down the hall with Plaintiff to the infirmary, Plaintiff yelled inside the classroom programs that the corrections officers were beating him. *Id*. at 79-80. Holmes told Plaintiff to shut up. *Id*. at 81. Plaintiff was very upset at being manhandled by Holmes and stopped walking. *Id*. When he stopped walking, the corrections officers slammed him back onto the floor. *Id.* Holmes punched Plaintiff in the face and mouth, causing his lip to burst open and bleed, and Cacciotti twisted Plaintiff's left leg in an attempt to

4

break it, causing Plaintiff to scream out in pain. (Dkt. No. 51-3 at 81.) Plaintiff, who believes that Strassberger called for a stretcher because Plaintiff could not walk due to pain in his left knee, was taken the rest of the way to medical on the stretcher. *Id*. at 82, 87.

Plaintiff was under treatment for depression at the time and claims to have been diagnosed with Post Traumatic Stress Disorder ("PTSD") as a result of the assault and to have also sustained numerous physical injuries. *Id*. at 93-99.

### B.    Unusual Incident Report Regarding the July 14, 2010, Incident

The July 20, 2010, Unusual Incident Report prepared on the incident stated that Plaintiff continued to resist and failed to comply with orders as he was returned to his cell, and that he turned towards staff and kicked at them. (Dkt. No. 59-12 at 5.) Ballard, Onyan, and Wojtanowski took Plaintiff to the floor, and when Plaintiff kicked at Wojtanowski, Onyan delivered three jabs to Plaintiff's mid-section to gain compliance. *Id*. Strassberger ordered the corrections officers to take Plaintiff down when he began resisting again on the way back to his cell. *Id*. Wojtanowski delivered two jabs to Plaintiff's mid-section when he, Ballard, and Onyan had difficulty taking Plaintiff down. *Id*. When Plaintiff grabbed Onyan's baton, Holmes and Cacciotti responded with Cacciotti striking Plaintiff in the thigh several times with his right knee until Plaintiff let go of the baton. *Id*. While Plaintiff was being escorted to medical, he resisted again and was forced to the wall where he was held until he stopped struggling and was then taken to medical on a stretcher. *Id*.

### C.    Misbehavior Report of July 14, 2010

Strassberger issued Plaintiff a misbehavior report arising out of the July 14, 2010, incident, charging Plaintiff with 106.10   Refusing Direct Order, 100.11   Assault on Staff,

104.11   Violent Conduct, and 104.13   Creating a Disturbance.  (Dkt. No. 59-12 at 2.)  The

misbehavior report stated that as Plaintiff was leaving the classroom to be returned to his cell for

being uncooperative and refusing to comply with staff direction, he struck Ballard with his

shoulder as he walked by him.  *Id.*  Plaintiff was then restrained by Defendants Ballard,

Wojtanowski, and Onyan but was resistive and combative.  *Id.*  Plaintiff refused Strassberger's

order to stop resisting.  *Id.*  Once control was gained, staff began to escort Plaintiff for a medical

evaluation, and Plaintiff became combative and resistant two more times and refused orders to

stop resisting.  *Id.*  Plaintiff was then taken to medical.  *Id.*

Plaintiff, who in his deposition testimony denied striking Ballard with his shoulder (Dkt.

No. 51-3 at 40-14), was found guilty on all charges on August 13, 2010.  (Dkt. No. 59-12 at 3-4.)

The Superintendent's hearing determination was reversed and expunged by the Acting Director

of Special Housing/Inmate Discipline on November 12, 2010, for failure to maintain a complete

electronic record.  *Id.* at 11.

### D.       Plaintiff's July 17, 2010, Grievance

On July 17, 2010, Plaintiff submitted an eleven page grievance describing the manner in

which he had been assaulted by Ballard, Cacciotti, Holmes, Onyan, and Wojtanowski on July 14,

2010, and Strassberger's failure to intervene despite watching the assault.[2]  (Dkt. Nos. 51-3 at

---

[2]  Plaintiff also submitted a handwritten five page grievance against Defendant McArdle
on or about July 27, 2010.  (Dkt. No. 59-7 at 14-18.)  McArdle had issued a security restraint
order on July 14, 2010, placing Plaintiff in leg irons.  *Id.*  Since Plaintiff's due process claim
against McArdle regarding the leg irons was dismissed without prejudice on initial review, (Dkt.
No. 7 at 13), and Plaintiff did not amend, the question of exhaustion of the July 27, 2010,
grievance is not at issue in this action.  The same is true of Plaintiff's third grievance, number
MCY-14797, which was submitted on or about October 13, 2010.  (Dkt. Nos. 51-3 at 103; 59-2
at ¶¶ 46-47.)  The grievance was against the same corrections officers who had initially assaulted
Plaintiff and was submitted when they started threatening him prior to the submission of the

103; 51-4 at 1-11.)  The grievance office gave the grievance the number MCY-14658.  (Dkt. No. 51-3 at 106.)

After the grievance was submitted by Plaintiff, Captain Harper told him that the handwritten grievance was illegible and directed him to do an audio recording of the grievance, which Plaintiff did.  (Dkt. Nos. 51-3 at 107; 59-2 at ¶ 38.)  Lieutenant Corey, who had been directed by Harper to investigate the July 17, 2010, grievance, came to Plaintiff's cell and asked him if there was anything he wanted to add.  *Id*.  Corey informed Plaintiff that the Grievance Committee had listened to the audiotape, that a copy of the tape was being transcribed, and that Plaintiff would receive a copy, although he never did.  (Dkt. Nos. 51-3 at 108; 59-12 at ¶ 43.) Corey told the Plaintiff he would be receiving a response on the grievance from him, and although he might not like the response, he could appeal.  (Dkt. No.  59-2 at ¶ 43.)  Plaintiff claims he never received a response to his July 17, 2010, grievance regarding the claimed assault. (Dkt. Nos. 51-3 at 105-06.)

In an August 24, 2010, response to a letter Plaintiff had sent to Bellnier regarding the assault and requesting a separation order and criminal protection against the corrections officers responsible, McArdle acknowledged that Plaintiff had filed a grievance regarding the incident. (Dkt. Nos. 59-2 at ¶¶ 39-40.)  On October 7, 2010, Plaintiff received a message from Marcy Inmate Grievance Program Supervisor Thomas regarding Grievance No. MCY-14658.  (Dkt. No. 59-8 at 5.)  Thomas informed Plaintiff that the grievance was pending before the Superintendent.

_____

grievance.  *Id*.  The grievance was denied by the Superintendent, and Plaintiff appealed.  (Dkt. No. 59-13 at 2.)  Plaintiff claims it is the only one of the three grievances to which he received a response.  (Dkt. No, 59-12 at 105.)  Because the third grievance did not involve claims pending in this action, exhaustion of that grievance is not at issue in this action.

*Id.*

Plaintiff was transferred to Elmira Correctional Facility on or about October 20, 2010. (Dkt. No. 59-2 at ¶ 50.)  Before he left, Thomas told Plaintiff the response to the grievance would be forwarded to him via legal mail.  *Id.*  On November 26, 2010, Plaintiff wrote to Thomas advising her that he had not received responses to any of the three grievances relating to the July 14, 2010, assault that he had filed at Marcy.  (Dkt. Nos. 51-5 at 1-10; 59-2 at ¶ 51.)  Plaintiff reminded Thomas that she had told him that the responses would be forwarded to him at his new facility.  *Id.* at 2.  Plaintiff again asked that responses to the grievances be forwarded to him.  *Id.* at 3.  In the letter, Plaintiff reviewed the administrative history regarding the handling of the July 17, 2010, grievance concerning the assault, indicating that Thomas had kept the grievance.  *Id* at 6-10.

Having received no response to his letter to Thomas, on January 3, 2011, Plaintiff wrote to Karen Bellamy ("Bellamy"), Director of the Inmate Grievance Program for the Department of Corrections and Community Supervision ("DOCCS").  (Dkt. Nos. 51-6 at 1-15; 59-2 at ¶¶ 52-53.)  The letter was captioned "Never Receiving the initial Response from 3 different grievance (sic) I Filed [?] From July 14, 2010 incident at Marcy Correctional Facility Residential Mental Health Unit Program."  (Dkt. No. 51-6 at 1.)  Plaintiff explained the factual background of the July 17, 2010, assault grievance, and the administrative history of the grievance, including his meeting with Corey and communications with Thomas regarding the outstanding response.  *Id.* at 7-10.  Plaintiff also told Bellamy that he had notified the Elmira Superintendent that he was waiting for the response and had asked him to call Thomas.  *Id.* at 12.  Plaintiff advised Bellamy that the Elmira Superintendent had instructed him to write to Thomas.  *Id.* at 12-13.  Plaintiff

asked Bellamy to please help him receive his initial responses to his grievances. (Dkt. No. 51-6 at 14.)

After writing to Bellamy, Plaintiff received responses to two grievance he had filed at Marcy, but not the two he had written about the July 17, 2010, grievance on the assault, and the July 27, 2010, grievance regarding the restraints. (Dkt. No. 59-2 at ¶ 53.)

On January 27, 2011, Plaintiff again sent letters to Bellamy, Thomas, and Bellnier advising them that while he had received responses to two grievances, he was still awaiting responses to the two outstanding grievances regarding the assault and use of restraints. (Dkt. Nos. 51-7 at 1-11; 51-8 at 1-7; 59-2 at ¶ 54.) None of the three responded to his requests for a response. (Dkt. No. 59-2 at ¶ 55.)

According to DOCCS Assistant Director of the Inmate Grievance Program, Plaintiff failed to exhaust his administrative remedies because DOCCS records show that Plaintiff did not file appeals on Grievance No. MCY-14658, or the July 27, 2010, and October 13, 2010, grievances with the Central Office Review Committee ("CORC"). (Dkt. No. 51-10 at ¶ 12.)

Plaintiff has averred in his affidavit in response to Defendants' motion that he was not given DOCCS Inmate Grievance Program Directive 4040 when he was transferred from New York City custody to DOCCS custody in 2007.[3] (Dkt. No. 59-2 at ¶ 18.) He was only given an inmate rule book which did not discuss or outline the inmate grievance program or rules. *Id.* Plaintiff was unfamiliar with Directive 4040 at the time Thomas told him he would receive a

---

[3] DOCCS Directive 4040 includes the regulations regarding the New York Inmate Grievance Program set forth in N.Y. Comp. Codes R. & Regs. tit. 7, § 701.1, *et seq.*

response to his July 17, 2010, grievance via legal mail.[4]  (Dkt. No. 59-2 at ¶ 50.)

Plaintiff claims that he knew through hearsay that an inmate had to file an inmate grievance complaint within twenty-one days of the incident being grieved.  *Id*. at ¶ 19.  Plaintiff contends he did not know about the appeal process for grievances as far as specific steps for filing an appeal.  *Id.*  Plaintiff also knew through hearsay that he had to exhaust administrative remedies by receiving a final decision regarding the complaint from CORC but was never told about the appeal process or reasons why he could file an appeal to CORC other than not liking the grievance decision.  *Id*. at ¶¶ 20 and 44.  Plaintiff claims that all of his correspondence to DOCCS officials regarding his July 17, 2010, grievance satisfied the requirement for an appeal to CORC.  *Id*. at ¶ 56.

### E.  Supervisory Liability Claims Against Defendants Hilton, Bellnier, Harper McArdle, Corey, and Kalies

#### 1.  Hilton

Defendant Hilton, who has submitted no affidavit, declaration, or other admissible relevant evidence in support of his motion, is the Deputy Superintendent for the Office of Mental Health at Marcy.  (Dkt. No. 1 at 9.)  At his deposition, Plaintiff testified that before the July 14, 2010, incident in which he was assaulted, Hilton was made aware that D Wing correctional staff, Ballard, Wojtanowski, and Onyan were harassing, threatening, and physically assaulting Plaintiff and numerous other inmate-patients at the RMHU.  (Dkt. No. 51-3 at 109-10.)  According to Plaintiff, he spoke with Hilton about it himself before July 14, 2010, and Hilton ignored the

---

[4] Plaintiff indicates in his affidavit that much later after "this" incident, another inmate pointed him to the library to request review of Directive 4040.  (Dkt. No. 59-2 at ¶ 50.)  How much later is unclear from the affidavit.

complaints and allowed the corrections officers to continue to violate the inmate-patients' rights. *Id*. at 109-11.

In his affidavit in response to Defendants' motion for summary judgment, Plaintiff has averred that during the months of January 2010 throughout July 2010, he and other inmate-patients observed corrections officers Ballard, Wojtanowski, and Onyan threaten, harass, ostracize, belittle, put their hands on, and assault the inmate-patients in the RMHU.  (Dkt. No. 59-2 at ¶ 6.)  Plaintiff has stated that he complained face-to-face to Hilton about Ballard, Wojtanowski, and Onyan's behavior and asked that Ballard be removed from working in the RMHU because he was the leader who initiated most of the violent conduct.  (Dkt. No. 59-2 at ¶ 10.)  According to Plaintiff, Hilton ignored his and the other inmates' complaints and failed to address the officers' misconduct  *Id*. at ¶ 12.

Plaintiff has also filed the affidavit of Jason N. Johnson ("Johnson") a Marcy RMHU inmate from 2010 through 2012, in response to Defendants' motion.  (Dkt. No. 59-11.)  According to Johnson, it was brought to Hilton's attention that the D Wing correction staff officers Ballard, Wojtanowski, and Onyan, were harassing and physically assaulting the inmate-patients.  *Id*. at 2.  Inmates complained to their therapist-clinicians and counselors and were told by them that they would bring the corrections officers' actions to the attention of the "treatment team," which met on a daily basis.  *Id*.  Hilton was one of the individuals in control of the treatment team meetings, and he failed to stop Ballard, Wojtanowski, and Onyan's behavior against the inmates and refused to split them up so that they could no longer team up and gang up and antagonize, harass, and "put their hands on the inmate patients in the RMHU."  *Id*.

## 2. Bellnier

Defendant Bellnier, who like Hilton has submitted no affidavit, declaration, or other admissible relevant evidence in support of his motion, is the Marcy Superintendent. (Dkt. No. 51-2 at ¶ 1.) At his deposition, Plaintiff testified that before the July 14, 2010, incident in which he was assaulted, Plaintiff personally spoke to Bellnier about Ballard, Wojtanowski, and Onyan verbally harassing, threatening, and physically assaulting other inmate-patients in the RMHU. (Dkt. No. 51-3 at 109-10.) According to Plaintiff, during the conversation, which took place in April 2010, Bellnier tried to justify the corrections officers' actions saying things like "[the inmate] should have listened to what the officers said," and "if an inmate doesn't listen to what an officer says, then he's supposed to be written a    a inmate misbehavior report." *Id*. at 111-12.

In his affidavit in response to Defendants' motion for summary judgment, Plaintiff has averred that he complained face-to-face to Bellnier about Ballard, Wojtanowski, and Onyan's behavior and asked that Ballard be removed from working in the RMHU because he was the leader who initiated most of the violent conduct. (Dkt. No. 59-2 at ¶ 10.) Plaintiff again stated that Bellnier tried to justify corrections officers Ballard, Wojtanowski, and Onyan's behavior. *Id*. at ¶ 11.

In his affidavit, Johnson has averred that, as with Hilton, Bellnier was in control of the treatment team meetings where therapist-clinicians and counselors had said they would bring up the inmate-patients' complaints that Ballard, Wojtanowski, and Onyan were harassing and physically assaulting them. (Dkt. No. 59-11 at 2.)

### 3. Harper

Defendant Harper, who like Hilton and Bellnier has submitted no affidavit, declaration, or other admissible relevant evidence in support of his motion, is a Captain at Marcy. (Dkt. No. 51-2 at ¶ 1.) At his deposition, Plaintiff testified that he is suing Harper "for the exact same reasons as   as stated [as to Hilton and Bellnier]." (Dkt. No. 51-3 at 114.) In his affidavit, Plaintiff has averred that he spoke face-to-face with Harper about Ballard, Wojtanowski, and Onyan's behavior and asked that Ballard be removed from working in the RMHU because he was the leader who initiated most of the violent conduct. (Dkt. No. 59-2 at ¶ 10.) According to Plaintiff, Harper, like Bellnier, tried to justify the corrections officers' actions by saying that the inmate had not followed the rules. *Id*. at ¶ 11. In his affidavit, Johnson has identified Harper as one of the "higher ups prison officials" in the RMHU who were made aware of Ballard, Wojtanowski, and Onyan's behavior through treatment team meetings. (Dkt. No. 59-11 at 2.)

### 4. McArdle

Defendant McArdle, who like Hilton, Bellnier, and Harper, has submitted no affidavit, declaration, or other admissible relevant evidence in support of his motion, is Deputy Superintendent at Marcy. (Dkt. No. 51-2 at ¶ 1.) At his deposition, Plaintiff testified that he is suing McArdle "just as explained with Defendant Hilton and Defendant Bellnier." (Dkt. No. 51-3 at 112.) In his affidavit, Johnson has identified Harper as one of the "higher ups prison officials" in the RMHU who were made aware of Ballard, Wojtanowski, and Onyan's behavior through treatment team meetings. (Dkt. No. 59-11 at 2.)

### 5.  Corey

Defendant Corey, who like Hilton, Bellnier, Harper, and McArdle has submitted no affidavit, declaration, or other admissible relevant evidence in support of his motion, is a Lieutenant at Marcy.  (Dkt. No. 51-2 at ¶ 1.)  At his deposition, Plaintiff responded in the affirmative when asked if he was suing Corey for the "same reasons."  (Dkt. No. 51-3 at 114.)  In his affidavit, Johnson has identified Corey as one of the "higher ups prison officials" in the RMHU who were made aware of Ballard, Wojtanowski, and Onyan's behavior through treatment team meetings.  (Dkt. No. 59-11 at 2.)

### 6.  Kalies

Defendant Kalies, who submitted a declaration in support of her motion, is employed by the New York State Office of Mental Health ("OMH") as Forensic Unit Chief at the Marcy RMHU, a position she also held in July 2010.  (Dkt. No. 51-9 at ¶¶ 1-2.)  Kalies has never been employed by DOCCS.  *Id*. at ¶ 4.

At his deposition, Plaintiff testified that he is suing Kalies because "she was the unit chief and she, as well, was made aware of the assaulting officers, Wojtanowski, Onyan, and Ballard's unlawful behavior."  (Dkt. No. 51-3 at 113.)  According to Plaintiff, he did not personally tell her about the corrections officers' behavior and testified he did not see her a lot.  *Id*.  However, she was a member of the treatment team, and the inmate-patients' clinicians, counselors, and therapists had told them that they would bring the behavior to the attention of the treatment team. *Id*.  In his affidavit, Johnson has identified Kalies as one of the "higher ups prison officials" in the RMHU who were made aware of Ballard, Wojtanowski, and Onyan's behavior through

14

treatment team meetings.  (Dkt. No. 59-11 at 2.)

In her declaration, Kalies has explained that she is a clinical social worker for OMH, and that her duties do not include overseeing DOCCS employees and/or providing security to inmates in the custody of DOCCS.  (Dkt. No. 51-9 at ¶ 12.)  She has stated that her duties as Forensic Unit Chief include co-chairing treatment team meetings.  *Id.* at ¶ 11.  Kalies has also stated that she was unaware of the alleged assault on Plaintiff; has no recollection of Plaintiff ever reporting any assaults or potential assaults to her or anyone else; and has no knowledge of complaints made by Plaintiff about the possibility of being assaulted.  *Id.* at ¶¶ 7-10.  However, Kalies' declaration is silent as to what she may or may not have learned at team meetings regarding officers Wojtanowski, Onyan, and Ballard's allegedly unlawful behavior, or their alleged assaults on other inmate-patients, from the inmate-patients' clinicians, counselors, and therapists.  *Id.* at ¶¶ 1-11.

## III.    APPLICABLE SUMMARY JUDGMENT LEGAL STANDARDS

Summary judgment may be granted only if the submissions of the parties taken together "show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56; *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).  The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists.  *Salahuddin v. Goord*, 467 F.3d 263, 272-73 (2d Cir. 2006).  A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

Only after the moving party has met this burden is the nonmoving party required to

15

produce evidence demonstrating that genuine issues of material fact exist. *Salahuddin*, 467 F.3d at 272-73. The nonmoving party must do more than "rest upon the mere allegations . . . of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986). "Conclusory allegations, conjecture and speculation . . . are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998).

A party opposing summary judgment is required to submit admissible evidence. *See Spiegel v. Schulmann*, 604 F.3d 72, 81 (2d Cir. 2010) ("It is well established that in determining the appropriateness of a grant of summary judgment, [the court] . . . may rely only on admissible evidence.") (citation and internal quotation marks omitted). A plaintiff's verified complaint is to be treated as an affidavit.[5] *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995) ("A verified complaint is to be treated as an affidavit . . . and therefore will be considered in determining whether material issues of fact exist . . . .") (citations omitted).

In *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005), the Second Circuit reminded that on summary judgment motions "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could *reasonably* find for the plaintiff." "To defeat summary judgment, . . . nonmoving parties "may not rely on conclusory allegations or unsubstantiated speculation." *Jeffreys*, 426 F.3d at 554 (citation and internal quotation marks omitted). "At the summary judgment stage, a nonmoving party must offer some hard evidence showing that its version of the events is not

---

[5] The Court finds that Plaintiff's amended complaint was adequately verified under 28 U.S.C. § 1746 by the language "'[p]ursuant to 28 USC § 1746, I declare under penalty of perjury that the foregoing is true and correct." (Dkt. No. 1-2 at 63.)

wholly fanciful." *Id.* (citation and internal quotation marks omitted). "[T]o satisfy Rule 56(e), affidavits must be based upon 'concrete particulars,' not conclusory allegations. "*Schwapp v. Town of Avon*, 118 F.3d 106, 111 (2d Cir. 1997) (citation omitted). "Statements that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment." *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir. 1999).

In determining whether a genuine issue of material fact exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008). Where a party is proceeding pro se, the court is obliged to "read [the pro se party's] supporting papers liberally, and . . . interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994). However, "a pro se party's 'bald assertion,' unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Cole v. Artuz*, No. 93 Civ. 5981 (WHP) (JCF), 1999 WL 983876 at *3 (S.D.N.Y. Oct. 28, 1999)[6] (citing *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991)).

## IV. EXHAUSTION OF ADMINISTRATIVE REMEDIES

### A. Legal Standard for Exhaustion Under the PLRA

Under the PLRA, "[n]o action shall be brought with respect to prison conditions under section 1983 . . . by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); *see Ross v. Blake*, ___ U.S. ___, 136 S.Ct. 1850, 1854-55 (2016). "[T]he PLRA's exhaustion requirement applies

---

[6] Copies of all unpublished decisions cited herein will be provided to Plaintiff in accordance with *LeBron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002).

The PLRA requires "proper exhaustion," which means using all steps required by the administrative review process applicable to the institution in which an inmate is confined and doing so properly. *Jones v. Bock*, 549 U.S. 199, 218 (2007) (citing *Woodford v. Ngo*, 548 U.S. 81, 88 (2006)). *See also Amador v. Andrews*, 655 F.3d 89, 96 (2d Cir. 2011) (exhaustion necessitates "using all steps that the [government] agency holds out, and doing so properly").

In New York state prisons, DOCCS has a well-established three-step Inmate Grievance Program ("IGP"). N.Y. Comp. Codes R. & Regs. ("NYCRR") tit. 7, § 701.5 (2013). Generally, the DOCCS IGP involves the following procedure for the filing of grievances. First, an inmate must file a complaint with the facility's IGP clerk within twenty-one calendar days of the alleged occurrence. *Id.* at § 701.5(a) (2010). A representative of the facility's Inmate Grievance Resolution Committee ("IGRC") has sixteen calendar days from receipt of the grievance to informally resolve the issue. *Id.* at § 701.5(b)(1). If there is no such informal resolution, the full IGRC conducts a hearing within sixteen calendar days of receipt of the grievance *Id.* at § 701.5(b)(2)), and issues a written decision within two working days of the conclusion of the hearing. *Id.* at § 701.5(b)(3).

Second, a grievant may appeal the IGRC decision to the facility's superintendent within seven calendar days of receipt of the IGRC's written decision. *Id.* at § 701.5(c)(1). If the grievance involves an institutional issue (as opposed to a DOCCS-wide policy issue), the superintendent must issue a written decision within twenty calendar days of receipt of the

grievant's appeal. *Id*. at § 701.5(c)(3)(ii). Grievances regarding DOCCS-wide policy issues are forwarded directly to the Central Office Review Committee ("CORC") for a decision under the process applicable to the third step. *Id*. at § 701.5(c)(3)(i). Third, a grievant may appeal to CORC within seven working days of receipt of the superintendent's written decision. *Id*. at 701.5(d)(1)(i). CORC is to render a written decision within thirty calendar days of receipt of the appeal. *Id*. at 701.5(d)(3)(ii).

Grievances claiming employee harassment "are of particular concern to the administration of [DOCCS] facilities," and subject to an expedited procedure whereby the grievance goes directly to the facility superintendent.[7] *Id*. at § 701.8. The superintendent is required to initiate an in-house investigation by higher ranking supervisory personnel; request an investigation by the inspector general's office; or request an investigation by the New York State Police Bureau of Investigation if the superintendent determines that criminal activity may be involved. *Id*. at 701.8(d). A grievance referred to the superintendent and determined to be an allegation of harassment, may not be withdrawn and must be addressed by the superintendent. *Id*. at 701.8(d). The superintendent is required to render a decision on the grievance within twenty-five calendar days, and extensions may be granted only with the consent of the grievant. *Id*. at 701.8(f). If the superintendent fails to respond within the required twenty-five days, the grievant may appeal the grievance to CORC by "filing a notice of decision to appeal (form #2133) with the inmate grievance clerk." *Id*. at 701.8(g).

If a prisoner has failed to properly follow each of the applicable steps, including receipt of

---

[7] Section 701.8 has been found applicable to claims of excessive force. *See, e.g., Torres v. Carry*, 691 F. Supp. 2d 366 (S.D.N.Y. 2009).

a decision from CORC, prior to commencing litigation, he has failed to exhaust his administrative remedies and is barred from commencing a federal lawsuit. *Woodford*, 548 U.S. at 93; *Neal v. Goord*, 267 F.3d 116, 122-23 (2d Cir. 2001) (inmate commencing litigation before receiving a decision from CORC does not satisfy PLRA's requirement that administrative remedies be exhausted before filing suit), *overruled on the other grounds*, *Nussle*, 534 U.S. 516; *Martin, II v. Niagara County Jail*, No. 05-CV-868 (JTC), 2012 WL 3230435, at * 6 (W.D.N.Y. Aug. 6, 2012) (inmate who fails to exhaust his administrative remedies is barred from commencing a federal lawsuit).

Because failure to exhaust is an affirmative defense, defendants bear the burden of showing by a preponderance of the evidence that a plaintiff has failed to exhaust his available administrative remedies.[8] *See Murray v. Palmer*, No. 9:03-CV-1010 (GTS/GHL), 2010 WL 1235591, at *4 (N.D.N.Y. Mar. 31, 2010); *Bailey v. Fortier,* No. 09-CV-0742 (GLS/DEP), 2012 WL 6935254, at *6 (N.D.N.Y. Oct. 4, 2012) (the party asserting failure to exhaust bears the burden of proving its elements by a preponderance of the evidence).

## B.    Plaintiff's Failure to Exhaust Grievance No. MCY-14658

The record evidence establishes that on or about July 17, 2010, Plaintiff submitted a grievance regarding the alleged July 14, 2010, assault by the Marcy RMHU corrections officers, and that the grievance was given the number MCY-14658.  (Dkt. Nos. 51-3 at 103, 106; 51-4 at 1-11.)  The evidence further shows that Plaintiff did not receive a timely response to the grievance that went directly to the Superintendent under § 701.8 (Dkt. No. 51-3 at 105-06), and

---

[8] Defendants have asserted failure to exhaust administrative remedies as an affirmative defense in their answer to Plaintiff's complaint.  (Dkt. No. 40 at ¶ 14.)

that Plaintiff thereafter failed to exhaust under the New York IGP, by failing to appeal to CORC as required under § 701.8(g), and commencing this lawsuit before receiving a decision from CORC. *See Woodford*, 548 U.S. at 93; 7 NYCRR §§ 701.8(f), 701.8(g).

C.       *Ross v. Blake*, ___ U.S. ___, 136 S.Ct. 1850 (2016)

A prisoner's failure to exhaust does not end a court's exhaustion review. For more than ten years, courts in this district were guided by the Second Circuit's decision in *Hemphill v. New York*. 380 F.3d 680, 686 (2d Cir. 2004). Under *Hemphill*, the Second Circuit established a three-part inquiry to determine whether, *inter alia*, a plaintiff's failure to exhaust available administrative remedies could nevertheless be justified by "special circumstances." *Id.*

However, last year, not long after Defendants filed their motion for summary judgment, the Supreme Court rejected the "special circumstances" exception applied by many circuits, and held that "[c]ourts may not engraft an unwritten 'special circumstance' onto the PLRA's exhaustion requirement." *Ross,* 136 S.Ct. 1850, 1862 (2016). In *Ross*, the question before the Court was whether there was a "special circumstances" exception under the PLRA where the inmate erroneously believed that he had satisfied the exhaustion requirement. *Id.* at 1855. In an opinion by Justice Elena Kagan, the Supreme Court held that there is no such exception:

> the [PLRA] mandates that an inmate exhaust "such administrative remedies as are available" before bringing suit to challenge prison conditions. The court below adopted an unwritten "special circumstances" exception to that provision, permitting some prisoners to pursue litigation even when they have failed to exhaust available administrative remedies. Today, we reject that freewheeling approach to exhaustion as inconsistent with the PLRA.

*Id.* at 1854-55. (internal citation omitted). *See Williams v. Priatno*, 829 F.3d 118, 123 (2d Cir.

2016) (*Hemphill* and *Giano v. Goord*, 380 F.3d 670, 675-76 (2d Cir. 2004) have been abrogated by *Ross* to the extent those decisions established the "special circumstances" exception from the exhaustion of administrative remedies requirement in the PLRA).

The Supreme Court rejection of the "special circumstances" exception in *Ross* did not signal an end a court's review of the exhaustion issue upon a finding that the plaintiff had failed to properly follow each of the applicable steps, including receipt of a decision from CORC, "because the PLRA contains its own, textual exception to mandatory exhaustion." *Ross,* 136 S.Ct. at 1858. Under the PLRA, "the exhaustion requirement hinges on the 'availab[ility]' of administrative remedies: An inmate, that is, must exhaust available remedies, but need not exhaust unavailable ones." *Id*. Thus, courts are still tasked with determining whether or not a prisoner's administrative remedies are, in fact "available."

The Supreme Court found the ordinary meaning of the word "available" to be "'capable of use for the accomplishment of a purpose,' and that which 'is accessible or may be obtained.'" *Id*. (quoting *Booth v. Churner*, 532 U.S. 731, 737-38 (2001)). "Accordingly, an inmate is required to exhaust those, but only those, grievance procedures that are 'capable of use' to obtain 'some relief for the action complained of.'" *Id*. at 1859 (citation omitted).

To guide courts in the "availability" analysis, the Supreme Court in *Ross* identified "three kinds of circumstances" in which an administrative remedy, "although officially on the books," is not "available."[9] *Id*. at 1853. First, "an administrative procedure is unavailable when

_____

[9] In a footnote in *Williams v. Priatno*, 829 F.3d 118, 123 n.2 (2d Cir. 2016), the Second Circuit noted that "the three circumstances discussed in *Ross* do not appear to be exhaustive, given the Court's focus on three kinds of circumstances that were 'relevant' to the facts of the case." Because the same three circumstances were relevant to the PLRA exhaustion issue in *Williams*, the Second Circuit did not "opine on what other circumstances might render an

(despite what regulations or guidance materials may promise) it operates as a simple dead end with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Id*. "Next, an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use." *Id*. at 1853-54. Finally, an administrative remedy is not "available" when "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id*. When one of the three circumstances is found, "an inmate's duty to exhaust 'available' remedies does not come into play. *Id*. at 1859.

**D.    Availability of the DOCCS IGP With Respect to Grievance No.  MCY-14658**

1.    The Question of Whether Plaintiff was Thwarted from Taking Advantage of the Grievance Process through Machination, Misrepresentation, or Intimidation

The undisputed record evidence establishes Plaintiff's claim that he filed Grievance No. MCY 14658, dated July 17, 2010, complaining of the alleged use of excessive force by the Defendants corrections officers on July 14, 2010.[10]  (Dkt. Nos. 51-4 at 1-11; 59-8 at 2, 4-5.)  The record further shows that Marcy Inmate Grievance Program Supervisor Thomas and Lieutenant Corey were aware that the grievance had been filed, told Plaintiff it was pending before Superintendent Bellnier, and led Plaintiff to believe he would receive a determination of the grievance from Bellnier.  (Dkt. Nos. 51-3 at 108; 59-8 at 5; 59-12 at ¶ 42.)

Defendants do not dispute that Plaintiff over a period of time conscientiously pursued a

---

otherwise available administrative remedy actually incapable of use." *Id.*

[10]  Defendants' motion papers do not include affidavits or declarations from Defendants McArdle, Corey, Thomas, Bellnier, Bellamy, or anyone else who may have had personal involvement in the receipt and handling of Grievance No. MCY 14658 by DOCCS personnel, or Superintendent Bellnier's failure to respond to the grievance.

response to his grievance from the Superintendent by sending detailed letters to Thomas on November 26, 2010, and January 27, 2011 (Dkt. Nos. 51-5 at 1-10; 51-7 at 1-11); to Bellamy on January 3, 2011, and January 27, 2011. (Dkt. Nos. 51-6 at 1-15; 59-9 at 41-45); and to Bellnier on January 27, 2011, (Dkt. No. 51-8 at 1-7), inquiring as to the status of the grievance and requesting a response. Defendants do not dispute Plaintiff's claim that all of those letters, which were sent after Plaintiff had been transferred from Marcy to Elmira on October 20, 2010, went unanswered. (Dkt. No. 59-2 at ¶¶ 51-52-54, 57.) Nor do Defendants dispute that Plaintiff never received a response to Grievance No. MCY 14658, or an explanation as to why no response was forthcoming.

Based upon the foregoing, and considering in particular Defendants' total silence with regard to Plaintiff's multiple inquiries as to the status of his grievance, both at the time the letters were sent and in their motion papers, the Court finds that there are, at the very least, questions of fact regarding whether Plaintiff was "thwart[ed] . . . from taking advantage of the grievance process through machination, misrepresentation, or intimidation." *Ross*, 136 S.Ct. at 1860.

### 2. The Opacity of 7 NYCRR § 701.8(g)

Under the DOCCS IGP, in order to exhaust his administrative remedies in this case, where Plaintiff received no response to his grievance from Superintendent Bellnier despite his dogged pursuit, Plaintiff was required under 7 NYCRR § 701.8(g) to "appeal his/her grievance to CORC." Section 701.8(g) explains that this was to be accomplished by "filing a Notice of Decision to Appeal (Form #2133) with the inmate grievance clerk." Form 2133 is the form used for the Superintendent's decision on a grievance. *See Davis v. State of New York*, 311 F. App'x 397, 399 n.2 (2d Cir. 2009) (explaining that Form 2133 is the form which has the

Superintendent's grievance decision printed on the top half of a single sheet and on the bottom half contains the form an inmate is required to file to appeal the Superintendent's decision to CORC). As noted in *Davis*, Form 2133 explains "[i]f you wish to refer the above decision of the Superintendent please sign below and return this copy to your Inmate Grievance Clerk." *Id*. *See also Kotler v. Fischer*, No. 9:09-cv-01443 (MAD/ATB), 2012 WL 929823, at * 1 (N.D.N.Y. March 19, 2012) ("Form 2133 is typically used to set forth the ruling of a facility Superintendent on a grievance, and has a block for the Superintendent's signature and a space at the bottom for the inmate to indicate his intention to appeal the Superintendent's decision to [CORC].")[11]

Section 701.8(g) contains no instruction as to how an inmate who has received no response from the Superintendent is to obtain Form 2133, nor does the section give direction as to whether an inmate who has been transferred since filing his grievance, is required to submit the completed form to the grievance clerk in his former or present correctional facility.[12] In paragraph 10 of their Statement Pursuant to Rule 7.1(a)(3), Defendants state that "Plaintiff was fully aware of how to file an appeal to the Central Office Review Committee ("CORC"), which

---

[11] In *Kotler*, 2012 WL 929823, the plaintiff inmate was charged with a disciplinary infraction because he had attempted to obtain a copy of a Form 2133 relating to a past grievance which he had redacted to create a blank version of the form, after he had been unsuccessful in his attempt to obtain a blank Form 2133 from the library so that he could appeal a prior grievance for which he had not yet received a Superintendent's ruling. *Id*. at * 2. At the plaintiff's disciplinary hearing, the facility grievance supervisor testified that inmates were not authorized to possess Form 2133 in blank format. *Id*. at * 3.

[12] 7 NYCRR § 701.6(h)(1) provides that a response to a grievance filed by an inmate who is subsequently transferred is to be mailed to the inmate's new facility. Section 701.6(h)(2) (2) provides that an inmate transferred to another facility may continue an appeal from a grievance and must mail the signed appeal form to the IGP supervisory at the facility where the grievance was originally filed within seven days after receipt, presumably of the grievance response referenced in § 701.6(h)(1).

is evidenced by the fact that he filed four appeals before July 14, 2010, and twenty-five appeals after July 14, 2010. (Dkt. No. 51-28 at ¶ 10.) Defendants cite to the declaration of Jeffrey Hale ("Hale"), Assistant Director of the DOCCS IGP as support for the statement. (Dkt. No. 51-10.) However, as Plaintiff explained in his response to the statement, the earlier appeals referenced by Hale had all been from written decisions to the grievances on which there were instructions on appealing to the Superintendent and/or CORC. (Dkt. No. 59-1 at ¶ 10.) Plaintiff never received a written response to Grievance No. MCY-14658 instructing him on how to appeal to CORC. *Id*.

In *Williams,* 829 F.3d at 120-21, the inmate plaintiff was transferred to a new facility after an unsuccessful attempt to file a grievance. The inmate never received a response to the unfiled grievance and never appealed as authorized under 7 NYCRR § 701.6(g)(2), which provides that absent an extension of the time limitations imposed for a grievance hearing, answering a grievance, or deciding an appeal, matters not decided within the IGP time limitations may be appealed to the next step. *Id*. at 121. The district court dismissed the action for failure to exhaust, and the Second Circuit reversed and remanded on the grounds that exhaustion was unavailable because "the regulations plainly do not describe a mechanism for appealing a grievance that was never filed," and "the process to appeal an unfiled and unanswered grievance is prohibitively opaque, such that no inmate could actually make use of it." *Id*. at 126.

This case is distinguishable from *Williams* in that Plaintiff's grievance was filed, and the relevant provision regarding the appeal of a grievance to which no response has been received is § 701.8(g), rather than §§ 701.6(g)(2) and (h)(2), in this case. However, as in *Williams*, Plaintiff in this case was transferred to a new facility before receiving a response to his grievance and failed to receive a response after the transfer. In addition, § 701.8(g) presumes that an inmate has

access to Form 2133 so that he can complete it in compliance with the section, and that he knows to which grievance clerk the appeal should be sent.

The Court finds that the Second Circuit's conclusion in *Williams* that "[t]he regulations plainly do not provide guidance on how a transferred inmate can appeal his grievance with the original facility without having a response," is also applicable to appeals to be taken under § 701.8(g), and that § 701.8(g) is also so opaque and confusing that it is "practically speaking, incapable of use."[13] *Id*. at 126 (quoting *Ross*, 136 S.Ct. at 1859). *See Sawyer v. Prack*, No. 9:14-CV-1198 (DNH/DEP), 2016 WL 5440596, at * 8 n.13 (N.D.N.Y. July 29, 2016) (noting that the *Williams* court "rejected defendants' argument that the plaintiff in that case 'still could have attempted to appeal the grievance in accordance with sections 701.6(g)(2) and 701.8(g)' even if the grievance was never filed in the first place and despite the fact that he had been transferred to a new facility prior to receiving a response, and concluded that 'even if Williams technically could have appealed his grievance, . . . the regulatory scheme providing for that appeal is 'so opaque' and 'so confusing that . . . no reasonable person can use [it].'" [*Williams*, 829 F.3d at 126] (quoting *Ross*,136 S.Ct. at 1859)).

Based upon the foregoing, the Court concludes that the IGP was unavailable to Plaintiff with respect to Grievance No. MCY-14658, and recommends that Defendants' motion for summary judgment be denied to the extent it seeks judgment on failure to exhaust grounds.

---

[13] In *Williams*, the Second Circuit recommended that "DOCCS revise its grievance procedures to instruct inmates . . . how to appeal a grievance, to which the inmate never received a response, after being transferred."  829 F.3d at 126-27.

## V.     STATUTE OF LIMITATIONS

Defendants also seek summary judgment on the grounds that Plaintiff's claims are barred by the three year statute of limitations for civil rights claims under § 1983. (Dkt. No. 51-12 at 11.) Plaintiff's excessive force and failure to intervene claims arise out of an alleged assault on July 14, 2010. (Dkt. No. 7 at 3.) Plaintiff submitted his complaint in this lawsuit on September 30, 2013, more than three years after his claims arose. (Dkt. No. 1.)

The Second Circuit has adopted a rule that "equitable tolling is applicable to the time period during which a prisoner-plaintiff is exhausting his administrative remedies pursuant to the PLRA." *Gonzalez v. Hasty*, 651 F.3d 318, 323 (2d Cir. 2011). The Court agreed with the Seventh Circuit that "[t]he 'catch-22' . . . is self-evident: the prisoner who files suit . . . prior to exhausting administrative remedies risks dismissal based upon § 1997e; whereas the prisoner who waits to exhaust his administrative remedies risks dismissal based upon untimeliness." *Id*. (quoting *Johnson v. Rivera*, 272 F.3d 519, 522 (7th Cir. 2001)). The Court also shared the concern of the Seventh Circuit that "any other interpretation of the PLRA could 'permit [prison officials] to exploit the exhaustion requirement through indefinite delay in responding to grievances." *Id*. (quoting *Lewis v. Washington*, 300 F.3d 829, 833 (7th Cir. 2002)).

Under the tolling rule articulated by the Second Circuit in *Gonzalez,* 651 F.3d at 324, the three-year statute of limitations applicable to § 1983 actions "is tolled only during the exhaustion period and not during the period in between the accrual of those claims and when [the inmate] began the administrative process." The Court in *Gonzalez* refused to find that there is a maximum time period beyond which equitable tolling will not save a claim as long as the inmate

28

is "*actively exhausting his administrative remedies.*" (emphasis in original). *Id*. at 322 n.2, 324.

Plaintiff's claims arising out of the alleged assault accrued on July 14, 2010, when the assault occurred, and the tolling began three days later when Plaintiff submitted his July 17, 2010, grievance.[14]  (Dkt. Nos. 51-3 at 20-21; 51-4 at 1-11.)

The Superintendent had still not responded to Plaintiff's July 17, 2010, grievance at the time the lawsuit was commenced, and to the Court's knowledge has still not done so.  As the Second Circuit noted in *Gonzalez,* 651 F.3d at 323, one of the reasons for the equitable tolling rule is to protect inmates against the exploitation of the exhaustion requirement through indefinite delay in responding to grievances resulting in an inmate's lawsuit being subject to dismissal either for failure to exhaust or as time-barred.

The Court finds that the statute of limitations on Plaintiff's § 1983 claims was equitably tolled at the very least from July 17, 2010, through the end of January 2011, when Plaintiff stopped writing to DOCCS officials requesting a response to his grievance, and arguably through the time Plaintiff commenced this suit.  Either way, the Court finds that the suit was commenced within the three year statute for a § 1983 action and recommends that Defendants' motion for summary judgment be denied to the extent it seeks judgment on statute of limitations grounds.

## VI.    SUPERVISORY LIABILITY

Plaintiff has asserted supervisory liability claims against Defendants Hilton, Bellnier, McArdle, Harper, Corey, and Kalies, claiming that prior to the time Plaintiff was allegedly assaulted on July 14, 2010, they had all been made aware that D Wing correctional staff Ballard,

---

[14]  Plaintiff made it clear in his letters to the various DOCCS officials that he was actively pursuing his administrative remedies at the very least during the period of time through the end of January 2011, while he was writing to DOCCS officials seeking a response.

Wojtanowski, and Onyan were harassing, threatening, and physically assaulting Plaintiff and numerous other inmate-patients at RMHU and took no action to stop it. (Dkt. Nos. 51-3 at 109-10, 112-114.) Defendants seek summary judgment on the supervisory liability claims on the grounds that there is no evidence that they were personally involved in the alleged assault on Plaintiff and failure to protect, and that Plaintiff has asserted nothing more than "'conclusory allegations with no facts demonstrating notice' of the officers threatening, assaulting, or harassing inmates."[15] (Dkt. No. 51-12 at 17.) Kalies has submitted a declaration in support of the summary judgment motion while the other five supervisory officials have remained mute as to their knowledge or lack thereof regarding Ballard, Wojtanowski, and Onyan's alleged physical assault of Plaintiff and other inmate-patients prior to July 14, 2010. (Dkt. Nos. 51-9.)

The law is clear that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir. 1977). "Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each government-official defendant, through the official's own individual actions, has violated the Constitution." *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009) ("Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*."). "Holding a position in a hierarchical chain of command, without more, is insufficient to support a showing of personal involvement." *Groves v. Davis*, No. 9:11-CV-1317 (GTS/RFT), 2012 WL 651919, at *6 (N.D.N.Y. Feb. 28, 2012) (citing *McKinnon*, 568 F.2d at 934) Therefore, "a plaintiff must . . allege a tangible

---

[15] *See Guillory v. Cuomo*, No. 14-CV-0971 (MAD/RFT), 2014 WL 11173632 at * 4 (N.D.N.Y. Dec. 2, 2014) (dismissing plaintiff's supervisory liability claims without prejudice on initial review pursuant to 28 U.S.C. §§ 1915(e) and 1915A).

connection between the acts of a defendant and the injuries suffered." *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986).

The Second Circuit has held that personal involvement by a supervisor necessary to state a claim under § 1983 may be found where: "(1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring." *Colon,* 58 F.3d at 873.[16]

A.      **Kalies**

According to Kalies, Forensic Unit Chief in the RMHU, she was employed by the OMH, not DOCCS; she was not responsible for overseeing DOCCS employees or providing security to inmates; she did co-chair treatment team meetings; she was unaware of the assault on Plaintiff; had no recollection of Plaintiff or anyone else reporting assaults or potential assaults to her; and had no knowledge of complaints made about Plaintiff being assaulted.  (Dkt. No. 59-9 at ¶¶ 7-12.)

Although Plaintiff testified at his deposition that Kalies was aware of Ballard, Wojtanowski, and Onyan's assaultive behavior, Plaintiff conceded that he never personally told her about it, and his supervisory liability claim against Kalies is based on the conclusory claim

---

[16] The Second Circuit has thus far expressly declined to determine whether *Iqbal* eliminated any of the *Colon* bases for liability.  *See Grullon v. City of New Haven*, 720 F.3d 133, 139 (2d Cir. 2013).

31

that inmate-patients had been told by the clinicians, counselors, and therapists that they would bring Ballard, Wojtanowski, and Onyan's assaultive behavior to the attention of the treatment team. (Dkt. No. 51-3 at 113.) There is no evidence that the clinicians, counselors, followed through on speaking with the treatment team regarding the assaultive behavior.

The Court finds, based upon the foregoing, that the evidence establishes that Kalies had no supervisory authority over the Defendant DOCCS corrections officers and, therefore, cannot be found to have had the personal involvement necessary for a supervisory liability claim against her under § 1983. *McKinnon,* 568 F.2d at 934. Given Kalies lack of supervisory authority, the Court concludes that there is no evidence on which a jury could reasonably find for the Plaintiff on his supervisory liability claim against Kalies and recommends that summary judgment be granted in her favor. *Jeffreys*, 426 F.3d at 554.

### B. McArdle and Corey

The only record evidence supporting Plaintiff's supervisory liability claim against McArdle is: (1) deposition testimony that he is suing McArdle "just as explained with Defendant Hilton and Defendant Bellnier"; and (2) Johnson's affidavit in which he in conclusory fashion identifies McArdle as one of the "higher ups prison officials" who was made aware of the corrections officers' misconduct through treatment team meetings. (Dkt. Nos. 51-3 at 112; 59-11 at 2.) The only evidence in the record supporting Plaintiff's supervisory liability claim against Corey is: (1) Plaintiff's response in the affirmative when asked if he was suing Corey for the "same reasons"; and (2) Johnson's conclusory statement that Corey was also one of the "higher ups prison officials" who was made aware of the corrections officers' misconduct through treatment team meetings. (Dkt. Nos. 51-3 at 114; 59-11 at 2.)

There is no evidence in the record that Plaintiff spoke with McArdle and Corey regarding the corrections officers' assaultive behavior prior to the time he was assaulted. Moreover, there is no evidence in the record establishing that the clinicians, counselors, and therapists who allegedly had agreed to bring up the inmate-patients' complaints regarding the assaultive behavior of the corrections officers at treatment team members followed through, or that McArdle or Corey were present at any meeting at which the matter was raised. *See Grullon v. City of New Haven*, 720 F.3d 133, 140-41 (2d Cir. 2013) (evidence of actual receipt of notice of wrongdoing by a supervisory official is necessary to defeat summary judgment on a supervisory liability claim). Therefore, the Court concludes that there is no evidence on which a jury could reasonably find for the Plaintiff on his supervisory liability claims against McArdle and Corey and recommends summary judgment in their favor.

## C.      Hilton, Bellnier, and Harper

At his deposition, Plaintiff testified that spoke with Hilton, Bellnier, and Harper prior to the July 14, 2010, alleged assault and complained to them that D Wing correctional staff Ballard, Wojtanowski, and Onyan were, among other things, physically assaulting Plaintiff and other inmate-patients in the RMHU. (Dkt. No. 51-3 at 109-114.) According to Plaintiff, Hilton ignored his complaints, and Bellnier and Harper tried to justify the corrections officers' action. *Id*. Despite Plaintiff's deposition testimony, neither Hilton, Bellnier, nor Harper submitted declarations refuting or otherwise addressing Plaintiff's testimony in their summary judgment motion.

In his affidavit in response to Defendants' motion, Plaintiff elaborated on his communications with Hilton, Bellnier, and Harper regarding the corrections officers' assaultive

behavior.  (Dkt. No. 59-2.)  According to Plaintiff, he had complained to Hilton face-to-face,

asking that Ballard be moved as he initiated most of the violent conduct, and Hilton had ignored

the complaints.  *Id*. at ¶ 10.  Plaintiff averred that in April 2010, he had complained face-to-face

to Bellnier and had also asked Bellnier to move Ballard from the RMHU.  *Id*. at ¶¶ 10-11.

Plaintiff also described in his affidavit complaining to Harper face-to-face, making the same

request regarding Ballard, and having Harper respond by attempting to justify the corrections

officers' actions.  *Id*. at ¶ 11.  Despite the averments in Plaintiff's affidavit, neither Hilton,

Bellnier, nor Harper submitted a declaration in reply.

The Court finds that Plaintiff's unchallenged deposition testimony and averments in his

affidavit are sufficient to raise a material issue of fact with regard to whether Hilton, Bellnier,

and Harper, after being informed of Ballard, Wojtanowski, and Onyan's physical assaults on

inmate-patients, including Plaintiff, failed to take action to prevent the use of excessive force by

the correction officer Defendants against Plaintiff in violation of his rights under the Eighth

Amendment.  *See Colon*, 58 F.3d at 873.  Therefore, the Court recommends that Defendants

Hilton, Bellnier, and Harper be denied summary judgment on the supervisory liability claims

asserted against them.

## VII.    QUALIFIED IMMUNITY

Defendants Hilton, Bellnier, Harper, McArdle, Corey, and Kalies have also moved for

summary judgment on Plaintiff's supervisory liability claims based upon the defense of qualified

immunity.  (Dkt. No. 51-12 at 18-19.)  Inasmuch as the Court is recommending that summary

judgment be granted to McArdle, Corey, and Kalies based upon the lack of evidence showing

personal involvement, the question of qualified immunity is addressed only with respect to

Hilton, Bellnier, and Harper.

Qualified immunity shields governmental officials performing discretionary functions from liability for damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) (citations omitted); *see also Pearson v. Callahan*, 555 U.S. 223, 232 2009) (In determining whether a state official is entitled to qualified immunity, courts consider whether the facts alleged "make out a violation of a constitutional right," and whether "the right at issue was clearly established at the time of defendant's alleged misconduct.") "A right is clearly established when 'the contours of the right are sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Dancy v. McGinley*, 843 F.3d 93, 106 (2d Cir. 2016) (quoting *Jackler v. Byrne*, 658 F.3d 225, 242 (2d Cir. 2011) (alterations omitted).

There can be no doubt that inmates have long had a clearly established Eighth Amendment right to remain incarcerated in reasonably safe conditions, which includes being protected from the use of excessive force. *See Randle v. Alexander*, 960 F.Supp. 2d 457, 479 (S.D.N.Y. 2013) ("There can be no doubt that inmates have long had a clearly established right to remain incarcerated in reasonably safe conditions."); *Rodriguez v. McGinnis*, 1 F. Supp. 2d 244, 249 (S.D.N.Y. 1998) (discussing a clearly established right to be free from excessive force).  It is also established that "a failure-to-protect claim can be premised upon a supervisory official's failure to prevent violence perpetrated by other officers." *Stephens v. Venettozzi*, No. 13-cv-5779 (RA) (DF), 2016 WL 929268, at *12 (S.D.N.Y. Feb. 24, 2016) (citing *Carter v. Kiernam*, No. 98cv2664 (JGK), 2000 WL 760303, at *6 (S.D.N.Y. June 12, 2000)).

Defendants base their qualified immunity defense on their assertion that Plaintiff's claim that they had notice that Ballard, Wojtanowski, and Onyan were physically assaulting inmate-patients in the RMHU prior to the July 14, 2010, alleged assault on Plaintiff was purely conclusory. (Dkt. No. 51-12 at 16-19.) The Court has recommended, based upon Plaintiff's deposition testimony and affidavit, that Defendants Hilton, Bellnier, and Harper's request for summary judgment on the grounds of lack of personal involvement be denied on the grounds that there are material issues of fact in dispute. With regard to their claim of entitlement to qualified immunity, the Court finds that assuming *arguendo* that Hilton, Bellnier, and Harper were informed that Ballard, Wojtanowski, and Onyan were using excessive force on inmate-patients prior to the time of the alleged assault on Plaintiff as he claims, and that they disregarded Plaintiff's complaints as he also claims, it would not have been objectively reasonable for them to believe that their actions were lawful at the time. *Lennon v. Miller*, 66 F.3d 416, 420 (2d Cir. 1995) (citation omitted). Therefore, the Court recommends that Hilton, Bellnier, and Harper's motion for summary judgment be denied without prejudice to the extent judgment is sought on the grounds of qualified immunity.

**WHEREFORE**, it is hereby

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 51) be **GRANTED IN PART AND DENIED IN PART**; and it is further

**RECOMMENDED** that Defendants' motion for summary judgment be **DENIED** to the extent it seeks judgment for failure to exhaust with respect to Grievance No. MCY-14658 complaining of the alleged July 14, 2010, assault; and it is further

**RECOMMENDED** that Defendants' motion for summary judgment be **DENIED** to the

36

extent it seeks judgment on statute of limitations grounds; and it is further

**RECOMMENDED** that Defendants McArdle, Corey, and Kalies be **GRANTED** summary judgment on lack of supervisory liability grounds; and it is further

**RECOMMENDED** that Defendants Hilton, Bellnier, and Harper's motion for summary judgment **DENIED** to the extent it seeks judgment on lack of supervisory liability grounds; and it is further

**RECOMMENDED** that Defendants Hilton, Bellnier, and Harper's motion for summary judgment be **DENIED WITHOUT PREJUDICE** to the extent it seeks judgment on qualified immunity grounds; and it is hereby

**ORDERED** that the Clerk provide Plaintiff with a copy of this Order and Report-Recommendation, along with copies of the unpublished decisions cited herein in accordance with the Second Circuit decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (*per curiam*).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report.[17]  Such objections shall be filed with the Clerk of the Court.  **<u>FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW</u>**.  *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.

---

[17]  If you are proceeding pro se and are served with this Order and Report-Recommendation by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Order and Report-Recommendation was mailed to you to serve and file objections.  Fed. R. Civ. P. 6(d).  If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday.  Fed. R. Civ. 6(a)(1)(C).

Dated: February 3, 2017
      Syracuse, New York

Thérèse Wiley Dancks
United States Magistrate Judge

2012 WL 6935254
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Everton BAILEY, Plaintiff,
v.
M. FORTIER, Defendant.

Civ. Action No. 9:09–CV–0742 (GLS/DEP).
|
Oct. 4, 2012.

**Attorneys and Law Firms**

Hancock Estabrook LLP, Michael J. Sciotti, Esq., Robert Thorpe, Esq., of Counsel, Syracuse, NY, for Plaintiff.

Hon. Richard S. Hartunian, United States Attorney, Charles E. Roberts, Esq., Assistant U.S. Attorney, of counsel, Syracuse, NY, for Defendant.

*REPORT AND RECOMMENDATION*

DAVID E. PEEBLES, United States Magistrate Judge.

**\*1** Plaintiff Everton Bailey, a federal prison inmate, has commenced this *Bivens*[1] action against defendant Michelle Fortier, a corrections officer stationed at the prison facility in which Bailey was confined at the relevant times, alleging deprivation of his civil rights. Bailey's claims are based upon Fortier's alleged failure to protect him from an assault by a cellmate, despite having registered prior complaints expressing fear for his safety.

Currently at the forefront of the action is the threshold question of whether Bailey, who admits that he did not file a grievance following the procedures in place at Bureau of Prisons ("BOP") facilities, should be excused from the requirement of exhausting administrative remedies before commencing suit due to the alleged refusal of prison officials to provide him with the forms necessary to file a grievance. Because I find, based upon an evidentiary hearing conducted, that Bailey was not prevented by the actions of prison officials from filing a grievance regarding his claim against Fortier, and that he has offered no special circumstances providing a basis to excuse his failure to exhaust administrative remedies, I recommend that his

complaint be dismissed on this procedural basis, without addressing its merits.

I. *BACKGROUND*

Bailey is a federal prison inmate currently being held in the custody of the BOP as a result of a 2007 criminal conviction entered in the United States District Court for the Eastern District of Pennsylvania. *See generally* Complaint (Dkt. No. 1); *see also* VanWeelden Decl. (Dkt. No. 10–4) ¶ 5; June 20, 2012 Hearing Transcript (Dkt. No. 44) at p. 84.[2] While he is presently housed in another BOP facility, at times relevant to this litigation Bailey was designated by the BOP to the Ray Brook Federal Correctional Institution ("FCI Ray Brook"), located in Ray Brook, New York. *Id.*

On the morning of February 23, 2009, while housed in a six-person cell in the Mohawk Housing Unit at FCI Ray Brook, Bailey was confronted and physically assaulted by one of his cellmates after being accused of stealing that inmate's prayer oil. Complaint (Dkt. No. 1) ¶¶ 8–9; *see also* VanWeelden Decl. (Dkt. No. 10–4) Exh. D. Bailey reported the incident to Fortier, and requested that he be moved to another cell. Complaint (Dkt. No. 1) ¶ 10. That request was denied, and Bailey was directed by Fortier to return to his cell in light of an impending inmate count. *Id.* at ¶ 11.

Following the inmate count, Bailey again was accosted by the same inmate, who on this occasion threw hot oil from a ceramic mug onto his face.[3] Complaint (Dkt. No. 1) ¶ 13; VanWeelden Decl. (Dkt. No. 10–4) Exh. D; Tr. 100, 145. Bailey suffered second degree burns to his face resulting in his being hospitalized at an outside medical facility for a period of fourteen days. Complaint (Dkt. No. 1) ¶¶ 13–14; Tr. 32, 84–85. Upon his return to FCI Ray Brook, Bailey was placed in a special housing unit ("SHU") cell, where he remained until he was transferred to another BOP facility. Tr. 59–60, 85.

**\*2** The BOP has established an Administrative Remedy Program ("ARP"), comprised of a four-step administrative process through which inmates can seek formal internal review of any complaint regarding any aspect of their imprisonment. Tr. 10; 28 C.F.R. § 542.10 *et seq.; see also Macias v. Zenk,* 495 F.3d 37, 42 (2d Cir.2007). In accordance with the established ARP protocol, an inmate must first attempt informal resolution

of his or her complaint by presenting the issue informally to staff, and staff must attempt to resolve the issue. 28 C.F.R. § 542.13(a); *see also Johnson v. Testman,* 380 F.3d 691, 693 (2d Cir.2004). This informal, initial procedure typically begins with the filing of a "cop-out," which can be submitted either on a BP–8 form available to inmates through several sources, including their assigned counselors, or on paper of any other description. Tr. 10, 22, 27, 66–67, 129, 142.

If the complaint cannot be resolved informally, the inmate may next submit a formal written Administrative Remedy Request ("ARR") to the warden of the facility, utilizing a BP–9 form, within twenty calendar days of the event that generated the inmate's complaint. [4] Tr. 22, 32, 44; 28 C.F.R. § 542.14(a); *see also Johnson,* 380 F.3d at 693. That twenty-day period, however, can be extended in appropriate circumstances. [5] Tr. 33, 54, 144. If that formal request is denied, the inmate may next appeal the matter to the appropriate BOP Regional Director, utilizing a BP–10 form, within twenty calendar days of the date the grievance is denied by the facility warden. Tr. 22; 28 C.F.R. § 542.15(a); *see also Johnson,* 380 F.3d at 693. An unfavorable decision from the Regional Director can then be appealed to the General Counsel's office, utilizing a BP–11 form, within twenty calendar days of the date of the Regional Director's response. Tr. 22; 28 C.F.R. § 542.15(a).

Despite the existence of the ARP, Bailey did not avail himself of that process by filing a grievance regarding the assault or the defendant's alleged failure to protect him from it. Tr. 101–02, 106. Bailey claims that he requested the appropriate forms for commencing the grievance process from several prison workers, including Hawley Snyder, Barbara Darrah, and the warden at FCI Ray Brook. Tr. 86–88, 91, 93–95, 107–09. Employees at FCI Ray Brook, however, uniformly testified that Bailey never requested the appropriate grievance forms from them. *See* Tr. 72, 131, 146–47, 153, 155, 168; *see also* Tr. 49 (Robin Van Weelden); 161 (Jean Marie Diehl); 166 (Michelle Gonyea). I credit the testimony of defendant's witnesses and find that Bailey failed to ask his corrections counselor, or any other BOP employee at FCI Ray Brook, for the necessary forms to commence the grievance process.

The record also reflects that Bailey had abundant opportunity to secure the necessary grievance forms. In February and March of 2009, he was assigned a unit

team that included Barbara Darrah, his unit manager; Michelle Gonyea, a case worker; Hawley Snyder, his assigned corrections counselor; and one other corrections counselor. [6] Tr. 46, 86, 140–41. Members of Bailey's unit team, particularly his corrections counselor, were in frequent contact with him. *See, e.g.,* Tr. 126, 129–30, 140–41, 165.

**\*3** Various other BOP officials were also in regular contact with Bailey, making periodic rounds of the FCI Ray Brook SHU. Tr. 35. For example, at the times relevant to this litigation, the facility's warden typically visited the SHU every Wednesday morning, normally accompanied by Robin Van Weelden, who in February 2009 served as a legal assistant, as well as one or two associate wardens, a corrections captain, and unit team members. Tr. 35, 55. When making those rounds the group would proceed from cell to cell, knocking on doors and asking whether an inmate in a particular cell wished to voice any needs. Tr. 57. In addition, Barbara Darrah, as a unit manager, was required to visit inmates in the SHU twice weekly, although she testified that she was in that portion of the facility "pretty much daily." Tr. 126. When visiting the SHU, Darrah generally carried with her a folder of various forms, including BP–8, BP–9, BP–10, BP–11 and cop-out forms, earning her the nickname "the form lady." Tr. 70–71, 120, 124–27, 131. Like the warden and the warden's group, when visiting the SHU facility Darrah normally would proceed from cell-to-cell. Tr. 128. Similarly Michelle Gonyea, as plaintiff's case manager during February and March of 2009, was required to visit the SHU at least once weekly. Tr. 165.

Despite all of those visits and requests as to whether he needed anything, Bailey did not ask any of those individuals for the forms necessary to grieve Fortier's alleged failure to protect him from harm. Tr. 161–62, 166, 49–50, 72, 132, 144, 154–55, 161, 166.

As previously indicated, plaintiff was absent from FCI Ray Brook receiving outside treatment for his injuries during the fourteen-day period immediately following the inmate assault. In accordance with FCI Ray Brook policy requiring visits by prison officials to any inmate hospitalized for more than five days, Darrah, as plaintiff's unit manager, visited him in or about March of 2009, while he was a patient at the Adirondack Medical Center in Saranac Lake, in order to insure that his needs were being

met. Tr. 133. When asked on that occasion whether he needed anything, Bailey replied, "No." [7] *Id.*

## II. *PROCEDURAL HISTORY*

Bailey commenced this action on June 29, 2009. Dkt. No. 1. His complaint identifies Corrections Officer M. Fortier as the sole named defendant, and alleges that she violated his constitutional rights by failing to protect him from foreseeable harm. *Id.*

On January 8, 2010, prior to answering, Fortier moved to dismiss Bailey's complaint for failure to state a claim upon which relief may be granted, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure or, alternatively, for summary judgment pursuant to Rule 56. Dkt. No. 10. The sole basis for Fortier's motion was her contention that Bailey's complaint is subject to dismissal based upon his failure to exhaust available administrative remedies before commencing suit, as required under 42 U.S.C. § 1997e(a). That motion resulted in my issuance of a report on August 30, 2010, recommending that the motion be denied, based upon the existence of genuine disputes of material fact to be resolved before addressing whether a proper basis for excusing the governing exhaustion requirement had been demonstrated. Dkt. No. 19. That recommendation was adopted by Chief District Judge Gary L. Sharpe on October 12, 2010. Dkt. No. 21.

**\*4** Following the issuance and acceptance of my report and recommendation, the parties were afforded the opportunity to engage in discovery, and a scheduling order was entered requiring, *inter alia,* that any additional dispositive motions be filed on or before October 3, 2011. *See* Dkt. No. 23. All deadlines under that scheduling order have passed, without the filing of any additional motions, and the case is now trial-ready. In light of the existence of a threshold procedural issue regarding exhaustion, the matter was referred to me for the purpose of conducting an evidentiary hearing, pursuant to *Messa v. Goord,* 652 F.3d 305 (2d Cir.2011), in order to develop the record concerning Bailey's efforts to satisfy his exhaustion requirement. *See* Text Entry 11/02/11. That hearing was conducted on June 20, 2012, *see* Text Entry 6/20/12, and, following the close of the hearing, decision was reserved pending briefing by the parties. [8] , [9]

## III. *DISCUSSION*

### A. *Governing Legal Principles*

The Prison Litigation Reform Act of 1996 ("PLRA"), Pub.L. No. 104–134, 110 Stat. 1321 (1996), which imposes several restrictions on the ability of prisoners to maintain federal civil rights actions, expressly requires that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); *see Woodford v. Ngo,* 548 U.S. 81, 84, 126 S.Ct. 2378, 2382, 165 L.Ed.2d 368 (2006); *Hargrove v. Riley,* No. CV–04–4587, 2007 WL 389003, at \*5–6 (E.D.N.Y. Jan.31, 2007). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle,* 534 U.S. 516, 532, 122 S.Ct. 983, 992, 152 L.Ed.2d 12 (2002). An inmate plaintiff's complaint is subject to dismissal if the evidence establishes that he or she failed to properly exhaust available remedies prior to commencing the action, his or her complaint is subject to dismissal. *See Pettus v. McCoy,* No. 04–CV–0471, 2006 WL 2639369, at \*1 (N.D.N.Y. Sept. 13, 2006) (McAvoy, J.); *see also Woodford,* 548 U.S. at 94–95, 126 S.Ct. at 2387–88 (holding that the PLRA requires "proper exhaustion" of available remedies). "Proper exhaustion" requires a plaintiff to procedurally exhaust his or her claims by "compl[ying] with the system's critical procedural rules." *Woodford,* 548 U.S. at 95, 126 S.Ct. at 2388; *see also Macias,* 495 F.3d at 43 (citing *Woodford* ). Complete exhaustion has not occurred, for purposes of the PLRA, until all of the steps of that available process have been taken. *Macias,* 495 F.3d at 44; *see also Johnson v. Rowley,* 569 F.3d 40, 45 (2d Cir.2009); *Strong v. Lapin,* No. 90–CV–3522, 2010 WL 276206, at \*4 (E.D.N.Y. Jan.15, 2010) ("Until the BOP'S Central Office considers the appeal, no administrative remedy is considered to be fully exhausted.").

**\*5** In a series of decisions rendered since the enactment of the PLRA, the Second Circuit has crafted a three-part test for determining whether dismissal of an inmate plaintiff's complaint is warranted in the event of a failure to satisfy the PLRA's exhaustion requirement. *Macias,* 495 F.3d at 41; *see Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004). Under the prescribed rubric, a court must first determine whether administrative remedies were available to the plaintiff at the relevant times. *Macias,*

495 F.3d at 41; *Hemphill,* 380 F.3d at 686. If such a remedy existed and was available, the court must next examine whether the defendant should be deemed to have forfeited the affirmative defense of non-exhaustion by failing to properly raise or preserve it, or whether, through the defendant's own actions preventing the plaintiff from exhausting otherwise available remedies, he or she should be estopped from asserting failure to exhaust as a defense. *Id.* In the event the proffered defense survives these first two levels of scrutiny, the court must determine whether the plaintiff has established the existence of special circumstances sufficient "to justify the failure to comply with applicable administrative procedural requirements.[10], [11] *Id.*

### B. *Burden of Proof*

Before applying the foregoing legal principles, I must first consider who bears the burden of proof, and whether that burden shifts throughout the analysis prescribed under *Hemphill.*

As an affirmative defense, *Jones v. Bock,* 549 U.S. 199, 216, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007), exhaustion is a claim upon which the party asserting it typically bears the ultimate burden of proving its essential elements by a preponderance of the evidence. *Soria v. Girdich,* No. 9:04–CV–727, 2007 WL 4790807, at *2 (N.D.N.Y. Dec. 2007) (DiBianco, M.J.) (citing *McCoy v. Goord,* 255 F.Supp.2d 233, 247 (S.D.N.Y.2003)); *McEachin v. Selsky,* No. 9:04–CV–83(FJS/RFT), 2005 WL 2128851, at *4 (N.D.N.Y. Aug.30, 2005) (Scullin, C.J.) (citing *Howard v. Goord,* No. 98–CV–7471, 1999 WL 1288679, *3 (E.D.N.Y. Dec. 28, 1999)), *aff'd in part, vacated in part,* 225 F. App'x 36 (2d Cir.2007). The issue is somewhat complicated, however, by consideration of the three-part analysis mandated by *Hemphill* and related cases because that line of cases incorporates concepts—such as estoppel, for example— that typically require the party asserting them to bear the ultimate burden of proof. *See e.g.,* *Abbas v. Dixon,* 480 F.3d 636, 642 (2d Cir.2007) ("The plaintiff bears the burden of showing that the action was brought within a reasonable period of time after the facts giving rise to the equitable tolling or equitable estoppel ...."); *In re Heflin,* 464 B.R. 545, 554 (D.Conn.2011) ("The burden of providing every element of an estoppel is upon the party seeking to set up the estoppel.") (citing *Comm'r v. Union Pac. R.R. Co.,* 86 F.2d 637, 640 (2d Cir.1936)).

**\*6** Also complicating matters is the fact that several courts have held that once a defendant satisfies the burden of demonstrating that an inmate has failed to exhaust administrative remedies, it then becomes incumbent upon the plaintiff to counter with a showing of unavailability, estoppel, or special circumstances. *See, e.g., Murray v. Palmer,* No. 9:03–CV–1010 (GTS/GHL), 2010 WL 1235591, at * 4 and n. 17 (N.D.N.Y. Mar.31, 2010) (Suddaby, J.); *see also Calloway v. Grimshaw,* No. 9:09–CV–1354, 2011 WL 4345299, at *5 and n. 5 (N.D.N.Y. Aug.10, 2011) (Lowe, M.J.) (citing cases); *report and recommendation adopted,* 2011 WL 4345296 (N.D.N.Y. Sep.15, 2011) (McAvoy, S.J.); *Cohn v. KeySpan Corp.,* 713 F.Supp.2d 143, 155 (E.D.N.Y.2010) (finding that, in the employment discrimination context, defendants bear the burden of establishing the affirmative defense of failure to timely exhaust his administrative remedies, but once defendants have done so, the plaintiff must plead and prove facts supporting equitable avoidance of the defense.). Those decisions, while referencing the burden of proof on an affirmative defense, seem to primarily address an inmate's burden of *production,* or of going forward, to show facts that would form the basis for finding of unavailability, estoppel, or a finding of special circumstances, rather than speaking to the ultimate burden of *persuasion.*

I have been unable to uncover any cases squarely holding that the defendant bears the ultimate burden of proof with regard to all elements of a *Hemphill* analysis. In the final analysis, however, *Hemphill* addresses all of the elements a court is required to consider when analyzing an exhaustion defense. *See Macias,* 495 F.3d at 41 ("In *Hemphill* we "read together" [a series of cases] and formulated a three-part *test* ....") (emphasis added). Therefore, I recommend a finding that, while the burden of production may shift to the plaintiff when a court undertakes a *Hemphill* analysis, the ultimate burden of proof with respect to the exhaustion defense remains, at all times, with the defendant. *See Soria,* 2007 WL 4790807, at *2 ("[A]s with other affirmative defenses, the defendant has the burden of proof to show that plaintiff failed to exhaust his administrative remedies.").

### C. *Application of Governing Legal Principles*

#### 1. *Availability of Administrative Remedy*

In this instance, the question of whether the ARP was available to Bailey is at the heart of the exhaustion

analysis. The hearing testimony confirmed, and Bailey admitted, that at all times relevant to this litigation, there was an inmate grievance procedure in place at FCI Ray Brook. This, however, does not necessarily mean that it was "available" to the plaintiff.

Bailey contends that the grievance process was not available to him in light of the alleged refusal of prison officials to provide him with the forms necessary to file an ARR and pursue the grievance to culmination. Having considered the competing testimony, however, I conclude that Fortier has established, by a preponderance of the evidence, that the forms necessary to pursue a grievance in accordance with the ARP in place at FCI Ray Brook were available to Bailey through several sources, but were not requested. As such, Fortier has satisfied the first *Hemphill* factor.

### 2. *Presentation of Defense/Estoppel*

**\*7** The focus of the second prong of the *Hemphill* analysis is upon "whether the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it, or whether the defendants' own actions inhibiting the inmate's exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." *Hemphill,* 380 F.3d at 686 (citations omitted). In her answer, Fortier raised exhaustion as a defense in a timely fashion. *See* Answer (Dkt. No. 22) Second Defense ("Plaintiff cannot failed to exhaust his administrative remedies, as required by the Prison Litigation Reform Act, 42 U.S.C. § 1997e(a)."). Bailey argues, however, that his failure to follow the prescribed grievance process was a direct result of the refusal of prison officials to cooperate in his efforts to grieve the matter.

" 'Generally, a defendant in an action may not be estopped from asserting the affirmative defense of failure to exhaust administrative remedies based on the actions (or inactions) of other individuals.' " *Atkins v. Menard,* No. 9:11–CV–9366, 2012 WL 4026840, at \*3 (N.D.N.Y. Sept.12, 2012) (Suddaby, J.) (citing *Murray,* 2010 WL 1235591, at \*5 and n. 26 (collecting cases)). Put differently, a plaintiff must allege that a defendant named in the lawsuit acted to interfere with his ability to exhaust in order to establish a basis to estop that defendant from invoking the exhaustion defense. *Calloway,* 2011 WL 4345299, at \*4 (citing *Bennett v. James,* 737 F.Supp.2d

219, 226 (S.D.N.Y.2010), *aff'd,* 441 F. App'x 816 (2d Cir.2011)) (other citations omitted).

The question of whether, in this instance, prison officials should be estopped from asserting failure to exhaust as an affirmative defense as a result of their conduct is inextricably intertwined with the question of availability of the remedy. Assuming, however, that this presents a distinct inquiry, the court must examine whether, through her conduct, Fortier has provided a basis to estop her from asserting an exhaustion defense.

In this instance, Bailey does not allege that Fortier engaged in a campaign to preclude him from filing a grievance regarding her actions. Instead, his focus is upon the alleged refusal of other officials at FCI Ray Brook to provide him with necessary forms and cooperate in his efforts to present his grievance against Fortier. Accordingly, Bailey has failed to present any evidence that would support an estoppel against the defendant from raising the issue of exhaustion. *Atkins,* 2012 WL 4026840, at \* 3. Therefore, I conclude that Fortier has proven, by a preponderance of the evidence, that she did not, through her own actions, preclude Bailey from taking advantage of the ARP and therefore should not be estopped from asserting the defense.

### 3. *Special Circumstances*

The third, catchall factor that must be considered under the Second Circuit's prescribed exhaustion rubric centers upon whether special circumstances sufficient to justify excusing the plaintiff's failure to exhaust administrative remedies have been demonstrated. *Hemphill,* 380 F.3d at 689; *see also Giano,* 380 F.3d at 676–77; *Hargrove,* 2007 WL 389003, at \*10. Among the circumstances potentially qualifying as "special" under this prong of the test is where a plaintiff's reasonable interpretation of applicable regulations regarding the grievance process differs from that of prison officials and leads him or her to conclude that the dispute is not grievable. *Giano,* 380 F.3d at 676–77; *see also Hargrove,* 2007 WL 389003, at \*10 (quoting and citing *Giano* ). Special circumstances may also exist when a facility's "[f]ailure to provide grievance deposit boxes, denial of forms and writing materials, and a refusal to accept or forward plaintiff's appeals-which effectively rendered the grievance process unavailable to him." *Murray,* 2010 WL 1235591, at \*6 (quoting *Sandlin v. Poole,* 488 (W.D.N.Y.2008) (noting that "[s]uch facts support a finding that defendant's are estopped from

relying on exhaustion defense as 'special circumstances' excusing plaintiff's failure to exhaust")).

**\*8** During the evidentiary hearing, Bailey testified to his awareness of the existence of the ARP at FCI Ray Brook. *See, e.g.,* Tr. 102. Bailey's testimony regarding his alleged efforts to secure the forms necessary to pursue the grievance plainly evidences his knowledge of the requirement that he exhaust available administrative remedies, and negates a finding of any reasonable belief on his part that the dispute in issue was not grievable and could not have been presented through the BOP's internal grievance process. Accordingly, again allocating the ultimate burden of proof on the issue of special circumstances to the defendant, I nonetheless conclude that she has demonstrated, by a preponderance of the evidence, the absence of any special circumstances that would serve to excuse plaintiff's failure to exhaust administrative remedies.

## IV. *SUMMARY AND RECOMMENDATION*

The credible testimony and evidence adduced at the recent hearing, held to address the merits of defendant's exhaustion defense, establishes that (1) Bailey failed to avail himself of the BOP grievance process, which was available to him, before commencing this action; (2) Fortier did not, through her actions, preclude Bailey from filing a grievance regarding the claims set forth in his complaint, or otherwise engage in conduct for which she should be estopped from asserting failure to exhaust as an affirmative defense; and (3) Bailey has offered no special circumstances warranting that he be excused from the PLRA's exhaustion requirement. Accordingly, it is therefore hereby respectfully

RECOMMENDED, that plaintiff's complaint in this action be DISMISSED, based upon his failure to comply with the exhaustion requirements of 42 U.S.C. § 1997e(a).

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the Clerk of the Court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 6935254

---

## Footnotes

1    *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971).

2    The June 20, 2012 Hearing Transcript (Dkt. No. 44) will hereinafter be cited as "Tr. ____".

3    According to Bailey, there were no corrections officers present in his cell unit at the time of the assault. Complaint (Dkt. No. 1) ¶ 13.

4    Plaintiff was aware of the twenty-day limitation for filing a BP–9 form to initiate the formal grievance process. Tr. 103.

5    Here, the record demonstrates that in light of his circumstances, including the fourteen-day period of hospitalization following the incident, Bailey almost certainly would have been granted relief from that requirement had such a request been made. *See* Tr. 43, 144. I note, parenthetically, that the handbook provided to inmates at FCI Ray Brook does not address the possibility of requesting an extension of the twenty-day time limit for filing a BP–9. *See* Tr. 34, 43.

6    Jean Marie Diehl took over as plaintiff's correction counselor in or about September 2009, shortly before Snyder's retirement from the BOP. Tr. 140, 163.

7    During the hearing Bailey testified that he did not recall Darrah visiting him. *See* Tr. 114. Once again, I credit the testimony of Darrah over that of the Bailey with respect to this issue.

8    The hearing was conducted by video conference, with Bailey participating and testifying from the Kentucky federal correctional facility in which he is currently being held, pursuant to Rule 43(a) of the Federal Rules of Civil Procedure. *See Rivera v. Santirocco,* 814 F.2d 859, 862 (2d Cir.1987). At the outset of the hearing I placed upon the record the factors which I considered in declining to exercise my discretion to require that Bailey be produced in person for the evidentiary hearing. *See* Tr. 3.

9    Attorney Michael J. Sciotti, Esq., of the firm of Hancock & Estabrook, LLP, was appointed in January 2012 to represent the plaintiff in this action, *pro bono,* at the hearing. The court wishes to express its thanks to Attorney Sciotti and his co-counsel, Robert Thorpe, Esq., for their energetic and diligent efforts on behalf of the plaintiff.

10    In *Macias,* which, like this action, involved an Eighth Amendment claim under *Bivens,* as well as claims under the Federal Court Claims Act, 28 U.S.C. § 2671 *et seq.,* defendants asserted that plaintiff's complaint was subject to dismissal under the PLRA based upon his failure to exhaust available administrative remedies. *Macias,* 495 F.3d at 40. Reiterating the importance of exhaustion in both a substantive and a procedural sense, the Second Circuit concluded that, while a prisoner may have substantially exhausted remedies by making informal complaints regarding the conditions at issue, the PLRA, as illuminated by *Woodford,* 548 U.S. 81, 126 S.Ct. 2378, 165 L.Ed.2d 368, requires proper procedural exhaustion through the available grievance channels. *Id.* at 41. The court left open, however, the possibility that, notwithstanding the Supreme Court's decision in *Woodford,* a defendant could be precluded from asserting failure to exhaust available administrative remedies in the event of a finding that threats by prison officials may have deterred compliance with the PLRA exhaustion requirements, including under *Hemphill. Id.* at 44–45. The court in *Macias* also noted that the plaintiff in that case did not assert that the available internal remedial scheme was so confusing as to excuse his failure to avail himself of that process, thereby obviating the need for the court to determine what effect, if any, *Woodford* would have upon the *Hemphill* holding to the effect that a reasonable misinterpretation of the available scheme could justify an inmate's failure to follow the procedural rules. *See Amador v. Superintendents of Dep't of Correctional Serv.,* No. 03 CIV. 0650 (KTD/CWG), 2007 WL 4326747, at *6 (S.D.N.Y. Dec.4, 2007). It therefore appears that the teachings of *Hemphill* remain intact, at least with regard to the first two points of inquiry. *Id.* at *7.

11    In practicality, these three prongs of the prescribed test, though perhaps intellectually distinct, plainly admit of significant overlap. *See Hargrove,* 2007 WL 389003, at *8 n. 14; *see also Giano v. Goord,* 380 F.3d 670, 677 n. 6 (2d Cir.2004).

---

2000 WL 760303
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Pleasant CARTER, Plaintiff,

v.

Stephen J. KIERNAN, Adam W. Hulse, Andrew
T. Jones, Cornelious J. Hegeman, Defendants.

No. 98 Civ. 2664(JGK).
|
June 12, 2000.

*OPINION AND ORDER*

KOELTL, J.

**\*1** The plaintiff, an inmate currently incarcerated at
Southport Correctional Facility, brought this action *pro
se* pursuant to 42 U.S.C. § 1983 alleging that a number of
correctional officers at Downstate Correctional Facility,
where the plaintiff was previously incarcerated, violated
his rights under the Eighth Amendment to the United
States Constitution. In an Opinion and Order dated
January 11, 1999, this Court denied the defendants'
motion to dismiss the complaint pursuant to Fed.R.Civ.P.
12(b)(1) on the basis that plaintiff failed to exhaust his
administrative remedies in accordance with 42 U.S.C.
§ 1997e(a). The defendants had also moved to dismiss
the complaint under Fed.R.Civ.P. 12(b)(1) on the basis
that they are immune from suit under the Eleventh
Amendment to the United States Constitution. This
Court dismissed the plaintiff's claims to the extent that
the plaintiff was suing the defendants in their official
capacities but permitted the plaintiff to proceed with the
suit to the extent that defendants were being sued in
their individual capacities for money damages. *See rter v.
Kiernan,* No. 98 Civ. 2664, 1999 W.L. 14014 (S.D.N.Y.
January 14, 1999). The defendants now move pursuant to
Fed.R.Civ.P. 56 for an order granting summary judgment
on all the plaintiff's claims. For the reasons that follow,
the defendants' motion is denied.

I.

The standard for granting summary judgment is
well established. Summary judgment may not be
granted unless "the pleadings, depositions, answers to
interrogatories, and admissions on file, together with the
affidavits, if any, show that there is no genuine issue as
to any material fact and that the moving party is entitled
to a judgment as a matter of law." Fed.R.Civ.P. 56(c);
*see also Celotex Corp. v. Catrett,* 477 U.S. 317 (1986);
*Gallo v. Prudential Residential Servs. Ltd. Partnership,* 22
F.3d 1219, 1223 (2d Cir.1994). "The trial court's task at
the summary judgment motion stage of the litigation is
carefully limited to discerning whether there are genuine
issues of material fact to be tried, not to deciding them.
Its duty, in short, is confined at this point to issue-finding;
it does not extend to issue resolution." *Gallo,* 22 F.3d
at 1224. The moving party bears the initial burden of
"informing the district court of the basis for its motion"
and identifying the matter that "it believes demonstrate[s]
the absence of a genuine issue of material fact." *Celotex,*
477 U.S. at 323. The substantive law governing the case
will identify those facts which are material and "only
disputes over facts that might affect the outcome of the
suit under the governing law will properly preclude the
entry of summary judgment." *Anderson v. Liberty Lobby,
Inc.,* 477 U.S. 242, 248 (1986).

In determining whether summary judgment is
appropriate, a court must resolve all ambiguities and draw
all reasonable inferences against the moving party. *See
Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475
U.S. 574, 587 (1986) (citing *United States v. Diebold, Inc.,*
369 U.S. 654, 655 (1962)); *see also Gallo,* 22 F.3d at 1223.
If the moving party meets its burden, the burden shifts
to the nonmoving party to come forward with "specific
facts showing that there is a genuine issue for trial."
Fed.R.Civ.P. 56(e). With respect to the issues on which
summary judgment is sought, if there is any evidence in the
record from any source from which a reasonable inference
could be drawn in favor of the nonmoving party, summary
judgment is improper. *See Chambers v. TRM Copy Ctrs.
Corp.,* 43 F.3d 29, 37 (2d Cir.1994); *Adams v. Galletta,* No.
96 Civ. 3750, 1999 W.L. 959368, at [*] 1 (S.D.N.Y. Oct. 19,
1999).

**\*2** Where, as here, a pro se litigant is involved, although
the same standards for dismissal apply, a court should
give the pro se litigant special latitude. *See McPherson v.
Coombe,* 174 F.3d 276, 279 (2d Cir.1999) (courts "read
the pleadings of a pro se plaintiff liberally and interpret

them 'to raise the strongest arguments that they suggest" ') (quoting *Burgos v. Hopkins,* 14 F .3d 787, 790 (2d Cir.1994)). In particular, the pro se party must be given express notice of the consequences of failing to respond appropriately to a motion for summary judgment. *See McPherson,* 174 F.3d at 281; *Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 620–21 (2d Cir.1999); *Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996); *Ruotolo v. IRS,* 28 F.3d 6, 8 (2d Cir.1994); *Graham v. Lewinski,* 848 F.2d 342, 344 (2d Cir.1988). In this case, by Notice of Motion for Summary Judgment dated December 10, 1999, the plaintiff was advised of the procedures for responding to a motion for summary judgment, including the requirement to submit a response to the defendants' Rule 56.1 Statement and the need to submit counter-evidence. The plaintiff thereafter submitted a timely response to the motion, together with a Rule 56.1 Statement and Statement of Disputed Factual Issues.

## II.

The plaintiff's claim arises from events occurring while the plaintiff, inmate Pleasant Carter, was incarcerated at Downstate Correctional Facility ("Downstate").

On February 5, 1998, Correction Officers Adam W. Hulse and Andrew T. Jones conducted a routine, random, authorized search of the plaintiff's cell. *See* Affidavit of Pleasant Carter, sworn to December 28, 1999 ("Carter Aff.") ¶ 4.; Transcript of Proceedings at Disciplinary Hearing of Pleasant Carter, commenced July 23, 1998 ("Tr.Proc.") at 25–26 (C.O. Hulse Test.). Mr. Carter cooperated with the officers and was moved to an empty cell while the search was conducted. *See* Tr. Proc. at 26 (C.O. Hulse Test.). C.O. Hulse and C.O. Jones reported finding contraband in Mr. Carter's cell, including gang-related material and half a toothbrush that had been cut or melted. [1] *See* Tr. Proc. at 26 (C.O. Hulse Test.); Report of Strip Search, attached as Ex. J to Declaration of Dian Kerr McCullough, dated Oct. 15, 1999 ("McCullough Decl."). Fearing that the other half of the toothbrush might be used as a weapon, C.O. Hulse and C.O. Jones received permission from Sergeant Cornelius Hegeman, the area supervisor, to conduct a strip search of Mr. Carter. *See* Affidavit of Adam W. Hulse, sworn to Sept. 15, 1999 ("Hulse Aff.") ¶¶ 7,9; Affidavit of Andrew T. Jones, sworn to Sept. 27, 1999 ("Jones Aff.") ¶¶ 6,8. Both Sergeant Hegeman and C.O. Stephen J. Kiernan, another

officer assigned to Mr. Carter's cell block, were present outside of Mr. Carter's cell during the strip search. *See* Hulse Aff. ¶ 10; Jones Aff. ¶ 9. Mr. Carter fully complied throughout the strip search. *See* Hulse Aff. ¶ 9; Jones Aff. ¶ 8; Carter Aff. ¶ 5.

**\*3** What transpired immediately after the strip search is the basis for the present complaint. Mr. Carter alleges, and several inmate witnesses agree, that when he exited the temporary holding cell to return to his own cell, C.O. Hulse struck him in the back of the head. *See* Carter Aff. ¶ 8; Deposition of Jason Baelfort ("Baelfort Dep.") at 15–21; Deposition of Michael Gonzalez ("Gonzalez Dep.") at 14–16. Mr. Carter alleges that he then turned around, inadvertently hitting C.O. Hulse with the food tray that Mr. Carter had been carrying. *See* Tr. Proc. at 11 (Carter Test.).

The defendants, however, allege that as Mr. Carter, C.O. Hulse, and C.O. Jones exited the temporary holding cell, Mr. Carter, without provocation, turned around quickly, striking C.O. Hulse in the face with the food tray that Mr. Carter had been carrying. *See* Affidavit of Stephen J. Kiernan, sworn to September 15, 1999 ("Kiernan Aff.") ¶ 6; Hulse Aff. ¶ 12; Jones Aff. ¶ 11; Affidavit of Cornelius J. Hegeman, sworn to Sept. 15, 1999 ("Hegeman Aff.") ¶ 7. [2] The defendants deny that C.O. Hulse struck Mr. Carter in the head as the parties exited the cell. *See* Answer ¶ 9; Tr. Proc. at 32–33 (C.O. Hulse Test.).

All parties agree that a struggle ensued; Mr. Carter estimated that it lasted for five to ten minutes. *See* Deposition of Pleasant Carter ("Carter Dep.") at 61; Kiernan Aff. ¶ 11; Hulse Aff. ¶ 14; Hegeman Aff. ¶ 12. According to Mr. Carter, he was grabbed and held by C.O. Jones, while being repeatedly hit with a baton by C.O. Kiernan. *See* Carter Dep. at 53, 57. He was also repeatedly struck in the head and kicked in the face by C.O. Hulse, who also allegedly yelled racial epithets at the plaintiff and pulled his hair. *See id.* at 43; Carter Aff. ¶ 9; Baelfort Dep. at 23. After additional officers from a response team arrived, Mr. Carter alleges that he was placed in hand cuffs but the defendants continued to kick him. *See* Carter Dep. at 55. *See also* Gonzalez Dep. at 18. The hand cuffs were tightened, cutting off his circulation. *See* Carter Aff. ¶ 12. When leg irons were placed on Mr. Carter's ankles by C.O. Kiernan, his legs were bent back and his left leg was twisted until his knee and ankle popped. *See id.* ¶3. Although Mr. Carter did not specifically see Sgt. Hegeman

hit him, Mr. Carter alleges that Sgt. Hegeman was present during the entire altercation and that he could have, and should have, stopped the incident. *See* Carter Dep. at 71; Pl.'s 56.1 St. ¶¶ 6, 17, 19. Mr. Carter contends that he neither hit nor kicked any of the officers during the struggle but rather, that he lay on the floor and covered his head to protect himself from the officers' blows. *See* Carter Dep. at 43, 60–61; Pl.'s St. of Disputed Factual Issues ¶¶ 5–7, 9. *See also* Baelfort Dep. at 23; Gonzalez Dep. at 26.

The defendants offer a different account of the altercation. According to the defendants, Mr. Carter, after striking C.O. Hulse with the food tray, acted violently towards all four officers, punching and kicking all four men and resisting orders. *See* Kiernan Aff. ¶¶ 7–10; Hulse Aff. ¶ 13; Jones Aff. ¶¶ 12–13; Hegeman Aff. ¶¶ 8–9. Defendants claim that force was necessary to control and subdue Mr. Carter and that only minimal force was used. *See* Use of Force Report, attached as Ex. I to McCullough Decl.; Kiernan Aff. ¶ 13; Hulse Aff. ¶ 16; Jones Aff. ¶ 16; Hegeman Aff. ¶ 14. C.O. Kiernan acknowledges striking Mr. Carter with a baton in the upper body area and handcuffing him (Kiernan Aff. ¶¶ 7, 9); C.O. Hulse acknowledges striking Mr. Carter with a baton in the upper body area (Hulse Aff. ¶ 13); C.O. Jones acknowledges attempting to restrain and subdue Mr. Carter as well as using body holds on Mr. Carter's arms so that handcuffs could be applied (Jones Aff. ¶¶ 12–13); Sgt. Hegeman acknowledges attempting to subdue and restrain Mr. Carter, including applying pressure to Mr. Carter's back to assist in handcuffing (Hegeman Aff. ¶ 9). Sgt. Hegeman also witnessed C.O. Kiernan applying a "figure four" to Mr. Carter's legs in order to shackle Mr. Carter's ankles. *See* Hegeman Aff. ¶ 11.

**\*4** As a result of the incident, Mr. Carter suffered a swollen ankle, bruised knee, cuts on his wrist, a cut on his forehead, a lump on his jaw, lumps on his forearm and elbow, and tenderness of his scalp. *See* Carter Dep. at 75–76; Unusual Incident Report, attached as Ex. H to McCullough Decl. Mr. Carter also claims psychological injury as a result of the incident. [3] *See* Carter Dep. at 66. Mr. Carter was treated at the medical unit for his injuries. *Id.* at 64–66. He received bandages for his cuts but no stitches. *Id.* at 65. X-rays revealed no broken bones. *Id.* at 65–66.

In a disciplinary hearing, Mr. Carter was found guilty of assault on staff and violent conduct, for which he

ultimately received three years in the Special Housing Unit ("SHU"). *See id.* at 68–69; Tr. Proc. at 50–51.

### III.

The defendants advance four grounds for their motion for summary for judgment. First, the defendants argue that the plaintiff cannot establish a claim under the Eighth Amendment. Second, the defendants argue that the claim should be dismissed with regard to Defendant Hegeman for lack of personal involvement. Third, the defendants claim that they are entitled to a defense of qualified immunity. Finally, the defendants claim that they are immune from suit pursuant to the Eleventh Amendment.

### A.

The defendants argue that summary judgment should be granted because the plaintiff has failed to establish a claim under the Eighth Amendment. The Eighth Amendment prohibits the infliction of "cruel and unusual punishments." U.S. Const. Amend. VIII. " '[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well being." ' *Blyden v. Mancusi,* 186 F.3d 252, 262 (2d Cir.1999) (citations omitted).

To establish a constitutional violation under the Eighth Amendment, a plaintiff must meet both a subjective and objective requirement. *See Wilson v. Seiter,* 501 U.S. 294, 298–99 (1991); *Davidson v. Flynn,* 32 F.3d 27, 29 (2d Cir.1994); *Blyden,* 186 F.3d at 262. To prove the subjective element of an Eighth Amendment claim, the plaintiff must prove that the defendants had a "wanton" state of mind at the time they engaged in the alleged misconduct. *Hudson v. McMillian,* 503 U.S. 1, 9–10 (1992); *Wilson,* 501 U.S. at 302–303; *Davidson,* 32 F.3d at 30. "[W]antonness does not have a fixed meaning but must be determined with due regard for differences in the kind of conduct against which an Eighth Amendment objection is lodged." *Wilson,* 501 U.S. at 302 (internal quotation and citation omitted). In a case involving the alleged use of excessive force by prison officials, the key inquiry is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson,* 503 U.S. at 7. *See also Davidson,* 32 F.3d at 30 (finding that

a material question of fact existed as to whether risk of escape made it necessary for defendants to shackle the plaintiff so tightly as to cause severe pain and injury). "The key inquiry ... is whether the alleged conduct involved 'unnecessary and wanton infliction of pain.' " *Davidson, 32 F.3d at 30* (quoting *Hudson, 503 U.S. at 8*). Malice need not be present. *See Blyden, 186 F.3d at 263*.

**\*5** Under the objective element, the injury actually inflicted must be sufficiently serious to warrant Eighth Amendment protection. *See Wilson, 501 U.S. at 298*. The objective component of an Eighth Amendment claim is contextual and responsive to " 'contemporary standards of decency.' " *Hudson, 503 U.S. at 8* (quoting *Estelle v. Gamble, 429 U.S. 97, 103 (1976)*). In excessive force cases, "[w]hen prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated." *Id. at 9; see also Griffin v. Crippen, 193 F.3d 89, 91 (2d Cir.1999)*. The malicious use of force to cause harm constitutes an Eighth Amendment violation per se whether or not significant injury is evident. *Blyden, 186 F.3d at 263*. Of course, "[n]ot every push or shove ... violates a prisoner's constitutional rights." *Romano v. Howarth, 998 F.2d 101, 105 (2d Cir.1993)* (quoting *Johnson v. Glick, 481 F.2d 1028, 1033 (2d Cir.1973)*). Eighth Amendment protection "necessarily excludes from constitutional recognition de minimis uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." *Hudson, 503 U.S. at 9–10* (internal quotations and citations omitted).

There are issues of fact as to what force the defendants used against the plaintiff and whether whatever force was used was applied in a malicious and sadistic manner. Even if, as defendants allege, the plaintiff initiated the altercation by using force on C.O. Hulse and lashing out at the other officers, a material question of fact would still remain as to whether the disturbance made it necessary for officers to use the degree of force which the plaintiff alleges was used against him. *See Griffin, 193 F.3d at 91–92*.

The injuries allegedly suffered by the plaintiff—injuries allegedly sustained in an altercation that lasted about ten minutes and which took up to a month to heal—were more than de minimis injuries. *See Griffin, 193 F.3d at 91–92*. In *Griffin,* the Court of Appeals for the Second Circuit reversed a district court's dismissal of an Eighth Amendment excessive force claim in which the plaintiff's only injuries were a bruised shin and swelling over his

left knee. Though the injuries were not severe, the Court of Appeals held that the injuries did not "preclude a reasonable jury from finding that excessive force was used." *Id.* at 92. The same can be said of the injuries sustained by Mr. Carter which are alleged to be more serious.

Given the issues of fact as to the nature and extent of the injuries suffered by Mr. Carter and the discrepancies as to the degree and justification for the force used on Mr. Carter by the defendants, it cannot be said that no reasonable jury could find in favor of the plaintiff on the facts as alleged and thus, defendants are not entitled to summary judgment dismissing the plaintiff's claim.

### B.

**\*6** Defendant Hegeman argues that, at a minimum, summary judgment should be granted in his favor because he was not personally involved in the alleged use of excessive force. To be liable for a violation of § 1983, a defendant must have been personally involved in the alleged constitutional violation. *See Wright v. Smith, 21 F.3d 496, 501 (2d Cir.1994); Adams v. Galletta, 966 F.Supp. 210, 212 (S.D.N.Y.1997); Lee v. Artuz, No. 96 Civ. 8604, 2000 W.L. 231083, at \*5 (S.D.N.Y. Feb. 29, 2000)*. Personal involvement for purposes of a § 1983 action means "direct participation, or failure to remedy the alleged wrong after learning of it, or creation of a policy or custom under which unconstitutional practices occurred, or gross negligence in managing subordinates." *Black v. Coughlin, 76 F.3d 72, 74 (2d Cir.1996); see also Wright, 21 F.3d at 501*. Just as prison officials may be liable for their deliberate indifference in failing to protect inmates from fellow inmates, *Farmer v. Brennan, 511 U .S. 825, 832–33 (1994)*, prison officials may also be liable for their deliberate indifference in failing to protect inmates from violence by subordinates. *See Blyden, 186 F.3d at 265; Meriwether v.. Coughlin, 879 F.2d 1037, 1048 (2d Cir.1989)* ("[S]upervisory liability may be imposed when an official has actual or constructive notice of unconstitutional practices and demonstrates 'gross negligence' or 'deliberate indifference' by failing to act.") (citation omitted); *see also Lee, 2000 W.L. 231083, at \*5; Snider v. Dylang, 188 F.3d 51, 54 (2d Cir.1999)*.

According to the plaintiff, C.O. Hegeman authorized the strip search, stood guard while the strip search

was conducted, and witnessed and participated in the use of excessive force on the plaintiff. Defendant Hegeman himself acknowledges the foregoing and that he personally applied force to the plaintiff's back, although he claims that the force used was reasonable under the circumstances. A question of fact remains as to whether C.O. Hegeman was an active participant in the alleged use of excessive force, and whether he displayed gross negligence or deliberate indifference in managing his subordinates. Therefore, Defendant Hegeman is not entitled to summary judgment on the basis that he lacked personal involvement in the alleged constitutional violations.

### C.

The defendants also claim that they are entitled to summary judgment based on their defense of qualified immunity. Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982) (citations omitted). There is no doubt that the right to be free from cruel and unusual punishments, and more particularly the right of a prison inmate under the Eighth Amendment to be free from the excessive use of force by prison officials, was well established by February 5, 1998, the date on which Mr. Carter was allegedly assaulted by the defendants. *See Hudson,* 503 U.S. at 5; *see also Wright v. Dee,* 54 F.Supp.2d 199, 203 (S.D.N.Y.1999). But even where a right is well established, an official defendant may enjoy qualified immunity "if it was objectively reasonable for him to believe that his acts did not violate" that right. *Frank v. Relin,* 1 F.3d 1317, 1328 (2d Cir.1993). *See LaBounty v. Coughlin,* 137 F.3d 68, 73 (2d Cir.1998). There are factual issues as to whether the defendants violated the plaintiff's right under the Eighth Amendment to be free from the imposition of excessive force. If those factual issues were resolved in the plaintiff's favor and the

defendants were found to have engaged in the unnecessary and wanton infliction of pain, then no reasonable official could have believed that the use of such force was constitutionally permissible. Given these issues of fact as to what occurred, which cannot be resolved on this motion for summary judgment, the defendants are not entitled to summary judgment based on the defense of qualified immunity.

### D.

**\*7** Finally, the defendants assert that the court lacks subject matter jurisdiction because the defendants are protected by the Eleventh Amendment prohibition on suits against state officials sued in their official capacities. The Court already granted the defendants' motion to dismiss to the extent they were sued in their official capacity and denied it to the extent they were sued for damages in their personal capacity. *See Carter,* 1999 W.L. 14014, at \* 5–6. The plaintiff has now made it clear that he is suing the defendants solely in their individual, personal capacities. *See* Pl.'s Br. in Opp'n to Def.'s Mot. Summ. J. at 14 ("Plaintiff states that he is sueing [sic] the state officials in their *individual* capacity.") (emphasis added). Therefore, for the reasons already explained in this Court's prior Opinion and Order, the defendants' motion for summary judgment based on the Eleventh Amendment is denied to the extent that the defendants are being sued for money damages in their individual capacities, the only capacities in which they are being sued.

### CONCLUSION

For all of the foregoing reasons, the defendants' motion for summary judgment is denied.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2000 WL 760303

---

Footnotes

1   Mr. Carter denies that contraband was found in his cell. *See* Pl.'s St. of Disputed Factual Issues ¶¶ 1, 3.

2   C.O. Hulse suffered a two-inch gash on his face, which required seven stitches. *See* Hulse Aff. ¶ 15.

3    In their motion for summary judgment, the defendants argue that because Mr. Carter suffered only de minimis physical injuries, he cannot state a claim for mental or emotional suffering. There are, however, genuine issues of material fact as to the severity of the physical injuries suffered by the plaintiff, as well as the alleged emotional injuries. The defendants are not entitled to summary judgment on this basis in view of the genuine issues of material fact.

**End of Document**                                                © 2017 Thomson Reuters. No claim to original U.S. Government Works.

1999 WL 983876
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Craig COLE, Plaintiff,

v.

Christopher P. ARTUZ, Superintendent, Green
Haven Correctional Facility, R. Pflueger, A.
Glemmon, Sgt. Stevens, Lt. Haubert, Capt.
W.M. Watford, Capt. T. Healey, and John
Doe # 1–5, all as individuals, Defendants.

No. 93 Civ. 5981(WHP) JCF.
|
Oct. 28, 1999.

**Attorneys and Law Firms**

Mr. Craig Cole, Bare Hill Correctional Facility, Malone,
New York, Legal Mail, Plaintiff, pro se.

William Toran, Assistant Attorney General, Office of the
Attorney General of the State of New York, New York,
New York, for Defendant.

*MEMORANDUM & ORDER*

PAULEY, J.

 **\*1** The remaining defendant in this action, Correction
Officer Richard Pflueger, having moved for an order,
pursuant to Fed.R.Civ.P. 56, granting him summary
judgment and dismissing the amended complaint, and
United States Magistrate Judge James C. Francis IV
having issued a report and recommendation, dated
August 20, 1999, recommending that the motion
be granted, and upon review of that report and
recommendation together with plaintiff's letter to this
Court, dated August 28, 1999, stating that plaintiff does
"not contest the dismissal of this action", it is

ORDERED that the attached report and
recommendation of United States Magistrate Judge
James C. Francis IV, dated August 20, 1999, is adopted in
its entirety; and it is further

ORDERED that defendant Pflueger's motion for
summary judgment is granted, and the amended
complaint is dismissed; and it is further

ORDERED that the Clerk of the Court shall enter
judgment accordingly and close this case.

*REPORT AND RECOMMENDATION*

FRANCIS, Magistrate J.

The plaintiff, Craig Cole, an inmate at the Green Haven
Correctional Facility, brings this action pursuant to 42
U.S.C. § 1983. Mr. Cole alleges that the defendant
Richard Pflueger, a corrections officer, violated his First
Amendment rights by refusing to allow him to attend
religious services. The defendant now moves for summary
judgment pursuant to Rule 56 of the Federal Rules of Civil
Procedure. For the reasons set forth below, I recommend
that the defendant's motion be granted.

*Background*

During the relevant time period, Mr. Cole was an
inmate in the custody the New York State Department
of Correctional Services ("DOCS"), incarcerated at the
Green Haven Correctional Facility. (First Amended
Complaint ("Am.Compl.") ¶ 3). From June 21, 1993 to
July 15, 1993, the plaintiff was in keeplock because of
an altercation with prison guards. (Am.Compl.¶¶ 17–
25). An inmate in keeplock is confined to his cell for
twenty-three hours a day with one hour for recreation.
(Affidavit of Anthony Annucci dated Dec. 1, 1994 ¶
5). Pursuant to DOCS policy, inmates in keeplock must
apply for written permission to attend regularly scheduled
religious services. (Reply Affidavit of George Schneider
in Further Support of Defendants' Motion for Summary
Judgment dated September 9, 1996 ("Schneider Aff.") ¶
3). Permission is granted unless prison officials determine
that the inmate's presence at the service would create
a threat to the safety of employees or other inmates.
(Schneider Aff. ¶ 3). The standard procedure at Green
Haven is for the captain's office to review all requests
by inmates in keeplock to attend religious services.
(Schneider Aff. ¶ 3). Written approval is provided to the
inmate if authorization is granted. (Affidavit of Richard
Pflueger dated April 26, 1999 ("Pflueger Aff.") ¶ 5). The
inmate must then present the appropriate form to the

gate officer before being released to attend the services. (Pflueger Aff. ¶ 5).

**\*2** On June 28, 1993, the plaintiff submitted a request to attend the Muslim services on July 2, 1993. (Request to Attend Scheduled Religious Services by Keep–Locked Inmate dated June 28, 1993 ("Request to Attend Services"), attached as Exh. B to Schneider Aff.) On June 30, 1993, a supervisor identified as Captain Warford signed the request form, indicating that the plaintiff had received permission to attend the services. (Request to Attend Services). Shortly before 1:00 p.m. on July 2, 1993, the plaintiff requested that Officer Pflueger, who was on duty at the gate, release him so that he could proceed to the Muslim services. (Pflueger Aff. ¶ 3). However, Officer Pflueger refused because Mr. Cole had not presented the required permission form. (Pflueger Aff. ¶ 3). The plaintiff admits that it is likely that he did not receive written approval until some time thereafter. (Deposition of Craig Cole dated February 28, 1999 at 33–35, 38).

On August 25, 1993, the plaintiff filed suit alleging that prison officials had violated his procedural due process rights. On December 4, 1995, the defendants moved for summary judgment. (Notice of Defendants' Motion for Summary Judgment dated December 4, 1995). The Honorable Kimba M. Wood, U.S.D.J., granted the motion and dismissed the complaint on the grounds that the plaintiff failed to show that he had been deprived of a protected liberty interest, but she granted the plaintiff leave to amend. (Order dated April 5, 1997). On May 30, 1997, the plaintiff filed an amended complaint, alleging five claims against several officials at the Green Haven Correctional Facility. (Am.Compl.) On November 16, 1998, Judge Wood dismissed all but one of these claims because the plaintiff had failed to state a cause of action or because the statute of limitations had elapsed. (Order dated Nov. 16, 1998). The plaintiff's sole remaining claim is that Officer Pflueger violated his First Amendment rights by denying him access to religious services on July 2, 1993. The defendant now moves for summary judgment on this issue, arguing that the plaintiff has presented no evidence that his First Amendment rights were violated. In addition, Officer Pflueger contends that he is entitled to qualified immunity. (Defendants' Memorandum of Law in Support of Their Second Motion for Summary Judgment).

A. *Standard for Summary Judgment*

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Tomka v. Seiler Corp.,* 66 F.3d 1295, 1304 (2d Cir.1995); *Richardson v. Selsky,* 5 F.3d 616, 621 (2d Cir.1993). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Where the movant meets that burden, the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute concerning material facts. Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986). In assessing the record to determine whether there is a genuine issue of material fact, the court must resolve all ambiguities and draw all factual inferences in favor of the nonmoving party. *Anderson,* 477 U.S. at 255; *Vann v. City of New York,* 72 F.3d 1040, 1048–49 (2d Cir.1995). But the court must inquire whether "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party" and grant summary judgment where the nonmovant's evidence is conclusory, speculative, or not significantly probative. *Anderson,* 477 U.S. at 249–50 (citation omitted). "The litigant opposing summary judgment may not rest upon mere conclusory allegations or denials, but must bring forward some affirmative indication that his version of relevant events is not fanciful." *Podell v. Citicorp Diners Club, Inc.,* 112 F.3d 98, 101 (2d Cir.1997) (citation and internal quotation omitted); *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986) (a non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts"); *Goenaga v. March of Dimes Birth Defects Foundation,* 51 F.3d 14, 18 (2d Cir.1995) (nonmovant "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible") ((citations omitted)). In sum, if the court determines that "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.' " *Matsushita Electric Industrial Co.,* 475 U.S. at 587 (quoting *First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 288 (1968)); *Montana v. First Federal Savings & Loan Association,* 869 F.2d 100, 103 (2d Cir.1989).

**\*3** Where a litigant is *pro se,* his pleadings should be read liberally and interpreted "to raise the strongest arguments that they suggest." *McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir.1999) (quoting *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994)). Nevertheless, proceeding *pro se* does not otherwise relieve a litigant from the usual requirements of summary judgment, and a *pro se* party's "bald assertion," unsupported by evidence, is not sufficient to overcome a motion for summary judgment. *See Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991); *Gittens v. Garlocks Sealing Technologies,* 19 F.Supp.2d 104, 110 (W.D.N.Y.1998); *Howard Johnson International, Inc. v. HBS Family, Inc.,* No. 96 Civ. 7687, 1998 WL 411334, at \*3 (S.D .N.Y. July 22, 1998); *Kadosh v. TRW, Inc.,* No. 91 Civ. 5080, 1994 WL 681763, at \*5 (S.D.N.Y. Dec. 5, 1994) ("the work product of *pro se* litigants should be generously and liberally construed, but [the *pro se*' s] failure to allege either specific facts or particular laws that have been violated renders this attempt to oppose defendants' motion ineffectual"); *Stinson v. Sheriff's Department,* 499 F.Supp. 259, 262 (S.D.N.Y.1980) (holding that the liberal standard accorded to *pro se* pleadings "is not without limits, and all normal rules of pleading are not absolutely suspended").

B. *Constitutional Claim*

It is well established that prisoners have a constitutional right to participate in congregate religious services even when confined in keeplock. *Salahuddin v. Coughlin,* 993 F.2d 306, 308 (2d Cir.1993); *Young v. Coughlin,* 866 F.2d 567, 570 (2d Cir1989). However, this right is not absolute. *See Benjamin v. Coughlin,* 905 F.2d 571, 574 (2d Cir.1990) (right to free exercise balanced against interests of prison officials). Prison officials can institute measures that limit the practice of religion under a "reasonableness" test that is less restrictive than that which is ordinarily applied to the alleged infringement of fundamental constitutional rights. *O'Lone v. Estate of Shaabazz,* 482 U.S. 342, 349 (1986). In *O'Lone,* the Court held that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Id.* at 349 (quoting *Turner v. Safley,* 482 U.S. 78, 89 (1987)). The evaluation of what is an appropriate and reasonable penological objective is left to the discretion of the administrative officers operating the prison. *O'Lone,* 482 U.S. at 349. Prison administrators are "accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish,* 441 U.S. 520, 547 (1979).

The policy at issue here satisfies the requirement that a limitation on an inmate's access to religious services be reasonable. The practice at Green Haven was to require inmates in keeplock to present written approval to the prison gate officer before being released to attend religious services. This policy both accommodates an inmate's right to practice religion and allows prison administrators to prevent individuals posing an active threat to security from being released. The procedure is not overbroad since it does not permanently bar any inmate from attending religious services. Rather, each request is decided on a case-by-case basis by a high ranking prison official and denied only for good cause.

**\*4** Furthermore, in order to state a claim under § 1983, the plaintiff must demonstrate that the defendant acted with deliberate or callous indifference toward the plaintiff's fundamental rights. *See Davidson v. Cannon* 474 U.S. 344, 347–48 (1986) (plaintiff must show abusive conduct by government officials rather than mere negligence). Here, there is no evidence that the defendant was reckless or even negligent in his conduct toward the plaintiff or that he intended to violate the plaintiff's rights. Officer Pflueger's responsibility as a prison gate officer was simply to follow a previously instituted policy. His authority was limited to granting access to religious services to those inmates with the required written permission. Since Mr. Cole acknowledges that he did not present the necessary paperwork to Officer Pflueger on July 2, 1993, the defendant did nothing improper in denying him access to the religious services. Although it is unfortunate that the written approval apparently did not reach the plaintiff until after the services were over, his constitutional rights were not violated. [1]

*Conclusion*

For the reasons set forth above, I recommend that the defendant's motion for summary judgment be granted and judgment be entered dismissing the complaint. Pursuant to 28 U.S.C. § 636(b)(1) and Rules 72, 6(a), and 6(e) of the Federal Rules of Civil Procedure, the parties shall have ten (10) days to file written objections to this report and recommendation. Such objections shall be filed with

the Clerk of the Court, with extra copies delivered to the chambers of the Honorable William H. Pauley III, Room 234, 40 Foley Square, and to the Chambers of the undersigned, Room 1960, 500 Pearl Street, New York, New York 10007. Failure to file timely objections will preclude appellate review.

Respectfully submitted,

**All Citations**

Not Reported in F.Supp.2d, 1999 WL 983876

Footnotes

1    In light of this finding, there is no need to consider the defendant's qualified immunity argument.

**End of Document**                    © 2017 Thomson Reuters. No claim to original U.S. Government Works.

2012 WL 651919
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Kenneth Carl GROVES, Sr., Plaintiff,

v.

Brett DAVIS, Secure Care Treatment Aid; David
W. Sill, Secure Care Treatment Aid; Thomas
Nicolette, RN, Ward Nurse; Charmaine Bill,
Treatment Team Leader; Jill E. Carver, Social
Worker, Primary Therapist; Edwin Debroize,
Psychologist Assist; Jeff Nowicki, Chief of Mental
Health Treatment Serv.; Terri Maxymillian,
Ph.D., Dir. of Mental Health Serv.; Sgt. Sweet,
Security Services, CNYPC; Michael Hogan,
Comm'r, Dep't of Mental Health, Defendants.

No. 9:11–CV–1317 (GTS/RFT).
|
Feb. 28, 2012.

**Attorneys and Law Firms**

Kenneth Carl Groves, Sr., Marcy, NY, pro se.

***MEMORANDUM DECISION and ORDER***

Hon. GLENN T. SUDDABY, District Judge.

**\*1** Currently before the Court, in this *pro se* civil rights
action filed by Kenneth Carl Groves, Sr. ("Plaintiff"),
against numerous employees of New York State or the
Central New York Psychiatric Center ("Defendants"),
are Plaintiff's motion to proceed *in forma pauperis,* his
motion for a temporary restraining order and preliminary
injunction, and his motion for appointment of counsel.
(Dkt.Nos.2, 3, 4.) [1] For the reasons set forth below,
Plaintiff's motion to proceed *in forma pauperis* is granted;
his motion for a preliminary injunction is denied; his
motion for appointment of counsel is denied; Plaintiff's
claims of deliberate indifference to his mental health
needs against Defendants Bill, Carver and DeBroize are
*sua sponte* dismissed with prejudice; Plaintiff's claims
against Defendants Bill, Carver, DeBroize, Nowicki,
Maxymillian, and Hogan arising from their alleged
personal involvement in the August 8, 2011 assault are

*sua sponte* dismissed without prejudice and with leave to
amend in this action in accordance with Fed.R.Civ.P.
15; Sgt. Sweet is *sua sponte* dismissed without prejudice
as a Defendant in this action; the Clerk is directed to
issue summonses, and the U.S. Marshal is directed to
effect service of process on Defendants Davis, Sill, and
Nicolette.

**I. RELEVANT BACKGROUND**
On November 7, 2011, Plaintiff commenced this action
*pro se* by filing a civil rights Complaint, together with
a motion to proceed *in forma pauperis.* (Dkt. Nos.1,
2.) [2] Liberally construed, Plaintiff's Complaint alleges
that the following constitutional violations against him
occurred during his confinement at Central New York
Psychiatric Center ("CNYPC"): (1) Defendants Davis and
Sill used excessive force against him under the Eighth
and/or Fourteenth Amendments; (2) Defendant Nicolette
knew of and failed to take action to protect Plaintiff
from the assault under the Eighth and/or Fourteenth
Amendments; (3) Defendants Bill, Carver, and DeBroize
were deliberately indifferent to his mental health needs
under the Eighth and/or Fourteenth Amendments;
and (4) Defendants Bill, Carver, DeBroize, Nowicki,
Maxymillian, Bosco, and Hogan failed to "adequately
train the staff under their supervision" and to take
appropriate action in response to the incident. (*See
generally* Dkt. No. 1.) For a more detailed description of
Plaintiff's claims, and the factual allegations giving rise to
those claims, the reader is referred to Part III.B of this
Decision and Order.

**II. MOTION TO PROCEED *IN FORMA PAUPERIS***
Because Plaintiff sets forth sufficient economic need, the
Court finds that Plaintiff may properly commence this
action *in forma pauperis.* (Dkt. No. 2.)

**III. *SUA SPONTE* REVIEW OF PLAINTIFF'S
COMPLAINT**
In light of the foregoing, the Court must now review the
sufficiency of the allegations that Plaintiff has set forth in
his Complaint in light of 28 U.S.C. § 1915(e)(2)(B). This is
because Section 1915(e)(2)(B) directs that, when a plaintiff
seeks to proceed *in forma pauperis,* "(2) ... the court shall
dismiss the case at any time if the court determines that
—... (B) the action ... (i) is frivolous or malicious; (ii) fails
to state a claim on which relief may be granted; or (iii)

seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2)(B). [3]

**A. Governing Legal Standard**

**\*2** It has long been understood that a dismissal for failure to state a claim upon which relief can be granted, pursuant to Fed.R.Civ.P. 12(b)(6), can be based on one or both of two grounds: (1) a challenge to the "sufficiency of the pleading" under Fed.R.Civ.P. 8(a)(2); or (2) a challenge to the legal cognizability of the claim. *Jackson v. Onondaga Cnty.,* 549 F.Supp.2d 204, 211, nn. 15–16 (N.D.N.Y.2008) (McAvoy, J., adopting Report–Recommendation on *de novo* review).

Because such dismissals are often based on the first ground, a few words regarding that ground are appropriate. Rule 8(a)(2) of the Federal Rules of Civil Procedure requires that a pleading contain "a *short and plain* statement of the claim *showing* that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2) [emphasis added]. In the Court's view, this tension between permitting a "short and plain statement" and requiring that the statement "show[ ]" an entitlement to relief is often at the heart of misunderstandings that occur regarding the pleading standard established by Fed.R.Civ.P. 8(a)(2).

On the one hand, the Supreme Court has long characterized the "short and plain" pleading standard under Fed.R.Civ.P. 8(a)(2) as "simplified" and "liberal." *Jackson,* 549 F.Supp.2d at 212, n. 20 (citing Supreme Court case). On the other hand, the Supreme Court has held that, by requiring the above-described "showing," the pleading standard under Fed.R.Civ.P. 8(a)(2) requires that the pleading contain a statement that "give[s] the defendant *fair notice* of what the plaintiff's claim is and the grounds upon which it rests." *Jackson,* 549 F.Supp.2d at 212, n .17 (citing Supreme Court cases) (emphasis added).

The Supreme Court has explained that such *fair notice* has the important purpose of "enabl[ing] the adverse party to answer and prepare for trial" and "facilitat[ing] a proper decision on the merits" by the court. *Jackson,* 549 F.Supp.2d at 212, n. 18 (citing Supreme Court cases); *Rusyniak v. Gensini,* 629 F.Supp.2d 203, 213 & n. 32 (N.D.N.Y.2009) (Suddaby, J.) (citing Second Circuit cases). For this reason, as one commentator has correctly observed, the "liberal" notice pleading standard "has its limits." 2 *Moore's Federal Practice* § 12.34[1][b] at 12–

61 (3d ed.2003). For example, numerous Supreme Court and Second Circuit decisions exist holding that a pleading has failed to meet the "liberal" notice pleading standard. *Rusyniak,* 629 F. Supp .2d at 213, n. 22 (citing Supreme Court and Second Circuit cases); *see also Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949–52, 173 L.Ed.2d 868 (2009).

Most notably, in *Bell Atlantic Corp. v. Twombly,* the Supreme Court reversed an appellate decision holding that a complaint had stated an actionable antitrust claim under 15 U.S.C. § 1. *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). In doing so, the Court "retire[d]" the famous statement by the Court in *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Twombly,* 127 S.Ct. at 1968–69. Rather than turn on the *conceivability* of an actionable claim, the Court clarified, the "fair notice" standard turns on the *plausibility* of an actionable claim. *Id.* at 1965–74. The Court explained that, while this does not mean that a pleading need "set out in detail the facts upon which [the claim is based]," it does mean that the pleading must contain at least "some factual allegation[s]." *Id .* at 1965. More specifically, the "[f]actual allegations must be enough to raise a right to relief above the speculative level [to a plausible level]," assuming (of course) that all the allegations in the complaint are true. *Id.*

**\*3** As for the nature of what is "plausible," the Supreme Court explained that "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 129 S.Ct. at 1949. "[D]etermining whether a complaint states a plausible claim for relief ... [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.... [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged— but it has not show[n]—that the pleader is entitled to relief." *Id.* at 1950 [internal quotation marks and citations omitted]. However, while the plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully," *id.,* it "does not impose a probability requirement." *Twombly,* 550 U.S. at 556.

Because of this requirement of factual allegations plausibly suggesting an entitlement to relief, "the tenet that a court must accept as true all of the allegations contained in the complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by merely conclusory statements, do not suffice." *Iqbal,* 129 S.Ct. at 1949. Similarly, a pleading that only "tenders naked assertions devoid of further factual enhancement" will not suffice. *Iqbal,* 129 S.Ct. at 1949 (internal citations and alterations omitted). Rule 8 "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* (citations omitted).

This pleading standard applies even to *pro se* litigants. While the special leniency afforded to *pro se* civil rights litigants somewhat loosens the procedural rules governing the form of pleadings (as the Second Circuit has observed), it does not completely relieve a *pro se* plaintiff of the duty to satisfy the pleading standards set forth in Fed.R.Civ.P. 8, 10 and 12.[4] Rather, as both the Supreme Court and Second Circuit have repeatedly recognized, the requirements set forth in Fed.R.Civ.P. 8, 10 and 12 are procedural rules that even *pro se* civil rights plaintiffs must follow.[5] Stated more simply, when a plaintiff is proceeding *pro se,* "all normal rules of pleading are not absolutely suspended." *Jackson,* 549 F.Supp.2d at 214, n. 28 [citations omitted].[6]

**B. Analysis of Plaintiff's Complaint**

The Court prefaces its analysis of Plaintiff's Complaint by noting that, although Plaintiff is a civilly committed sex offender and no longer a prisoner, the Court will look to cases addressing prisoner's rights in analyzing Plaintiff's claims, because "confinement of civilly committed patients is similar to that of prisoners." *Holly v. Anderson,* 04–CV–1489, 2008 WL 1773093, at *7 (D.Minn. Apr.15, 2008); *see also Morgan v. Rabun,* 128 F.3d 694, 697 (8th Cir.1997) ("The governmental interests in running a state mental hospital are similar in material aspects to that of running a prison."). Thus, whereas claims of excessive force by convicted criminals are analyzed under the Eighth Amendment to the United States Constitution, because Plaintiff is a civilly committed sex offender and no longer a prisoner, his substantive rights to be free from unsafe conditions of confinement arise under the Due Process Clause of the Fourteenth Amendment. In *Youngberg v. Romeo,* 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982), the Court stated "[i]f it is cruel and unusual punishment to hold convicted criminals in unsafe conditions, it must be unconstitutional [under the Due Process Clause] to confine the involuntarily committed-who may not be punished at all-in unsafe conditions." *Youngberg,* 457 U.S. at 315–16. As have numerous other courts which have considered the issue, this Court has found that "the standard for analyzing a civil detainee's Fourteenth Amendment [conditions of confinement] claim is the same as the Eighth Amendment standard." *Groves v. Patterson,* 09–CV–1002, Memorandum–Decision and Order at *15–16 (N.D.N.Y. filed Nov. 18, 2009).[7]

**1. Excessive Force Claims Against Defendants Davis, Still and Nicolette**

**\*4** Plaintiff alleges that on August 8, 2011, Defendant Davis entered Plaintiff's dorm room at CNYPC and "viciously attacked and brutally assaulted and battered" him. (Dkt. No. 1 at 4.) During the course of this assault, Defendant Sill is alleged to have entered Plaintiff's room and "jump[ed] on the plaintiff's legs holding and pinning them as Defendant Davis [continued to beat Plaintiff]." (*Id.*) As alleged in the Complaint, although Defendant Nicolette knew in advance that this assault was planned, he "remained in the Nurses Station" and "did nothing to interceed [sic] or stop the brutal attack on the plaintiff." (*Id.* at 5.)

To validly assert a violation of the Eighth Amendment through the use of excessive force, an inmate must allege the following: (1) subjectively, that the defendants acted wantonly and in bad faith; and (2) objectively, that the defendants' actions violated "contemporary standards of decency." *Blyden v. Mancusi,* 186 F.3d 252, 262–63 (2d Cir.1999) (internal quotation marks omitted) (citing *Hudson v. McMillian,* 503 U.S. 1, 8 [1992] ).

Here, construing the factual allegations of Plaintiff's Complaint with special leniency, the Court finds that Plaintiff appears to have alleged facts plausibly suggesting that he was subjected to excessive force by Defendants Davis and Sill. In addition, by alleging that Defendants Davis, Sill and Nicolette discussed the assault in advance of it occurring, and that Nicolette was in the vicinity of Plaintiff's room and had an opportunity to intervene to prevent it, the Complaint sufficiently alleges that

Defendant Nicolette was personally involved and/or failed to protect Plaintiff from the assault. *See Bhuiyan v. Wright,* 06–CV–0409, 2009 WL 3123484, at *7 (N.D.N.Y. Sept.29, 2009) (Scullin, J.) ("The fact that defendant Davis was not in the room, but was acting as a 'lookout' so that no one came into the room while plaintiff was being beaten, would not absolve him from liability for the assault. An officer's failure to intervene during another officer's use of excessive force can itself constitute an Eighth Amendment violation unless the assault is "sudden and brief," and the defendant had no real opportunity to prevent it."); *Jeffreys v. Rossi,* 275 F.Supp.2d 463, 474 (S.D.N.Y.2003) (holding that an officer may be personally involved in the use of excessive force if he either directly participates in the assault or if he was present during the assault, yet failed to intervene on behalf of the victim, even though the officer had a reasonable opportunity to do so).

As a result, a response to these claims is required from Defendants David, Sill, and Nicolette. In so ruling, the Court expresses no opinion as to whether Plaintiff's claims can withstand a properly filed motion to dismiss or for summary judgment.

### 2. Deliberate Indifference Claims Against Defendants Bill, Carver and DeBroize

Plaintiff alleges that on August 9, 2011, the day after the alleged assault, he attempted to "discuss the incident and what transpired" with Defendants Bill and Carver. (Dkt. No. 1 at 5.) Plaintiff alleges that Defendant Bill told him, "I don't want to discuss this Mr. Groves, we're too busy for your foolishness and the matter is being investigated." (*Id.*) Plaintiff's effort to explain that he was frightened by the incident was rebuffed by Defendant Bill, who told Plaintiff to "grow up." (*Id.* at 5–6.) The following day, Plaintiff attempted to discuss the incident with Defendant Carver, his primary therapist, again without success. A further attempt at discussion later that day was met with Defendant Carver "stating to the plaintiff in a snotty tone 'grow the hell up!' " (*Id.* at 6.) On August 10, 2011, Plaintiff attempted to discuss the incident "and his current fears and feelings," during his Monday afternoon "Process Group," which is facilitated by Defendant DeBroize. As alleged, Defendant DeBroize told Plaintiff and the other group members that the matter was under investigation "so no one could discuss the incident with anyone." (*Id.* at 6.)

*5 To state a claim of deliberate indifference to a serious medical and/or mental health need under the Eighth Amendment, a plaintiff must first allege facts plausibly suggesting that prison officials acted with "deliberate indifference to serious medical needs." *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). "[T]he plaintiff must allege conduct that is 'repugnant to the conscience of mankind' or 'incompatible with the evolving standards of decency that mark the progress of a maturing society.' " *Ross v. Kelly,* 784 F.Supp. 35, 44 (W.D.N.Y.), *aff'd,* 970 F.2d 896 (2d Cir.1992) (quoting *Estelle v. Gamble,* 429 U.S. at 102, 105–06). The "deliberate indifference standard embodies both an objective and a subjective prong," both of which the plaintiff must establish. *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994), *cert. denied,* 513 U.S. 1154, 115 S.Ct. 1108, 130 L.Ed.2d 1074 (1995). "First, the alleged deprivation must be, in objective terms, 'sufficiently serious.' " *Id.* (citations omitted). Second, the defendant "must act with a sufficiently culpable state of mind." *Id.*

With regard to the first element, generally, to be sufficiently serious for purposes of the Constitution, a medical condition must be "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Nance v. Kelly,* 912 F.2d 605, 607 (2d Cir.1990) (Pratt, J. dissenting) [citations omitted], *accord, Hathaway,* 37 F.3d at 66; *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998).). [8] Under the subjective component, a plaintiff must also allege facts plausibly suggesting that the defendant acted with "a sufficiently culpable state of mind." *Hathaway,* 37 F.3d at 66. The requisite culpable mental state is similar to that of criminal recklessness. *Wilson v. Seiter,* 501 U.S. 294, 301–03, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991). A physician's negligence in treating or failing to treat a prisoner's medical condition does not implicate the Eighth Amendment and is not properly the subject of a Section 1983 action. *Estelle,* 429 U.S. at 105–06; *Chance,* 143 F.3d at 703. [9]

Here, even when construed with the utmost special liberality, Plaintiff's Complaint fails to allege facts plausibly suggesting that Defendants Bill, Carver, and DeBroize acted with deliberate indifference to Plaintiff's serious mental health condition when they declined to discuss the incident of August 8, 2011. There is nothing in the Complaint that even remotely suggests that the requested conversations were integral to Plaintiff's treatment as a convicted sex offender involuntarily

committed to CNYPC, or that Defendants' refusal to discuss the incident with Plaintiff when he requested to do so caused Plaintiff to suffer any harm or worsening of his condition. In addition, Plaintiff does not allege that any of these Defendants acted with the requisite culpable state of mind.

Moreover, the statements made by Defendants Bill and Carver that he should "grow up," even if construed as verbal harassment, do not give rise to a cognizable claim that may be pursued under Section 1983. Allegations of verbal harassment are insufficient to support a Section 1983 claim. *Johnson v. Eggersdorf,* 8 F. App'x 140, 143 (2d Cir.2001); *see also Purcell v. Coughlin,* 790 F.2d 263, 265 (2d Cir.1986) ("[A]llegations of verbal harassment are insufficient to base a § 1983 claim if no specific injury is alleged .").

**\*6** For these reasons, Plaintiff's deliberate indifference claims against Defendants Bill, Carver, and DeBroize are dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) and Fed.R.Civ.P. 12(b)(6). Moreover, because the Court cannot imagine how Plaintiff might correct this claim through better pleading, he is not granted leave to attempt to do so in an amended pleading. [10] Rather, this claim is hereby dismissed with prejudice.

### 3. Failure to Supervise Claims Against Defendants Bill, Carver, DeBroize, Nowicki, Maxmillian, and Hogan

To prevail on a claim under 42 U.S.C. § 1983, a defendant must be personally involved in the plaintiff's constitutional deprivation. *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977). Generally, for purposes of 42 U.S.C. § 1983, supervisory personnel may be considered "personally involved" only if they (1) directly participated in the violation, (2) failed to remedy that violation after learning of it through a report or appeal, (3) created, or allowed to continue, a policy or custom under which the violation occurred, (4) had been grossly negligent in managing subordinates who caused the violation, or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that the violation was occurring. [11]

Holding a position in a hierarchical chain of command, without more, is insufficient to support a showing of personal involvement. *McKinnon,* 568 F.2d at 934. Rather, a plaintiff must demonstrate " 'a tangible

connection between the acts of the defendant and the injuries suffered.' " *Austin v. Pappas,* 04–CV–7263, 2008 WL 857528, at \*2 (S.D.N.Y. Mar.31, 2008) (quoting *Bass v. Jackson,* 790 F.2d 260, 263 [2d Cir.1986] ) (other citation omitted). An official's failure to respond to grievance letters from inmates, however, "does not establish supervisory liability." *Watson v. McGinnis,* 964 F.Supp. 127, 130 (S.D.N.Y.1997). [12] Moreover, "the law is clear that inmates do not enjoy a constitutional right to an investigation of any kind by government officials." *Pine v. Seally,* 9–CV–1198, 2011 WL 856426, at \*9 (N.D.N.Y. Feb.4, 2011). [13]

In his Complaint, Plaintiff alleges in wholly conclusory terms that Defendants Bill, Carver, DeBroize, Nowicki, Maxmillian, and Hogan failed to "adequately train the staff under their supervision and fail[ed] to act within the scope and training of the position and job title they hold." (Dkt. No. 1 at 8.) Plaintiff alleges that he submitted a letter of complaint to Defendant Hogan and wrote to Defendant Nowicki on several occasions expressing concern his complaint had not been responded to, only to be advised that in September, 2011 that an investigation was ongoing. (*Id.* at 6–7.) Plaintiff does not allege that any of these Defendants personally participated in the alleged assault on August 8, 2011.

Here, even when construed with the utmost special liberality, Plaintiff's Complaint fails to allege facts plausibly suggesting any personal involvement by these Defendants in the alleged used of excessive force on August 8, 2011. As a result, Plaintiff's claims against Defendants Bill, Carver, DeBroize, Nowicki, Maxmillian, and Hogan arising from this incident are *sua sponte* dismissed pursuant to 28 U.S.C. § 1915(e) (2)(B)(ii) and Fed.R.Civ.P. 12(b)(6). This dismissal is without prejudice to Plaintiff's right to file an Amended Complaint that corrects the above-described pleading defects, and states a viable claim against these Defendants. The Court notes that, at this early stage of the case, Plaintiff has the right—without leave of the Court— to file an Amended Complaint within the time limits established by Fed.R.Civ.P. 15(a)(1)(B). However, if he seeks to file an Amended Complaint after those time limits, he must file a motion for leave to file an Amended Complaint in accordance with Fed.R.Civ.P. 15(a)(2). In either event, Plaintiff is advised that *any Amended Complaint must be a complete pleading that will replace and supersede the original Complaint in its entirety, and that*

*may not incorporate by reference any portion of the original Complaint. See* N.D.N.Y. L.R. 7.1(a) (4).

**\*7** Finally, although Plaintiff names Sgt. Sweet as a Defendant in the caption of the complaint and the listing of the parties, he has not set forth in the Complaint any allegations of fact regarding the conduct of this Defendant complained of. (*See generally* Dkt. No. 1.) As a result, the Complaint fails to state a claim upon which relief may be granted and Sgt. Sweet is dismissed from this action without prejudice to Plaintiff's right to file an Amended Complaint as set forth above.

## IV. MOTION FOR INJUNCTIVE RELIEF

A preliminary injunction is an "extraordinary remedy that should not be granted as a routine matter." *Patton v. Dole,* 806 F.2d 24, 28 (2d Cir.1986). In most cases, to warrant the issuance of a preliminary injunction, a movant must show (a) irreparable harm and (b) either (1) a likelihood of success on the merits of the claim or (2) sufficiently serious questions going to the merits, and a balance of hardships tipping decidedly in favor of the moving party. *D.D. ex rel. V.D. v. New York City Bd. of Educ.,* 465 F.3d 503, 510 (2d Cir.2006) (quotation omitted). "The purpose of issuing a preliminary injunction is to 'preserve the status quo and prevent irreparable harm until the court has an opportunity to rule on the ... merits.' " *Candelaria v. Baker,* 00–CV–912, 2006 WL 618576, at \*3 (W.D.N.Y. Mar.10, 2006) (quoting *Devose v. Herrington,* 42 F.3d 470, 471 [8th Cir.1994] ). Preliminary injunctive relief " 'should not be granted unless the movant, by a clear showing, carries the burden of persuasion.' " *Moore v. Consolidated Edison Co. of New York, Inc.,* 409 F.3d 506, 510 (2d Cir.2005) (quoting *Mazurek v. Armstrong,* 520 U.S. 968, 972 [1997] ). "Where there is an adequate remedy at law, such as an award of money damages, injunctions are unavailable except in extraordinary circumstances." *Moore,* 409 F.3d at 510 (citing *Morales v. Trans World Airlines, Inc.,* 504 U.S. 374, 381, 112 S.Ct. 2031, 119 L.Ed.2d 157 (1992). The same standards govern consideration of an application for a temporary injunctive relief order. *Perri v. Bloomberg,* 06–CV–0403, 2008 WL 2944642, at \*2 (E.D.N.Y. Jul.31, 2008) [citation omitted]. The district court has broad discretion in determining whether to grant a preliminary injunction. *Moore,* 409 F.3d at 511.

"The Second Circuit has defined 'irreparable harm' as 'certain and imminent harm for which a monetary award does not adequately compensate,' noting that 'only harm shown to be non-compensable in terms of money damages provides the basis for awarding injunctive relief.' " *Perri,* 2008 WL 2944642, at \*2 (citing *Wisdom Import Sales Co., L.L.C. v. Labatt Brewing Co., Ltd.,* 339 F.3d 101, 113–14 [2d Cir.2003] ); *see also Kamerling v. Massanari,* 295 F.3d 206, 214 (2d Cir.2002) ("To establish irreparable harm, a party seeking preliminary injunctive relief must show that there is a continuing harm which cannot be adequately redressed by final relief on the merits and for which money damages cannot provide adequate compensation.") (internal quotation omitted). Speculative, remote or future injury is not the province of injunctive relief. *Los Angeles v. Lyons,* 461 U.S. 95, 111–12, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983); *see also Hooks v. Howard,* 07–CV–0724, 2008 WL 2705371, at \*2 (N.D.N.Y. Jul.3, 2008) (citation omitted) ("Irreparable harm must be shown to be imminent, not remote or speculative, and the injury must be such that it cannot be fully remedied by monetary damages.").

**\*8** Plaintiff has submitted a document entitled "Order to Show Cause for Preliminary Injunction and Tempor[ary] Restraining Order." (Dkt. No. 3.) Construed liberally, Plaintiff's submission seeks a temporary restraining order and injunctive relief enjoining Defendants from "submitting and filing false and untrue statements and reports" regarding the August 11, 2011 incident, and to "stop all retaliatory actions against the plaintiff ...." (*Id.* at 1.) Plaintiff also seeks an "Order of Seperation [sic]" directing that Defendants Davis, Sill, Nicolette, Bill, Carver and DeBroize be "restrained from being within 100 feet from the plaintiff in any form or matter." (*Id.* at 2.)

The Court has reviewed Plaintiff's motion papers thoroughly and considered the claims asserted therein in the light most favorable to Plaintiff, as a *pro se* litigant. Based upon that review, the Court finds that the harm Plaintiff alleges is purely speculative and, therefore, not "irreparable." Plaintiff's motion is supported only by a recitation of the alleged assault in August, 2011. (*Id.* at 1–4.) Plaintiff has not supported the claims of ongoing misconduct set forth in his motion papers with any factual allegations, such as the dates on which the misconduct occurred, the nature of the injuries he claims to have suffered, the identities of the persons responsible for the conduct he seeks to enjoin, or the relationship between those actions and the claims asserted in his Complaint. Simply stated, Plaintiff's alleged fear of future

wrongdoing by the Defendants is not sufficient to warrant the extraordinary remedy of preliminary injunctive relief.

The Court further notes that the requested injunctive relief cannot be granted unless there is also proof that Plaintiff has a likelihood of succeeding on the merits of his claim, or evidence that establishes sufficiently serious questions going to the merits of his claim and a balance of hardships tipping decidedly toward him. *See Covino v. Patrissi,* 967 F.2d 73, 77 (2d Cir.1992). Plaintiff has failed to submit *proof or evidence* that meets this standard. Plaintiff's allegations, standing alone, are not sufficient to entitle him to preliminary injunctive relief. *See Ivy Mar Co. v. C.R. Seasons Ltd.,* 907 F.Supp. 547, 561 (E.D.N.Y.1995) ("[B]are allegations, without more, are insufficient for the issuance of a preliminary injunction."); *Hancock v. Essential Resources, Inc.,* 792 F.Supp. 924, 928 (S.D.N.Y.1992) ("Preliminary injunctive relief cannot rest on mere hypotheticals."). Without evidence to support his claims that he is in danger from the actions of anyone at CNYPC, the Court will not credit Plaintiff's conclusory allegations that he will be retaliated against or harmed in the future.

Plaintiff has failed to establish either of the two requisite elements discussed above. As a result, Plaintiff's request for a temporary restraining order and/or injunctive relief is denied.

## V. MOTION FOR APPOINTMENT OF COUNSEL

**\*9** Courts cannot utilize a bright-line test in determining whether counsel should be appointed on behalf of an indigent party. *Hendricks v. Coughlin,* 114 F.3d 390, 392–93 (2d Cir.1997). Instead, a number of factors must be carefully considered by the court in ruling upon such a motion:

> [T]he district judge should first determine whether the indigent's position seems likely to be of substance. If the claim meets this threshold requirement, the court should then consider the indigent's ability to investigate the crucial facts, whether conflicting evidence implicating the need for cross examination will be the major proof presented to the fact finder, the indigent's ability to present the case,

the complexity of the legal issues and any special reason in that case why appointment of counsel would be more likely to lead to a just determination.

*Terminate Control Corp. v. Horowitz,* 28 F.3d 1335, 1341 (2d Cir.1994) (quoting *Hodge v. Police Officers,* 802 F.2d 58, 61 [2d Cir.1986] ). This is not to say that all, or indeed any, of these factors are controlling in a particular case. [14] Rather, each case must be decided on its own facts. *Velasquez v. O'Keefe,* 899 F.Supp. 972, 974 (N.D.N.Y.1995) (McAvoy, C.J.) (citing *Hodge,* 802 F.2d at 61).

Upon due consideration, the Court finds that the relevant factors weigh decidedly against granting Plaintiff's motion at this time. For example, the Court finds as follows: (1) the case does not present novel or complex issues; (2) it appears to the Court as though, to date, Plaintiff has been able to effectively litigate this action; (3) while it is possible that there will be conflicting evidence implicating the need for cross-examination at the time of the trial, as is the case in many actions brought under 42 U.S.C. § 1983 by *pro se* litigants, "this factor alone is not determinative of a motion for appointment of counsel," *Velasquez,* 899 F.Supp. at 974; (4) if this case survives any dispositive motions filed by Defendants, *it is highly probable that this Court will appoint trial counsel at the final pretrial conference;* (5) this Court is unaware of any special reasons why appointment of counsel at this time would be more likely to lead to a just determination of this litigation; and (6) Plaintiff's motion for counsel is not accompanied by documentation that substantiates his efforts to obtain counsel from the public and private sector.

For these reasons, Plaintiff's motion for the appointment of counsel is denied without prejudice. After the Defendants have responded to the allegations in the Complaint which survive *sua sponte* review, and the parties have undertaken discovery, Plaintiff may file a second motion for the appointment of counsel, at which time the Court may be better able to determine whether such appointment is warranted in this case. Plaintiff is advised that any second motion for appointment of counsel must be accompanied by documentation that substantiates his efforts to obtain counsel from the public and private sector.

**\*10  ACCORDINGLY,** it is

**ORDERED** that Plaintiff's motion to proceed *in forma pauperis* (Dkt. No. 2) is **GRANTED;** [15] and it is further

**ORDERED** that Plaintiff's motion for injunctive relief (Dkt. No. 3) is **DENIED;** and it is further

**ORDERED** that Plaintiff's motion for appointment of counsel (Dkt. No. 4) is **DENIED without prejudice;** and it is further

**ORDERED** that Plaintiff's claims of deliberate indifference against Defendants Bill, Carver and DeBroize are *sua sponte* **DISMISSED with prejudice** pursuant to 28 U.S.C. § 1915(e)(2) (B)(ii) and Fed.R.Civ.P. 12(b)(6); and it is further

**ORDERED** that Plaintiff's claims against Defendants Bill, Carver, DeBroize, Nowicki, Maxymillian, and Hogan arising from their alleged personal involvement in the August 8, 2011 incident are *sua sponte* **DISMISSED without prejudice and with leave to amend** in this action in accordance with Fed.R.Civ.P. 15 (as described above in Part III.B.3. of this Decision and Order), pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) and Fed.R.Civ.P. 12(b)(6); and it is further

**ORDERED** that Defendant Sweet is *sua sponte* **DISMISSED without prejudice and with leave to be reinstated** as a Defendant in this action in accordance with Fed.R.Civ.P. 15, pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) and Fed.R.Civ.P. 12(b)(6); and it is further

**ORDERED** that Plaintiff's Complaint (Dkt. No. 1) is otherwise accepted for filing (i.e., as to the claims against Defendants Davis, Sill, and Nicolette arising from the August 8, 2011 incident); and it is further

**ORDERED** that Plaintiff provide a summons, USM–285 form and a copy of the complaint for Defendant Davis,

Sill and Nicolette for service, and upon receipt from Plaintiff of the documents required for service of process, the Clerk shall (1) issue summonses and forward them, along with copies of the Complaint to the United States Marshal for service upon the remaining Defendants, and (2) forward a copy of the summons and Complaint by mail to the Office of the New York State Attorney General, together with a copy of this Decision and Order; and it is further

**ORDERED** that, after service of process on Defendants, a response to the Complaint shall be filed by the Defendants or their counsel as provided for in the Federal Rules of Civil Procedure; and it is further

**ORDERED** that all pleadings, motions and other documents relating to this action be filed with the Clerk of the United States District Court, Northern District of New York, 7th Floor, Federal Building, 100 S. Clinton St., Syracuse, New York 13261–7367. **Any paper sent by a party to the Court or the Clerk must be accompanied by a certificate showing that a true and correct copy of it was mailed to all opposing parties or their counsel. Any document received by the Clerk or the Court which does not include a certificate of service showing that a copy was served upon all opposing parties or their attorneys will be stricken from the docket .** Plaintiff must comply with any requests by the Clerk's Office for any documents that are necessary to maintain this action. All parties must comply with Local Rule 7.1 of the Northern District of New York in filing motions. **Plaintiff is also required to promptly notify, in writing, the Clerk's Office and all parties or their counsel of any change in Plaintiff's address; his failure to so may result in the dismissal of this action.** All motions will be decided on submitted papers without oral argument unless otherwise ordered by the Court.

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 651919

Footnotes

1    This is the fourth civil rights action filed by Plaintiff in this District. Generally, two of these actions arose out of Plaintiff's refusal to consent to a strip search and the subsequent actions taken against Plaintiff as a result of his refusal. *See Groves v. New York,* 09–CV–0406, Decision and Order (N.D.N.Y. filed May 11, 2009) (Hurd, J.) (*sua sponte* dismissing complaint pursuant to 28 U.S.C. § 1915[e][2][B] ); *Groves v. The State of New York,* 9:09–CV–0412, Decision and Order (N.D.N.Y. filed Mar. 26, 2010) (Sharpe, J.) (granting defendants' motion to dismiss the complaint pursuant to Fed.R.Civ.P. 12[b][6] ).

The third action alleged numerous violations of Plaintiff's constitutional rights during the period July 23, 2009, and August 26, 2009, and was dismissed without prejudice upon Plaintiff's request in October, 2010. *See Groves v. Maxymillian,* 9:09–CV–1002, Decision and Order (N.D.N.Y. filed Oct. 8, 2010) (Suddaby, J.). As a result, it does not appear that the current action is barred because of res judicata, collateral estoppel, and/or the rule against duplicative litigation.

2    At that time, Plaintiff also filed motions for injunctive relief and for appointment of counsel. (Dkt.Nos.3, 4.)

3    The Court notes that, similarly, Section 1915A(b) directs that a court must review any "complaint in a civil action in which a prisoner seeks redress from a governmental entity or officer or employee of a governmental entity" and must "identify cognizable claims or dismiss the complaint, or any portion of the complaint, if the complaint ... is frivolous, malicious, or fails to state a claim upon which relief may be granted; or ... seeks monetary relief from a defendant who is immune from such relief." 28 U.S.C. § 1915(b).

4    *See Vega v. Artus,* 610 F.Supp.2d 185, 196 & nn. 8–9 (N.D.N.Y.2009) (Suddaby, J.) (citing Second Circuit cases); *Rusyniak,* 629 F.Supp.2d at 214 & n. 34 (citing Second Circuit cases).

5    *See Vega,* 610 F.Supp.2d at 196, n. 10 (citing Supreme Court and Second Circuit cases); *Rusyniak,* 629 F.Supp.2d at 214 & n. 34 (citing Second Circuit cases).

6    It should be emphasized that Fed.R.Civ.P. 8's plausibility standard, explained in *Twombly,* was in no way retracted or diminished by the Supreme Court's decision (two weeks later) in *Erickson v. Pardus,* in which (when reviewing a *pro se* pleading) the Court stated, *"Specific facts are not necessary"* to successfully state a claim under Fed.R.Civ.P. 8(a) (2). *Erickson v. Pardus,* 551 U.S. 89, 93, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007) [emphasis added]. That statement was merely an abbreviation of the often-repeated point of law—first offered in *Conley* and repeated in *Twombly*—that a pleading need not "set out *in detail* the facts upon which [the claim is based]" in order to successfully state a claim. *Twombly,* 127 S.Ct. 1965, n. 3 (citing *Conley,* 355 U.S. at 47) [emphasis added]. That statement did not mean that all pleadings may achieve the requirement of "fair notice" without ever alleging any facts whatsoever. Clearly, there must still be enough fact set out (however set out, whether in detail or in a generalized fashion) to raise a right to relief above the speculative level to a plausible level. *See Rusyniak,* 629 F.Supp.2d at 214 & n. 35 (explaining holding in *Erickson* ).

7    *See Weyant v. Okst,* 101 F.3d 845, 856 (2d Cir.1996) ("[W]hile the Supreme Court has not precisely limned the duties of a custodial official under the Due Process Clause to provide needed medical treatment to a pretrial detainee, it is plain that an unconvicted detainee's rights are at least as great as those of a convicted prisoner."); *Walton v. Breeyear,* 05– CV–0194, 2007 WL 446010, at *8, n. 16 (N.D.N.Y. Feb.8, 2007) (Peebles, M.J.) (noting that pretrial detainees enjoy protections under the due process clause of the Fourteenth Amendment parallel to those afforded to sentenced prisoners by the Eighth Amendment); *Vallen v. Carrol,* 02–CV–5666, 2005 WL 2296620, at ——8–9 (S.D.N.Y. Sep.20, 2005) (finding that the Eighth Amendment standard of "deliberate indifference" is the correct one for Section 1983 claims brought by involuntarily committed mental patients based on alleged failures to protect them that violated their substantive due process rights); *Bourdon v. Roney,* 99–CV–0769, 2003 WL 21058177, at *10 (N.D.N.Y. Mar.6, 2003) (Sharpe, M.J.) ("The standard for analyzing a pretrial detainee's Fourteenth Amendment [conditions of confinement] claim is the same as the Eighth Amendment standard.").

8    Relevant factors informing this determination include whether the plaintiff suffers from an injury that a "reasonable doctor or patient would find important and worthy of comment or treatment," a condition that "significantly affects" a prisoner's daily activities, or "the existence of chronic and substantial pain." *Chance,* 143 F.3d at 702.

9    Thus, a physician who "delay[s] ... treatment based on a bad diagnosis or erroneous calculus of risks and costs" does not exhibit the mental state necessary for deliberate indifference. *Harrison,* 219 F.3d at 139. Likewise, an inmate who disagrees with the physician over the appropriate course of treatment has no claim under Section 1983 if the treatment provided is "adequate." *Chance,* 143 F.3d at 703. The word "adequate" reflects the reality that "[p]rison officials are not obligated to provide inmates with whatever care the inmates desire. Rather, prison officials fulfill their obligations under the Eighth Amendment when the care provided is 'reasonable.' " *Jones v. Westchester Cnty. Dept. of Corr.,* 557 F.Supp.2d 408, 413 (S.D.N.Y.2008). In addition, "disagreements over medications, diagnostic techniques (e .g., the need for X-rays), forms of treatment, or the need for specialists or the timing of their intervention are not adequate grounds for a section 1983 claim." *Sonds v. St. Barnabas Hosp. Corr. Health Servs.,* 151 F.Supp.2d 303, 312 (S.D.N.Y.2001). However, if prison officials consciously delay or otherwise fail to treat an inmate's serious medical condition "as punishment or for other invalid reasons," such conduct constitutes deliberate indifference. *Harrison,* 219 F.3d at 138.

10    The Court notes that, generally, leave to amend pleadings shall be freely granted when justice so requires. Fed.R.Civ.P. 15(a). However, an opportunity to amend is not required where amendment would be futile. *John Hancock Mut. Life Ins. Co. v. Amerford Int'l Corp.,* 22 F.3d 458, 462 (2d Cir.1994). *John Hancock Mut. Life Ins. Co.,* 22 F.3d at 462. The Second Circuit has explained that "[w]here it appears that granting leave to amend is unlikely to be productive, ... it is not

an abuse of discretion to deny leave to amend." *Ruffolo v. Oppenheimer & Co.,* 987 F.2d 129, 131 (2d Cir.1993); *see Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) ("The problem with [Plaintiff's] cause of action is substantive; better pleading will not cure it. Repleading would thus be futile. Such a futile request to replead should be denied."). This rule is applicable even to *pro se* plaintiffs. *See, e.g., Cuoco,* 222 F.3d at 103.

11    *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (adding fifth prong); *Wright,* 21 F.3d at 501 (adding fifth prong); *Williams v. Smith,* 781 F.2d 319, 323–324 (2d Cir.1986) (setting forth four prongs).

12    *See also Gillard v. Rosati,* 08–CV–1104, 2011 WL 4402131, at *7 (N.D.N.Y. Aug.22, 2011) (Peebles, J.) ("It is well-established that without more, 'mere receipt of letters from an inmate by a supervisory official regarding a medical claim is insufficient to constitute personal liability." [internal quotation marks and brackets omitted] ); *Greenwaldt v. Coughlin,* 93–CV–6551, 1995 WL 232736, at *4 (S.D.N.Y. Apr.19, 1995) ("it is well-established that an allegation that an official ignored a prisoner's letter of protest and request for an investigation of allegations made therein is insufficient to hold that official liable for the alleged violations."); *Clark v. Coughlin,* 92–CV 0920, 1993 WL 205111, at *5 n. 2 (S.D.N.Y. Jun.10, 1993) ("Courts in this jurisdiction have consistently held that an inmate's single letter does not constitute the requisite personal involvement in an alleged constitutional deprivation to trigger the Commissioner's liability.")

13    *See also Bernstein v. N.Y.,* 591 F.Supp.2d 448, 460 (S.D.N.Y.2008) ("Courts within the Second Circuit have determined that there is no constitutional right to an investigation by government officials." [internal quotation marks, brackets and ellipsis omitted] ).

14    For example, a plaintiff's motion for counsel must always be accompanied by documentation that substantiates his efforts to obtain counsel from the public and private sector, and such a motion may be denied solely on the failure of the plaintiff to provide such documentation. *See Terminate Control Corp. v. Horowitz,* 28 F.3d 1335, 1341 (2d Cir.1994); *Cooper v. Sargenti Co., Inc.,* 877 F.2d 170, 172, 174 (2d Cir.1989) [citation omitted].

15    Plaintiff should note that he will still be required to pay fees that he may incur in this action, including but not limited to copying and/or witness fees.

---

**End of Document**                                    © 2017 Thomson Reuters. No claim to original U.S. Government Works.

2012 WL 929823
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Kerry KOTLER, Plaintiff,

v.

Brian FISCHER, Commissioner, NYS Department
of Correctional Services; Robert Woods,
Superintendent, Upstate Correctional Facility;
Marian B. Tirone, Deputy/Acting Superintendent,
Upstate Correctional Facility; Karen Bellamy,
Director of Inmate Grievance Program for DOCS; C.
Gregory, Supervisor, Inmate Grievance Resolution
Committee, Upstate Correctional Facility; D.
Quinn, Captain, Upstate Correctional Facility;
R. Lamora, Lieutenant, Upstate Correctional
Facility; and Anthony Annucci, Executive
Deputy Commissioner for D.O.C.S., Defendants.

No. 9:09−cv−01443 (MAD/ATB).
|
March 19, 2012.

**Attorneys and Law Firms**

Kerry Kotler, Albion, NY, pro se.

Office of the New York State Attorney General, Michael
G. McCartin, AAG, of Counsel, Albany, NY, for
Defendants.

**MEMORANDUM–DECISION AND ORDER**

MAE A. D'AGOSTINO, District Judge.

**I. INTRODUCTION**

 **\*1** In a complaint dated November 13, 2009, Plaintiff
*pro se* seeks monetary damages and injunctive relief
pursuant to 42 U.S.C. § 1983, for alleged violations
of his constitutional rights while he was incarcerated
by the New York State Department of Correctional
Services ("DOCS").[1] *See* Dkt. No. 1. Primarily, Plaintiff
claims that he was subjected to retaliation and denied
due process by various DOCS employees in connection

with a disciplinary proceeding conducted at Upstate
Correctional Facility ("Upstate") in 2007. *See id.*

In an Amended Report–Recommendation dated January
31, 2012, Magistrate Judge Baxter recommended that the
Court deny, without prejudice to renewal, the summary
judgment motion as to the due process claims against
Defendants LaMora and Quinn. *See* Dkt. No. 85 at 2.
Further, Magistrate Judge Baxter recommended that the
Court grant Defendants' summary judgment motion as to
all remaining claims and Defendants, including Plaintiff's
retaliation claims against Defendants Gregory, Bellamy,
LaMora, Quinn and Annucci. *See id.*

Currently before the Court are Defendants' objections
to Magistrate Judge Baxter's January 31, 2012 Amended
Report–Recommendation. *See* Dkt. No. 86.

**II. BACKGROUND**

In May 2007, Plaintiff was transferred to Upstate, for
alleged disciplinary infractions not related to the instant
claims. At that time, Plaintiff had an unrelated civil
rights action and a number of grievances pending against
DOCS employees other than the named Defendants in this
action. *See* Dkt. No. 79–1 at ¶¶ 2–14. Starting in early
June 2007, Plaintiff wrote a series of letters to Defendant
Gregory—Upstate's Inmate Grievance Program ("IGP")
Supervisor—and Defendant Bellamy—the IGP Director
—criticizing Defendant Gregory's handling of Plaintiff's
grievances. *See* Dkt. No. 79–3 at 17–27. [2]

On June 22, 2007, Plaintiff submitted for photocopying
at the Upstate library a copy of DOCS Form 2133
relating to a past grievance, which Plaintiff had redacted
to create a blank version of the form. *See* Dkt. No.
71–24 at ¶ 7. Form 2133 is typically used to set forth
the ruling of a facility Superintendent on a grievance,
and has a block for the Superintendent's signature and
a space at the bottom for the inmate to indicate his
intention to appeal the Superintendent's decision to the
DOCS Central Office Review Committee ("CORC"). *See*
Dkt. No. 71–12. Corrections Officer ("C.O.") Santamore,
who is no longer a Defendant in this action, asked
Defendant Gregory whether inmates were allowed to
have blank copies of Form 2133, and Defendant Gregory
advised that inmates were not allowed to possess that
form in blank. C.O. Santamore, after consulting with

his supervisor, decided to file an inmate misbehavior report against Plaintiff, charging him under a disciplinary rule that prohibits altering, forging, or counterfeiting any document, as well as distributing or possessing DOCS documents "without authorization." *See* Dkt. No. 71–24 at ¶¶ 7–9 & Exhibit "A" attached thereto. After the misbehavior report was filed against Plaintiff, but before the disciplinary hearing, Defendant Gregory confirmed with her IGP supervisors, including Defendant Bellamy, that inmates were not allowed to possess Form 2133 in blank. *See* Dkt. No. 71–19 at ¶¶ 8–11 & Exhibit "A" attached thereto.

**\*2** Defendant LaMora presided over Plaintiff's disciplinary hearing, at which C.O. Santamore and Defendant Gregory testified. Plaintiff argued that Defendant Gregory and others in the IGP were mistaken in their interpretation that DOCS' rules prohibit inmates from possessing Form 2133 in blank. *See* Dkt. No. 71–28 at 13–14, 21. Plaintiff claimed that DOCS inmates had been allowed to possess blank copies of the form in order to appeal the denial of a grievance to the CORC when the facility Superintendent did not review the denial on a timely basis. *See id.* at 24–25. Plaintiff asserted that he tried to secure blank copies of Form 2133 from the library so that he could appeal, in good faith, a prior grievance for which he had not yet received a Superintendent's ruling. *See id.* at 12–14.

Defendant LaMora, accepting the testimony of Defendant Gregory that inmates are not allowed to possess blank copies of Form 2133, found Plaintiff guilty on the misbehavior report, and sentenced him to 30 days of "keeplock" confinement, along with the suspension of certain other privileges. *See id.* at 28. Defendant Quinn reviewed and denied Plaintiff's appeal of the disciplinary action against him. *See* Dkt. No. 79–3 at 41–54.

Plaintiff claims that, as a result of the Progressive Inmate Movement System ("PIMS") in place at Upstate, he served significantly more than thirty (30) days of disciplinary confinement as a result of the misbehavior report against him. *See* Dkt. No. 79–1 at ¶¶ 45–48; Dkt. No. 79–3 at 35–40. Plaintiff alleges, in considerable detail, how the conditions of his confinement at Upstate amounted to an "atypical and significant hardship." *See* Dkt. No. 79–1 at ¶¶ 137–171.

Plaintiff wrote numerous letters complaining to Defendants Bellamy and Fischer that the imposition of disciplinary sanctions against him were contrary to DOCS' rules, were fundamentally unfair, and were the result of retaliation against him because of his extensive grievance-related activities. *See* Dkt. No. 79–5 at 4–33. Both Defendant Bellamy and Defendant Annucci, the DOCS Executive Deputy Commissioner, replied to Plaintiff. They advised Plaintiff, in essence, that his recourse was limited to the appeal of the disciplinary action, which had already been decided, and that they would not or could not conduct any further investigation or take any other remedial action. *See id.* at 13, 19, 25, 33.

In his complaint, Plaintiff alleges that Defendant LaMora violated his due process rights because he was a biased hearing officer, who conducted the disciplinary hearing in an unfair and partial manner. Further, the complaint alleges that Defendants Annucci and Quinn denied Plaintiff due process by ratifying and failing to correct the violations allegedly committed by Defendant LaMora. *See* Dkt. No. 1 at 16. Moreover, the complaint alleges that Defendants LaMora, Gregory and Bellamy retaliated against Plaintiff because of his "protected grievance related activities" by pursuing the disciplinary charges against him. Plaintiff also claims that Defendants Annucci, Bellamy, and Quinn are liable for this purported retaliation because they ratified and failed to correct the conduct of Defendants more directly involved in the disciplinary proceeding. *See id.* at 15.

**\*3** In his January 31, 2012 Amended Report–Recommendation, Magistrate Judge Baxter recommended that the Court grant in part and deny in part Defendants' motion for summary judgment. *See* Dkt. No. 85. Specifically, Magistrate Judge Baxter recommended that the Court deny without prejudice to renewal the summary judgment motion as to the due process claims against Defendants LaMora and Quinn and that the Court grant the motion as to all of the remaining Defendants and claims, including Plaintiff's retaliation claims against Defendants Gregory, Bellamy, LaMora, Quinn, and Annucci.

In their objections dated February 7, 2012, Defendants argue that Magistrate Judge Baxter erred in determining that Defendants LaMora and Quinn were not entitled to qualified immunity. *See* Dkt. No. 86 at 4. Specifically, Defendants argue as follows:

The disciplinary rule at issue here, Rule 116.12, states in total: "An inmate shall not alter, forge or counterfeit any document. An inmate shall not distribute or be in possession of any departmental document without authorization." 7 NYCRR 270.2, Rule 116.12. At plaintiff's Tier II disciplinary hearing, Defendant LaMora was told by the grievance supervisor for the facility, Ms. Christine Gregory, a person who he reasonably expected would know, that the departmental form that plaintiff sought to possess in blank format (a Form 2133) was an "unauthorized" form for the plaintiff to possess in blank format. Dkt. No. 71–22, pp. 9–10. Ms. Gregory told Defendant LaMora that she had confirmed this with her supervisor in Albany. *Id.,* at p. 10. In fact, Ms. Bellamy, the Director of DOCCS Inmate Grievance Program, confirmed that this was a correct interpretation of the DOCCS' rule. Dkt. No. 711–11, at ¶¶ 9–13.

*See id.* at 5–6. Based on this, Defendants argue that Defendant LaMora acted reasonably in interpreting Rule 116.12 as prohibiting Plaintiff from creating a "blank" Form 2133, despite the fact that DOCS Directive 4040 requires inmates, in certain circumstances, to initiate an appeal to CORC on a blank Form 2133. *See id.* at 6–7. Defendants assert that Defendant LaMora is not a "grievance official expert" and that he reasonably relied on the grievance experts' interpretations of the rules. *See id.* at 7. Moreover, Defendants argue that Defendant LaMora could have reasonably concluded that Plaintiff believed that he was doing something knowingly wrong because he "did not simply 'ask permission before acting'—*i.e.,* he did not simply ask the grievance office at Upstate CF for copies of the form in question free of charge, as opposed to seeking to pay for altered forms to be copied in the prison library." *See id.* at 10. Finally, Defendants argue that, "[b]ecause it was not 'plainly incompetent' or a 'knowing[ ] violat[ion of] the law' for Defendant LaMora or Defendant Quinn to accept the DOCCS' grievance department's expert opinions on which departmental forms were 'unauthorized,' qualified immunity should apply to protect them from a jury trial on this issue." *See id.* at 12 (citation omitted).

### III. DISCUSSION

**A. Standard of review**

**\*4** When a party files specific objections to a magistrate judge's report-recommendation, the district court makes a *"de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1). However, when a party files "[g]eneral or conclusory objections or objections which merely recite the same arguments [that he presented] to the magistrate judge," the court reviews those recommendations for clear error. *O'Diah v. Mawhir,* No. 9:08–CV–322, 2011 WL 933846, \*1 (N.D.N.Y. Mar. 16, 2011) (citations and footnote omitted). After the appropriate review, "the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b) (1).

A court may grant a motion for summary judgment only if it determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the movant as a matter of law. *See Chambers v. TRM Copy Ctrs. Corp.,* 43 F.3d 29, 36 (2d Cir.1994) (citations omitted). When analyzing a summary judgment motion, the court " 'cannot try issues of fact; it can only determine whether there are issues to be tried.' " *Id.* at 36–37 (quotation and other citation omitted). Moreover, it is well-settled that a party opposing a motion for summary judgment may not simply rely on the assertions in its pleadings. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 56(c), (e)).

In assessing the record to determine whether any such issues of material fact exist, the court is required to resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. *See Chambers,* 43 F.3d at 36 (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 2513–14, 91 L.Ed.2d 202 (1986)) (other citations omitted). Where the non-movant either does not respond to the motion or fails to dispute the movant's statement of material facts, the court may not rely solely on the moving party's Rule 56.1 statement; rather, the court must be satisfied that the citations to evidence in the record support the movant's assertions. *See Giannullo v. City of N.Y.,* 322 F.3d 139, 143 n. 5 (2d Cir.2003) (holding that not verifying in the record the assertions in the motion for summary judgment "would derogate the truth-finding functions of the judicial process by substituting convenience for facts").

In reviewing a *pro se* case, the court "must view the submissions by a more lenient standard than that accorded to 'formal pleadings drafted by lawyers.' " *Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y.2007) (quoting *Haines v. Kerner,* 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972)) (other citations omitted). The Second Circuit has opined that the court is obligated to "make reasonable allowances to protect *pro se* litigants" from inadvertently forfeiting legal rights merely because they lack a legal education. *Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y.2007) (quoting *Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983)). However, this does not mean that a *pro se* litigant is excused from following the procedural requirements of summary judgment. *See id.* at 295 (citing *Showers v. Eastmond,* 00 CIV. 3725, 2001 WL 527484, at *2 (S.D.N.Y. May 16, 2001)). Specifically, "a *pro se* party's 'bald assertion,' completely unsupported by evidence" is not sufficient to overcome a motion for summary judgment. *Lee v. Coughlin,* 902 F.Supp. 424, 429 (S.D.N.Y.1995) (citing *Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991)).

## B. Qualified immunity

**\*5** "The doctrine of qualified immunity shields public officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Salahuddin v. Goord,* 467 F.3d 263, 273 (2d Cir.2006) (citing *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)).

> For a constitutional right to be "clearly established" for purposes of determining whether an officer is entitled to qualified immunity, the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent.

*Mollica v. Volker,* 229 F.3d 366, 370–71 (2d Cir.2000) (quoting *Anderson v. Creiehton,* 483 U.S. 635, 638, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)) (internal quotations omitted). "Where the right at issue in the circumstances confronting police officers ... was clearly established but was violated, the officers will nonetheless be entitled to qualified immunity 'if ... it was objectively reasonable for them to believe their acts did not violate those rights.' " *Zellner v. Summerlin,* 494 F.3d 344, 367 (2d Cir.2007) (quotation and other citation omitted).

"Although a mere mistake in the performance of an official duty may not deprive the officer of qualified immunity, the doctrine does not shield performance that either (a) was in violation of clearly established law, or (b) was plainly incompetent." *Manganiello v. City of New York,* 612, F.3d 149, 165 (2d Cir.2010) (citations omitted). "With respect to both the legal question and the matter of competence, the officials' actions must be evaluated for objective reasonableness.... That is, '[e]ven if the right at issue was clearly established in certain respects ... an officer is still entitled to qualified immunity if "officers of reasonable competence could disagree" on the legality of the action at issue in its particular factual context.' " *Id.* (quotations omitted).

The determination of whether an official's conduct was objectively reasonable is a mixed question of law and fact. *See Zellner,* 494 F.3d at 367 (citing *Kerman v. City of New York,* 374 F.3d 93, 109 (2d Cir.2004)) (other citations omitted). "The ultimate question of whether it was objectively reasonable for the officer to believe that his conduct did not violate a clearly established right, *i.e.,* whether officers of reasonable competence could disagree as to the lawfulness of such conduct, is to be decided by the court. However, '[a] contention that ... it was objectively reasonable for the official to believe that his acts did not violate those rights has "its principle focus on the particular facts of the case." ' " *Id.* (quotation and other citations omitted).

**\*6** If there is no dispute as to any material fact, the issue of whether the official's conduct was objectively reasonable is an issue of law to be decided by the court. *See id.* at 368 (citation omitted). Any unresolved factual issues, however, must be resolved by the jury. *See id.* (quoting *Kerman,* 374 F.3d at 109) (other citations omitted). Once the court has received the jury's decision as to "what the facts were that the officer faced or perceived," the court must then "make the ultimate legal determination of whether qualified immunity attaches on

those facts." *Stephenson v. Doe,* 332 F.3d 68, 81 (2d Cir.2003) (quotation omitted); *see also Lennon v. Miller,* 66 F.3d 416, 421 (2d Cir.1995) (quotation omitted).

In the present matter, Magistrate Judge Baxter correctly determined that Defendants LaMora and Quinn are not entitled to qualified immunity. As discussed, Plaintiff was charged with violating Rule 116.12, which provides that "[a]n inmate shall not alter, forge or counterfeit any document." 7 N.Y.C.R.R. § 270.2(B) (17)(iii); *see also* Dkt. No. 71–25. In *Constantino v. Goord,* 38 A.D.3d 659, 831 N.Y.S.2d 538 (2d Dep't 2007), the petitioner was charged with violating Rule 116.12 because he created "a personalized grievance form which he sought to replicate in the library to enable him to file grievances." *Id.* at 659, 831 N.Y.S.2d 538. The petitioner claimed that there was a shortage of grievance forms and that he sought to replicate the forms in the library to enable him to file grievances. *See id.* The hearing officer found the petitioner guilty, stating that " '[i]t is apparent that this form was forged and counterfeited solely for your use in submitting grievances.' " *Id.* The Appellate Division disagreed. Specifically, the court found that "[t]he terms 'forge' and 'counterfeit' carry with them an element of intent to defraud or deceive.... While the word 'alter' could conceivably embrace what the petitioner did to the grievance form in this case—indeed, by filling out any form a person is, in a sense, altering it—the word 'alter' as it appears in Rule 116.12 has rational meaning only by reference to the words with which it is associated." *Id.* at 660, 831 N.Y.S.2d 538 (citations omitted). Therefore, the court found that the word "alter" as used in Rule 116.12 "carries the same intent to defraud or deceive as do its companion words 'forge' and 'counterfeit.' " *Id.* Since there was no evidence that the petitioner altered the form with an intent to deceive or defraud, the court vacated the charge. *See id.*

In *Farid v. Ellen,* an inmate was charged with violating, among other things, the prison's general ban on contraband as a result of a pamphlet criticizing New York's parole policies. *See Farid v. Ellen,* 593 F.3d 233, 237–38 (2d Cir.2010). The defendants argued that the pamphlet constituted contraband because it violated the bylaws of the prison-approved organization, which included the plaintiff as a member, and which produced the pamphlet. *See id.* The Second Circuit agreed with the district court "that these rules were unconstitutionally vague as applied to Farid, both because they failed to give

him adequate notice and because they failed adequately to constrain the discretion of the prison officials who had the power to impose them." *Id.* at 241. The Circuit, however, disagreed that the defendants were entitled to qualified immunity and held that, "in light of *Chatin,* a jury could very well decide that it is unreasonable for a prison official to act on the belief that violation of a prisoner organization's internal by-laws can properly subject a prisoner to discipline under the prison's rules." *Id.* at 247.

**\*7** As in *Farid,* in the present matter, Magistrate Judge Baxter correctly determined that "a jury could very well decide that it is unreasonable for a prison official to act on the belief that a lay inmate should have understood, based on a nuanced interpretation of various provisions of DOCS Directive 4040, that he could be disciplined for his attempts to obtain a blank copy of DOCS Form 2133." *See* Dkt. No. 85 at 23–24. According to section 701.9(f) of DOCS Directive 4040, "[i]f the superintend[e]nt fails to respond within the required twenty-five (25) calendar day time limit the grievant may appeal to CORC. This is done by filing a Notice of Decision to Appeal (Form # 2133) with the inmate grievance clerk." *See* Dkt. No. 71–11 at ¶ 10. This language, which seemingly contradicts Defendants' position that Plaintiff was not allowed to possess this form in blank, could lead a jury to find Defendants actions unreasonable. This is especially true in light of the fact that there is no indication in the record that Plaintiff intended to do anything other than use the blank form to appeal an adverse ruling in a previous grievance and the fact that Plaintiff alleges that he and other DOCS inmates were often allowed to possess blank copies of Form 2133 to pursue grievance appeals.

Based on the foregoing, the Court denies Defendants' motion for summary judgment on this ground and accepts Magistrate Judge Baxter's Report–Recommendation and Order.

# IV. CONCLUSION

After carefully considering Magistrate Judge Baxter's Report–Recommendation and Order, Defendants' objections thereto and the applicable law, and for the reasons stated herein, the Court hereby

**ORDERS** that Magistrate Judge Baxter's January 31, 2012 Report–Recommendation and Order is **ADOPTED** in its entirety for the reasons stated therein; and the Court further

**ORDERS** that Defendants' motion for summary judgment is **GRANTED in part** and **DENIED in part;** and the Court further

**ORDERS** that the Clerk of the Court shall serve the parties with a copy of this Memorandum–Decision and Order in accordance with the Local Rules.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 929823

Footnotes

1  On April 1, 2011, DOCS and the New York State Division of Parole were merged into one agency, named the New York State Department of Corrections and Community Supervision. Since the events relevant to this suit occurred before the merger, the Court will refer to New York State's corrections agency as "DOCS."

2  To avoid confusion, anytime the Court references a specific page number or range of pages for an entry on the docket, the Court will cite to the page number or numbers assigned by the Court's electronic filing system.

---

© 2017 Thomson Reuters. No claim to original U.S. Government Works.

2012 WL 3230435
Only the Westlaw citation is currently available.
United States District Court,
W.D. New York.

Cornelius MARTIN, II, Plaintiff,

v.

The NIAGARA COUNTY JAIL, et al,, Defendants.

No. 05–CV–868(JTC).
|
Aug. 6, 2012.

**Attorneys and Law Firms**

Cornelius Martin, II, pro se.

Webster Szanyi, LLP (Charles E. Graney, Esq. and Mark C. Davis, Esq., of Counsel), Buffalo, NY, for Defendants Niagara County Jail, Beilein, Mahar, Drehs, and Woock.

Roach, Brown, McCarthy & Gruber, P.C. (Joel J. Java, Jr., Esq., of Counsel), Buffalo, NY, for Defendants Hohensee, Aikin, and Inter–Community Memorial Hospital.

JOHN T. CURTIN, District Judge.

## INTRODUCTION

**\*1** Plaintiff brought this action pursuant to 42 U.S.C. § 1983 seeking compensatory and punitive damages for the alleged deliberate indifference to his serious medical needs and the deprivation of medical care. Currently pending before the court are the defendants' motions for summary judgment (Items 59, 60) and plaintiff's cross-motion for summary judgment on liability (Item 62).

## BACKGROUND

Plaintiff commenced this action on December 12, 2005 with the filing of a *pro se* complaint pursuant to Title 42 U.S.C. § 1983 (Item 1). He filed an amended complaint on March 30, 2006 (Item 6). Plaintiff seeks injunctive relief and compensatory and punitive damages for the alleged deliberate indifference to his medical needs in violation of his rights under the Eighth Amendment to the United States Constitution.

Answers to the amended complaint were filed on November 13, 2006, by defendants Mahar, Drehs, Woock, Niagara County Jail, and Beilein ("the County defendants") (Item 18), and on November 15, 2006 by defendants Hohensee, Aikin, and Inter–Community Memorial Hospital ("the medical defendants") (Item 22). Plaintiff's deposition was taken on September 4, 2008. Following the deposition, the parties stipulated to the following: 1) plaintiff agreed to withdraw his claims against the defendants based on excessive dust, regarding his treatment for sinus problems, and arising from his lack of a mattress and pillow for 12 hours; 2) plaintiff agreed to withdraw his claims against defendants Drehs and Woock individually; 3) all issues regarding plaintiff's CPAP machine were resolved; and 4) plaintiff acknowledged that his claim that he did not receive an inmate handbook did not constitute a violation of the Eighth Amendment (Item 53).

Pursuant to a case management order and following the parties' exchange of discovery materials, on August 27, 2009, the medical defendants moved for summary judgment pursuant to Fed.R.Civ.P. 56 (Item 59). On August 28, 2009, the County defendants filed a motion for summary judgment (Item 60). Defendants assert the following grounds for summary judgment: 1) the plaintiff failed to exhaust his administrative remedies in accordance with the Prison Litigation Reform Act of 1995; 2) Inter–Community Memorial Hospital cannot be held liable on the basis of *respondeat superior;* 3) there was no deliberate indifference to plaintiff's medical needs; 4) defendants are entitled to qualified immunity; and 5) plaintiff's claims against Sheriff Beilein must be dismissed as they are based on a policy that does not exist.

Plaintiff filed his cross-motion for summary judgment on August 31, 2009 (Item 62). He asserted that administrative remedies were unavailable to him as he never received an inmate handbook at the Niagara County Jail. Plaintiff also argued that he suffers from a serious medical need and that the interference by the defendants with his ongoing medical treatment constituted deliberate indifference.

**\*2** On October 30, 2009, defendants filed responses in opposition to plaintiff's motion for summary judgment (Items 66, 67). Plaintiff filed a response to defendant's

motions on November 5, 2009 and agreed to withdraw his claim against Inter–Community Memorial Hospital (Item 68, p. 3). Thereafter, on January 27, 2010, the medical defendants filed a reply (Item 70), and the County defendants filed a reply on January 29, 2010 (Item 71).

The court has determined that oral argument is unnecessary. For the reasons that follow, defendants' motions for summary judgment are granted, and plaintiff's motion for summary judgment is denied.

## FACTS [1]

Plaintiff was incarcerated at the Niagara County Jail ("NCJ") from May 11, 2005 through July 5, 2005, and again from October 7, 2005 until February 3, 2006. At the time he entered the jail, he had been undergoing treatment following multiple spinal surgeries which consisted of physical therapy; two 80 milligram time-released oxycontin pills, one taken at night and one in the morning; and five milligram oxycodone pills to be taken in combination with aspirin or tylenol for breakthrough pain (Item 59, Exh. H, "Martin Dep.," p. 20). Plaintiff stated that while he was not addicted to oxycontin, he was physically "dependent" on the medication. *Id.,* p. 34.

At the time he was booked into the NCJ on May 11, 2005, plaintiff was evaluated by defendant Mahar, a nurse employed by the NCJ. She noted a diagnosis of diabetes and sleep apnea and a prior history of spinal surgery (Item 60, Att. 6, "Mahar Aff.," Exh. A). Nurse Mahar contacted defendant Aikin, the nurse practitioner for the NCJ, who issued a telephone order for plaintiff to be started on the facility's diabetes and detoxification protocols. *Id.,* ¶¶ 14–15. According to the signed standing medical orders of the detox protocol, Nurse Mahar gave plaintiff one tablet of darvocet on the evening of May 11, 2005. *Id.,* ¶ 16.

As a result of being on the detox protocol, plaintiff was housed in an area of the NCJ that he described as "squalor" (Martin Dep., pp. 51, 97). On May 13, 2005, plaintiff asked to be removed from the detox program so that he could be moved to more suitable housing for federal prisoners. *Id.,* p. 98. As a result of being denied oxycontin, plaintiff testified that he suffered sweats, tremors, extremely high blood pressure, diarrhea, and pain in his extremities which lasted about a week to

ten days. *Id.,* p. 41, 42. Other than extremity pain, the withdrawal symptoms plaintiff experienced as a result of the detox protocol have all resolved. *Id.,* p. 47. While housed at the NCJ, plaintiff was also prescribed Ultram for pain, nasal spray for rhinitis, Imodium for diarrhea, and blood pressure medication for hypertension. *Id.,* pp. 44, 54, 106–07.

Prior to his admission to the NJC, plaintiff had not spent a significant amount of time in custody in a New York State jail or prison. He spent 14 days at the Erie County Medical Center awaiting extradition to Ohio in 1995, and approximately one hour in Fredonia awaiting bail in 1990 (Martin Dep., pp. 61–62). He was not familiar with the grievance process and had never filed a grievance. *Id.,* pp. 62–63. Plaintiff stated that he learned of the grievance process in December 2005 or January 2006 by reading the New York State "Minimum Standards" binder in the facility law library. *Id.,* pp. 65, 86.

**\*3** During the intake process, plaintiff signed a form acknowledging receipt of an inmate handbook, although he denies receiving the handbook either time he was processed. Plaintiff stated that he simply signed the acknowledgment because he was told to do so by the admitting officer (Martin Dep., pp. 80, 84–85). He filed a grievance related to his Eighth Amendment claim on January 2, 2006 and pursued the grievance through the appeals process. *Id.,* pp. 71–72.

In support of the motion for summary judgment, defendants submitted an affidavit of Captain Duane Vendetta, grievance coordinator for the Niagara County Sheriff's Department (Item 60, att. 7). The grievance policy in effect at the time plaintiff was incarcerated provided that inmates must complete and submit a grievance form within five days of the act or occurrence giving rise to the grievance. *Id.,* ¶ 9. If the inmate is dissatisfied with the decision of the grievance coordinator, he can appeal to the Chief Administrative Officer of the facility. *Id.,* ¶ 10. After receiving a response from the Chief Administrative Officer, the inmate could seek review of the decision with the Citizen's Policy and Complaint Review Council ("CPCRC") of the New York State Commission of Correction. *Id.,* ¶ 11. Capt. Vendetta stated he reviewed the grievance file for the time period that plaintiff was incarcerated at the NCJ and found no grievances filed by the plaintiff until January 3, 2006 and January 13, 2006. *Id.,* ¶¶ 15–16. Additionally, Capt.

Vendetta stated that it is standard practice for all incoming inmates to receive an inmate handbook that outlines the grievance process. *Id.,* ¶ 24. Even if plaintiff did not receive a handbook, the grievance process is outlined in reference books available in the NCJ law library. *Id.,* ¶ 25. All officers in the housing units are familiar with the grievance process and are instructed to provide grievance forms to any inmate wishing to report a problem. *Id.,* ¶ 26.

In further support of the motion for summary judgment, Dr. James Hohensee stated that at the NCJ, the use of narcotics for pain control is strictly scrutinized (Item 59, att. 17, ¶ 14). In a correctional facility, there is a preference for non-narcotic pain management, if medically possible, but narcotics are prescribed in some cases. *Id.,* ¶ 15. The detoxification protocol at the NCJ in 2005 consisted of a set of standing orders. *Id.,* ¶ 17. The order to place plaintiff on the detox protocol was given by Nurse Practitioner Christopher Aikin and carried out by Rebecca Mahar, a jail nurse. *Id.,* ¶ 18. Thereafter, Dr. Hohensee reviewed plaintiff's chart and countersigned the detox order. *Id.,* ¶ 19. Dr. Hohensee saw plaintiff on June 28, 2005 for a scheduled follow-up visit. Plaintiff complained that the Ultracet he was prescribed was not helping his pain and that he had swelling in his legs. *Id.,* ¶ 22. Dr. Hohensee did not believe narcotics were clinically warranted and chose to add 600 mg. of Motrin to be given three times per day. *Id.,* ¶ 23. On December 2, 2005, Dr. Hohensee saw plaintiff for sinus complaints. *Id.,* ¶ 25. Dr. Hohensee saw plaintiff on December 30, 2006 for complaints of knee pain. He saw no evidence of acute injury and did not feel additional medication was necessary. *Id.,* ¶ 28. Dr. Hohensee saw plaintiff for the last time on January 27, 2006. Plaintiff complained of nosebleeds associated with his use of a CPAP machine. *Id.,* ¶ 27.

**\*4** In his affidavit, Christopher Aikin stated that he practices medicine at the NCJ in collaboration with Dr. Hohensee. As a licensed nurse practitioner, he may examine patients, write prescriptions, and order tests (Item 59, att. 18, ¶ 8). On May 11, plaintiff was booked at the NCJ and was evaluated by Rebecca Mahar, R.N. *Id.,* ¶ 14. At NJC, narcotic medications are strictly regulated, although there is no blanket prohibition against their use when medically necessary. *Id.,* ¶ 17. Mr. Aikin examined plaintiff on May 12, 2005. He confirmed that plaintiff was appropriately on the detox protocol, requested plaintiff's medical records from his neurosurgeon, and determined that narcotic pain

medication was not medically necessary. *Id.,* ¶ 19. On May 13, 2005, plaintiff denied detox symptoms, told Mr. Aikin that he had taken only dose of oxycontin in the last 14 days, and requested to be removed from the detox protocol. *Id.,* ¶ 21. On May 16, 2005, Mr. Aikin ordered Zestril for plaintiff's hypertension. *Id.,* ¶ 23. On May 19, 2005, Mr. Aikin saw plaintiff again, discontinued the Zestril, ordered Imodium for gastrointestinal complaints, and prescribed Ultracet for pain. *Id.,* ¶ 25. On June 3, 2005, Mr. Aikin increased the dosage of Ultracet. *Id.,* ¶ 27. On June 14, 2005, Mr. Aikin saw plaintiff, who complained of constipation. Mr. Aikin ordered magnesium citrate and advised plaintiff to increase his fruit and vegetable intake. *Id.,* ¶ 28. Upon his return to the NCJ in October 2005, plaintiff had lost 75 pounds, no longer needed blood pressure medication, and was taking only Ibuprofen for pain. *Id.,* ¶¶ 31–33. He was seen by Mr. Aikin on October 12, 2005 for treatment of a sebaceous cyst and for sinus problems. *Id.,* ¶ 34. He was seen again on November 15, 2005 for sinus complaints, at which time Mr. Aikin prescribed a different allergy medication. *Id.,* ¶ 35. On December 16, 2006, plaintiff was seen by Mr. Aikin, complaining of knee pain. Mr. Aikin tested the knee for ligament tears and ordered x-rays. *Id.,* ¶ 38. The last time Mr. Aikin saw the plaintiff was on January 6, 2006 for a follow-up visit regarding his knee. The x-ray was negative for fracture but indicated osteoarthritis. *Id.,* ¶ 41. During plaintiff's second incarceration, he never presented in sick call for complaints related to neck or back pain. *Id.,* ¶ 42.

Dr. Paul Adler reviewed plaintiff's records from the NCJ, the Federal Bureau of Prisons, and the Northeast Ohio Correctional Center, the amended complaint, plaintiff's responses to interrogatories, and his deposition testimony. He stated that "it is well within the standard of care for nurse practitioners to see and treat patients with the plaintiff's medical issues both in and out of a correctional setting." (Adler Aff., ¶ 13). It is also standard practice in the hospital or correctional setting for a nurse to execute a telephone order from a physician or nurse practitioner. *Id.,* ¶ 16. Dr. Adler stated that Mr. Aikin's initial examination of plaintiff on May 12, 2005 was consistent with the standard of care and his order to begin detoxification was "within good medical judgment." *Id.,* ¶ 20. During plaintiff's initial incarceration at NCJ, defendants Aikin and Hohensee evaluated and addressed plaintiff's various medical issues, changing and/or increasing his pain medication as needed. *Id.,* ¶ 33. Additionally, during his subsequent incarceration

at NCJ, plaintiff's complaint regarding knee pain was appropriately evaluated. *Id.,* ¶¶ 43, 47, 49.

**\*5** Dr. Adler stated that detoxification in correctional facilities is a "standard intervention," and the "decision of whether to prescribe narcotic versus non-narcotic pain relief is in the judgment of the prescribing physician." (Adler Aff., ¶ 52). The plaintiff was seen in sick call 14 times during the less-than six months he was housed at the NCJ, and was seen and treated for various reasons, including detoxification, pain, edema, hypertension, diabetes, sleep apnea, rhinitis, and knee pain. *Id.,* ¶ 56. In Dr. Adler's opinion, the medical care rendered to plaintiff by defendants Hohensee and Aikin "reflects not deliberate indifference, but clearly health care that is consistent with the applicable standard of care." *Id.,* ¶ 57.

In her affidavit, defendant Mahar stated that she followed medical orders provided to her by the Chief Medical Officer or the nurse practitioner. She never deviated from these orders and merely dispensed medication that had been prescribed by authorized medical providers (Mahar Aff., ¶¶ 19–20).

Major John T. Saxton, chief administrative officer of the NCJ, stated in an affidavit that the NCJ does not have, nor did it have at any time relevant to this litigation, a blanket prohibition preventing the Chief Medical Officer, Dr. James Hohensee, or Nurse Practitioner Aikin from prescribing narcotic pain medication in appropriate circumstances (Item 60, att. 8, ¶ 6). It is the policy of the NCJ to provide narcotic pain medication "when and if such medication is medically necessary." *Id.,* ¶ 7.

## DISCUSSION

### 1. Summary Judgment Standard

Rule 56 provides that, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). Although the language of this Rule has been amended in recent years, the well-settled standards for considering a motion for summary judgment remain unchanged. *See, e.g., Faulkner v. Arista Records LLC,* 797 F.Supp.2d 299, 311 n. 7 (S.D.N.Y.2011). Under those standards, the party seeking summary judgment bears the initial burden

of establishing that no genuine issue of material fact exists. *Rockland Exposition, Inc. v. Great American Assur. Co.,* 746 F.Supp.2d 528, 532 (S.D.N.Y.2010), *aff'd,* 445 Fed.Appx. 387 (2d Cir.2011). A "genuine issue" exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing law .... " *Id.*

Once the court determines that the moving party has met its burden, the burden shifts to the opposing party to "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (internal quotation marks and citation omitted). The nonmoving party may not rest upon mere conclusory allegations or denials, but must set forth "concrete particulars showing that a trial was needed ...." *R.G. Group, Inc. v. Horn & Hardart Co.,* 751 F.2d 69, 77 (2d Cir.1984) (internal quotation marks and citation omitted) (quoted in *Kaminski v. Anderson,* 792 F.Supp.2d 657, 662 (W.D.N.Y.2011). In considering whether these respective burdens have been met, the court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Amnesty Am. v. Town of W. Hartford,* 361 F.3d 113, 122 (2d Cir.2004) (internal quotation marks and citation omitted).

**\*6** The court recognizes its duty to "extend extra consideration" to *pro se* plaintiffs and that *"pro se* parties are to be given special latitude on summary judgment motions." *Bennett v. Goord,* 2006 WL 2794421, at \*3 (W.D.N.Y. Aug.1, 2006), *aff'd,* 2008 WL 5083122 (2d Cir.2008) (quoting *Salahuddin v. Coughlin,* 999 F.Supp. 526, 535 (S.D.N.Y.1998)); *see also McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir.1999) (*pro se* party's pleadings should be read liberally and interpreted "to raise the strongest arguments that they suggest"). "Nevertheless, proceeding *pro se* does not otherwise relieve a litigant from the usual requirements of summary judgment, and a *pro se* party's 'bald assertion,' unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Cole v. Artuz,* 1999 WL 983876, at \*3 (S.D.N.Y. October 28, 1999) (citing cases).

The defendants contend that summary judgment should be granted dismissing the complaint as plaintiff failed to exhaust his administrative remedies in accordance with the grievance procedures in place at the NCJ. Additionally, they argue that plaintiff has not shown deliberate indifference to his medical needs. Plaintiff contends that administrative remedies were unavailable to him as he was unaware of the grievance procedures at the NCJ and was never given an inmate handbook. He also argues that the defendants violated the Eighth Amendment by interfering with his ongoing treatment for pain related to his spinal surgeries, by denying him narcotic pain medication, and by providing medical evaluation and treatment by a registered nurse and nurse practitioner.

**2. Exhaustion of Administrative Remedies**

The Prisoner Litigation Reform Act of 1995 ("PLRA"), mandates exhaustion by prisoners of all administrative remedies before bringing an action regarding prison conditions. *See* 42 U.S.C. § 1997e(a). Specifically, the PLRA provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." *Id.* The Supreme Court has held that the PLRA's "exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Smart v. Goord,* 441 F.Supp.2d 631, 636 (S.D.N.Y.2006) (quoting *Porter v. Nussle,* 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002)). Failure to exhaust is an absolute bar to an inmate's action in federal court; section 1997e(a) "requires exhaustion of available administrative remedies before inmate-plaintiffs may bring their federal claims to court at all." *Neal v. Goord,* 267 F.3d 116, 122 (2d Cir.2001), *overruled on other grounds by Porter v. Nussle,* 534 U.S. 516, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002).

In assessing the affirmative defense of non-exhaustion, the Second Circuit employs a three-part inquiry. *See Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004). A court must (1) determine whether administrative remedies were in fact "available" to the prisoner; (2) consider whether the defendant has forfeited the affirmative defense of non-exhaustion or is estopped from raising it; and (3) determine whether "special circumstances"

justify the prisoner's failure to comply with administrative procedural requirements. *Id.* "Courts should be careful to look at the applicable set of grievance procedures, whether city, state or federal" in assessing availability. *Mojias v. Johnson,* 351 F.3d 606, 610 (2d Cir.2003).

**\*7** In New York, formal exhaustion for prisoners in county jails requires compliance with the three-step grievance and appeal procedure outlined in the New York State Minimum Standards for Management of County Jails. *See* N.Y. Comp.Codes R. & Regs. tit. 9 ("9 N.Y.C.R.R."), § 7032.1. In this case, the NCJ employed a three-tiered grievance process with review of an inmate's complaint by the grievance coordinator, the Chief Administrative Officer of the facility, and finally the New York State Commission of Correction. Generally, "[a] prisoner has not exhausted his administrative remedies until he goes through all three levels of the grievance procedure." *Hairston v. LaMarche,* 2006 WL 2309592, at \*7 (S.D.N.Y. August 10, 2006) (citing cases).

Here, as stated by Capt. Vendetta, there was a grievance procedure in place at the NJC that was available to plaintiff (Item 60, att. 7, ¶ 5). Pursuant to this policy, an inmate must complete and submit a grievance within five days of the act or occurrence giving rise to the grievance. *Id.,* ¶ 9. Capt. Vendetta stated he reviewed the grievance file for the relevant time period and found no formal grievances filed by the plaintiff between May 11 and July 5, 2005, the dates of his initial incarceration at the NCJ. *Id.,* ¶ 16. On January 3, 2006, plaintiff filed a grievance claiming that the NCJ seized oxycontin and oxycodone upon his initial admission to the NJC and that he was unlawfully placed on the detox protocol in May 2005. *Id.,* ¶ 17. Capt. Vendetta stated that this grievance was untimely, as it referenced events that occurred significantly more than five days prior to its filing. Despite the untimeliness, the grievance was processed through the system. *Id.,* ¶ 20.

Plaintiff contends that he did not file a timely grievance because he was unaware of the grievance procedure and was never issued an inmate handbook upon his admission to the NJC. Grievance procedures may be deemed unavailable "where plaintiff is unaware of the grievance procedures or did not understand [them] or where defendants' behavior prevents plaintiff from seeking administrative remedies." *Murrary v. Palmer,* 2010 WL 1235591, at \*5 (N.D.N.Y. March 31, 2010); *Hargrove*

*v. Riley,* 2007 WL 389003, at *8 (E.D.N.Y. January 31, 2007). Here, there is no dispute that plaintiff had not spent a significant amount of time in custody in New York State. While he signed an intake form acknowledging his receipt of an inmate handbook on both of his admissions to the NCJ, plaintiff stated that he signed the form without reading it and because he was told to do so by the admitting officer. He was unaware of the grievance policies and procedures until approximately December 2005, when he read the grievance policy in the law library. Construing the facts in the light most favorable to plaintiff, he has raised a material fact as to whether a similarly situated person would have been unaware of the grievance process, rendering it unavailable. *See Brown v. Fischer,* 2010 WL 5797359 (N.D.N.Y. December 8, 2010) (failure to exhaust administrative remedies was excusable where inmate was unaware of the grievance procedures and there was no evidence he received an inmate handbook). Accordingly, the defendants' motions for summary judgment based on the plaintiff's failure to exhaust administrative remedies are denied.

### 3. Constitutional Claims

**\*8** Even excusing plaintiff's failure to exhaust his administrative remedies, the complaint must nonetheless be dismissed as plaintiff has failed to establish a violation of the Eighth Amendment.

Title 42 U.S.C. § 1983 provides in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress ....

42 U.S.C. § 1983. "In order to maintain a section 1983 action, two essential elements must be present: (1) the conduct complained of must have been committed by a person acting under color of state law; and (2) the conduct

complained of must have deprived a person of rights, privileges, or immunities secured by the Constitution or laws of the United States." *Pitchell v. Callan,* 13 F.3d 545, 547 (2d Cir.1994); *see also Kasiem v. Guzman,* 2011 WL 4352387, at *3 (W.D.N.Y. September 16, 2011).

"The Eighth Amendment's prohibition against cruel and unusual punishment has been construed to include the denial of adequate medical care for an inmate's serious medical needs." *Woods v. Goord,* 2002 WL 31296325, *2 (S.D.N.Y. October 10, 2002); *see also Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994); *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). The care provided to prisoners to treat their injuries or illnesses must meet minimum medical standards of adequacy and be reasonably intended to satisfy their medical needs. To show that prison medical treatment was so inadequate as to amount to "cruel or unusual punishment" prohibited by the Eighth Amendment, plaintiff must prove that defendants' actions or omissions amounted to "deliberate indifference to serious medical needs." *Estelle v. Gamble,* 429 U.S. at 106; *Harrison v. Barkley,* 219 F.3d 132, 136 (2d Cir.2000).

Under 42 U.S.C. § 1983, every claim for deliberate indifference to a serious medical need must pass a two-pronged test consisting of objective and subjective elements. First, the court must determine whether, objectively speaking, plaintiff's condition is such that the alleged deprivation of medical assistance is "sufficiently serious." *Woods,* 2002 WL 31296325, at *3 (citing *Hathaway v. Coughlin,* 37 F.3d 63, 66–67 (2d Cir.1994)); *see also Wilson v. Seiter,* 501 U.S. 294, 298, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991). Second, the court must consider whether the official " 'knew that an inmate faced a substantial risk of serious harm, and disregarded that risk by failing to take reasonable measures to abate it.' " *Woods* 2002 WL 31296325 at *3 (internal cites and alterations omitted); *Harrison v. Barkley,* 219 F.3d at 137.

A serious medical need is one with some urgency or one which, if ignored, may produce death, degeneration, or extreme pain. *Hathaway,* 37 F.3d at 66. As the Second Circuit held in *Brock v. Wright,* 315 F.3d 158, 162 (2d Cir.2003), there is no precise metric to guide the court in its estimation of the seriousness of a prisoner's medical condition. Any inquiry into the objective component of an Eighth Amendment claim must be tailored to the specific

facts of each case. *Smith v. Carpenter,* 316 F.3d 178, 185 (2d Cir.2003). In *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998), the court set forth a non-exhaustive list of factors that are relevant to the inquiry whether a given medical condition is serious. These factors include: (1) whether a reasonable doctor or patient would perceive the medical need in question as "important and worthy of comment or treatment;" (2) whether the medical condition significantly affects daily activities; and (3) "the existence of chronic and substantial pain." *Chance,* 143 F.3d at 702.

**\*9** Plaintiff's medical conditions included pain as a result of previous spinal surgeries, edema from a blood pressure medication, and knee pain. He acknowledges that the defendants adequately responded to his complaints of allergic rhinitis and sleep apnea. Edema and knee pain are not sufficiently serious to cause death, degeneration, or extreme pain. Accordingly, the plaintiff's only medical conditions that are arguably "serious" relate to plaintiff's pain resulting from his previous spinal surgeries.

Even if the court were to assume that plaintiff's pain as a result of multiple spinal surgeries constituted a serious medical need, there is no evidence of defendants' deliberate indifference to that medical need. Plaintiff's Eighth Amendment claim is based on his assumption that there is a policy against the prescription of any and all narcotic pain medications in the NCJ. He complains that defendant Mahar ordered the detox protocol and that Major Saxton, the Chief Administrative Officer of the NCJ, implemented a policy of no narcotic pain medication. Plaintiff offers no proof to support these factual assumptions. In contrast, the defendants have established that there is no blanket prohibition against the prescription of narcotic medications and that Nurse Mahar initiated the detox protocol upon the order of Nurse Practitioner Aikin.

Plaintiff also complains that he was not seen by Dr. Hohensee until June 28, 2005, 48 days after his arrival at the NCJ. He argues that given his serious medical need, he should have been seen by a physician earlier. "A difference of opinion between a prisoner and prison officials regarding medical treatment does not, as a matter of law, constitute deliberate indifference." *Sonds v. St. Barnabas Hosp. Corr. Health Serv.,* 151 F.Supp.2d 303, 311 (S.D.N.Y.2001); *see also Chance,* 143 F.3d 698 at 703; *McCloud v. Delaney,* 677 F.Supp. 230, 232 (S.D.N.Y.1988) ("[T]here is no right to the medical

treatment of one's choice if the prescribed treatment is based on applicable medical standards."). Additionally, "[m]ere delay in the rendering of medical treatment in and of itself does not rise to the level of a constitutional violation." *Smith v. Montefiore Med. Ctr.-Health Serv. Div.,* 22 F.Supp.2d 275, 280 (S.D.N.Y.1998). "Nor does the fact that an inmate might prefer an alternative treatment, or feels that he did not get the level of medical attention he preferred." *Sonds,* 151 F.Supp.2d at 311; *see also Dean v. Coughlin,* 804 F.2d 207, 215 (2d Cir.1986). "To demonstrate a constitutional violation, a plaintiff must show that he sustained substantial harm because of the delay in the rendering of medical treatment." *Smith,* 22 F.Supp.2d at 280. "As long as the medical care is adequate, there is no Eighth Amendment violation." *Sonds,* 151 F.Supp.2d at 311; *see also Wandell v. Koenigsmann,* 2000 WL 1036030, \*3 (S.D.N.Y. July 27, 2000) ("So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation.").

**\*10** Additionally, plaintiff contends that the medical staff of the NCJ improperly interfered with his treatment by his personal physician by discontinuing his use of oxycontin and oxycodone and placing him on the detox protocol. Plaintiff's assertion that he should have been given narcotic pain medication is likewise a disagreement over the course of treatment. "[M]ere disagreement over the proper treatment does not create a constitutional claim." *Chance,* 143 F.3d at 703. Although plaintiff claims that the defendants ignored and overruled the treatment plan in place when he entered NCJ, an inmate is not entitled to the treatment of his choice. *Id.* at 702. Plaintiff's demand for narcotic pain medications and defendants' unwillingness to prescribe them does not create an Eighth Amendment claim. *See Ifill v. Weinstock,* 2012 WL 162405, \*4 (W.D.N.Y. January 19, 2012); *Guarneri v. Wood,* 2011 WL 4592209, at \*13 (N.D.N.Y. September 2, 2011) ("Defendants regularly offered [plaintiff] non-narcotic pain medication ..... [Plaintiff]'s complaints about the type of medication given to him for pain again amounts to a disagreement over treatment, which is insufficient to allege a constitutional violation.").

In this case, plaintiff was seen by a registered nurse on the day of his admission. He was seen by Nurse Practitioner Aikin on May 12, 13, 16, and 19, 2005, June 3 and 14, 2005, October 12, 2005, November 15, 2005, December 16, 2005, and January 6, 2006. He was seen by Dr. Hohensee on

June 28, 2005, December 2, and 30, 2005, and January 27, 2005. He received medication, medical advice, diagnostic x-rays, and followup care with a physician. Even granting plaintiff the benefit of every favorable inference, it cannot be said that this medical care was inadequate or evinces deliberate indifference on the part of the defendants. Based on the foregoing, no reasonable jury could find that the defendants acted with deliberate indifference to plaintiff's medical needs in violation of his rights under the Eighth and Fourteenth Amendments. Accordingly, defendants are entitled to summary judgment as a matter of law dismissing plaintiff's complaint. The court need not address the argument that the defendants are entitled to qualified immunity.

**CONCLUSION**

The defendants' motions for summary judgment (Items 59, 60) are granted and the complaint is dismissed.

Plaintiff's cross motion for summary judgment (Item 62) is denied. The Clerk of the Court is directed to enter judgment in favor of defendants and to close this case.

The Court hereby certifies, pursuant to 28 U.S.C. § 1915(a) (3), that any appeal from this Order would not be taken in good faith, and leave to appeal to the Court of Appeals as a poor person is denied. *Coppedge v. United States,* 369 U.S. 438, 82 S.Ct. 917, 8 L.Ed.2d 21 (1962). Further requests to proceed on appeal as a poor person should be directed, on motion, to the United States Court of Appeals for the Second Circuit, in accordance with Rule 24 of the Federal Rules of Appellate Procedure.

**\*11** So Ordered.

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 3230435

---

Footnotes

1    This factual statement is taken from the plaintiff's medical and grievance records (Item 59, Exhs. G, J–M), the plaintiff's deposition testimony (Item 59, Exh. H), the affidavits of James Hohensee, M.D., Christopher Aikin, N.P. and Paul Adler, D.O., with exhibits (Item 59, atts. 17–21), and the affidavits of Rebecca Mahar, Duane Vendetta, and John T. Saxton (Item 60, atts. 6–8).

---

**End of Document**                    © 2017 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Distinguished by Arnett v. Shojaie, C.D.Cal., November 8, 2011

2010 WL 1235591
Only the Westlaw citation is currently available.

**This decision was reviewed by West editorial staff and not assigned editorial enhancements.**

United States District Court,
N.D. New York.

James MURRAY, Plaintiff,
v.
R. PALMER; S. Griffin; M. Terry;
F. Englese; Sergeant Edwards; K.
Bump; and K.H. Smith, Defendants.

No. 9:03-CV-1010 (GTS/GHL).
|
March 31, 2010.

**Attorneys and Law Firms**

James Murray, Malone, NY, pro se.

Bosman Law Office, AJ Bosman, Esq., of Counsel, Rome, NY, for Plaintiff.

Hon. Andrew M. Cuomo, Attorney General for the State of New York, Timothy Mulvey, Esq., James Seaman, Esq., Assistant Attorneys General, of Counsel, Albany, NY, for Defendants.

### *DECISION and ORDER*

Hon. GLENN T. SUDDABY, District Judge.

**\*1** The trial in this prisoner civil rights action, filed *pro se* by James Murray ("Plaintiff") pursuant to 42 U.S.C. § 1983, began with an evidentiary hearing before the undersigned on March 1, 2010, regarding the affirmative defense of seven employees of the New York State Department of Correctional Services-R. Palmer, S. Griffin, M. Terry, F. Englese, Sergeant Edwards, K. Bump, and K.H. Smith ("Defendants")-that Plaintiff failed to exhaust his available administrative remedies, as required by the Prison Litigation Reform Act, before filing this action on August 14, 2003. At the hearing, documentary evidence was admitted, and testimony

was taken of Plaintiff as well as Defendants' witnesses (Darin Williams, Sally Reams, and Jeffery Hale), whom Plaintiff was able to cross-examine through *pro bono* trial counsel. At the conclusion of the hearing, the undersigned indicated that a written decision would follow. This is that written decision. For the reasons stated below, Plaintiff's Second Amended Complaint is dismissed because of his failure to exhaust his available administrative remedies.

### I. RELEVANT LEGAL STANDARD

The Prison Litigation Reform Act of 1995 ("PLRA") requires that prisoners who bring suit in federal court must first exhaust their available administrative remedies: "No action shall be brought with respect to prison conditions under § 1983 ... by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U .S.C. § 1997e. The PLRA was enacted "to reduce the quantity and improve the quality of prisoner suits" by "afford[ing] corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case." *Porter v. Nussle,* 534 U.S. 516, 524-25, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002). In this regard, exhaustion serves two major purposes. First, it protects "administrative agency authority" by giving the agency "an opportunity to correct its own mistakes with respect to the programs it administers before it is haled into federal court, and it discourages disregard of the agency's procedures." *Woodford v. Ngo,* 548 U.S. 81, 89, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006). Second, exhaustion promotes efficiency because (a) "[c]laims generally can be resolved much more quickly and economically in proceedings before an agency than in litigation in federal court," and (b) "even where a controversy survives administrative review, exhaustion of the administrative procedure may produce a useful record for subsequent judicial review." *Woodford,* 548 U .S. at 89. "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter,* 534 U.S. at 532.

In accordance with the PLRA, the New York State Department of Correctional Services ("DOCS") has made available a well-established inmate grievance program. 7 N.Y.C.R.R. § 701.7. Generally, the DOCS Inmate Grievance Program ("IGP") involves the following three-step procedure for the filing of grievances. 7 N.Y.C.R.R.

§§ 701.5, 701.6(g), 701.7.[1] *First,* an inmate must file a complaint with the facility's IGP clerk within a certain number of days of the alleged occurrence.[2] If a grievance complaint form is not readily available, a complaint may be submitted on plain paper. A representative of the facility's inmate grievance resolution committee ("IGRC") has a certain number of days from receipt of the grievance to informally resolve the issue. If there is no such informal resolution, then the full IGRC conducts a hearing within a certain number of days of receipt of the grievance, and issues a written decision within a certain number of days of the conclusion of the hearing. *Second,* a grievant may appeal the IGRC decision to the facility's superintendent within a certain number of days of receipt of the IGRC's written decision. The superintendent is to issue a written decision within a certain number of days of receipt of the grievant's appeal. *Third,* a grievant may appeal to the central office review committee ("CORC") within a certain number of days of receipt of the superintendent's written decision. CORC is to render a written decision within a certain number of days of receipt of the appeal.

**\*2** Moreover, there is an expedited process for the review of complaints of inmate harassment or other misconduct by corrections officers or prison employees. 7 N.Y.C.R.R. § 701.8. In the event the inmate seeks expedited review, he or she may report the misconduct to the employee's supervisor. The inmate then files a grievance under the normal procedures outlined above, but all grievances alleging employee misconduct are given a grievance number, and sent immediately to the superintendent for review. Under the regulations, the superintendent or his designee shall determine immediately whether the allegations, if true, would state a "bona fide" case of harassment, and if so, shall initiate an investigation of the complaint, either "in-house," by the Inspector General's Office, or by the New York State Police Bureau of Criminal Investigations. An appeal of the adverse decision of the superintendent may be taken to the CORC as in the regular grievance procedure. A similar "special" procedure is provided for claims of discrimination against an inmate. 7 N.Y.C.R.R. § 701.9.

It is important to note that these procedural requirements contain several safeguards. For example, if an inmate could not file such a complaint within the required time period after the alleged occurrence, he or she could apply to the facility's IGP Supervisor for an exception to the

time limit based on mitigating circumstances. If that application was denied, the inmate could file a complaint complaining that the application was wrongfully denied.[3] Moreover, any failure by the IGRC or the superintendent to timely respond to a grievance or first-level appeal, respectively, can-and must-be appealed to the next level, including CORC, to complete the grievance process.[4] There appears to be a conflict in case law regarding whether the IGRC's nonresponse must be appealed to the superintendent where the plaintiff's grievance was never assigned a grievance number.[5] After carefully reviewing this case law, the Court finds that the weight of authority appears to answer this question in the affirmative.[6] The Court notes that, if the plaintiff adequately describes, in his appeal to the superintendent, the substance of his grievance (or if the plaintiff attaches, to his appeal, a copy of his grievance), it would appear that there is something for the superintendent to review.

It is also important to note that DOCS has a *separate and distinct* administrative appeal process for inmate misbehavior hearings:

A. For Tier III superintendent hearings, the appeal is to the Commissioner's designee, Donald Selsky, D.O.C.S. Director of Special Housing/Inmate Disciplinary Program, pursuant to 8 N.Y.C.R.R. § 254.8;

B. For Tier II disciplinary hearings, the appeal is to the facility superintendent pursuant to 7 N.Y.C.R.R. § 253.8; and

C. For Tier I violation hearings, the appeal is to the facility superintendent or a designee pursuant to 7 N.Y.C.R.R. § 252.6.

**\*3** "An individual decision or disposition of any current or subsequent program or procedure having a written appeal mechanism which extends review to outside the facility shall be considered nongrievable." 7 N.Y.C.R.R. § 701.3(e)(1). Similarly, "an individual decision or disposition resulting from a disciplinary proceeding ... is not grievable." 7 N.Y.C.R.R. § 701.3(e)(2). However, "[t]he policies, rules, and procedures of any program or procedure, including those above, are grievable." 7 N.Y.C.R.R. § 701.3(e)(3); *see also* N.Y. Dep't Corr. Serv. Directive No. 4040 at III.E.

Generally, if a prisoner has failed to follow each of the required three steps of the above-described grievance procedure prior to commencing litigation, he has failed to exhaust his administrative remedies. *Ruggiero v. County of Orange,* 467 F.3d 170, 175 (2d Cir.2006) (citing *Porter,* 534 U.S. at 524). However, the Second Circuit has held that a three-part inquiry is appropriate where a defendant contends that a prisoner has failed to exhaust his available administrative remedies, as required by the PLRA. *Hemphill v. State of New York,* 380 F.3d 680, 686, 691 (2d Cir.2004), *accord, Ruggiero,* 467 F.3d at 175. First, "the court must ask whether [the] administrative remedies [not pursued by the prisoner] were in fact 'available' to the prisoner." *Hemphill,* 380 F.3d at 686 (citation omitted). Second, if those remedies were available, "the court should ... inquire as to whether [some or all of] the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it ... or whether the defendants' own actions inhibiting the [prisoner's] exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." *Id.* [citations omitted]. Third, if the remedies were available and some of the defendants did not forfeit, and were not estopped from raising, the non-exhaustion defense, "the Court should consider whether 'special circumstances' have been plausibly alleged that justify the prisoner's failure to comply with the administrative procedural requirements." *Id.* [citations and internal quotations omitted].

With regard to this third inquiry, the Court notes that, *under certain circumstances,* an inmate may exhaust his administrative remedies by raising his claim during a related *disciplinary proceeding. Giano v. Goord,* 380 F.3d 670, 678-79 (2d Cir.2004); *Johnson v. Testman,* 380 F.3d 691, 697 (2d Cir.2004).[7] However, in essence, the circumstances in question include instances in which (1) the inmate reasonably believed that his "only available remedy" was to raise his claim as part of a tier disciplinary hearing,[8] *and* (2) the inmate articulated and pursued his claim in the disciplinary proceeding in a manner that afforded prison officials the time and opportunity to thoroughly investigate that claim.[9] Some district courts have found the first requirement not present where (a) there was nothing objectively confusing about the DOCS regulations governing the grievability of his claim,[10] (b) the inmate was specifically informed that the claim in question was grievable,[11] (c) the inmate separately

pursued the proper grievance process by filing a grievance with the IGRC,[12] (d) by initially alleging that he did appeal his claim to CORC (albeit without proof), the inmate has indicated that, during the time in question, he understood the correct procedure for exhaustion,[13] and/or (e) before and after the incident in question, the inmate pursued similar claims through filing a grievance with the IGRC.[14] Other district courts have found the second requirement not present where (a) the inmate's mention of his claim during the disciplinary hearing was so insubstantial that prison officials did not subsequently investigate that claim,[15] and/or (b) the inmate did not appeal his disciplinary hearing conviction.[16]

**\*4** Finally, two points bear mentioning regarding exhaustion. First, given that non-exhaustion is an affirmative defense, the defendant bears the burden of showing that a prisoner has failed to exhaust his available administrative remedies. *See, e.g., Sease v. Phillips,* 06-CV-3663, 2008 WL 2901966, *4 (S.D.N.Y. July 25, 2008).* However, once a defendant has adduced reliable evidence that administrative remedies were available to Plaintiff and that Plaintiff nevertheless failed to exhaust those administrative remedies, Plaintiff must then "counter" Defendants' assertion by showing exhaustion, unavailability, estoppel, or "special circumstances."[17]

Second, the Court recognizes that there is case law from within the Second Circuit supporting the view that the exhaustion issue is one of fact, which should be determined by a jury, rather than by the Court.[18] However, there is also case law from within the Second Circuit supporting the view that the exhaustion issue is one of law, which should be determined by the Court, rather than by a jury.[19] After carefully reviewing the case law, the Court finds that the latter case law-which includes cases from the Second Circuit and this District-outweighs the former case law.[20] (The Court notes that the latter case law includes cases from the Second Circuit and this District.)[21] More importantly, the Court finds that the latter cases are better reasoned than are the former cases. In particular, the Court relies on the reasons articulated by the Second Circuit in 1999: "Where administrative remedies are created by statute or regulation affecting the governance of prisons, ... the answer depends on the meaning of the relevant statute or regulation." *Snider v. Melindez,* 199 F.3d 108, 113-14 (2d Cir.1999). The Court relies also

on the several reasons articulated by Judge Richard A. Posner in a recent Seventh Circuit decision: most notably, the fact that the exhaustion-of-administrative-remedies inquiry does not address the merits of, or deadlines governing, the plaintiff's claim but an issue of "judicial traffic control" (i.e., what forum a dispute is to be resolved in), which is never an issue for a jury but always an issue for a judge. *See Pavey v. Conley,* 544 F.3d 739, 740-42 (7th Cir.2008) (en banc), *cert. denied,* --- U.S. ----, 129 S.Ct. 1620, 173 L.Ed.2d 995 (2009). The Court notes that the First, Third, Fourth, Fifth, Sixth, Eighth, Ninth, Tenth and Eleventh Circuits appear to agree with the ultimate conclusion of the Second and Seventh Circuits that the exhaustion issue is properly decided by a judge, not a jury. [22]

## II. ANALYSIS

As an initial matter, Plaintiff argues that he exhausted his administrative remedies regarding the claims at issue in this action, by filing a grievance regarding those claims, and then appealing the non-response to that grievance all the way to CORC. Because the Court rejects this argument based on the evidence adduced at the hearing, the Court proceeds to an analysis of the three-step exhaustion inquiry established by the Second Circuit.

### A. Availability of Administrative Remedies

**\*5** New York prison inmates are subject to an Inmate Grievance Program established by DOCS and recognized as an "available" remedy for purposes of the PLRA. *See Mingues v. Nelson,* 96-CV-5396, 2004 WL 324898, at \*4 (S.D.N.Y. Feb.20, 2004) (citing *Mojias v. Johnson,* 351 F.3d 606 (2d Cir.2003), and *Snider v. Melindez,* 199 F.3d 108, 112-13 [2d Cir.1999] ). There are different circumstances under which the grievance procedure is deemed not to have been available to an inmate plaintiff. *Hemphill,* 380 F.3d at 687-88. For example, courts have found unavailability "where plaintiff is unaware of the grievance procedures or did not understand it or where defendants' behavior prevents plaintiff from seeking administrative remedies." *Hargrove v. Riley,* 04-CV-4587, 2007 WL 389003, at \*8 (E.D.N.Y. Jan.31, 2007) (internal citations omitted). When testing the availability of administrative remedies in the face of claims that undue influence from prison workers has caused a plaintiff inmate to forego the formal grievance process, courts employ an objective test, examining whether "a similarly situated individual of ordinary firmness [would]

have deemed them available." *Hemphill,* 380 F.3d at 688 (quotations and citations omitted); *see Hargrove,* 2007 WL 389003, at \*8.

Here, after carefully considering the evidence submitted at the hearing in this action on March 1, 2010, the Court finds that administrative remedies were "available" to Plaintiff during the time in question. The Court makes this finding for the following four reasons.

First, in his sworn Complaint (which has the force and effect of an affidavit), Plaintiff stated, "Yes," in response to the question, "Is there a prisoner grievance procedure at this facility ." (Dkt. No. 1, ¶ 4.a.) [23] Second, both Darin Williams (the corrections officer in charge of the special housing unit during the relevant time period) and Sally Reams (the Inmate grievance program supervisor during the relevant time period) testified credibly, at the exhaustion hearing, that there was a working grievance program at Great Meadow Correctional Facility during the time in question. (Hearing Tr. at 10, 12, 14-21, 40-54.) Third, Plaintiff testified, at the exhaustion hearing that, during this approximate time period (the August to November of 2000), he filed at least three other grievances Great Meadow Correctional Facility, to which he received responses from the inmate grievance clerk, the Superintendent, and CORC. (*Id.* at 154, 157-58, 169-70; *see also* Hearing Exs. D-4, D-5, P-8, P-13, P-14.) [24] Fourth, the Court finds the relevant portions of Plaintiff's hearing testimony regarding the grievance at issue in this action to be incredible due to various omissions and inconsistencies in that testimony, and his demeanor during the hearing. (*Id.* at 127-34.) [25]

### B. Estoppel

After carefully considering the evidence submitted at the hearing in this action on March 1, 2010, the Court finds that Defendants did not forfeit the affirmative defense of non-exhaustion by failing to raise or preserve it, or by taking actions that inhibited Plaintiff's exhaustion of remedies. For example, Defendants' Answer timely asserted this affirmative defense. (Dkt. No. 35, ¶ 17.) Moreover, Plaintiff failed to offer any credible evidence at the hearing that *Defendant* s in any way interfered with Plaintiff's ability to file grievances during the time in question. (Hearing Tr. at 127-34, 157-58, 169-70.) Generally, a defendant in an action may not be estopped from asserting the affirmative defense of failure to

exhaust administrative remedies based on the actions (or inactions) of other individuals. [26]

**C. Special Circumstances**

**\*6** There are a variety of special circumstances that may excuse a prisoner's failure to exhaust his available administrative remedies, including (but not limited to) the following:

(1) The facility's "failure to provide grievance deposit boxes, denial of forms and writing materials, and a refusal to accept or forward plaintiff's appeals-which effectively rendered the grievance appeal process unavailable to him." *Sandlin v. Poole,* 575 F.Supp.2d 484, 488 (W.D.N.Y.2008) (noting that "[s]uch facts support a finding that defendants are estopped from relying on the exhaustion defense, as well as "special circumstances" excusing plaintiff's failure to exhaust");

(2) Other individuals' "threats [to the plaintiff] of physical retaliation and reasonable misinterpretation of the statutory requirements of the appeals process." *Clarke v. Thornton,* 515 F.Supp.2d 435, 439 (S.D.N.Y.2007) (noting also that "[a] correctional facility's failure to make forms or administrative opinions "available" to the prisoner does not relieve the inmate from this burden."); and

(3) When plaintiff tries "to exhaust prison grievance procedures[, and] although each of his efforts, alone, may not have fully complied, together his efforts sufficiently informed prison officials of his grievance and led to a thorough investigation of the grievance." *Hairston v. LaMarche,* 05-CV-6642, 2006 WL 2309592, at \*8 (S.D.N.Y. Aug.10, 2006).

After carefully considering the issue, the Court finds that there exists, in this action, no "special circumstances" justifying Plaintiff's failure to comply with the administrative procedural requirements. Construed with the utmost of special leniency, Plaintiff's hearing testimony, and his counsel's cross-examination of Defendants' witnesses, raise the specter of two excuses for not having exhausted his available administrative remedies before he (allegedly) mailed his Complaint in

this action on August 14, 2003:(1) that exhaustion was not possible because of the administrative procedures that DOCS has implemented regarding inmate grievances; and/or (2) that an unspecified number of unidentified corrections officers (who are not Defendants in this action) somehow interfered with the delivery of his grievance and appeals. For example, Plaintiff testified at the exhaustion hearing that he handed his grievance and appeals to various corrections officers making rounds where he was being housed, and that, if his grievance and/ or appeals were never received, it must have been because his letters were not properly delivered. (Hearing Tr. at 126-36.)

With regard to these excuses, the Court finds that, while these excuses could constitute special circumstances justifying an inmate's failure to exhaust his available administrative remedies in certain situations, [27] these excuses are not available to Plaintiff in the current action because, as stated in Part II.A. of this Decision and Order, the credible testimony before the Court indicates that Plaintiff did not hand his grievance and appeals to various corrections officers with regard to the claims in question. *See, supra,* Part II.A. of this Decision and Order. [28]

**\*7** For all these reasons, the Court finds that Plaintiff's proffered excuse does not constitute a special circumstance justifying his failure to exhaust his available administrative remedies before filing this action.

**ACCORDINGLY,** it is

**ORDERED** that Plaintiff's Second Amended Complaint (Dkt. No. 10) is ***DISMISSED* in its entirety without prejudice** for failure to exhaust his available administrative remedies before filing this action, pursuant to the PLRA; and it is further

**ORDERED** that the Clerk of the Court shall enter judgment for Defendants and close the file in this action.

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 1235591

Footnotes

1    *See also White v. The State of New York,* 00-CV-3434, 2002 U . S. Dist. LEXIS 18791, at *6 (S.D.N.Y. Oct 3, 2002).

2    The Court uses the term "a certain number of days" rather than a particular time period because (1) since the three-step process was instituted, the time periods imposed by the process have changed, and (2) the time periods governing any particular grievance depend on the regulations and directives pending during the time in question.

3    *Groves v. Knight,* 05-CV-0183, Decision and Order at 3 (N.D.N.Y. filed Aug. 4, 2009) (Suddaby, J.).

4    7 N.Y.C.R.R. § 701.6(g) ("[M]atters not decided within the time limits may be appealed to the next step."); *Hemphill v. New York,* 198 F.Supp.2d 546, 549 (S.D.N.Y.2002), *vacated and remanded on other grounds,* 380 F.3d 680 (2d Cir.2004); *see, e.g* ., DOCS Directive 4040 dated 8/22/03, ¶ VI.G. ("Absent [a time limit extension granted by the grievant], matters not decided within the time limits may be appealed to the next step.); *Pacheco v. Drown,* 06-CV-0020, 2010 WL 144400, at *19 & n. 21 (N.D.N.Y. Jan.11, 2010) (Suddaby, J.) ("It is important to note that any failure by the IGRC or the superintendent to timely respond to a grievance or first-level appeal, respectively, can be appealed to the next level, including CORC, to complete the grievance process."), *accord, Torres v. Caron,* 08-CV-0416, 2009 WL 5216956, at *5 & n. 28 (N.D.N.Y. Dec.30, 2009) (Mordue, C.J.), *Benitez v. Hamm,* 04-CV-1159, 2009 WL 3486379, at *13 & n. 34 (N.D.N.Y. Oct.21, 2009) (Mordue, C.J.), *Ross v. Wood,* 05-CV-1112, 2009 WL 3199539, at *11 & n. 34 (N.D.N.Y. Sept.30, 2009) (Scullin, J.), *Sheils v. Brannen,* 05-CV-0135, 2008 WL 4371776, at *6 & n. 24 (N.D.N.Y. Sept.18, 2008) (Kahn, J.), *Murray v. Palmer,* 03-CV-1010, 2008 WL 2522324, at *15 & n. 46 (N.D.N.Y. June 20, 2008) (Hurd, J.), *McCloud v. Tureglio,* 07-CV-0650, 2008 WL 17772305, at *10 & n. 25 (N.D.N.Y. Apr. 15, 2008) (Mordue, C.J.), *Shaheen v. McIntyre,* 05-CV-0173, 2007 WL 3274835, at *14 & n. 114 (N.D.N.Y. Nov.5, 2007) (McAvoy, J.); *Nimmons v. Silver,* 03-CV-0671, Report-Recommendation, at 15-16 (N.D.N.Y. filed Aug. 29, 2006) (Lowe, M.J.) (recommending that the Court grant Defendants' motion for summary judgment, in part because plaintiff adduced no evidence that he appealed the lack of a timely decision by the facility's IGRC to the next level, namely to either the facility's superintendent or CORC), *adopted by* Decision and Order (N.D.N.Y. filed Oct. 17, 2006) (Hurd, J.); *Gill v. Frawley,* 02-CV-1380, 2006 WL 1742738, at *11 & n. 66 (N.D.N.Y. June 22, 2006) (McAvoy, J.) ("[A]n inmate's mere attempt to file a grievance (which is subsequently lost or destroyed by a prison official) is not, in and of itself, a reasonable effort to exhaust his administrative remedies since the inmate may still appeal the loss or destruction of that grievance."); *Walters v. Carpenter,* 02-CV-0664, 2004 WL 1403301, at *3 (S.D.N.Y. June 22, 2004) ("[M]atters not decided within the prescribed time limits must be appealed to the next level of review."); *Croswell v. McCoy,* 01-CV-0547, 2003 WL 962534, at *4 (N.D.N.Y. March 11, 2003) (Sharpe, M.J.) ("If a plaintiff receives no response to a grievance and then fails to appeal it to the next level, he has failed to exhaust his administrative remedies as required by the PLRA."); *Reyes v. Punzal,* 206 F.Supp.2d 431, 433 (W.D.N.Y.2002) ("Even assuming that plaintiff never received a response to his grievance, he had further administrative avenues of relief open to him.").

5    *Compare Johnson v. Tedford,* 04-CV-0632, 616 F.Supp.2d 321, 326 (N.D.N.Y.2007) (Sharpe, J.) ("[W]hen a prisoner asserts a grievance to which there is no response, *and it is not recorded or assigned a grievance number,* administrative remedies may be completely exhausted, as there is nothing on record for the next administrative level to review.") [emphasis in original, and citations omitted] *with Waters v. Schneider,* 01-CV-5217, 2002 WL 727025, at *2 (S.D.N.Y. Apr.23, 2002) (finding that, in order to exhaust his available administrative remedies, plaintiff had to file an appeal with the superintendent from the IGRC's non-response to his grievance, of which no record existed).

6    *See, e.g., Murray v. Palmer,* 03-CV-1010, 2008 WL 2522324, at *16, 18 (N.D.N.Y. June 20, 2008) (Hurd, J., adopting Report-Recommendation of Lowe, M.J.) (finding that, in order to exhaust his available administrative remedies with regard to his grievance of August 30, 2000, plaintiff had to file an appeal with the superintendent from the IGRC's non-response to that grievance, which included a failure to acknowledge the receipt of the grievance and assign it a number); *Midalgo v. Bass,* 03-CV-1128, 2006 WL 2795332, at *7 (N.D.N.Y. Sept.26, 2006) (Mordue, C.J., adopting Report-Recommendation of Treece, M.J.) (observing that plaintiff was "requir[ed]" to seek an appeal to the superintendent, even though he never received a response to his grievance of April 26, 2003, which was never assigned a grievance number); *Collins v. Cunningham,* 06-CV-0420, 2009 WL 2163214, at *3, 6 (W.D.N.Y. July 20, 2009) (rejecting plaintiff's argument that his administrative remedies were not available to him where his grievance of March 20, 2004, was not assigned a grievance number); *Veloz v. New York,* 339 F.Supp.2d 505, 515-16 (S.D.N.Y.2004) (rejecting inmate's argument that the prison's grievance procedure had been rendered unavailable to him by the practice of prison officials' losing or destroying his grievances, because, *inter alia,* "there was no evidence whatsoever that any of [plaintiff's] grievances were filed with a grievance clerk," and he should have "appeal[ed] these claims to the next level once it became clear to him that a response to his initial filing was not forthcoming"); *cf. Hernandez v. Coffey,* 582 F.3d 303, 305, 309, n. 3 (2d Cir.2009) ("Our ruling in no way suggests that we agree with Hernandez's arguments regarding exhaustion or justification for failure to exhaust [which included an argument that the Inmate Grievance Program was not available to him because, when

he filed a grievance at the first stage of the Program, he received no response and his grievance was not assigned a grievance number].").

7    The Court recognizes that the Supreme Court's decision in *Woodford v. Ngo,* 548 U.S. 81, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006), may have changed the law regarding possible exceptions to the exhaustion requirement (and thus the possibility that exhaustion might occur through the disciplinary process). Specifically, in *Woodford,* the Supreme Court held that the PLRA required "proper" exhaustion as a prerequisite to filing a section 1983 action in federal court. *Woodford,* 548 U.S. at 93. "Proper" exhaustion means that the inmate must complete the administrative review process *in accordance with the applicable procedural rules,* as a prerequisite to bringing suit in federal court. *Id.* at 88-103 (emphasis added). It is unclear whether *Woodford* has overruled any decisions that recognize "exceptions" to the exhaustion requirement. Out of special solicitude to Plaintiff, the Court will assume that *Woodford* has not overruled the Second Circuit's *Giano-Testman* line of cases.

8    *Giano,* 380 F.3d at 678 ("[W]hile Giano was required to exhaust available administrative remedies before filing suit, his failure to do so was justified by his reasonable belief that DOCS regulations foreclosed such recourse."); *Testman,* 380 F.3d at 696-98 (remanding case so that district court could consider, *inter alia,* whether prisoner was justified in believing that his complaints in the disciplinary appeal procedurally exhausted his administrative remedies because the prison's remedial system was confusing).

9    *Testman,* 380 F.3d at 696-98 (remanding case so that district court could consider, *inter alia,* whether prisoner's submissions in the disciplinary appeals process exhausted his remedies "in a substantive sense" by "afford[ing] corrections officials time and opportunity to address complaints internally"); *Chavis v. Goord,* 00-CV-1418, 2007 WL 2903950, at *9 (N.D.N.Y. Oct.1, 2007) (Kahn, J.) ("[T]o be considered proper, exhaustion must occur in both a substantive sense, meaning that prison officials are somehow placed on notice of an inmate's complaint, and procedurally, in that it must be presented within the framework of some established procedure that would permit both investigation and, if appropriate, remediation.") [citation omitted]. The Court joins the above-described two requirements in the conjunctive because the Second Circuit has recognized that mere notice to prison officials through informal channels, without more, does not suffice to satisfy the PLRA procedural exhaustion requirement. *See Macias v. Zenk,* No. 04-6131, 495 F.3d 37, at *43-44 (2d Cir.2007) (recognizing that *Woodford v. Ngo,* 548 U.S. 81 [2006], overruled *Braham v. Casey,* 425 F.3d 177 [2d Cir.2005], to the extent that *Braham* held that "informal complaints" would suffice to exhaust a claim).

10   *See, e.g., Reynoso v. Swezey,* 423 F.Supp.2d 73, 75 (W.D.N.Y.2006), *aff'd,* 238 F. App'x 660 (2d Cir.2007) (unpublished order), *cert. denied,* 552 U.S. 1207, 128 S.Ct. 1278, 170 L.Ed.2d 109 (2008); *Holland v. James,* 05-CV-5346, 2009 WL 691946, at *3 (S.D.N.Y. March 6, 2009); *Winston v. Woodward,* 05-CV-3385, 2008 WL 2263191, at *10 (S.D.N.Y. May 30, 2008); *cf. Muniz v. Goord,* 04-CV-0479, 2007 WL 2027912, at *5 & n. 23 (N.D.N.Y. July 11, 2007) (McAvoy, J.) (reciting this point of law in context of failure to appeal grievance determination to CORC).

11   *See, e.g., Johnson v. Barney,* 04-CV-10204, 2007 WL 2597666, at *2 (S.D.N.Y. Aug.30, 2007); *Reynoso,* 423 F.Supp.2d at 75-76.

12   *See, e.g., Reynoso,* 423 F.Supp.2d at 75 ("There is no evidence that plaintiff was confused or misled about the proper method for raising his claims. In fact, the record shows exactly the opposite: plaintiff did file a grievance about the incident. He simply failed to appeal the denial of that grievance to CORC."); *Tapp v. Kitchen,* 02-CV-6658, 2004 WL 2403827, at *9 (W.D.N.Y. Oct.26, 2004) ("In the instant case, however, plaintiff does not and cannot claim to have believed that his only available remedy was to raise his complaint as part of his disciplinary hearing, since he also filed a grievance with the Inspector General, and also claims to have filed both an inmate grievance and a separate complaint with the facility superintendent."); *cf. Muniz,* 2007 WL 2027912, at *5 & n. 23 ("Plaintiff's Complaint alleges facts indicating that he believed it necessary to file a grievance with the Gouverneur C.F. IGRC and to appeal the denial of that grievance to the Gouverneur C.F. Superintendent. Why would he not also believe it necessary to take the next step in the exhaustion process and appeal the Superintendent's decision to CORC?").

13   *See, e.g., Petrusch v. Oliloushi,* 03-CV-6369, 2005 WL 2420352, at *5 (W.D.N.Y. Sept.30, 2005) ("[A]s to his grievance, which is the subject of this lawsuit, plaintiff does not appear to be contending that he believed the Superintendent's denial constituted exhaustion, since by initially claiming that he did appeal to CORC, albeit without proof, he has demonstrated his knowledge of the correct procedure for exhaustion.").

14   *See, e.g., Benjamin v. Comm'r N.Y. State DOCS,* 02-CV-1703, 2007 WL 2319126, at *14 (S.D.N.Y. Aug.10, 2007) ("Benjamin cannot claim that he believed that appealing his disciplinary proceeding was the only available remedy at his disposal in light of the numerous grievances he has filed during his incarceration at Green Haven [both before and after the incident in question]."), *vacated in part on other grounds,* No. 07-3845, 293 F. App'x 69 (2d Cir.2008).

15   *See, e.g., Chavis,* 2007 WL 2903950, at \*9 ("The focus of a disciplinary hearing is upon the conduct of the inmate, and not that of prison officials.... While the mention of a constitutional claim during plaintiff's disciplinary hearing could potentially have satisfied his substantive exhaustion requirement by virtue of his having notified prison officials of the nature of his claims, he did not fulfill his procedural exhaustion requirement [under the circumstances due to his] ... mere utterance of his claims during the course of a disciplinary hearing .... [T]here is nothing in the record to suggest that when the issues of interference with plaintiff's religious free exercise rights or alleged retaliation for having voiced his concerns were in any way investigated by prison officials.") [citations omitted].

16   *See, e.g., Colon v. Furlani,* 07-CV-6022, 2008 WL 5000521, at \*2 (W.D.N.Y. Nov.19, 2008) ("Colon was found guilty of harassment based on a letter that he wrote to defendant Bordinaro, concerning some of the events giving rise to his failure-to-protect claim, but it does not appear that he appealed that disposition.... While under some circumstances an inmate may be able to satisfy the exhaustion requirement by appealing from a disciplinary hearing decision ..., plaintiff did not do so here, and this claim is therefore barred under the PLRA.") [citations omitted]; *Cassano v. Powers,* 02-CV-6639, 2005 WL 1926013, at \*5 (W.D.N.Y. Aug.10, 2005) ("[E]ven assuming plaintiff believed that his proper recourse was to raise [his] complaint at his disciplinary hearing, rather than using the Inmate Grievance Program, he did not exhaust that process. That is, plaintiff has not provided any evidence that he appealed his Tier III hearing conviction. Since plaintiff did not pursue even the disciplinary appeal process, he can not have made submissions in the disciplinary process that were sufficient, in a substantive sense, to exhaust his remedies under § 1997e(a).") [internal quotation marks and citation omitted].

17   *See Hemphill,* 380 F.3d at 686 (describing the three-part inquiry appropriate in cases where a prisoner plaintiff plausibly seeks to "counter" defendants' contention that the prisoner failed to exhaust his available administrative remedies under the PLRA); *Verley v. Wright,* 02-CV-1182, 2007 WL 2822199, at \*8 (S.D.N.Y. Sept.27, 2007) ("[P]laintiff has failed to demonstrate that the administrative remedies were not, in fact, 'actually available to him.' "); *Winston v. Woodward,* 05-CV-3385, 2008 WL 2263191, at \*10 (S.D.N.Y. May 30, 2008) (finding that the plaintiff "failed to meet his burden under *Hemphill* of demonstrating 'special circumstances' "); *see also Ramirez v. Martinez,* 04-CV-1034, 2009 WL 2496647, at \*4 (M.D.Pa. Aug.14, 2009) ("In order to effectively oppose defendants' exhaustion argument, the plaintiff has to make a showing in regard to each of his claims."); *Washington v. Proffit,* 04-CV-0671, 2005 WL 1176587, at \*1 (W.D.Va. May 17, 2005) ("[I]t is plaintiff's duty, at an evidentiary hearing, "to establish by a preponderance of the evidence that he had exhausted his administrative remedies or that any defendant had hindered or prevented him from doing so within the period fixed by the Jail's procedures for filing a grievance.").

18   *See, e.g., Lunney v. Brureton,* 04-CV-2438, 2007 WL 1544629, at \*10 n. 4 (S.D.N.Y. May 29, 2007) ("There is certainly case law that supports the view that exhaustion should be determined by the Court rather than by a jury. As the Supreme Court has recently affirmed, however, exhaustion is an 'affirmative defense.' Where there are disputed factual questions regarding an affirmative defense such as a statute of limitations defense, the Second Circuit has stated that 'issues of fact as to the application of that defense must be submitted to a jury.' Thus, it is not clear that factual disputes regarding the exhaustion defense should ultimately be decided by the Court."); *Finch v. Servello,* 06-CV-1448, 2008 WL 4527758, at \*8 n. 5 (N.D.N.Y. Sept.29, 2008) (McAvoy, J.) (citing *Lunney* and noting that "it is not clear that factual disputes regarding the exhaustion defense should ultimately be decided by the Court").

19   *See, e.g., Harrison v. Goord,* 07-CV-1806, 2009 WL 1605770, at \*7 n. 7 (S.D.N.Y. June 9, 2009) (recognizing that "[t]here is authority ... for the position that where questions of fact exist as to whether a plaintiff has exhausted administrative remedies, such fact questions are for the Court, rather than a jury, to decide ...."); *Amador v. Superintend. of Dept. of Corr. Servs.,* 03-CV-0650, 2007 WL 4326747, at \*5 n. 7 (S.D.N.Y. Dec.4, 2007) ("It is unclear whether factual disputes regarding the exhaustion defense should ultimately be decided by the court or by a jury.... [T]here is ... case law ... supporting the view that exhaustion should be determined by the court and not a jury."), *appeal pending,* No. 08-2079-pr (2d Cir. argued July 15, 2009).

20   *See, e.g., Mastroianni v. Reilly,* 602 F.Supp.2d 425, 438 (E.D.N.Y.2009) (noting that the magistrate judge held an evidentiary hearing "on the issue of exhaustion"); *Sease v. Phillips,* 06-CV-3663, 2008 WL 2901966, \*3 n. 2 (S.D.N.Y. July 25, 2008) (finding that "the better approach is for the judge, and not the jury, to decide any contested issues of fact relating to the defense of failure to exhaust administrative remedies."); *Amador,* 2007 WL 4326747, at \*5 n. 7 ("[T]here is ... case law, which in my view is more persuasive and on point, supporting the view that exhaustion should be determined by the court and not a jury. I find it proper that this issue be decided by the court."); *Enigwe v. Zenk,* 03-CV-0854, 2006 WL 2654985, at \*4 (E.D.N.Y. Sept.15, 2006) (finding that, at the summary judgment "stage of the proceedings, a genuine question of fact exists with respect to whether [plaintiff] should be excused from exhausting his administrative remedies with regard to claims relating to his confinement at MDC Brooklyn," and therefore "direct[ing] that a hearing

be held" before a judge, to resolve this issue); *Dukes v. S.H.U. C.O. John Doe # 1,* 03-CV-4639, 2006 WL 1628487, at *6 (S.D.N.Y. June 12, 2006) (ordering an "evidentiary hearing [before a judge] on the issue of whether prison officials failed to assign grievance numbers to [plaintiff's] grievances and, if so, whether that rendered further administrative remedies unavailable, estopped the Defendants from asserting non-exhaustion, or justified [plaintiff's] failure to appeal to the CORC"); *Mingues v. Nelson,* 96-CV-5396, 2004 WL 324898, at *4 (S.D.N.Y. Feb.20, 2004) ("The Court could have *sua sponte* dismiss[ed] this action as the record is unmistakeably clear that an appropriate administrative procedure was available to him, that he was required to exhaust his administrative remedies, and that he failed to do so as required by the PLRA.... In this case, plaintiff has been afforded notice and given an opportunity to respond to the exhaustion issue and his failure remains clear."); *Roland v. Murphy,* 289 F.Supp.2d 321, 323 (E.D.N.Y.2003) "[W]hether the plaintiff has exhausted his administrative remedies is a question for the Court to decide as a matter of law.") [internal quotation marks and citation omitted]; *Evans v. Jonathan,* 253 F.Supp.2d 505, 509 (W.D.N.Y.2003) ( "[W]hether the plaintiff has exhausted his administrative remedies is a question for the Court to decide as a matter of law.").

21    *See, e.g., Snider v. Melindez,* 199 F.3d 108, 113-14 (2d Cir.1999) ("Whether an administrative remedy was available to a prisoner in a particular prison or prison system, and whether such remedy was applicable to the grievance underlying the prisoner's suit, are not questions of fact. They either are, or inevitably contain, questions of law. Where administrative remedies are created by statute or regulation affecting the governance of prisons, the existence of the administrative remedy is purely a question of law. The answer depends on the meaning of the relevant statute or regulation."), *accord, Mojias v. Johnson,* 351 F.3d 606, 608-11 (2d Cir.2003) (citing relevant language from *Snider v. Melindez,* and later stating that a district court could *sua sponte* dismiss a prisoner's civil rights complaint for failure to exhaust his available administrative remedies if it gave him notice and an opportunity to be heard); *DeBlasio v. Moriarty,* 05-CV-1143, Minute Entry (N.D.N.Y. filed Dec. 9, 2008) (McCurn, J.) (indicating that judge held pre-trial evidentiary hearing on whether plaintiff had exhausted administrative remedies before filing action); *Pierre v. County of Broome,* 05-CV-0332, 2007 WL 625978, at *1 n. 1 (N.D.N.Y. Feb.23, 2007) (McAvoy, J.) (noting that "[t]he court held an evidentiary hearing on October 25, 2006 concerning the issue of whether Plaintiff had exhausted administrative remedies"); *Hill v. Chanalor,* 419 F.Supp.2d 255, 257-59 (N.D.N.Y. March 8, 2006) (Kahn, J.) (*sua sponte* dismissing a prisoner's civil rights complaint, pretrial, for failure to exhaust his available administrative remedies after it gave him notice and an opportunity to be heard); *Raines v. Pickman,* 103 F.Supp.2d 552, 555 (N.D.N.Y.2000) (Mordue, J.) ("[I]n order for the Court to dismiss for failing to exhaust administrative remedies, the Court must be shown that such a remedy exists for an inmate beating in the grievance context. This is an issue of law for the Court to determine.").

22    *See Casanova v. Dubois,* 289 F.3d 142, 147 (1st Cir.2002); *Hill v. Smith,* 186 F. App'x 271, 273-74 (3d Cir.2006); *Mitchell v. Horn,* 318 F.3d 523, 529 (3d Cir.2003); *Anderson v. XYZ Corr. Health Servs., Inc.,* 407 F.3d 674, 682-83 (4th Cir.2005); *Dillon v. Rogers,* No. 08-30419, 2010 WL 378306, at *7 (5th Cir. Feb.4, 2010); *Taylor v. U.S.,* 161 F. App'x 483, 486 (6th Cir.2005); *Larkins v. Wilkinson,* 172 F.3d 48, at *1 (6th Cir.1998); *Husley v. Belken,* 57 F. App'x 281, 281 (8th Cir.2003); *Ponder v. Wackenhut Corr. Corp.,* 23 F. App'x 631, 631-32 (8th Cir.2002); *Wyatt v. Terhune,* 315 F.3d 1108, 1119-20 (9th Cir.2003), *cert. denied,* 540 U.S. 810 (2003); *Freeman v. Watkins,* 479 F.3d 1257, 1260 (10th Cir.2007); *Alloway v. Ward,* 188 F. App'x 663, 666 (6th Cir.2006); *Bryant v. Rich,* 530 F.3d 1368, 1373-76 (11th Cir.), *cert. denied, ---* U.S. ----, 129 S.Ct. 733, 172 L.Ed.2d 734 (2008).

23    The Court notes that, in his Complaint, Plaintiff also swore that his "grievance was denied." (Dkt. No. 1, ¶ 4.b.ii.) However, during the exhaustion hearing, Plaintiff testified that he never received a response to his grievance from any member of DOCS.

24    In addition, the documentary evidence adduced at the hearing establishes that, in actuality, Plaintiff filed ten other grievances during this time period (and several appeals from the denials of those grievances). The first of these grievances (Grievance Number GM-30651-00), filed on August 25, 2000, regarded Plaintiff's request for medications. (Hearing Exs. D-4, D-5.) The second of these grievances (Grievance Number GM-30691-00), filed on September 1, 2000, regarded Plaintiff's request for copies. (Hearing Ex. D-4.) The third of these grievances (Grievance Number GM-30729-00), filed on September 11, 2000, regarded the use of full restrains against Plaintiff. (*Id.; see also* Hearing Ex. P-14.) The fourth of these grievances, filed on October 19, 2000 (Grievance Number GM-30901-00), regarded Plaintiff's request for the repair of his cell sink. (Hearing Exs. D-4, D-5.) The fifth of these grievances (Grievance Number GM-30901-00), also filed on October 19, 2000, regarded Plaintiff's request for the clean up of his cell. (Hearing Ex. D-4.) The sixth of these grievances (Grievance Number GM-31040-00), filed on November 17, 2000, regarded the review of records. (*Id.*) The seventh of these grievances (Grievance Number GM-31041-00), also filed on November 17, 2000, regarded Plaintiff's request for medical attention. (*Id.; see also* Hearing Ex. P-13) The eighth of these grievances (Grievance Number GM-31048-00), filed on November 20, 2000, regarded the rotation of books. (Hearing Ex. D-14) The ninth of these grievances (Grievance

Number GM-31040-00), filed on November 27, 2000, regarded the review of records (and was consolidated with his earlier grievance on the same subject). (*Id.*) The tenth of these grievances (Grievance Number GM-31070-00), filed on November 27, 2000, regarded Plaintiff's eyeglasses. (*Id.*)

25    For example, Plaintiff was unable to identify the corrections officers to whom he handed his grievance and appeals for mailing. (*Id.* at 127-34.) Moreover, Plaintiff did not convincingly explain why the grievance and appeals at issue in this action did not make it through the mailing process, while his numerous other grievances and appeals did make it through the mailing process. (*Id.* at 154-171.) In addition, Plaintiff acknowledged that it was his belief, during this time period, that an inmate was not required to exhaust his administrative remedies in matters involving the use of excessive force; yet, according to Plaintiff, he decided to exhaust his administrative remedies on his excessive force claim anyway. (*Id.* at 148-49.)

26    *See Ruggiero v. County of Orange,* 467 F.3d 170, 178 (2d Cir.2006) (holding that defendants were not estopped from asserting the affirmative defense of non-exhaustion where the conduct plaintiff alleged kept him from filing a grievance-that he was not given the manual on how to grieve-was not attributable to the defendants and plaintiff "point[ed] to no affirmative act by prison officials that would have prevented him from pursuing administrative remedies"); *Murray v. Palmer,* 03-CV-1010, 2008 WL 2522324, at *19 (N.D.N.Y. June 20, 2008) (Hurd, J., adopting Report-Recommendation of Lowe, M.J.) ("I have found no evidence sufficient to create a genuine issue of triable fact on the issue of whether Defendants, *through their own actions,* have inhibited Plaintiff exhaustion of remedies so as to estop one or more Defendants from raising Plaintiff's failure to exhaust as a defense.") [emphasis in original]; *Shaheen v. McIntyre,* 05-CV-0173, 2007 WL 3274835, at *16 (N.D.N.Y. Nov.5, 2007) (McAvoy, J. adopting Report-Recommendation of Lowe, M.J.) (finding defendants not estopped from raising Plaintiff's non-exhaustion as a defense based on plaintiff's allegation "that [he] was inhibited (through non-responsiveness) by [ ] unnamed officials at Coxsackie C.F.'s Inmate Grievance Program (or perhaps the Grievance Review Committee), and Coxsackie C.F. Deputy Superintendent of Security Graham" because plaintiff's complaint and "opposition papers ... fail to contain any evidence placing blame on Defendants for the (alleged) failure to address his grievances and complaint letters"); *Smith v. Woods,* 03-CV-0480, 2006 WL 1133247, at *16 (N.D.N.Y. Apr.24, 2006) (Hurd, J. adopting Report-Recommendation of Lowe, M.J.) (finding that defendants are not estopped from relying on the defense of non-exhaustion because "no evidence (or even an argument) exists that any Defendant ... inhibit[ed] Plaintiff's exhaustion of remedies; Plaintiff merely argues that a non-party to this action (the IGRC Supervisor) advised him that his allegedly defective bunk bed was not a grievable matter."); *cf. Warren v. Purcell,* 03-CV-8736, 2004 WL 1970642, at *6 (S.D.N.Y. Sept.3, 2004) (finding that conflicting statements [offered by a non-party]-that the prisoner needed to refile [his grievance] and that the prisoner should await the results of DOCS's investigation-estopped the defendants from relying on the defense on non-exhaustion, or "[a]lternatively, ... provided ... a 'special circumstance' under which the plaintiff's failure to pursue the appellate procedures specified in the IGP was amply justified."); *Brown v. Koenigsmann,* 01-CV-10013, 2005 WL 1925649, at *1-2 (S.D.N.Y. Aug.10, 2005) ("Plaintiff does not assert that Dr. Koeingsmann personally was responsible for [the failure of anyone from the Inmate Grievance Program to address plaintiff's appeal]. [However,] *Ziemba [v. Wezner,* 366 F.3d 161 (2d Cir.2004) ] does not require a showing that Dr. Koenigsmann is personally responsible for plaintiff's failure to complete exhaustion [in order for Dr. Koenigsmann to be estopped from asserting the affirmative defense of failure to exhaust administrative remedies], as long as someone employed by DOCS is. If that reading of Ziemba is incorrect, however, ... then the circumstances here must be regarded as special, and as justifying the incompleteness of exhaustion, since a decision by CORC is hardly something plaintiff could have accomplished on his own.").

27    *See, e.g., Sandlin v. Poole,* 575 F.Supp.2d 484, 488 (W.D.N.Y.2008) (noting that "refusal to accept or forward plaintiff's appeals ... effectively render[s] the grievance appeal process unavailable to him").

28    The Court notes that, even if Plaintiff did (as he testified) hand to a corrections officer for mailing a letter to the Superintendent on September 13, 2000, appealing from the IGRC's failure to decide his grievance of August 22, 2000, within nine working days (i.e., by September 5, 2000), it appears that such an appeal would have been filed two days too late under DOCS Directive 4040, which requires that appeal to be filed within four working days of the IGRC's failure to decide his grievance (i.e., by September 11, 2000). (*See* Hearing Tr. 127-34; Hearing Ex. P-1, at 5-7 [attaching ¶¶ V.A, V.B. of DOCS Directive 4040, dated 6/8/98].)

2016 WL 5440596
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Trazz Sawyer, Plaintiff,

v.

Albert Prack, et al., Defendants.

Civil Action No. 9:14-CV-1198 (DNH/DEP)
|
Signed 07/29/2016

**Attorneys and Law Firms**

FOR PLAINTIFF: TRAZZ SAWYER, Pro se, 97-
B-2413, Orleans Correctional Facility, 3531 Gaines Basin
Road, Albion, NY 14411.

FOR DEFENDANTS: HON. ERIC T.
SCHNEIDERMAN, Attorney General of the, State of
New York, The Capitol, OF COUNSEL: KEVIN M.
HAYDEN, ESQ., Albany, NY 12224.

## REPORT AND RECOMMENDATION

David E. Peebles, U.S. Magistrate Judge

**\*1** *Pro se* plaintiff Trazz Sawyer, a New York state prison
inmate, has commenced this civil rights action against
several employees of the New York State Department
of Corrections and Supervision ("DOCCS"), four who
are identified by name and three of whom are sued as
"John Doe" defendants, pursuant to 42 U.S.C. § 1983.
In his complaint, plaintiff alleges that he was assaulted
by corrections officers, and that a prison nurse failed to
intervene and later refused to treat his injuries resulting
from the beating. Plaintiff also contends that he was
denied procedural due process at a related disciplinary
hearing, resulting in a finding of guilt and service of five
months confinement in a special housing unit ("SHU").

Currently pending before the court is a motion for
summary judgment brought by the defendants seeking
dismissal of plaintiff's pending claims. In their motion,
defendants argue that (1) plaintiff failed to exhaust
his administrative remedies before commencing suit,
(2) no reasonable factfinder could conclude plaintiff's

procedural due process rights were violated based
upon the record now before the court, (3) the claim
asserted against defendant Albert Prack, the DOCCS
Director of Special Housing/Inmate Disciplinary Program
should be dismissed alternatively for lack of personal
involvement, (4) the John Doe defendants should be
dismissed from the action based upon plaintiff's failure
to timely identify and serve process upon them, and
(5) in any event all defendants are entitled to qualified
immunity from suit. For the reasons set forth below, I
recommend that defendants' motion be granted, in part,
but otherwise denied, and that plaintiff's claims against
defendants Phelix and Prack and the John Doe defendants
be dismissed.

## I. BACKGROUND [1]

Plaintiff is a New York State prison inmate currently
being held in the custody of the DOCCS. *See generally*
Dkt. No. 1. At the times relevant to his claims in this
action, he was confined at the Bare Hill Correctional
Facility ("Bare Hill"), located in Malone, New York. *Id.*

On the morning of October 1, 2011, plaintiff was working
in the music room at Bare Hill. Dkt. No. 1 at 8; Dkt.
No. 37-1 at 1; Dkt. No. 35-21 at 1. For reasons that
are in dispute, the plaintiff was ordered to submit to
a pat frisk, and was holding a pen in his hand when
corrections officers Richards and Langdon, both of whom
are defendants in this case, began conducting the frisk.
Dkt. No. 35-21 at 1-2; Dkt. No. 37-1 at 1-2. Defendants
Richards and Langdon forcibly removed the pen from
plaintiff's hand and took him to the ground. *Id.* Dkt. No. 1
at 11-12; Dkt. No. 35-21 at 1-2; Dkt. No. 37-1 at 1-2. The
parties dispute whether additional force was used once
plaintiff was on the ground. Dkt. No. 35-21 at 2; Dkt.
No. 37-1 at 2-3. Plaintiff claims that defendants Richards
and Langdon "violently slammed him to the floor" and
dislocated his shoulder. Dkt. No. 1 at 12.

**\*2** Plaintiff alleges that after being transported to the
Bare Hill SHU, he was again assaulted by corrections
personnel. Dkt. No. 1 at 3, 12-14. At the time he filed
his complaint, plaintiff did not know the identities of
the corrections officers who assaulted him, and therefore
asserted claims related to this alleged second assault
against three John Doe defendants. *Id.* Plaintiff now
"believe[s]" that one of the three corrections officers who

assaulted him in the SHU was defendant Richards. Dkt. No. 37-2 at 5.

Based on the events of October 1, 2011, plaintiff was issued a Tier III misbehavior report for violent conduct, disobeying a direct order, interference, and harassment. [2] Dkt. No. 1 at 15; Dkt. No. 35-21 at 2; Dkt. No. 37-1 at 3. In preparation for the hearing, plaintiff met with a counselor, who plaintiff refers to as an employee assistant, three days before the hearing. Dkt. No. 35-21 at 4; Dkt. No. 37-1 at 5. Plaintiff contends that the "employee assistant was inadequate." Dkt. No. 37-2 at 5. Plaintiff also contends that his due process rights were violated at the ensuing Tier III disciplinary hearing, and with respect to the notice that gave rise to the hearing. Dkt. No. 37-2 at 5-6.

On October 6, 2011, a disciplinary hearing was conducted by Deputy Superintendent of Security D. Phelix, another defendant in this action. Dkt. No. 35-21 at 3; Dkt. No. 37-1 at 3. During the hearing, defendants Langdon and Richards testified regarding the incident that occurred on the morning of October 1, 2011. Dkt. No. 35-21 at 3; Dkt. No. 37-1 at 4; Dkt. No. 35-10 at 17, 22. Defendant Phelix also heard testimony from plaintiff and considered the following documents: (1) the October 1, 2011 misbehavior report signed by defendant Richards; (2) a memorandum from defendant Richards to Sergeant Carey, dated October 1, 2011; (3) a memorandum written by Sergeant Carey to Lieutenant Munson, dated October 1, 2011; (4) a use of force report, dated October 1, 2011; and (5) an inmate injury report, dated October 1, 2011. Dkt. No. 35-10 at 7-16.

As part of his defense, plaintiff requested that inmates Ponder and Farrell be called to testify on his behalf. Dkt. No. 35-21 at 4; Dkt. No. 37-1 at 5. While inmate Ponder was called as a witness, he testified that he was not present during the encounter between the plaintiff and defendants Langdon and Richards. Dkt. No. 35-21 at 4; Dkt. No. 37-1 at 5. Inmate Farrell refused to appear as a witness at the plaintiff's disciplinary hearing. Dkt. No. 35-21 at 5; Dkt. No. 37-1 at 7.

During the hearing plaintiff also requested a sign-in sheet from the music room. Dkt. No. 35-21 at 5; Dkt. No. 37-1 at 7. Defendant Phelix recessed the hearing so that an attempt could be made to locate the requested sign-in sheet. Dkt. No. 35-21 at 5; Dkt. No. 37-1 at 7. Upon reconvening the hearing, defendant Phelix advised

plaintiff that the sign-in sheets are not kept on file, and were therefore unavailable. Dkt. No. 35-21 at 5; Dkt. No. 37-1 at 7.

**\*3** Defendant Phelix then called Officer Sauve as a witness, who testified that the sign-in sheets are not maintained by Bare Hill staff. Dkt. No. 35-21 at 5; Dkt. No. 37-1 at 7. Officer Sauve did, however, provide defendant Phelix with a list of ten porters who worked in the music room area on October 1, 2011. Dkt. No. 35-10 at 49; Dkt. No. 35-21 at 5; Dkt. No. 37-1 at 7. Plaintiff requested that he be permitted to call all ten of the listed porters as witnesses. Dkt. No. 35-10 at 49. Plaintiff was unable to identify which of the ten porters were working in the music room during the relevant events on October 1, 2011, stating only that he "saw a whole bunch of guys that day." Dkt. No. 35-10 at 50. Defendant Phelix declined to allow plaintiff to call all ten porters as witnesses, but did permit him to identify five inmate porters that he desired to call as witnesses, and then contacted each of those five porters. Dkt. No. 35-21 at 5; Dkt. No. 37-1 at 7; Dkt. No. 35-10 at 50-51. All five of the requested inmate porters that defendant Phelix contacted refused to testify. Dkt. No. 35-21 at 5; Dkt. No. 37-1 at 7. There was no testimony at the hearing from any witnesses other than the officers involved and plaintiff as to what happened during the pat frisk. Dkt. No. 35-21 at 5; Dkt. No. 37-1 at 7; Dkt. No. 35-10 at 7-12. Plaintiff also did not provide defendant Phelix with any documentary evidence, other than medical records, in defense of the charges brought against him. Dkt. No. 35-21 at 4; Dkt. No. 37-1 at 5-6.

At the conclusion of the hearing, defendant Phelix found plaintiff guilty of all charges, except as to the allegation of interference, and sentenced Sawyer to two years of disciplinary SHU confinement. Dkt. No. 35-21 at 6; Dkt. No. 37-1 at 8. Plaintiff appealed the hearing officer's determination to defendant Prack, another defendant in this case. Dkt. No. 1 at 16-17; Dkt. No. 35-21 at 6; Dkt. No. 37-1 at 8. In his decision, defendant Prack upheld the hearing officer's finding of guilt, but reduced the sentence to six months in SHU. Dkt. No. 16-17; Dkt. No. 35-21 at 6; Dkt. No. 37-1 at 8. Plaintiff subsequently filed a petition pursuant to Article 78 of the New York Civil Practice Law and Rules in New York state court. Dkt. No. 1 at 17; Dkt. No. 35-21 at 6; Dkt. No. 37-1 at 8. While that petition was pending, the disciplinary determination was administratively reversed. Dkt. No. 1 at 17; Dkt. No. 35-21 at 6; Dkt. No. 37-1 at 8. By that time, plaintiff had

spent approximately five months in SHU confinement. Dkt. No. 1 at 17; Dkt. No. 35-3 at 79.

Plaintiff claims that defendant Phelix violated his Fourteenth Amendment right to due process by failing to provide him with proper notice regarding the charges against him, finding him guilty without supporting evidence, denying him adequate assistance in preparation for the hearing, and rejecting his request for witnesses. Dkt. No. 35-21 at 6; Dkt. No. 37-1 at 8. Plaintiff claims that defendant Prack violated plaintiff's Fourteenth Amendment right to due process by ignoring "strong" evidence that would have warranted a reversal of defendant Phelix's determination. Dkt. No. 1 at 17-18; Dkt. No. 35-21 at 6; Dkt. No. 37-1 at 8.

## II. PROCEDURAL HISTORY

Plaintiff, who is proceeding *pro se* and *in forma pauperis*, commenced this action on October 1, 2014. Dkt. No. 1. Plaintiff's complaint named as defendants the following DOCCS employees: (1) Albert Prack, the DOCCS Director of Special Housing/Inmate Discipline Program; (2) D. Phelix, a deputy superintendent of security at Bare Hill; (3) Bare Hill corrections officers D. Richards and S. Langdon; (4) Ms. Mulverhill, a registered nurse at Bare Hill; and (5) two John Doe corrections officers and a John Doe corrections sergeant at Bare Hill. *Id.* at 1.

On December 31, 2014, the court issued an order granting plaintiff's request for leave to proceed *in forma pauperis* and *sua sponte* dismissing certain causes of action in his complaint pursuant to 28 U.S.C. §§ 1915(e) and 1915A. Dkt. No. 4. Based on that decision, plaintiff's two remaining claims include: (1) excessive use of force and failure to protect claims under the Eighth Amendment, asserted against defendants Richards, Langdon, John Doe #1, John Doe #2, and John Doe #3; and (2) a violation of due process cause of action under the Fourteenth Amendment, asserted against defendants Phelix and Prack. *Id.* at 9-11, 22-23. As relief, plaintiff seeks compensatory damages for his injuries, including for pain and suffering, as well as for his allegedly wrongful disciplinary confinement. Dkt. No. 1 at 18-20.

**\*4** Following the close of discovery, defendants filed a motion for summary judgment, arguing that plaintiff's complaint should be dismissed because the record evidence conclusively establishes that plaintiff inexcusably failed to exhaust his administrative remedies and, in any

event, defendants are all entitled to qualified immunity. *See generally* Dkt. No. 35. In their motion, defendants additionally argue that the John Doe defendants should be dismissed from the action based upon plaintiff's failure to identify and serve them with process, and that the record evidence does not give rise to a genuine dispute of material fact regarding whether (1) defendants Phelix and Prack violated plaintiff's due process rights; or (2) defendant Prack was personally involved in the Fourteenth Amendment constitutional violation alleged. *Id.* Defendants' motion, which is now fully briefed, has been referred to me for the issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See* Fed. R. Civ. P. 72(b).

## III. DISCUSSION

### A. Summary Judgment Standard

Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, the entry of summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 82-83 (2d Cir. 2004). A fact is "material" for purposes of this inquiry if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248; *see also Jeffreys v. City of N.Y.*, 426 F.3d 549, 553 (2d Cir. 2005). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson*, 477 U.S. at 250 n.4; *Sec. Ins. Co.*, 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material dispute of fact for trial. Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at 250.

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences, in a light

most favorable to the non-moving party. *Anderson*, 477 U.S. at 255; *Jeffreys*, 426 F.3d at 553; *Wright v. Coughlin*, 132 F.3d 133, 137-38 (2d Cir. 1998). The entry of summary judgment is justified only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *Bldg. Trades Employers' Educ. Ass'n v. McGowan*, 311 F.3d 501, 507-08 (2d Cir. 2002); *see also Anderson,* 477 U.S. at 250 (finding summary judgment appropriate only when "there can be but one reasonable conclusion as to the verdict").

## B. Exhaustion of Available Administrative Remedies

### 1. Controlling Legal Principles

The Prison Litigation Reform Act of 1996 ("PLRA"), Pub. L. No. 104-134, 110 Stat. 1321 (1996), which imposes several restrictions on the ability of prisoners to maintain federal civil rights actions, expressly requires that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); *see also Woodford v. Ngo*, 548 U.S. 81, 84 (2006) ("Exhaustion is ... mandatory. Prisoners must now exhaust all 'available' remedies[.]"); *Hargrove v. Riley*, No. 04-CV-4587, 2007 WL 389003, at *5-6 (E.D.N.Y. Jan. 31, 2007) ("The exhaustion requirement is a mandatory condition precedent to any suit challenging prison conditions, including suits brought under Section 1983."). [3] "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002). "Proper exhaustion" requires a plaintiff to procedurally exhaust his claims by "compl[ying] with the system's critical procedural rules." *Woodford*, 548 U.S. at 95; *accord, Macias v. Zenk*, 495 F.3d 37, 43 (2d Cir. 2007).

**\*5** Compliance with the PLRA's exhaustion requirement may be excused when administrative remedies are "unavailable" to an inmate. *Ross v. Blake*, 136 S. Ct. 1850, 1858 (2016). The Supreme Court recently identified three circumstances in which such unavailability can be found. *Id.* at 1859-1860. First, administrative procedures are unavailable when they "operate[ ] as a

simple dead end – with officers unable or consistently unwilling to provide any relief[.]" *Id.* at 1859. Second, they are unavailable when "an administrative scheme [is] so opaque that it becomes, practically speaking, incapable of use." *Id.* at 1859-1860. Lastly, exhaustion can be excused "when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." [4] *Id.* at 1860.

### 2. The DOCCS IGP

The DOCCS has instituted a grievance procedure, entitled the Inmate Grievance Program ("IGP"), and made it available to inmates. The IGP is comprised of three steps that an inmate must satisfy when he has a grievance regarding prison conditions. 7 N.Y.C.R.R. § 701.5; *Mingues v. Nelson*, No. 96-CV-5396, 2004 WL 324898, at *4 (S.D.N.Y. Feb. 20, 2004). Embodied in 7 N.Y.C.R.R. § 701, the IGP requires that an inmate first file a complaint with the facility's IGP clerk within twenty-one days of the alleged occurrence. 7 N.Y.C.R.R. § 701.5(a)(1). If a grievance complaint form is not readily available, a complaint may be submitted on plain paper. *Id.* Representatives of the facility's inmate grievance resolution committee ("IGRC") have up to sixteen days after the grievance is filed to informally resolve the issue. *Id.* at § 701.5(b)(1). If there is no such informal resolution, then the full IGRC conducts a hearing within sixteen days after receipt of the grievance. *Id.* at § 701.5(b)(2).

A grievant may then appeal the IGRC's decision to the facility's superintendent within seven days after receipt of the IGRC's written decision. *Id.* at § 701.5(c). The superintendent must issue a written decision within a certain number of days after receipt of the grievant's appeal. [5] *Id.* at § 701.5(c)(i), (ii).

The third and final step of the IGP involves an appeal to the DOCCS Central Office Review Committee ("CORC"), which must be taken within seven days after receipt of the superintendent's written decision. *Id.* at § 701.5(d)(1)(i). The CORC is required to render a written decision within thirty days of receipt of the appeal. *Id.* at § 701.5(d)(2)(i).

Accordingly, at each step of the IGP process, a decision must be rendered within a specified time period. Generally, if a plaintiff fails to follow each of the

required three steps of the above-described procedure prior to commencing litigation, he has failed to exhaust his administrative remedies. *See Ruggerio v. Cnty. of Orange,* 467 F.3d 170, 176 (2d Cir. 2006) ("[T]he PLRA requires proper exhaustion, which means using all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits)." (quotation marks omitted)).

3. Analysis

Plaintiff has conceded that he did not fully exhaust his administrative remedies with respect to any of the claims currently remaining in this action. *Compare* Dkt. No. 35-21 at 7 *with* Dkt. No. 37-1 at 8-9. When asked during his deposition whether he attempted to exhaust his administrative remedies with respect to the first use-of-force incident that occurred on October 1, 2011, plaintiff testified that he did not file a grievance while he was in SHU because he thought "it would have been futile" to do so based on his understanding that mail he was "sending out" was not "arriving where it was going." Dkt. No. 35-3 at 70. Plaintiff further testified that he did not "believe" he filed a grievance once he was "out of that particular SHU," but further stated, "maybe I did[,] I'm not one hundred percent sure[,] I would have to look at the documents." [6] Dkt. No. 35-3 at 70. With regard to the alleged second incident of assault that occurred on October 1, 2011 in the Bare Hill SHU, plaintiff testified candidly that he did not file a grievance. *Id.* at 71. Plaintiff further testified that he did not file a grievance against either defendant Phelix or defendant Prack based on their alleged violations of his due process rights because, according to him, formal exhaustion is not a requirement for raising a Fourteenth Amendment due process claim when an inmate has pursued an administrative appeal from a hearing officer's determination. *Id.* at 80; *see also* Dkt. No. 37-1 at 10.

**\*6** The record evidence adduced by defendants in support of their non-exhaustion defense includes a declaration from Jeffery Hale, the Assistant Director of the DOCCS IGP, and the custodian of records maintained by the CORC. Dkt. No. 35-6. In his declaration, Hale states that his office conducted a search of the appeals filed by plaintiff with the CORC, which revealed that plaintiff filed twenty-four appeals to the CORC between August 21, 2000 and January 3, 2012. *Id.* at 2. Hale

further states that plaintiff filed a grievance with the CORC bearing grievance number UST-48092-12, and that grievance alleges that "[p]laintiff tried to file a related grievance on October 26, 2011 at Bare Hill." [7] *Id.* at 3. Hale indicates that plaintiff's grievance dated October 26, 2011 was "properly returned to [p]laintiff by the Bare Hill IGRC" because plaintiff was not housed at Bare Hill at that time, and that plaintiff's subsequent filing of a grievance on December 27, 2011 at Upstate, where he was housed, was "untimely." *Id.*

Grievance Number UST-48092-12 mentions the October 1, 2011 use of force incident, but does not name any specific officers and does not raise any due process complaints. *Id.*; Dkt. No. 35-8 at 6-10, 17-20. Plaintiff also states in that grievance that he "attempted to file a grievance" regarding the alleged assault as early as October 11, 2011, [8] "[f]irst at Bare Hill where the assault occurred, then here at Upstate[,]" and that "[e]very attempt to file a grievance concerning the assault by officers have [sic] been prevented [.]" Dkt. No. 35-8 at 17. Plaintiff identifies October 20, 2011 as the second date on which he attempted to file a grievance, and states that this grievance was mailed from Upstate to the Bare Hill IGRC, and responded to on October 26, 2011, with a notation that the grievance needed to be filed at Upstate. *Id.* Plaintiff further states that on November 7, 2011, after he was released from the hospital at Upstate, he sent a letter to the Upstate IGRC requesting a forty-five day extension of his deadline to grieve the events of October 1, 2011, and attached to that letter a copy of the grievance he filed on October 20, 2011. *Id.* at 18. Plaintiff claims he never received a response to that request, but did receive a letter from "director Bellamy" on November 9, 2011, informing him that "Upstate and Bare Hill claim their IGRC were not receiving [his] grievances and none were on file." *Id.* Against this backdrop, the court must decide whether plaintiff's failure to exhaust his administrative remedies regarding the use of excessive force is excusable.

**\*7** Plaintiff has submitted record evidence, in the form of an affidavit, indicating that he attempted to file a grievance at Bare Hill on October 11, 2011, and that "guards at Bare Hill in-take the grievances and they would then disappear." Dkt. No. 37-2 at 7. Plaintiff also testified that, while he was confined in the SHU at Bare Hill, he attempted to mail letters to his sisters, and that those letters never arrived. Dkt. No. 35-3 at 71. While the court has not been provided with a copy of the October 11, 2011

grievance and understands defendants' position to be that no such grievance was ever filed, viewing the evidence in the light most favorable to plaintiff, these assertions create questions of fact regarding the filing of the grievance and availability of a grievance procedure to plaintiff. *See Ross*, 136 S. Ct. at 1860 (noting that "thwart[ing] [the] inmate[ ] from taking advantage of [the] grievance process through machination, misrepresentation, or intimidation" may effectively render a grievance program unavailable to an inmate).

I note, moreover, that the undisputed record before the court conclusively establishes plaintiff mailed a grievance to the IGRC at Bare Hill on October 20, 2011, nineteen days after the incidents that occurred on October 1, 2011, pertaining to at least the first alleged assault. [9] While it is also undisputed that plaintiff should have filed this grievance at Upstate, where he was housed on October 20, 2011, [10] it appears that Bare Hill did not receive plaintiff's grievance until October 26, 2011, and therefore plaintiff did not receive a response notifying him of his mistake until October 26, 2011. *See* Dkt. No. 35-8 at 1, 18. This date, of course, is beyond the twenty-one day exhaustion deadline. Plaintiff's grievance dated December 29, 2011 also contains a statement by him that within twelve days of receiving a response from Bare Hill regarding his October 20, 2011 grievance, he submitted a request to the Upstate IGRC for an extension of his exhaustion deadline relative to the events of October 1, 2011, pursuant to 7 N.Y.C.R.R. § 701.6(g), and attached to that request a copy of the October 20, 2011 grievance. [11] *See* Dkt. No. 35-8 at 8. Plaintiff states that he did not receive a response to his request, but did speak with a woman "whom [he was] told was grievance staff," which caused him to believe that his grievance was being investigated. [12] *Id.*; *see also* Dkt. No. 37-1 at 12.

The regulation on which plaintiff purportedly relied in requesting his extension, 7 N.Y.C.R.R. § 701.6(g), contemplates an extension of an inmate's time to grieve when the request is made beyond twenty-one days but within forty-five days of the incident, upon a showing of mitigating circumstances. Assuming plaintiff made his request to the Upstate IGRC on November 7, 2011, that is within forty-five days of October 1, 2011. Assuming further that plaintiff never received a response to his request for an extension of time, as he states, a question of fact remains regarding whether the process for requesting

an extension of time under 7 N.Y.C.R.R. § 701.6(g) was available to plaintiff within forty-five days of October 1, 2011.

**\*8** Moreover, plaintiff has adduced evidence of mitigating circumstances, in that he tried to timely file his grievance but submitted it to the wrong facility, and has further established that he filed a separate complaint grieving, among other things, the denial of an extension to the time limit. Dkt. No. 35-8 at 6-9. Defendants have not responded to plaintiff's contention that he requested an extension of time to exhaust his administrative remedies and never received a response to this request. It is therefore unclear whether, if the Upstate IGRC received plaintiff's request for an extension and the October 20, 2011 grievance within forty-five days of October 1, 2011, the request would have been granted. Based on these circumstances as well, I recommend that defendants' motion for summary judgment be denied to the extent it seeks dismissal of plaintiff's excessive force claims for failure to exhaust available administrative remedies. [13]

With respect to plaintiff's due process claim, plaintiff does not contend that administrative remedies were not available to him. Rather, his argument appears to be that the IGP procedure need not be followed in situations where the claim is for a due process violation stemming from a disciplinary hearing and there has been a "final administrative appeal." Dkt. No. 35-21 at 7; Dkt. No. 37-1 at 10.

There is support for plaintiff's claim that formal exhaustion may not be required with respect to plaintiff's due process claim against defendant Phelix, based on his having appealed defendant Prack's affirmance of defendant Phelix's determination into the New York state courts. *See*, *e.g.* *Toliver v. Stefinick*, 12-cv-0077, 2016 WL 3351974, at \*2 (N.D.N.Y. Mar. 22, 2016) (Baxter, M.J.) ("This court agrees that, before he initiated this lawsuit, plaintiff failed to exhaust his administrative remedies with respect to all of his remaining claims, except for the due process claims relating to disciplinary proceedings, which must be exhausted by administrative appeals of the sanctions imposed, not through the grievance process."), *adopted by* 2016 WL 3349316 (N.D.N.Y. June 15, 2016) (D'Agostino, J.); *see also* *LaBounty v. Johnson*, 253 F. Supp.2d 496, 502 n. 5 (W.D.N.Y. 2003) (citing *Flanagan v. Maly*, No. 99-CV-12336, 2002 WL 122921, at \*2 (S.D.N.Y. Jan. 29, 2002)); *Samuels v. Selsky*, No. 01-

CV-8235, 2002 WL 31040370, at *8 (S.D.N.Y. Sept. 12, 2002). Based upon these decisions, I recommend that plaintiff's due process claim be addressed on the merits.

### C. Merits of Plaintiff's Claims

**\*9** Defendants maintain that in the event plaintiff is allowed to pursue his due process claim on the merits, summary judgment dismissing that claim is nonetheless appropriate because, based upon the record now before the court, no reasonable factfinder could conclude that plaintiff's due process rights were violated during the course of his disciplinary hearing.

As a general matter, to prevail on a section 1983 due process claim arising out of a disciplinary hearing, a plaintiff must show that he both (1) possessed an actual liberty interest, and (2) was deprived of that interest without being afforded sufficient process. *Tellier v. Fields*, 280 F.3d 69, 79-80 (2d Cir. 2000); *Hynes v. Squillace*, 143 F.3d 653, 658 (2d Cir. 1998); *Bedoya v. Coughlin*, 91 F.3d 349, 351-52 (2d Cir. 1996).

### 1. Liberty Interest

In *Sandin v. Conner*, 515 U.S. 472 (1995), the Supreme Court determined that, to establish a liberty interest in the context of a prison disciplinary proceeding resulting in removal of an inmate from the general prison population, a plaintiff must demonstrate that (1) the state actually created a protected liberty interest in being free from segregation, and (2) the segregation would impose an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin*, 515 U.S. at 483-84; *Tellier*, 280 F.3d at 79-80; *Hynes*, 143 F.3d at 658. The prevailing view in this circuit is that, by its regulatory scheme, the State of New York has created a liberty interest in remaining free from disciplinary confinement, thus satisfying the first *Sandin* factor. *See, e.g.*, *LaBounty v. Coombe*, No. 95-CV-2617, 2001 WL 1658245, at *6 (S.D.N.Y. Dec. 26, 2001); *Alvarez v. Coughlin*, No. 94-CV-0985, 2001 WL 118598, at *6 (N.D.N.Y. Feb. 6, 2001) (Kahn, J.). Accordingly, I must next examine whether the allegations related to the conditions of plaintiff's SHU confinement rise to the level of an atypical and significant hardship under *Sandin*.

Atypicality in a *Sandin* inquiry is normally a question of law. [14] *Colon v. Howard*, 215 F.3d 227, 230-31 (2d Cir. 2000); *Sealey v. Giltner*, 197 F.3d 578, 585 (2d Cir. 1999). "[W]hether the conditions of a segregation amount to an 'atypical and significant hardship' turns on the duration of the segregation and a comparison with the conditions in the general population and in other categories of segregation." *Arce v. Walker*, 139 F.3d 329, 336 (2d Cir. 1998) (citing *Brooks v. DiFasi*, 112 F.3d 46, 48-49 (2d Cir. 1997)). In cases involving shorter periods of segregated confinement where the plaintiff has not alleged any unusual conditions, however, a court may not need to undergo a detailed analysis of these considerations. *Arce*, 139 F.3d at 336; *Hynes*, 143 F.3d at 658.

As to the duration of the disciplinary segregation, restrictive confinement of less than 101 days, on its own, does not generally rise to the level of an atypical and significant hardship. *Davis*, 576 F.3d at 133. Accordingly, when the duration of restrictive confinement is less than 101 days, proof of "conditions more onerous than usual" is required. *Davis*, 576 F.3d at 133 (citing *Colon*, 215 F.3d at 232-33 n.5). The court must examine "the [actual] conditions of [the plaintiff's] confinement 'in comparison to the hardships endured by prisoners in general population, as well as prisoners in administrative and protective confinement, assuming such confinements are imposed in the ordinary course of prison administration.' " *Davis*, 576 F.3d at 134 (quoting *Welch v. Bartlett*, 196 F.3d 389, 392-93 (2d Cir. 1999)). On the other hand, the Second Circuit has found that disciplinary segregation under ordinary conditions of more than 305 days rises to the level of atypicality. *See Colon*, 215 F.3d at 231 ("Confinement in normal SHU conditions for 305 days is in our judgment a sufficient departure from the ordinary incidents of prison life to require procedural due process protections under *Sandin*.").

**\*10** In this instance, the record evidence shows that, as a result of defendant Phelix's decision following the disciplinary hearing, plaintiff was held in disciplinary confinement for approximately 150 days before the decision was administratively reversed. Dkt. No. 35-3 at 79. Defendants do not dispute this fact.

The Second Circuit has explained that when an inmate plaintiff claims a due process violation plaintiff has been confined for an intermediate duration of between 101 and 305 days, the court must develop "a detailed record of

the conditions of the confinement relative to ordinary prison conditions ... and make a fact-intensive inquiry, ... examining the actual circumstances of SHU confinement in the case before it without relying on its familiarity with SHU conditions in previous cases." *Palmer v. Richards*, 364 F.3d 60, 65 (2d Cir. 2004) (internal quotation marks and citations omitted). "Disputes about conditions may not be resolved on summary judgment, ... but where the conditions are undisputed, the *Sandin* issue should be resolved by the court as a matter of law." *Id.*

Plaintiff has introduced minimal evidence regarding the conditions of his SHU confinement during the period in question.[15] Defendants, however, have failed to introduce any evidence concerning the conditions of SHU confinement at Bare Hill and Upstate. Because the parties have provided the court with little evidence regarding the conditions of plaintiff's SHU confinement, I have assumed, for purposes of this report, that plaintiff was deprived of a constitutionally cognizable liberty interest as a result of defendant Phelix's determination.

### 2. Procedural Safeguards

The procedural safeguards to which a prison inmate is entitled before being deprived of a constitutionally cognizable liberty interest are well established under *Wolff v. McDonnell*, 418 U.S. 539 (1974). In its decision in *Wolff*, the Court held that the constitutionally mandated due process requirements include (1) written notice of the charges to the inmate; (2) the opportunity to appear at a disciplinary hearing and a reasonable opportunity to present witnesses and evidence in support of his defense, subject to a prison facility's legitimate safety and penological concerns; (3) a written statement by the hearing officer explaining his decision and the reasons for the action being taken; and (4) in some circumstances, the right to assistance in preparing a defense. *Wolff*, 418 U.S. at 564-69; *see also Luna v. Pico*, 356 F.3d 481, 487 (2d Cir. 2004). To pass muster under the Fourteenth Amendment, it is also required that a hearing officer's disciplinary determination garners the support of at least "some evidence." *Superintendent, Mass. Corr. Inst., Walpole v. Hill*, 472 U.S. 445, 455 (1985); *Luna*, 356 F.3d at 488-88.

**\*11** The due process clause of the Fourteenth Amendment also guarantees that "[a]n inmate subject to a disciplinary hearing is entitled to... an impartial hearing officer." *Allen v. Cuomo*, 100 F.3d 253, 259 (2d Cir. 1996) (citing *Wolff*, 418 U.S. at 570-71). The Second Circuit has explained that its "conception of an impartial decisionmaker is one who, *inter alia*, does not prejudge the evidence and who cannot say ... how he would assess evidence he has not yet seen." *Patterson v. Coughlin*, 905 F.2d 564, 570 (2d Cir. 1990). "The degree of impartiality required of prison officials[, however,] does not rise to the level of that required of judges." *Allen*, 100 F.3d at 259. Indeed, "[i]t is well recognized that prison disciplinary hearing officers are not held to the same standard of neutrality as adjudicators in other contexts." *Russell v. Selsky*, 35 F.3d 55, 60 (2d Cir. 1996). "A hearing officer may satisfy the standard of impartiality if there is 'some evidence in the record' to support the findings of the hearing." *Allred v. Knowles*, No. 06-CV-0456, 2010 WL 3911414, at *5 (W.D.N.Y. Oct. 5, 2010) (quoting *Hill*, 472 U.S. at 455).

Examining the record to determine whether plaintiff was afforded procedural due process at the disciplinary hearing, I find no reasonable factfinder could conclude that defendant Phelix or defendant Prack denied plaintiff the protections afforded under the due process clause. Plaintiff was served with formal notice of the charges against him four days before the hearing, was provided with an assistant three days prior to the hearing, was present for the hearing and allowed to question witnesses, had witnesses called on his behalf, and had the opportunity to respond to statements made by DOCCS employees as well as provide his own version of the events giving rise to the charges against him. Dkt. No. 35-10; Dkt. No. 35-21 at 3-5; Dkt. No. 37-1 at 3-7.

Plaintiff contends that the notice of charges provided to him was deficient, that defendant Phelix denied him the opportunity to call five witnesses, identified as inmate porters who may or may not have been working in the music room on October 1, 2011, that defendant Phelix was biased, and that defendant Phelix's determination was not supported by any credible evidence. Dkt. No. 37-2 at 5-6. Plaintiff further claims that the assistant provided to him was "inadequate." *Id.* at 5.

With respect to plaintiff's challenge to the notice, plaintiff appears to be arguing that the notice charging him with "violent conduct" was procedurally improper because it did not identify the specific incident of violent conduct that gave rise to the charge. Dkt. No. 37-2 at 5-6.

The misbehavior report that listed the charges against plaintiff, which was read into the record at the outset of plaintiff's disciplinary hearing, [16] set forth the date, time, and location of the incident giving rise to the charges, and included a very specific account of the interaction between plaintiff and defendants Richards and Langdon. *See* Dkt. No. 35-12. The description of the incident also explained that plaintiff refused to release an uncapped pen during a pat frisk procedure despite multiple orders for him to do so. *Id.*

It appears to be plaintiff's position that a refusal to release an uncapped pen when a guard is preparing a pat frisk cannot be construed as "violent conduct." It is unnecessary to resolve that question, since in any event there is no dispute that plaintiff was apprised of the charges against him in a manner that allowed him to prepare his defense, which is the relevant inquiry as it relates to plaintiff's due process claim against defendant Phelix based on improper notice. *See, e.g., Kalwasinski v. Morse,* 201 F.3d 103, 108 (2d Cir. 1999) (rejecting inmate plaintiff's due process challenge based upon a "discrepancy as to the precise nature of the threatened harm" because the discrepancy "did not represent a failure of specificity that would impair Kalwasinski's ability to prepare his defense" given that the variance between the charge and proof arose in the context of an otherwise detailed misbehavior report). Moreover, to the extent plaintiff felt that the charge of violent conduct was improper or unwarranted, such a belief does not give rise to a due process claim against defendant Phelix. *See, e.g., Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir. 1986) (holding that an inmate who was found guilty by a prison disciplinary committee based on a false report did not have an actionable due process claim because the inmate was granted a hearing and the opportunity to rebut the false charges against him); *Fulmore v. Raimo,* 10-cv-1096, 2012 WL 4033731, at *4 (N.D.N.Y. Sept. 12, 2012) ("[J]ust as an inmate possesses no due process right to be free from being issued a false misbehavior report, an inmate possesses no due process right to be free from having that false misbehavior report relied on by a hearing officer at a disciplinary hearing."); *see also Boddie v. Schnieder,* 105 F.3d 857, 862 (2d Cir. 1997) ("[A] prison inmate has no general constitutional right to be free from being falsely accused in a misbehavior report."); *Alexander v. Fischer,* 14-cv-0548, 2015 WL 10568892, at *8 (N.D.N.Y. Dec. 21, 2015) (Baxter, M.J.) ("A prison inmate has no constitutionally guaranteed immunity from being falsely

or wrongly accused of conduct which may result in the deprivation of a protected liberty interest, as long as the prisoner is provided with procedural due process."), *adopted by* 2016 WL 1261124 (N.D.N.Y. Mar. 30, 2016) (Sharpe, J.).

**\*12** Turning next to the issue of uncalled witnesses, the record clearly shows that (1) plaintiff did not know which inmate porters were working in the music room on October 1, 2011, (2) plaintiff did not know whether any of the inmate porters who were working in the music room on October 1, 2011 witnessed the use of force by defendants Langdon and Richards, (3) plaintiff was allowed to choose five out of the ten inmate porters to call as witnesses, and (4) defendant Phelix asked the five inmate porters identified by plaintiff to be witnesses, and each declined. Dkt. No. 35-10 at 50-52. Plaintiff contends that, once the five inmate porters that he identified refused to testify as witnesses, defendant Phelix was obligated to ask the other five inmate porters to participate as witnesses, and his failure to do so violated plaintiff's due process rights. Dkt. No. 37 at 6-7, 15; Dkt. No. 37-2 at 5-6.

Prison disciplinary hearings are subject to judicial review for harmless error in a setting such as that now presented. *See Powell v. Coughlin,* 953 F.2d 744, 750 (2d Cir. 1991) ("If a person may be convicted and obliged to serve a substantial prison sentence notwithstanding a constitutional error determined to be harmless, surely the conditions of confinement of a sentenced prisoner may be made temporarily more severe as discipline for a prison rules infraction despite a harmless error in adjudicating the violation."). Moreover, it is well-established that "[d]isciplinary hearing officers ... have the discretion to deny witnesses for valid reasons, including irrelevance, lack of necessity, and other factors particular to each case." *Tafari v. McCarthy,* 714 F. Supp. 2d 317, 377 (N.D.N.Y. 2010) (Hurd, J., *adopting report and recommendation by* Lowe, M.J.) (citing *Wolff v. McDonnell,* 418 U.S. 539, 566-67 (1974).)

In denying plaintiff's request to call all ten inmate porters, defendant Phelix noted that plaintiff's request was "a little excessive," and that whether any of these inmate porters had relevant testimony to offer was "a shot in the dark" given that plaintiff did not know who was in the music room on October 1, 2011, or what they witnessed, if anything. Dkt. No. 35-10 at 50. Plaintiff did not object to this characterization by defendant Phelix.

Instead, he chose the witnesses he wanted to call, and informed defendant Phelix that he spoke with one of these witnesses, implying that he knew the identity of at least one inmate porter who was working in the music room on October 1, 2011. Dkt. No. 35-10 at 50. That witness, as well as the other four inmate porters identified by plaintiff, refused to testify.

An inmate's refusal to testify at the disciplinary hearing of another inmate does not give rise to a due process claim against the hearing officer. *See, e.g., Creech v. Schoellkoph*, 688 F.Supp.2d 205, 213 (W.D.N.Y. 2010) (finding no due process violation where two witnesses called by inmate refused to testify). Similarly, an inmate's speculation regarding what testimony a potential witness might have offered is not enough to demonstrate prejudice and non-harmless error from a disciplinary hearing officer's refusal to ask that potential witness to participate in the hearing. *See Tafari v. Rock*, 10-cv-0729, 2012 WL 1340799, at *7 (W.D.N.Y. Apr. 18, 2012) (dismissing due process claim based on denial of right to call employee witnesses where inmate plaintiff "failed to show how he was prejudiced, if at all, by the alleged lack of their testimony" and "it appear[ed] that [the plaintiff did] not know whether [these witnesses] would have provided helpful or even relevant testimony"). Accordingly, defendant Phelix's decision not to ask five inmate porters whether they would be witnesses in plaintiff's disciplinary hearing based on plaintiff's speculation that one or more of them could potentially possess relevant information regarding the charges against him does not rise to the level of a due process violation. *Id.*; *see also Hinton v. Prack*, 12-CV-1844, 2014 WL 4627120, at *12 (N.D.N.Y. Sept. 11, 2014) (although "a denial of the right to call witnesses without an explanation is a violation of New York's ... regulations, ... [the] decision to deny, without reason, Plaintiff's request to call ... witnesses ... did not rise to the level of a due process violation because Plaintiff failed to allege ... how he was prejudiced").

**\*13** Plaintiff's claim of bias on the part of defendant Phelix is entirely conclusory with no evidentiary support, and is therefore insufficient to withstand a motion for summary judgment. *See, e.g., Bunting v. Nagy*, 452 F.Supp.2d 447, 460-61 (S.D.N.Y. 2006) ("[I]n order to defeat a motion for summary judgment, a plaintiff-inmate must 'be armed with [something] more than conclusory allegations of bias and prejudgment' " of the

disciplinary hearing officer) (quoting *Francis v. Coughlin*, 891 F.2d 43, 47 (2d Cir. 1989)). Indeed, there is no evidence in the record that defendant Phelix ever even had any interactions with plaintiff prior to the disputed disciplinary hearing, nor is there any evidence in the record that would in any way suggest a prejudging of the charges by defendant Phelix. Similarly, plaintiff's contention that his assistant was inadequate does not give rise to a claim against defendant Phelix, who was not personally involved in any alleged inadequate services rendered by the corrections counselor assigned to assist plaintiff at his disciplinary hearing.

Finally, with respect to plaintiff's contention that defendant Phelix's ruling on the charges was not supported by "any real credible evidence," plaintiff is misguided. The Supreme Court has made clear that "where a prisoner claims he was denied due process in a prison disciplinary hearing because he was found guilty on the basis of insufficient evidence, the claim must be rejected if there was at least 'some evidence' to support the decision." *Gaston v. Coughlin*, 249 F.3d 156, 163 (2d Cir. 2001) (quoting *Superintendent, Massachusetts Correctional Institution v. Hill*, 472 U.S. 445, 455 (1985)).

In this case, plaintiff was charged with violent conduct, interference with an employee, harassment, violating a direct order, and refusal of a search and frisk. Dkt. No. 35-10 at 4-5, 17. Plaintiff was found guilty of all charges with the exception of the charge of interference with an employee. *Id.* at 55. In addition to both the misbehavior report and written memorandum created by defendant Richards setting forth grounds for the charges against plaintiff for which he was found guilty, defendants Langdon and Richards testified at plaintiff's disciplinary hearing. Dkt. No. 35-10 at 17-19, 23-25. Both testified that plaintiff refused several orders to drop an uncapped pen in his hand while he was in a pat frisk position, despite having time to drop the pen and knowing that defendants Langdon and Richards were ordered by Sergeant Carey to conduct a pat frisk. *Id.* Defendant Richards further testified that, after plaintiff was ordered to drop the pen, plaintiff cursed at defendant Richards and then resisted his and defendant Langdon's effort to place him in restraints, while still holding the pen. *Id.* at 17-19. This testimony constitutes "some evidence" that plaintiff was guilty of the charges against him other than interference, as defendant Phelix concluded. *Id.* at 55.

In short, for all the reasons discussed above, I recommend a finding that plaintiff's allegations regarding the violation of his due process rights are unfounded, and that no reasonable factfinder could conclude plaintiff was deprived of due process by defendant Phelix during the course of his disciplinary hearing. Accordingly, defendants' motion for summary judgment should be granted and plaintiff's claims against defendants Phelix and Prack should be dismissed. [17]

### D. Qualified Immunity

**\*14** Defendants also seek dismissal of plaintiff's claims asserted against them based on the doctrine of qualified immunity. Dkt. No. 35-22 at 20. Having already dismissed plaintiff's due process claims against defendants Phelix and Prack on the merits, I will only address this argument with respect to plaintiff's excessive force claims against defendants Langdon and Richards.

"Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Reichle v. Howards*, 132 S. Ct. 2088, 2093 (2012); *see also Pearson v. Callahan*, 555 U.S. 223, 231 (2009); *Sudler v. City of N.Y.*, 689 F.3d 159, 174 (2d Cir. 2012). The law of qualified immunity seeks to strike a balance between "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson*, 555 U.S. at 231. Government officials are shielded from liability by qualified immunity when making "reasonable mistakes" concerning the lawfulness of their conduct. *Sudler*, 689 F.3d at 174 (citing *Saucier v. Katz*, 533 U.S. 194, 206 (2001), *abrogated on other grounds by Pearson*, 555 U.S. 223).

Because qualified immunity is "an immunity from suit rather than a mere defense to liability," *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985), the Supreme Court has "repeatedly ... stressed the importance of resolving immunity questions at the earliest possible stage in the litigation," *Pearson*, 555 U.S. at 231 (quoting *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (per curiam)).

The determination of whether a government official is immune from suit is informed by two factors. *Doninger*

*v. Niehoff*, 642 F.3d 334, 345 (2d Cir. 2011). Specifically, the inquiry turns on whether the facts alleged, taken in a light most favorable to the plaintiff, show that the conduct at issue violated a statutory or constitutional right, and if so, whether that right "was clearly established at the time of the challenged conduct." *Terebesi v. Torreso*, 764 F.3d 217, 230 (2d Cir. 2014) (citing *Reichle*, 132 S. Ct. at 2093). The Supreme Court has said that an officer's "conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2083 (2011) (quotation marks and alterations omitted). "To this end, a plaintiff need not show a case 'directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate.' " *Terebesi*, 764 F.3d at 230 (quoting *al-Kidd*, 131 S. Ct. at 2083). However, '[e]ven where the law is 'clearly established' and the scope of an official's permissible conduct is 'clearly defined,' the qualified immunity defense also protects an official if it was 'objectively reasonable' for him at the time of the challenged action to believe his acts were lawful.' " *Higazy v. Templeton*, 505 F.3d 161, 169-70 (2d Cir. 2007) (citations omitted). This "objective reasonableness" part of the test is satisfied if "officers of reasonable competence could disagree on [the legality of the defendant's actions]." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). Stated differently, a defendant has acted in an objectively unreasonable manner only "when no officer of reasonable competence could have made the same choice in similar circumstances." *Lennon v. Miller*, 66 F.3d 416, 420-21 (2d Cir. 1995).

**\*15** In this case, when viewing the evidence in the light most favorable to plaintiff and drawing all inferences in his favor, I find that a question of fact remains regarding whether it was objectively reasonable for defendants Langdon and Richards to believe their acts were lawful when they used force against plaintiff on the morning of October 1, 2011. For example, plaintiff testified that defendant Richards knew plaintiff to be in possession of a pen before commencing a pat frisk, and proceeded with the frisk while at the same time preventing plaintiff from releasing the pen. Dkt. No. 35-3 at 18-19, 38-45. The misbehavior report drafted by defendant Richards also indicates that plaintiff's possession of the pen was the reason why force was used against him. [18] Dkt. No. 35-12. Crediting plaintiff's version of the events, a reasonable

factfinder could conclude that no amount of force was needed to effectuate a pat frisk under the circumstances such that defendant Richards and Langdon's use of force was not objectively reasonable. Plaintiff also testified that, as a result of the force used against him, he suffered a dislocated shoulder. Dkt. No. 35-3 at 56-57. Accordingly, I recommend that defendants' motion for summary judgment dismissing plaintiff's claims against defendants Langdon and Richards on the basis of qualified immunity be denied.

With respect to the second alleged use-of-force incident that occurred on October 1, 2011, plaintiff testified that, while at the SHU facility and facing the wall in a room, he was approached from behind and punched in the ribs by a sergeant he did not know, after which point he was hit multiple times on the head, legs and inner-thigh by other unknown officers, all without provocation or any justification. Dkt. No. 35-3 at 58, 61-63. Defendants have not offered any evidence to contradict plaintiff's version of the events. Accordingly, when viewing the evidence in the light most favorable to plaintiff and drawing all inferences in his favor, I find that a question of fact remains regarding whether it was objectively reasonable for any force to be used against plaintiff while he was in SHU on October 1, 2011.

E. Status of Doe Defendants

In his complaint, plaintiff alleges that he was assaulted twice on October 1, 2011. Dkt. No. 1 at 12-14. With respect to the second alleged incident of assault, plaintiff names as defendants John Doe #1, John Doe #2, and John Doe #3. *Id.* at 3. Plaintiff admitted during his deposition that he did not know the identity of anyone who participated in this second alleged incident of assault. Dkt. No. 35-3 at 63, 68. In plaintiff's response to defendants' motion for summary judgment, plaintiff now states for the first time that he believes defendant Richards was one of the individuals present during this second assault. Dkt. No. 37-2 at 5. Plaintiff cites as support for this believe an inmate injury report. *Id.* (citing Dkt. No. 37-3 at 21).

Leaving aside the question of whether defendant Richards was involved in the second assault on October 1, 2011, plaintiff has failed to take any steps to identify any other of the Doe defendants despite his testimony that the names of the officers who escorted him "around in the SHU area to a cell" after the second alleged assault ended was "probably part of discovery" because he "asked who was

present including those people who was working there." Dkt. No. 35-3 at 68.

Dismissal of a claim under Rule 41(b) for failure to prosecute is appropriate "where discovery has closed and the Plaintiff has had ample time and opportunity to identify and serve John Doe defendants" but has failed to do so. *Jones v. Rock*, No. 12-CV-0447, 2015 WL 791547, at *21 (N.D.N.Y. Feb. 24, 2015) (Mordue, J., *adopting report and recommendation by* Dancks, M.J.) (quotation marks and alteration omitted); *Le Sane v. Hall's Sec. Analyst, Inc.*, 239 F.3d 206, 209 (2d Cir. 2001) (Rule 41(b) "gives the district court authority to dismiss a plaintiff's case *sua sponte* for failure to prosecute"); *Delrosario v. City of N.Y.*, 07-cv-2027, 2010 WL 882990, at *5 (S.D.N.Y. Mar. 4, 2010) (*sua sponte* dismissing claims against John Doe Defendants for failure to prosecute "[w]here discovery was closed and the Plaintiff has had ample time and opportunity to identify and serve John Doe Defendants"); *Coward v. Town & Vill. of Harrison*, 665 F.Supp.2d 281, 301 (S.D.N.Y. 2009) ("Where a plaintiff has had ample time to identify a John Doe defendant but gives no indication that he has made any effort to discover the defendant's name, the plaintiff simply cannot continue to maintain a suit against the John Doe defendant."). Likewise, on a motion from a defendant, and in the absence of a showing of good cause by the plaintiff, dismissal of a claim under Rule 4(m) is appropriate if the defendant has not been served within ninety days after the complaint is filed.

*16 The court's initial order reviewing plaintiff's complaint permitted plaintiff to proceed with his claims against the John Doe defendants, provided that plaintiff "take reasonable steps to ascertain the identity" of the Doe defendants so as to permit the timely amendment of the complaint and service of process on them. Dkt. No. 4 at 22. That order warned plaintiff, however, as follows: "If plaintiff fails to ascertain the identity of any defendant so as to permit the timely service of process, all claims against that individual will be dismissed." *Id.* The deadline for joining parties to this lawsuit and amending pleadings was originally July 2, 2015. Dkt. No. 15 at 5. That deadline was extended twice, and ultimately passed on September 8, 2015. Dkt. Nos. 19, 21. Discovery in this matter was originally scheduled to close on September 4, 2015. Dkt. No. 15 at 5. That deadline was subsequently extended four times, ultimately to December 18, 2015. Dkt. Nos. 19, 21, 28, 31.

It is now more than ten months past the extended deadline for joinder of parties. Yet, despite the warnings given, plaintiff does not appear to have taken any steps to ascertain the identities of the unnamed corrections officers. As such, I recommend that the claims brought against these unnamed Doe defendants be *sua sponte* dismissed, without prejudice.

## IV. SUMMARY AND RECOMMENDATION

Defendants seek dismissal of all of plaintiff's claims set forth in the complaint based on a variety of grounds, both procedural and substantive. While plaintiff's due process claim is subject to dismissal on the merits, plaintiff's excessive force claim asserted against defendants Langdon and Richards should survive defendants' motion because questions of fact remain relating to the procedural issue of exhaustion, and at least the factual issue of whether the amount of force used against plaintiff was reasonable under the circumstances. Plaintiff's excessive force claim asserted against the John Doe defendants, however, should be dismissed based upon plaintiff's failure to take the steps necessary to identify the three Doe defendants and join them in the action. Accordingly, it is hereby respectfully

RECOMMENDED that defendants' motion for summary judgment (Dkt. No. 35) be GRANTED in part and DENIED in part, as follows:

(1) Plaintiff's due process claim asserted against defendants Phelix and Prack should be DISMISSED;

(2) Plaintiff's excessive force claims asserted against the John Doe defendants should be DISMISSED; and

(3) Plaintiff's excessive force claims, asserted against defendants Richards and Langdon, should survive defendants' motion; and it is further respectfully

RECOMMENDED that defendants Phelix, Prack, John Doe #1, John Doe #2 and John Doe #3 be DISMISSED from this action.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72; *Roldan v. Racette, 984 F.2d 85 (2d Cir. 1993)*.

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

Dated: July 29, 2016.

**All Citations**

Slip Copy, 2016 WL 5440596

Footnotes

1   In light of the procedural posture of the case, the following recitation is derived from the record now before the court, with all inferences drawn and ambiguities resolved in plaintiff's favor. *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003).

2   The DOCCS conducts three types of inmate disciplinary hearings. *See* 7 N.Y.C.R.R. § 270.3; *see also Hynes v. Squillace*, 143 F.3d 653, 655 n.1 (2d Cir. 1998). Tier I hearings address the least serious infractions and can result in minor punishments such as the loss of recreation privileges. *Hynes*, 143 F.3d at 655 n.1. Tier II hearings involve more serious infractions, and can result in penalties which include confinement for a period of time in the SHU. *Id.* Tier III hearings address the most serious violations and can result in unlimited SHU confinement and the loss of "good time" credits. *Id.*

3   Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff.

4   Notably, in *Ross* the Court specifically rejected the "special circumstances" exception to the PLRA's rule of exhaustion that had previously been engrafted into the exhaustion requirement by the Second Circuit in such cases as *Hemphill v. New York*, 380 F. 3d 680 (2d Cir. 2004).

5   Depending on the type of matter complained of by the grievant, the superintendent has either seven or twenty days after receipt of the grievant's appeal to issue a decision. *Id.* at § 701.5(c)(3)(i), (ii).

6   Plaintiff testified that he was held in SHU at Bare Hill for sixteen days before being transferred into the Upstate Correctional Facility ("Upstate"). Dkt. No. 1 at 14; Dkt. No. 35-3 at 71.

**7**    A letter sent to plaintiff on November 9, 2011 from the Director of the Inmate Grievance Program, Karen Bellamy, identifies October 20, 2011, and not October 26, 2011, as the actual date that plaintiff attempted to file a grievance at Bare Hill. Dkt. No. 35-8 at 15.

**8**    In that grievance, plaintiff initially states that he was assaulted on September 1, 2011, and first attempted to file a grievance on September 11, 2011. At a later point in the same grievance, plaintiff identifies the date he first attempted to file a grievance as October 11, 2011. Dkt. No. 35-8 at 17. In his affidavit submitted in opposition to defendants' motion, plaintiff identifies October 11, 2011 as the first date on which he attempted to file a grievance. Dkt. No. 37-2 at 7. The affidavit does not indicate whether the grievance plaintiff attempted to file on October 11, 2011 pertained to both alleged incidents of assault that occurred on October 1, 2011, or just the first use of force incident. Plaintiff also states in paragraph 72 of his statement of additional material facts that his reference to September 11 was incorrect, and should have read October 11, 2011. Dkt. No. 37-1 at 12. Defendants have not responded to plaintiff's statement of additional material facts. In light of this, the deference owed to plaintiff as the non-movant, the undisputed fact that a use-of-force incident occurred on October 1, 2011, and the impossibility of plaintiff filing a grievance in September with respect to an event that occurred in October of the same year, I view all references to a September date in Grievance Number UST-48092-12 as mistakes.

**9**    Neither party has submitted a copy of this grievance. While I have serious doubts regarding whether plaintiff ever attempted to exhaust his administrative remedies with respect to the second alleged incident of assault, based on his deposition testimony, I am unable to decide this issue based on the current record.

**10**    *See* 7 N.Y.C.R.R. § 701.5.

**11**    Plaintiff's grievance dated December 29, 2011 also indicates that he was in the hospital at Upstate beginning on an undisclosed date and concluding on November 7, 2011, and that he was unable to "mail anything" from the hospital during this period. Dkt. No. 35-8 at 8.

**12**    While not citing any record evidence in support of this statement, plaintiff has indicated in his statement of additional material facts that he submitted the October 20, 2011 grievance to the Upstate IGRC on November 7, 2011, and that the grievance was "held without filing until 45 days expired, then deemed untimely." *See* Dkt. No. 37-1 at 12.

**13**    Recently, the Second Circuit ruled in *Williams v. Priatno,* ___ F.3d ____, 2016 WL 3729383 (2d Cir. July 12, 2016) that a *pro se* inmate plaintiff was excused from exhausting his administrative remedies where the record showed that he (1) attempted to file a grievance at a facility where he was assaulted, (2) followed up with the Superintendent at the facility about the grievance after having received no response, (3) was then transferred to another facility, and (4) never appealed the grievance. 2016 WL 3729383, at *2, *5–*6. The *Williams* court rejected defendants' argument that the plaintiff in that case "still could have attempted to appeal the grievance in accordance with sections 701.6(g)(2) and 701.8(g)" even if the grievance was never filed in the first place and despite the fact that he had been transferred to a new facility prior to receiving a response, and concluded that "even if Williams technically could have appealed his grievance, ... the regulatory scheme providing for that appeal is 'so opaque' and 'so confusing that ... no reasonable prisoner can use [it].' " *Id.* at *5 (quoting *Ross,* 136 S. Ct. at 1859). Based on the Second Circuit's holding in *Williams,* it would seem that plaintiff's failure to appeal the non-decision on his request for an extension, as well as plaintiff's failure to appeal the non-decision on his grievance submitted on October 11, 2011, is excusable.

**14**    In cases where there is factual dispute concerning the conditions or duration of confinement, however, it may nonetheless be appropriate to submit those disputes to a jury for resolution. *Colon v. Howard,* 215 F.3d 227, 230-31 (2d Cir. 2000); *Sealey v. Giltner,* 197 F.3d 578, 585 (2d Cir. 1999).

**15**    Plaintiff argues in his opposition brief that the conditions were atypical because he was denied medical treatment, prevented from filing complaints, and had his mail tampered with. Dkt. No. 37 at 12. Plaintiff has offered some evidence in support of his argument that his mail was tampered with and that, on one occasion, he was prevented from filing a grievance while in Bare Hill. However, plaintiff has not offered any evidence that he was denied medical treatment at either facility, aside from his conclusory statement, or subject to any atypical conditions of confinement while housed in Upstate's SHU. Plaintiff merely states that the conditions he experienced while confined in SHU were "terrible," and that while there he faced "extreme hostile, threating [sic] conditions." Dkt. No. 1 at 17.

**16**    *See* Dkt. No. 35-10 at 10-11.

**17**    It could be argued that plaintiff's due process claim against defendant Prack is also potentially subject to dismissal for lack of personal involvement. Plaintiff's claim against defendant Prack is based on defendant Prack's failure to overturn defendant Phelix's determination. While the issue is the subject of debate in this circuit, at least some courts have held that a failure to reverse a disciplinary hearing officer's determination at the administrative appellate level does not, by itself, give rise to a separate constitutional violation. *See Jackson v. Bradt,* 13-cv-0004, 2014 WL 2505210, at *4 (W.D.N.Y. May 28, 2014) ("As to defendant Prack, the only allegation is that he affirmed Murray's disposition[, and] [t]his allegation alone

is insufficient to state a claim against Prack."); *Parks v. Smith*, 08-CV-0586, 2011 U.S. Dist. LEXIS 102460, 2011 WL 4055415, at *13 (N.D.N.Y. Mar. 29, 2011) (Lowe, M.J.), *adopted by* 2011 WL 4055414 (N.D.N.Y. Sept. 12, 2011) (McAvoy, J.); *Woodward v. Mullah*, No. 08-CV-463A, 2009 U.S. Dist. LEXIS 113917, 2009 WL 4730309, at *2-3 (W.D.N.Y. Dec. 7, 2009); *but see Smith v. Rosati*, 10-cv-1502, 2013 WL 1500422, at *7 (N.D.N.Y. Feb. 20, 2013) (collecting cases holding that "the review and response to an appeal of a disciplinary conviction are sufficient to establish personal involvement because that conduct implicates the second of the five potential grounds for supervisor liability under *Colon [v. Coughlin*, 58 F.3d 865 (2d Cir. 1995)]*.") (Peebles, M.J.), *adopted by* 2013 WL 1501022 (N.D.N.Y. Apr. 10, 2013) (Hurd, J.).

18    The misbehavior report notes that Sergeant Casey ordered defendants Richards and Langdon to take plaintiff to the floor. *See* Dkt. No. 35-12. Plaintiff, however, testified that it was defendant Richards who gave that order. *See* Dkt. No. 35-3 at 43-45.

---

2016 WL 929268
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Benjamin Stephens, Plaintiff,

v.

D. Venettozzi, et al., Defendants.

13-CV-5779 (RA) (DF)
|
Signed 02/24/2016

## REPORT AND RECOMMENDATION

DEBRA FREEMAN, United States Magistrate Judge

**\*1 TO THE HONORABLE RONNIE ABRAMS, U.S.D.J.:**

*Pro se* plaintiff Benjamin Stephens ("Plaintiff") brings this action under 42 U.S.C. § 1983, alleging that he suffered violations of his constitutional rights while incarcerated at Green Haven Correctional Facility ("Green Haven"). Currently before this Court for a report and recommendation are two motions to dismiss the Amended Complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure, by which four of the named defendants in this action (collectively, the "Moving Defendants") seek dismissal of the claims against them.

The first motion (Dkt.118) was initially filed by 14 (of what, at that time, were 26) named defendants, but, with the assistance of *pro bono* counsel who then entered the case on Plaintiff's behalf to assist with this motion practice and discovery, Plaintiff voluntarily dismissed the action against 11 of those defendants, leaving the dismissal motion to be pursued only by defendants Superintendent William A. Lee ("Lee"), Correction Officer ("C.O.") Robert Snedeker ("Snedeker"), and C.O. Daniel D'Angelico ("D'Angelico"). The second motion (Dkt.147) was separately filed by defendant Correctional Sergeant John Hann ("Hann"). For the reasons set forth below, I respectfully recommend that the motion by defendants Lee, Snedeker, and D'Angelico be granted in part (to the extent of dismissing certain of Plaintiff's claims against Lee), but otherwise denied, and that the motion by defendant Hann be denied in its entirety.

## BACKGROUND

### A. *Factual Background* [1]

In his Amended Complaint, Plaintiff alleges that, between June 2010 and March 2012, several officers at Green Haven subjected him to a pattern of harassment and violence in retaliation for his filing of grievances and informal complaints. (See *generally* Amended Complaint, dated Dec. 3, 2014 ("Am.Compl.") (Dkt.67).) [2] In particular, and as relevant to the pending motion, Plaintiff claims that he was subjected to the retaliatory use of excessive force in incidents that occurred on November 1, 2011, and March 23, 2012. (*Id.* ¶¶ 170–254.) Plaintiff does not allege, however, that any of the Moving Defendants personally assaulted him. Instead, as clarified in his opposition papers, Plaintiff contends that these four defendants bear responsibility for his injuries because they failed to intervene or protect him from violence perpetrated by other officers. (See Plaintiff Benjamin Stephens, Jr.'s, Opposition to Motion to Dismiss Claims Against 14 Defendants, dated Sept. 30, 2015 ("Pl.Mem.") (Dkt.139), at 2; Memorandum of Law in Opposition to Defendant Sgt. Hann's Motion to Dismiss, dated Dec. 7, 2015 ("Pl.Mem.Hann") (Dkt.161), at 1–2.) More specifically, Plaintiff claims that: (1) defendant Hann failed to intervene in the November 1, 2011 assault perpetrated by another officer (Carlson); (2) defendants Snedeker and D'Angelico failed to intervene in the March 23, 2012 assault perpetrated by another officer (Mrzyglod); and (3) Defendant Lee, as Superintendent of the facility, failed to protect him from both assaults, despite his actual knowledge—through receiving grievances and letters from Plaintiff—that Plaintiff had previously been subjected to harassment, threats, and violence in retaliation for his engaging in protected speech. (*See generally* Pl. Mem.; Pl. Mem. Hann.)

### 1. Alleged Pattern of Retaliation Against Plaintiff, Prior to the Alleged Assaults at Issue [3]

**\*2** Plaintiff, who was an inmate at Green Haven at all times relevant to his claims, has a medical condition that prevents him from fully voiding his bladder, for which he takes medication to promote frequent urination. (Am. Compl. ¶ 3 & n.1.) On June 9, 2010, while Plaintiff was in the Green Haven clinic to obtain his

medication, three correction officers—C.O. Philip Flora and defendants Corbin and DeStefano—denied Plaintiff's repeated requests to use the clinic's restroom. (*Id.* ¶¶ 5, 11–17.) While leaving the clinic, Plaintiff urinated in his pants, due to an inability to control his bladder. (*Id.* ¶¶ 19–20.) Plaintiff asked Corbin for permission to return to his housing block to change his clothes, but Corbin refused, forcing Plaintiff to wear the soaked clothes for another hour. (*Id.* ¶¶ 21–22.) With respect to this incident, Plaintiff filed grievance # GH–69773–10, which was denied by then-acting Superintendent Raymond Koskowski on the basis that the correction officers involved either denied or could not recall prohibiting Plaintiff from using the restroom on the date in question. (*Id.* ¶¶ 23–24.)

On August 6, 2010, as Plaintiff attempted to use the restroom in the same clinic, DeStefano stopped him and said: "Because you were stupid enough to grieve me about not letting you use this fuckin' [b]athroom, it'll be Out–of–Order whenever I'm here and you want to use it." (*Id.* ¶¶ 27–31.) Afterwards, Plaintiff approached defendant Cocuzza, a sergeant, and told him that he urgently needed to use the bathroom. (*Id.* ¶¶ 33–34.) Cocuzza stated that he could "only ... be of any assistance" if Plaintiff gave him a pack of Marlboro cigarettes. (*Id.* ¶¶ 35–36.) When Plaintiff stated that he did not have any cigarettes on his person, Cocuzza walked away and placed an out-of-order sign on the door of the lavatory, and DeStefano then locked the door. (*Id.* ¶¶ 36–37.) Consequently, Plaintiff suffered pain and discomfort in his lower abdomen and ultimately urinated in his pants again. (*Id.* ¶¶ 38, 40–41.)

On August 9, 2010, in the clinic, Plaintiff overheard defendants Scull and LePage call him a "prick" for filing grievances against staff because they did not let him use the bathroom. (*Id.* ¶¶ 43–44.) Later, when Plaintiff attempted to use the bathroom, LePage denied him access to it, causing Plaintiff to experience lower abdominal pain. (*Id.* ¶¶ 46–49.) Plaintiff's grievances regarding the August 6 and August 9 incidents were ultimately consolidated as # GH–70015–10. (*Id.* ¶ 42.)

On August 14, 2010, defendant Tokarz, who was assigned to investigate the consolidated grievance, interviewed Plaintiff in a "makeshift [c]ourt[r]oom." (*Id.* 54–58.) As Plaintiff tried to explain that his medical condition causes a frequent need to urinate, Tokarz exclaimed, "I don't give a fuck! You file all these [g]rievances and haven't won a single one. Keep filing these [g]rievances and I'll make your

time here rougher than it is." (*Id.* ¶¶ 60–61.) Upon seeing Tokarz's reaction, Plaintiff asked to leave, but Tokarz denied his request. (*Id.* ¶ 62.) Plaintiff then took out a pen and a piece of paper and asked for Tokarz's name. (*Id.* ¶ 63.) After Tokarz answered, Plaintiff asked him to spell his name, but Tokarz refused. (*Id.* ¶ 63–64.) Plaintiff then mentioned that he would find out the spelling of Tokarz's name from Tokarz's son, who also worked in the facility. (*Id.* ¶ 65.) Upon hearing this, Tokarz ordered C.O. Robert Madigan, the other correction officer who was present, to leave the room. (*Id.* ¶ 66.) Tokarz then yanked Plaintiff up from his chair, slammed his head on the table, and struck Plaintiff on the back of the neck and buttocks with his baton, warning: "If you grieve me or my son, I'll have you killed! Stop grieving my Sergeants and Officers!" (*Id.* ¶¶ 66–67.) Tokarz then threw Plaintiff to the ground, causing Plaintiff to have a seizure when his head struck the floor. (*Id.* ¶ 68.)

After the seizure, Plaintiff regained consciousness in the facility's emergency room,[4] and was later moved to the infirmary. (*Id.* ¶¶ 69, 72.) There, after Plaintiff had reported Tokarz's assault to nurse Salomy Ntambi (*id.* ¶¶ 76–77), Cocuzza and defendant Smith visited Plaintiff in the infirmary and ordered him to "get out of the bed" (*id.* ¶¶ 85–86). When Plaintiff refused, the pair slapped and punched Plaintiff in the face, with Cocuzza warning: "It's going to get wors[e] for you for grieving me." (*Id.* ¶¶ 85–87.) Plaintiff reported the attack by Cocuzza and Smith to Sergeant Orazio A. Bucolo and asked to file an "Inmate Injury Report."[5] (*Id.* ¶ 92.) Subsequently, in the presence of C.O. David Thorne, Smith again punched Plaintiff in the face and told him to "handle it like a man," apparently in an attempt to dissuade Plaintiff from filing such a report. (*Id.* ¶ 96.)

**\*3** On August 15, 2010, the next day, Plaintiff wrote a letter to Moving Defendant Lee, as Superintendent of Green Haven, to notify him of the August 14, 2010 assaults by Tokarz, Cocuzza, and Smith. (*Id.* ¶ 54.) He also filed grievance # GH–70083–10 with respect to these incidents. (*Id.* ¶¶ 120, 145–46.) At first, Plaintiff did not specifically identify Smith in this grievance, because he did not know his first or last name. (*Id.* ¶ 144.) Later, after learning Smith's name, Plaintiff filed a letter seeking to add Smith to grievance # GH–70083–10, but the correspondence was processed as a new grievance, # GH–70165–10. Additionally, in grievance # GH–70109–10, Plaintiff sought to exclude Tokarz and Cocuzza from

investigating any of his future grievances, citing their past "harassment, retaliatory conduct, and assaultive behavior toward [Plaintiff]." (*Id.* ¶ 140.)

Also on August 15, 2014, the same day as Plaintiff filed his grievances, Tokarz issued Plaintiff an Inmate Misbehavior Report, alleging that Plaintiff had engaged in violent conduct and threats during the August 14, 2010 interview. (*Id.* ¶¶ 116–17.) Plaintiff alleges that Tokarz fabricated this report to cover up his own violent, retaliatory conduct. (*Id.*)

On September 13, 2010, after he was found guilty of violating facility rules during the August 14, 2010 interview, Plaintiff wrote to Superintendent Lee, outside of the formal disciplinary process, to inform him that there was a lack of substantial evidence to support the charges against him, and that his disciplinary proceedings were tainted by procedural violations. (*Id.* ¶ 126.) Lee wrote back, confirming that a request for discretionary review may be forwarded to the Superintendent, but suggesting that Plaintiff file an appeal with the CORC. (*Id.* ¶ 127.) Plaintiff filed an appeal, as suggested, and the CORC affirmed the result of the hearing. (*Id.* ¶¶ 128–29.) Plaintiff then requested discretionary review by Lee, but Lee denied the request, stating that the penalty imposed was appropriate. (*Id.* ¶ 132–33.)

On September 20, 2010, Plaintiff was brought to Cocuzza by Smith and Corbin for the purpose of investigating grievance # GH–70165–10, which specifically named only Smith, but involved an assault allegedly perpetrated by both Smith and Cocuzza. (*Id.* ¶¶ 148–54.) Cocuzza informed Plaintiff that he had been assigned to handle the grievance, and that he "was tired of [Plaintiff's] complaining." (*Id.* ¶¶ 154–55.) As Cocuzza spoke, Smith and Corbin punched and slapped the back of Plaintiff's head, and Corbin applied a chokehold on Plaintiff for several seconds. (*Id.* ¶¶ 155–56.) Cocuzza then threatened Plaintiff, stating that, if Plaintiff complained about what happened during this interview, he would be "set-up with a weapon," confined in a special housing unit, and seriously injured. (*Id.* ¶ 157.) Fearing for his own safety, Plaintiff complied and did not pursue any internal grievance regarding this incident. (*Id.* ¶ 158.) Plaintiff did, however, inform the Office of the Attorney General of these events through a Verified Notice of Intention to File a Claim. (*Id.* ¶ 161.)

## 2. *Moving Defendant Lee's Responses to Plaintiff's Grievances*

On September 7, 2010, Superintendent Lee, relying on Tokarz's interview findings, denied Plaintiff's consolidated grievance # GH–70015–10, which concerned the two bathroom incidents in August 2010. (*Id.* ¶¶ 42, 50.) In doing so, Lee stated:

> The grievant (Plaintiff) alleges he was harassed and prevented from using the bathroom while in the Clinic. The grievant was interviewed by [Lieutenant Tokarz]. [6] ... During this interview the grievant was uncooperative and refused to identify any witnesses. He stated ... he saw no need to discuss the matter with [Lieutenant Tokarz]. [Lieutenant Tokarz] interviewed [Sergeant Cocuzza,] and the Sgt. states he has never spoken with the grievant. Sgt. C. has submitted a written statement ... he says the bathroom in the Clinic is located adjacent to the ER and there are times when there are emergencies: KL (Keep–Lock) medication, SHU (Special Housing Unit) inmates, insulin medication, etc .... going on in that area which, for security reasons, would prevent inmate access to the lavatory at those times. CO Lepage, CO Scull, and CO Destefano have submitted statements saying they allow inmates to utilize the bathroom, unless, for security reasons, the bathroom is not accessible to inmates. They recall no incident on the dates in question. Their statements say that at no time have they conspired with anyone to not allow the grievant or any other inmate to use the bathroom.

**\*4** (*Id.* ¶ 51.) [7]

On October 6, 2010, Lee, based on Cocuzza's investigation, denied grievance # GH–70165–10, which named Smith as the subject of the grievance, but related to the assaults allegedly perpetrated by Tokarz, Smith, and Cocuzza. (*Id.* ¶ 162.) Lee found:

> The grievant is alleging he was assaulted. According to the investigation, the grievant's allegations cannot be substantiated. The grievant was interviewed by a security supervisor ( [S]ergeant Cocuzza) and had nothing further to add to this complaint. The Sgt. also interviewed the officer named in this grievance (CO Smith), and the officer has submitted a written statement as well. The officer states that at no time did he speak to the grievant.... Medical was asked if the grievant had reported to the medical staff allegations of being assaulted, and if there were any injuries noted in his chart, there was not. Grievance is denied.

(*Id.* (alteration in original).) Plaintiff alleges that Lee improperly allowed Cocuzza to investigate this matter, despite the fact that he had personally participated in the events underlying the grievance.[8] (*Id.* ¶ 147.)

On December 7, Lee also denied grievance # GH–70083–10, finding that Plaintiff's allegations against Tokarz regarding the assaults during the August 14 interview were unsubstantiated:

> Grievant alleges he was assaulted. Grievant was interviewed by Captain Royce on 10/7/10 regarding his grievance. The grievant had nothing further to add to his grievance. [Lieutenant Tokarz] has responded and denie[d] striking inmate Stephens. CO Madigan reports entering the court room at the request of [Lieutenant Tokarz] and observing the inmate apparently having a seizure, the inmate was on the floor and banging on the right side of his face on

the floor. The grievant's assertion that he was assaulted by staff is unsubstantiated. The grievant is advised that his complaint is also the subject of an Inspector General's Office investigation. Grievance is denied.

(*Id.* ¶ 120 (alteration in original).) Despite the fact that Plaintiff had alleged that he was also assaulted in the infirmary by Cocuzza and Smith, Lee's decision did not address these allegations. (*Id.* ¶ 121.)

Finally, Lee denied grievance # GH–70109–10 (which sought to exclude Tokarz and Cocuzza from investigating Plaintiff's grievances), on the basis that "[a]ll grievances are investigated in accordance with Directive 4040," which provides that "[i]nvestigations are assigned to the security supervisor assigned to the area the complaint is about." (*Id.* ¶ 141.)

### 3. *The November 1, 2011 Assault and Related Events*

**\*5** Between February 2011 and October 2011, Plaintiff was housed in E–Block, and, during that period, he reported no incidents of retaliation or excessive force. (*Id.* ¶ 175.) Then, on October 20, 2011, Plaintiff was moved to A–Block "for unknown reason[s]." (*Id.*)

On October 26, 2011, Plaintiff wrote to Superintendent Lee to request an immediate transfer from A–Block. (*Id.* ¶ 171; *see also* Declaration of Christopher J. Stanley, Esq., in Support of Plaintiff's Opposition to Motion to Dismiss Claims Against 14 Defendants, dated Sept. 30, 2015 ("9/30/15 Stanley Decl.") (Dkt.140), Ex. A (Letter from Plaintiff to Lee, dated Oct. 26, 2011).) In the letter, Plaintiff expressed fear that he would be "physically assaulted, issued fabricated Misbehavior Reports, falsely accused of possessing ... contraband [and] falsely accused of physically assaulting staff." (Am. Compl. ¶ 171; 9/30/15 Stanley Decl., Ex. A, at 1.) Plaintiff attributed this fear to three recent guard-on-inmate assaults in A–Block, which Plaintiff had learned about from other inmates, and the fact that one of the officers who had previously assaulted him regularly worked on "Tour Two" in A–Block.[9] (Am. Compl. ¶ 171; 9/30/15 Stanley Decl., Ex. A, at 2–3.) Plaintiff further stated that, since his assignment to A–Block, he had already been verbally harassed by

two Tour Two A–Block officers, and that he "seriously fear[ed] that, if allowed to remain in A–Block any longer, [he would] be physically assaulted." [10] (9/30/15 Stanley Decl., Ex. A, at 5.) Plaintiff therefore requested Lee's assistance in "effect[ing] [his] immediate removal from A–Block and placement in an appropriate [Green Haven] housing block." (*Id.,* at 6.)

On October 28, 2011, Lee denied Plaintiff's request for a transfer, stating:

> Your request to move is based on speculation and assumption. You make references to staff members that you claim either harassed you or acted inappropriately. You do not, however, identify any particular individual. If you wish to make a complaint about the actions of a particular employee, you may utilize the Inmate Grievance Program, or directly address correspondence to me regarding the matter. In either case, however, you would need to identify who you are alleging is acting inappropriately to allow your claim to be investigated. Your request to be moved is denied.

(*Id.* ¶ 178 (alteration in original).)

A few days later, on the morning of November 1, 2011, as Plaintiff was getting breakfast in the dining area, defendant Carlson approached him and asked, "What did you place in your pocket?" (*Id.* ¶ 185.) Plaintiff replied, "What are you talking about? I have only a wallet and [ ] pen in my pockets." (*Id.* ¶ 186.) Carlson then ordered Plaintiff to leave his food and tray behind and exit the area. (*Id.*) As Plaintiff left the area with Carlson, he observed Hann, a sergeant and area supervisor (and one of the Moving Defendants), standing immediately near the entrance/exit of the dining area. (*Id.* ¶ 188.) Plaintiff and Carlson walked toward a wall-mounted stretcher, which was outside the B & C–Corridor gate control booth. (*Id.* ¶ 189.) Carlson then ordered Plaintiff to stop, empty his pockets, and place his hands on the wall in a pat-frisk position; Plaintiff fully complied with these directions. (Id.) Carlson said: "Me and other [o]fficers in the Block know about your bullshit letter to the Superintendent, complaining about us and your fuckin' fears. If you know

what's best for you, don't ever mention my name in your fuckin' letters or mouth; do I make myself absolutely clear?" (*Id.* ¶ 190.) When Plaintiff refused to respond, Carlson said, "So ... you want to be a smart-ass?" (*Id.* ¶ 191.) Carlson then "stepped directly behind" Plaintiff, "pull[ed] on and ball[ed] up Plaintiff's shirt collar," making it "taut and choking-tight around his neck," "grabbed the back-center[ ] waistband of Plaintiff's pants[,] and forcefully yank[ed] such pants" so that they became "extremely taut in the crouch area." (*Id.* ¶ 191.) Carlson then placed his hand near Plaintiff's right ankle, thrust his hand up Plaintiff's right leg and into his testicles and crotch, and repeated this action on Plaintiff's left side. (Id.) During the pat frisk, Plaintiff "briefly looked toward" the dining area entrance and observed Hann, who was standing immediately outside that entrance, "looking in the direction of [Plaintiff] and [Defendant] Carlson." (*Id.* ¶ 192.) Hann did not intercede or stop the alleged assault. (*Id.* ¶ 193.)

**\*6** After this incident, another correction officer searched Plaintiff's property, returned the items to Plaintiff's pocket, and escorted Plaintiff back to his housing block. (*Id.* ¶ 196–97.) On the same day, because of the pain and discomfort in his neck and testicles, Plaintiff placed a request to be called out for medical care. (*Id.* ¶ 200.) Plaintiff filed grievance # GH–72219–11 regarding the pat frisk and separately wrote a letter of complaint to Superintendent Lee. *(Id.* ¶¶ 201, 205.)

On November 2, 2011 (the day after the incident), Carlson filed a Misbehavior Report against Plaintiff, accusing him of violating five facility rules. (*Id.* ¶ 202.) Following a disciplinary hearing, Plaintiff was found guilty of three of the five violations and received a sanction of 30–days keeplock confinement and loss of package, phone, and commissary privileges. (*Id.* ¶¶ 210, 213.) Plaintiff unsuccessfully appealed the hearing result, and, in December 2011, Lee denied Plaintiff's request for reconsideration. (*Id.* ¶¶ 211–12, 220.) On December 22, 2011, Lee also denied grievance # GH–72219–11 with respect to Carlson's alleged assault on November 1, 2011, finding:

> Grievant alleges he was harassed by an officer.... The grievant requested staff members that did not observe the pat frisk in the corridor. The grievant requested a witness

(07A4957) be interviewed.[11] ... Inmate 07A4957 (I/M B) was interviewed by a security supervisor (Sergeant Alexander) on 12/19/11. Inmate 07A4957 stated that he did see the grievant pat frisked. The security supervisor states that 07A4957 did not state that he heard any threatening statements or harassment by the officer named in this complaint (Carlson). The officer named in this complaint was interviewed by [Sergeant Alexander]. The officer has submitted a written statement denying the grievant's allegations. The officer states that at no time did he choke or strike the grievant during the pat frisk in question. He states that he performed the pat frisk according to departmental procedures. He states that on 11/1/11 the grievant was issued a[MBR] for creating a disturbance, harassment, refusing direct order, movement regulation violation, mess hall serving/seating violation.... CO Finn was in B & C Corridor on the date in question and he has submitted a written statement saying that he observed the pat frisk in question, and at no time was the grievant harassed, threatened, or abused during the 11/1/11 pat frisk. According to the investigation[,] the grievant's allegations could not be substantiated. Grievance is denied.

(*Id.* ¶ 206.)

Also on November 2, 2011, Plaintiff was transferred from A–Block back to E–Block. (*Id.* ¶ 226.) Following the transfer, Green Haven staff failed to escort Plaintiff to a scheduled medical appointment, prompting Plaintiff to place an emergency sick-call request. (*Id.* ¶ 228.) Upon receiving the request, C.O. Keith G. Chase ("Chase") escorted Plaintiff to the clinic, but complained that it was not a medical emergency. (*Id.* ¶¶ 233–36.) In the clinic, in the presence of others, Chase loudly read out

Plaintiff's medical problems as they appeared on the sick-call request. (*Id.* ¶ 237.) After exiting the clinic, Chase asked to check Plaintiff's identification card and said to Plaintiff: "If your complaining has anything to do with Officer Carlson's pat frisk yesterday, I'd advise you not to pursue this any further. Officer Carlson is my buddy, and we can cause all sort of problems for you—no matter where you are housed at this facility." (*Id.* ¶ 250.) Chase then threw Plaintiff's card back, hitting Plaintiff in the forehead. (*Id.* ¶ 251.) Plaintiff filed grievance # GH–72216–11 against Chase, which Lee rejected on the basis that Chase denied engaging in any harassment, threat, or other misconduct towards Plaintiff. (*Id.* ¶¶ 252–53.)

### 4. *The March 23, 2012 Assault and Related Events*

**\*7** On March 23, 2012, in the dining area for E-block inmates, Plaintiff observed defendant Mrzyglod[12] talking with Cocuzza. Later, Mrzyglod, accompanied by C.O.s Snedeker and D'Angelico (two of the Moving Defendants here), directed Plaintiff to leave the food line and enter a strip search room adjacent to E-block. (*Id.* ¶¶ 256–61, 264.) Plaintiff entered the room alone with Mrzyglod. (*Id.* ¶ 265.) Snedeker and D'Angelico, who, according to Plaintiff, were not assigned to work in E-block, stood just outside the door. (*Id.* ¶¶ 264–66.)

Inside the room, Mrzyglod directed Plaintiff to sit at a desk, upon which Mrzyglod had already placed a large manila envelope. (*Id.* ¶¶ 267.) Mrzyglod then emptied the envelope; its contents were personal effects that had been taken from Plaintiff's cell, including photographs, correspondence with Plaintiff's attorney, and copies of grievances filed by Plaintiff. *(Id.* ¶¶ 267–68.) Mrzyglod called Plaintiff a " 'thorn' in 'a lot of asses'," and stated that Plaintiff had "better write" a statement withdrawing any pending grievances against Green Haven officers, if he desired the return of his personal property. (*Id.* ¶¶ 267–72.) When Plaintiff refused to do so, Mrzyglod punched Plaintiff twice on the left side of his face, warning that he "could seriously hurt" Plaintiff if he "play[ed] hardass." (*Id.* ¶ 272.) Plaintiff continued to refuse to withdraw his grievances. (*Id.* ¶ 273.) Mrzyglod then yanked Plaintiff out of his chair, pinned him down on a "bed/mattress frame," and punched Plaintiff twice more in the face. (*Id.*)

After that, Mrzyglod briefly left the room and told Plaintiff to "get smart and start writing." (*Id.* ¶ 274.) Upon returning and observing that Plaintiff had not written anything, Mrzyglod choked Plaintiff with both of his hands. (*Id.* ¶¶ 275–76.) After Plaintiff again refused to write anything, Mrzyglod punched Plaintiff in the face once more, warned him not to tell anyone about their "little chat," and brought him out of the room. (*Id.* ¶ 277.) On his way out, Plaintiff observed Snedeker and D'Angelico standing immediately outside, smiling. (*Id.* ¶ 278.) As Plaintiff made his way back to his cell, he became dizzy and sat on the floor to wait for medical assistance. (*Id.* ¶¶ 279–89.)

Subsequently, Mrzyglod went to the emergency room and warned Plaintiff not to report the assault, calling Plaintiff "a real punk." (*Id.* ¶ 287, 292–93.) Plaintiff reported the assault to medical staff, had his injuries photographed, and filled out an Inmate Injury Report. *(Id.* ¶¶ 294–99.) After Plaintiff returned the injury report to one of the nurses, Cocuzza entered the emergency room, warned Plaintiff not to report the assault, and suggested that Plaintiff attribute his injuries to falling down the stairs. (*Id.* ¶¶ 305–07, 309.) Subsequently, Plaintiff filed grievance # GH–73040–12; Lee denied that grievance and advised Plaintiff that the incident was being investigated by the Office of the Inspector General. (*Id.* ¶¶ 311–12.)

As a result of the March 23, 2012 assault, Plaintiff suffered facial swelling, pain, bruising, bleeding, a broken tooth, and hearing loss in his left ear. (*Id.* ¶¶ 296, 314–16.)

### B. *Procedural History*

On July 30, 2013, Plaintiff filed his original *pro se* Complaint against nine defendants, alleging that they had subjected him to retaliatory harassment, threats, and physical assaults at Green Haven. (*See* Complaint, dated July 30, 2013 (Dkt.2).) On December 3, 2014, Plaintiff filed a *pro se* Amended Complaint, this time naming 26 defendants—the nine defendants he had originally named, plus an additional 17 defendants—asserting claims for retaliation, excessive force, denial of disciplinary due process, and inadequate medical care. (*See generally* Am. Compl.)

**\*8** On June 19, 2015, 14 of the 26 defendants moved to dismiss the claims against them on the grounds that: (1) Plaintiff's claims against them were barred by the 11th Amendment to the extent that Plaintiff

sought monetary damages from them in their official capacities; (2) defendant CORC was not a suable entity; (3) Plaintiff failed to state claims against them upon which relief could be granted; (4) they were entitled to qualified immunity; and (5) certain of Plaintiff's claims were barred by the statute of limitations. (See Notice of Defendants' Motion to Dismiss Claims Against 14 Defendants, dated June 19, 2015 (Dkt.118); *see generally* Memorandum of Law in Support of Motion to Dismiss Claims Against 14 Defendants, dated June 19, 2015 ("Def.Mem.") (Dkt.119).)

On September 30, 2015, with the assistance of *pro bono* counsel,[13] Plaintiff filed (1) a notice of voluntary dismissal (Dkt.142), withdrawing his claims against 11 of the 14 defendants who had moved to dismiss (all except for Lee, Snedeker, and D'Angelico), and (2) a memorandum of law in opposition to the motion (*see* Pl. Mem.), addressing the arguments made by Lee, Snedeker, and D'Angelico. In his opposition brief, Plaintiff clarified that he is not pursuing any due-process claim against defendant Lee relating to the treatment or resolution of Plaintiff's grievances, but rather is pursuing claims that Lee, in his capacity as a supervisor, had failed to protect Plaintiff from violence at the hands of other prison officials. (Pl. Mem. at 11, 23.)[14] Plaintiff also submitted an attorney declaration (see 9/30/15 Stanley Decl.), attaching as exhibits a copy of Plaintiff's October 26, 2011 letter to Lee, in which Plaintiff had requested a housing transfer away from A–Block (*id.*, Ex. A), and a 2006 report on Green Haven by the Correctional Association of New York, (*id.*, Ex. B). On October 30, 2015, Lee, Snedeker, and D'Angelico filed a reply memorandum in further support of their motion to dismiss. (*See* Def. Reply.)

On November 9, 2015, defendant Hann filed a separate motion to dismiss the claims against him, on the grounds that: (1) he was entitled to 11th Amendment immunity to the extent that Plaintiff sought monetary damages from him in his official capacity; (2) Plaintiff failed to state any claim against him upon which relief could be granted; (3) Plaintiff failed to allege that he acted with a retaliatory motive; and (4) he was entitled to qualified immunity. *(See* Notice of Defendant Hann's Motion to Dismiss the Amended Complaint, dated Nov. 9, 2015 (Dkt.147); *see generally* Memorandum of Law in Support of Defendant Sgt. Hann's Motion to Dismiss, dated Nov. 9, 2015 ("Def. Hann Mem.") (Dkt.148).)

On December 7, 2015, with the assistance of counsel, Plaintiff filed a memorandum in opposition to Hann's motion. (*See* Pl. Mem. Hann.) Plaintiff also submitted an attorney declaration (Declaration of Christopher J. Stanley in Support of Plaintiff's Opposition to Defendant Hann's Motion to Dismiss, dated Dec. 7, 2015 ("12/7/15 Stanley Decl.") (Dkt.162)), attaching as exhibits a copy of Plaintiff's October 26, 2011 letter to Lee (*id.,* Ex. A) and the transcript of a May 28, 2010 oral argument concerning a summary judgment motion filed in *Lewis v. Fischer,* No. 08–CV–3027 (JG)(LB), 2009 WL 689803 (E.D.N.Y. May 28, 2010), *(id,* Ex. B). As he did in connection with his claims against Lee, Plaintiff also used his opposition to clarify the nature of his claims against Hann, explaining that he had not intended to assert any retaliation claim against Hann under the First Amendment, but rather a failure-to-intervene claim. (Pl. Mem. Hann at 13 n.4.) Plaintiff also requested oral argument on the motion. (*Id.,* at 1.) On December 22, 2015, Defendant Hann filed a reply memorandum on his motion to dismiss. (See Reply Memorandum of Law in Further Support of Defendant Sgt. Hann's Motion to Dismiss, dated Dec. 22, 2015 ("Def. Hann Reply") (Dkt.163).)

**\*9** In summary, 15 defendants currently remain in this action, 11 of whom have answered the Amended Complaint (see Answer (for 9 Defendants), dated Jan. 26, 2015 (Dkt.79); Answer (for Carlson and Mrzyglod), dated July 2, 2015 ("7/2/2015 Answer") (Dkt.127)), and four of whom have moved to dismiss the claims against them. The claims at issue on the two dismissal motions before the Court are as follows:

(1) Plaintiff's claim against defendant Hann for his failure to intervene in Carlson's alleged use of excessive force on November 1, 2011, when Hann was allegedly able to observe Carlson's assault of Plaintiff from a position down the hall;

(2) Plaintiff's claims against defendants Snedeker and D'Angelico, for their failure to intervene in Mrzyglod's alleged use of force on March 23, 2012, when Snedeker and D'Angelico were allegedly stationed outside a door, with knowledge that Myzyglod was assaulting Plaintiff behind the door; and

(3) a claim against Lee for his failure to protect Plaintiff from both the November 1, 2011 and March 23, 2012 assaults, when Lee allegedly had advance knowledge,

by way of Plaintiff's grievances and letters, that Plaintiff was at risk. [15]

### DISCUSSION

### I. *APPLICABLE LEGAL STANDARDS*

#### A. *Rule 12(b)(6)*
A complaint may be dismissed pursuant to Rule 12(b) (6) of the Federal Rules of Civil Procedure where it fails to state a claim upon which relief can be granted. Fed.R.Civ.P. (12)(b)(6). In deciding a motion to dismiss, the Court must "accept as true all factual statements alleged in the complaint and draw all reasonable inferences in favor of the non-moving party." *McCarthy v. Dun & Bradstreet Corp.,* 482 F.3d 184, 191 (2d Cir.2007); *accord Jaghory v. New York State Dep't of Ed.,* 131 F.3d 326, 329 (2d Cir.1997). The issue is not whether the plaintiff will ultimately prevail, but whether his claim, as pleaded, is sufficient to afford him the opportunity to proceed on the evidence. *See Chance v. Armstrong,* 143 F.3d 698, 701 (2d Cir.1998).

The court's function on a motion to dismiss is "not to weigh the evidence that might be presented at trial but merely to determine whether the complaint itself is legally sufficient." *Kopec v. Coughlin,* 922 F.2d 152, 155 (2d Cir.1991) (citation omitted). At the same time, "conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to defeat a motion to dismiss." *Achtman v. Kirby, McInerney, & Squire, LLP,* 464 F.3d 328, 337 (2d Cir.2006) (citation omitted). To survive a motion to dismiss, a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic v. Twombly,* 550 U.S. 544, 570 (2007).) "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Starr v. Sony BMG Music Entm't,* 592 F.3d 314, 321 (2d Cir.2010) (quoting *Iqbal,* 556 U.S. at 666), *cert. denied,* 131 S.Ct. 901 (2011).

**\*10** Additionally, "[i]t is well established that the submissions of a *pro se* litigant must be construed liberally and interpreted 'to raise the strongest arguments that they suggest.' " *Triestman v. Fed. Bureau of Prisons,* 470 F.3d

*471, 474 (2d Cir.2006)* (collecting cases); *see also Hughes v. Rowe,* 449 U.S. 5, 9–10 (1980) (noting that a *pro se* party's pleadings must be liberally construed in his favor and are held to a less stringent standard than the pleadings drafted by lawyers); *Lerman v. Bd. Of Educ.,* 232 F.3d 135, 139–40 (2d Cir.2000) ("Since most *pro se* plaintiffs lack familiarity with the formalities of pleading requirements, [a court] must construe *pro se* complaints liberally, applying a more flexible standard to evaluate their sufficiency."). This is especially true in the context of civil rights complaints. *See Weinstein v. Albright,* 261 F.3d 127, 132 (2d Cir.2001); *see also Gregory v. Daly,* 243 F.3d 687, 691 (2d Cir.2001) (noting that a court must be "mindful of the care exercised in this Circuit to avoid hastily dismissing complaints of civil rights violations").

On a motion to dismiss a complaint, a court is generally constrained to look only to the pleadings. *See* Fed.R.Civ.P. 12(b); *Calcutti v. SBU, Inc.,* 273 F.Supp.2d 488, 492 (S.D.N.Y.2003). Nonetheless, the mandate that a *pro se* plaintiffs complaint be construed liberally makes it appropriate for the court to consider the factual allegations in a *pro se* plaintiffs opposition materials to supplement the allegations in the complaint. *See Johnson v. Wright,* 234 F.Supp.2d 352, 356 (S.D.N.Y.2002); *see also Sommersett v. City of New York,* No. 09cv5916, 2011 WL 2565301, at *3 (S.D.N.Y. June 28, 2011) ("[W]here a *pro se* plaintiff has submitted other papers to the [c]ourt, such as legal memoranda, the [c]ourt may consider statements in such papers to supplement or clarify the plaintiff's pleaded allegations."). [16] A court may also consider certain additional materials, including documents attached to the complaint as exhibits or incorporated therein by reference, matters of which judicial notice may be taken, and documents that are "integral" to the complaint. *Calcutti,* 273 F.Supp.2d at 498 (citing *Brass v. American Films Tech.,* 987 F.2d 142, 150 (2d Cir.1993); *Chambers v. Time Warner, Inc.,* 282 F.3d 147, 153 (2d Cir.2002)).

"[T]he decision whether or not to hold an oral hearing on a motion to dismiss lies in the sound discretion of the trial court." *Greene v. WCI Holdings Corp.,* 136 F.3d 313, 316 (2d Cir.1998). [17]

**B. *Failure To Intervene To Stop Use of Excessive Force***
**\*11** To state an excessive-force claim under the Eighth Amendment, a plaintiff must satisfy a two-pronged test consisting of both objective and subjective elements. *See Sims v. Artuz,* 230 F.3d 14, 20–21 (2d Cir.2000). "The subjective component of the claim requires a showing that the defendant 'had the necessary level of culpability, shown by actions characterized by 'wantonness' in light of the particular circumstances surrounding the challenged conduct.' " *Id.* (quoting *Blyden v. Mancusi,* 186 F.3d 252, 262 (2d Cir.1999).) In this regard, "the core judicial inquiry is ... whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hogan v. Fischer,* 738 F.3d 509, 516 (2013) (quoting *Hudson v. McMillian,* 503 U.S. 1, 6–7 (1992)). With respect to the objective prong of the test, an inmate must establish that the conduct alleged was "sufficiently serious," such that it implicates the Eighth Amendment's prohibition against cruel and unusual punishment. *See Hogan,* 738 F.3d at 515 (quoting *Farmer v. Brennan,* 511 U.S. 825, 834 (1994)). This contextspecific inquiry focuses on whether the nature and level of force used against the plaintiff violated "contemporary standards of decency." *Wilkins v. Gaddy,* 559 U.S. 34, 37 (2010). Thus, while *de minimis* uses of force are "necessarily exclude[d] from constitutional recognition," a prisoner need not allege that he suffered a "certain quantum of injury" in order to state an excessive-force claim under the Eighth Amendment. *Id.* Rather, "when prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated ... whether or not significant injury is evident." *Hudson,* 503 U.S. at 9; *see also Wilkins,* 559 U.S. at 38 ("Injury and force ... are only imperfectly correlated, and it is the latter that ultimately counts.").

Moreover, "[i]t is widely recognized that all law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence." *Allen v. City of New York,* 480 F.Supp.2d 689, 694 (S.D.N.Y.2007) (quoting *Anderson v. Branen,* 17 F.3d 552, 557 (2d Cir.1994)). A correction officer who fails to intervene to prevent the use of excessive force against a prisoner is therefore "liable for the preventable harm caused by the actions of the other officers where that officer observes ... that excessive force is being used." *Tavares v. City of New York,* No. 08cv3782 (PAE) (JCF), 2011 WL 5877550, at *7 (S.D.N.Y. Oct. 17, 2011), *report and recommendation adopted by* 2011 WL 5877548 (S.D.N.Y. Nov. 23, 2011). To state a claim for a prison official's failure to intervene, a plaintiff must allege facts

showing that: "(1) the officer had a realistic opportunity to intervene and prevent the harm; (2) [the officer knew] that the victim's constitutional rights were being violated; and (3) the officer [did] not take reasonable steps to intervene." *See Jean–Laurent v. Wilkinson,* 540 F.Supp.2d 501, 512 (S.D.N.Y.2008). " 'Whether an officer had sufficient time to intercede or was capable of preventing the harm being caused by another officer is a question of fact,' unless the evidence shows that 'a reasonable jury could not possibly conclude otherwise.' " *Toliver v. City of New York,* No. 10cv5806 (SHS)(JCF), 2013 WL 6476791, at *3 (S.D.N.Y. Dec. 10 2013) (quoting *17 F.3d at 557), report and recommendation adopted by* 2014 WL 549402 (S.D.N.Y. Feb. 11, 2014).

### C. Supervisory Liability for Failure To Protect

The Eighth Amendment not only prohibits the excessive use of force, but also "requires prison officials to take reasonable measures to guarantee the safety of inmates in their custody." *Hayes v. N.Y. City Dep't of Corr.,* 84 F.3d 614, 620 (2d Cir.1996) (citing *Farmer v. Brennan,* 511 U.S. 825, 833 (1994)). To prevail on a claim that officials have failed to protect an inmate from harm, a plaintiff must demonstrate that, objectively, the conditions of his incarceration posed a substantial risk of serious harm and, subjectively, that the defendant acted with deliberate indifference. *See Farmer,* 511 U.S. at 834; *Dawes v. Walker,* 239 F.3d 489, 493 (2d Cir.2001). "[A] prison official acts with deliberate indifference and thus 'has sufficient culpable intent if he has knowledge that an inmate faces a substantial risk of serious harm and he disregards that risk by failing to take reasonable measures to abate the harm.' " *Lee v. Artuz,* No. 96cv8604 (JGK), 2000 WL 231083, at *5 (S.D.N.Y. Feb. 29, 2000) (quoting *Hayes,* 84 F.3d at 620).

**\*12** While a failure-to-protect claim can be premised on a supervisory official's failure to prevent violence perpetrated by other officers, *see Carter v. Kiernan,* No. 98cv2664 (JGK), 2000 WL 760303, at *6 (S.D.N.Y. June 12, 2000) ("Just as prison officials may be liable for their deliberate indifference in failing to protect inmates from fellow inmates, prison officials may also be liable for their deliberate indifference in failing to protect inmates from violence by subordinates."), the supervisor cannot be held vicariously liable for the actions of his subordinates under a *respondeat superior* theory, *see Ashcroft v. Iqbal,* 556 U.S. 662, 676 (2009). Instead, to state a failure-to-protect claim under *Section 1983,* a plaintiff must

allege facts showing the defendant's personal involvement in the claimed constitutional violation. *See Spavone v. N.Y. State Dep't of Corr. Serv.,* 719 F.3d 127, 135 (2d Cir.2013) (citing *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995)); *see also Iqbal,* 556 U.S. at 676 ("[V]icarious liability is inapplicable to *Bivens* and § 1983 suits."). The fact that a defendant employs or supervises a person who violated the plaintiff's rights is insufficient to demonstrate that defendant's personal involvement. *See Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003) ("[M]ere 'linkage in the prison chain of command' is insufficient to implicate a state commissioner of corrections or a prison superintendent in a § 1983 claim.") (quoting *Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir.1985)).

In *Colon v. Coughlin,* the Second Circuit held that a supervisor's personal involvement in a constitutional deprivation can be based on facts showing that the defendant: (1) directly participated in the violation; (2) failed to remedy that violation after learning of it through a report or appeal, (3) created, or allowed to continue, a policy or custom under which the violation occurred, (4) had been grossly negligent in supervising subordinates who committed the violation, or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that the violation was occurring. *Colon,* 58 F.3d at 873. "In *Iqbal,* however, the Supreme Court held that a supervisor's awareness of his subordinate's discriminatory intent was insufficient, by itself, to support a discrimination claim against the supervisor." *Salvatierra v. Connolly,* No. 09cv3722 (SHS) (DF), 2010 WL 5480756, at *15 (S.D.N.Y. Sept. 1, 2010) (citing *Iqbal,* 556 U.S. at 676–77), *report and recommendation adopted by* 2011 WL 9398 (S.D.N.Y. Jan. 3, 2011). Instead, "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal,* 556 U.S. at 676. The Supreme Court further explained that the facts necessary to make this showing "will vary with the constitutional provision at issue." *Id.*

Initially, in the wake of *Iqbal,* the precedent of this District was somewhat divided on the extent to which that decision abrogated *Colon.* While some courts took the position that "[o]nly the first and part of the third *Colon* categories pass *Iqbal*'s muster," *Bellamy v. Mount Vernon Hosp.,* No. 07cv1801 (SAS), 2009 U.S. Dist. LEXIS 54141, at *27 (S.D.N.Y June 26, 2009), *aff'd,* 2010 U.S.App. LEXIS 14981 (2d Cir. July 21, 2010) (summary

order), others found that, "even after the U.S. Supreme Court's decision in *Iqbal*, [Colon's] categories supporting personal liability of supervisors still apply as long as they are consistent with the requirements applicable to the particular constitutional provision alleged to have been violated," *JCG v. Ercole,* No. 11cv6844 (CM) (JLC), 2014 WL 1630815, at *20 (S.D.N.Y. Apr. 24, 2014) (citing *Hernandez v. Goord,* No. 01cv9585 (SHS), 2013 WL 2355448, at *7 (S.D.N.Y.2013)), *report and recommendation adopted by* 2014 WL 2769120 (S.D.N.Y. June 18, 2014); *Qasem v. Toro,* 737 F.Supp.2d 147, 152 (S.D.N.Y.2010).

Recently, though, in *Turkmen v. Hasty,* the Second Circuit resolved this conflict by holding that, regardless of the description applied to a particular theory or type of conduct, supervisory liability is permissible where, and only where, the defendant's conduct itself "reflects the elements of the underlying constitutional tort." 789 F.3d 218, 250 (2d Cir.2015); *see also Williams v. City of New York,* No. 14cv5123 (NRB), 2015 WL 4461716, at *7 (S.D.N.Y. July 21, 2015) (finding that *Turkmen* "explain[s] the consistency of *Colon* with *Iqbal* "). The Second Circuit went on to explain that a constitutional claim governed by the deliberate-indifference standard, as asserted against a supervisory defendant, "therefore survives so long as [the plaintiff] plausibly plead[s] that the conditions were sufficiently serious, and [that the defendant] 'kn[e]w of, and disregard[ed], an excessive risk to inmate health or safety.' " *Turkmen,* 789 F.3d at 250 (quoting *Walker v. Schult,* 717 F.3d 119, 125 (2d Cir.2013)). In other words, regardless of which of the five *Colon* categories is invoked to establish the supervisory defendant's personal involvement on a failure-to-protect claim, the claim can survive a motion to dismiss only if the plaintiff plausibly alleges facts showing that the supervisor acted with deliberate indifference. *See id.*; *see also Farmer,* 511 U.S. at 834, 847.

### D. *Qualified Immunity*

**\*13** Qualified immunity "protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan,* 555 U.S. 223, 231 (2009) (internal quotation marks omitted; citing *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982)). "In determining whether a right was clearly established at the time defendants acted, [courts] examine whether the right was

defined with reasonable specificity; whether the decisional law of the Supreme Court and the applicable circuit court supports its existence; and whether, under preexisting law, a defendant official would have reasonably understood that his acts were unlawful." *Rodriguez v. Phillips,* 66 F.3d 470, 476 (2d Cir.1995) (citation omitted). Even where the official violates a clearly established right, the defense of qualified immunity is nevertheless available if "it was 'objectively reasonable' for [the official] to believe that his actions were lawful at the time of the challenged act." *Cerrone v. Brown,* 246 F.3d 194, 199 (2d Cir.2001) (quoting *Lennon v. Miller,* 66 F.3d 416, 420 (2d Cir.1995) (internal quotations omitted)).

A qualified immunity defense, though, is "typically addressed at the summary judgment stage," because it "usually depends on the facts of the case, ... making dismissal at the pleading stage inappropriate." *See Woods v. Goord,* No. 01cv3255 (SAS), 2002 WL 731691, at *10 (S.D.N.Y. Apr. 23, 2002) (citing *King v. Simpson,* 189 F.3d 284, 289 (2d Cir.1999)); *see also Taylor v. Vermont Dept. of Educ.,* 313 F.3d 768 (2d Cir.2002) (holding that ruling on qualified immunity would be premature because the issue turned on factual questions that could not be resolved at the pleading stage). Accordingly, a motion to dismiss on qualified-immunity grounds will only be granted "if the complaint fails to allege the violation of a clearly established right." *Woods,* 2002 WL 731691, at *10 (quoting *Hardy v. Jefferson Community Coll.,* 260 F.3d 671, 677 (6th Cir.2001)); *see also Burton v. Lynch,* 664 F.Supp.2d 349, 368 (S.D.N.Y.2009) ("[A] defendant will be found to be shielded by qualified immunity on a motion to dismiss if the complaint fails to allege the violation of a clearly established constitutional right." (internal quotation marks and citation omitted)); *McKenna v. Wright,* 386 F.3d 432, 436 (2d Cir.2004) ("[On a motion to dismiss], the plaintiff is entitled to all reasonable inferences from the facts alleged, not only those that support his claim, but also those that defeat the immunity defense.").

## II. *THE PENDING MOTIONS TO DISMISS*

### A. *Documents Considered on the Motions Before the Court*

Attached to Plaintiff's attorney declarations are copies of three documents: (1) Plaintiff's October 26, 2011 letter to Lee, in which Plaintiff requested a housing transfer (12/7/15 Stanley Decl., Ex. A); (2) a transcript of an oral argument held in *Lewis v. Fischer,* No. 08–CV–3027

(JG)(LB) (E.D.N.Y.) (*id.,* Ex. B); and (3) a 2006 report on Green Haven issued by the Correctional Association of New York (9/30/15 Stanley Decl., Ex. B). Plaintiff seeks to introduce all three of these documents for the Court's consideration, despite the fact that, as explained above, courts are generally constrained to look only to the pleadings when considering motions to dismiss.

With respect to the October 26, 2011 letter and the *Lewis* transcript, this Court finds that it is permissible to consider these documents on this motion to dismiss. As Plaintiff refers to and quotes the October 26, 2011 letter in the Amended Complaint, the letter may be deemed incorporated by reference. Thus, the Court may look at the entirety of the letter in connection with this motion, despite the fact that it was not attached to the Amended Complaint and only a portion of it was directly quoted in that pleading. *See James v. Correct Care Sols.,* No. 13cv0019 (NSR), 2013 WL 5730176, at *3 (S.D.N.Y. Oct. 21, 2013)* ("One way a document may be deemed incorporated by reference is where the complaint 'refers to' the document."); *EQT Infrastructure Ltd. v. Smith,* 861 F.Supp.2d 220, 224 n.2 (S.D.N.Y.2012) ("The Complaint refers to and quotes from the Letter of Intent, thus incorporating it. Accordingly, I may consider the [Letter of Intent] on this Motion to Dismiss even though it was not attached to the Complaint.") Moreover, it is permissible for a district court to take judicial notice of court documents from other proceedings, such as the transcript submitted by Plaintiff. *See Grimes v. Fremont Gen. Corp.,* 933 F.Supp.2d 584, 600 n.7 (S.D.N.Y.2013) ("[O]n a motion to dismiss, a district court may take judicial notice of court documents from other proceedings.").

 **\*14** On the other hand, the 2006 report from the Correctional Association of New York must be excluded from this Court's consideration. Plaintiff did not incorporate the report or rely upon it in the drafting of his Amended Complaint, and the findings of a private organization are not a matter of public record such that this Court may take judicial notice of the report's contents. *See Ames v. Stevens,* No. 9:12–CV–1487 (MAD)(RFT), 2015 WL 5513021, *7 (N.D.N.Y. Sept. 17, 2015) (holding that the Correctional Association of New York is a private entity, and that its reports are therefore not public records).

For these reasons, this Court will consider the October 26, 2011 letter and the oral argument transcript, but not the Correctional Association of New York report, in connection with the Moving Defendants' motions to dismiss.

### B. *The Motion by Hann*

In the Amended Complaint, Plaintiff essentially alleges that, when Carlson assaulted him in a hallway on November 1, 2011, Hann was able to see that assault as it occurred, but failed to intervene to stop it. (Am.Compl.¶¶ 182–94, 336.) Hann argues that the Amended Complaint fails to allege facts sufficient to suggest that he was actually aware that Plaintiff's constitutional rights were being violated at the time of the incident, and that Plaintiff has thus failed to state a failure-to-intervene claim against him. (*See* Def. Hann Mem. at 7–12; Def. Hann Reply at 1–9.) Moreover, Hann argues that, even if his actions (or lack of action) could be found to have violated the Eighth Amendment, he is nonetheless entitled to qualified immunity on the basis that it was objectively reasonable for him to believe that he was not violating clearly established law. (Def. Hann Mem. at 13–14; Def. Hann Reply at 9–10.) For the reasons set forth below, I recommend that the Court deny Hann's motion to dismiss in its entirety.

### 1. *Sufficiency of Failure–To–Intervene Claim*

In his moving brief, Hann characterizes Plaintiff's claim against him as a failure-toprotect claim governed by the standard set forth in *Farmer.* (Hann. Mem. at 7–8 (arguing that Hann had no advance knowledge of any threat to Plaintiff's safety); *see also Farmer,* 511 U.S. at 834.) Yet in the Amended Complaint, as liberally construed, Plaintiff alleges that Hann observed Carlson's actions and directly participated in the constitutional violation by failing to intervene, not that Defendant Hann should be held liable in his capacity as a supervisor for his deliberate indifference to the likelihood that Carlson would assault Plaintiff at some point in the future. (Am. Compl. ¶¶ 188–95; *see also* Pl. Mem. Hann at 13 n.4 (clarifying that Plaintiffs only claim against Hann is for his failure to intervene in the assault allegedly perpetrated by Carlson).)

Where, as here, a plaintiff alleges that an officer failed to intercede in a presentlyoccurring assault perpetrated

by another officer, the claim is properly analyzed under the standard discussed above for failure to intervene in a use of excessive force, rather than under the *Farmer* standard for failure to protect a prisoner from a dangerous condition of confinement. *Compare Kee v. Hasty,* No. 01cv2123 (KMW)(DF), 2004 WL 807071, at *26 (S.D.N.Y. Apr. 14, 2004) (noting that a correction officer has an affirmative duty to intervene to prevent fellow officer from using excessive force against an inmate and analyzing claim under failure-to-intervene standard), *with Piper v. City of Elmira,* 12 F.Supp.3d 577, 596 (W.D.N.Y.2014) ("A plaintiff may establish an officer's personal involvement through facts suggesting that the officer was either personally involved in the use of force or was present during the use of force and failed to intervene.... [T]he 'plaintiff need not establish who, among a group of officers, directly participated in the attack and who failed to intervene.' " (quoting *Jeffreys v. Rossi,* 275 F.Supp.2d 463, 474 (S.D.N.Y.2003), *aff'd,* 426 F.3d 549 (2d Cir.2005))), *with Desulma v. City of New York,* No. 98cv2078 (RMB)(RLE), 2001 WL 798002, at *6 (S.D.N.Y. July 6, 2001) (noting that a failure-to-protect claim is treated as a challenge to the prisoner's conditions of confinement). Thus, as long as Plaintiff has plausibly alleged facts sufficient to show that Hann (1) had a realistic opportunity to intervene and prevent the harm, (2) knew that Plaintiff's constitutional rights were being violated, and (3) did not take reasonable steps to intervene, then Plaintiff must be found to have stated a viable claim against Hann for the injuries caused by Carlson's unconstitutional use of force.[18]

**\*15** As an initial matter, Plaintiff makes the requisite showing of an underlying constitutional violation by alleging that defendant Carlson, without any penological justification, balled up Plaintiff's shirt collar until it choked him, causing injury to Plaintiff's neck, and, after "forcefully" pulling on Plaintiff's pants until they became "extremely taut," twice thrust his hand upward into Plaintiff's crotch, causing injury to Plaintiff's testicles. (Am. Compl. ¶¶ 191, 200; *see also Crawford v. Cuomo,* 796 F.3d 252, 257–58 (2d Cir.2015)) (holding that sexual contact that is incidental to a legitimate pat frisk is permissible, while such contact undertaken to gratify the officer or humiliate the inmate violates the Eighth Amendment); *Hogan,* 738 F.3d at 515 ("[W]hen prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated ... whether or not significant injury is

evident."); *Romaine v. Rawson,* 140 F.Supp.2d 204, 212 (N.D.N.Y.2001) ("[E]ven one slap against a prisoner is objectively unreasonable and 'repugnant to the conscience of mankind' when ... the prisoner presents no threat to prison guards or others, poses no security risk, and does not otherwise pose a danger to himself.").)

Plaintiff asserts that, despite the fact that Hann was in a position to witness Carlson's excessive use of force (*see* Am. Compl. ¶ 192 (alleging that, "[d]uring [this] abusive [p]at-[f]risk procedure, [Plaintiff] ... observed Def. Hann looking in the direction of [Plaintiff] and Def. Carlson")), Hann did not intercede or otherwise stop this constitutional violation (*id.* ¶ 193). Liberally construed "to raise the strongest arguments that [it] suggest[s]," *Triestman,* at 470 F.3d at 474, Plaintiff's allegation that he was able to observe Hann looking at him supports the inference that Hann was able to see the incident from where he stood. Further, as Plaintiff alleges that he "fully complied" with Carlson's orders and had his hands on the wall at the time that Carlson choked and struck him (Am.Compl.¶ 189), it is entirely plausible that an officer observing the incident would have understood that Carlson's use of force violated the Eighth Amendment. The argument that Hann offers to refute this inference —that Plaintiff's allegations do not suggest that Hann was able to distinguish an unconstitutional assault from a routine pat-frisk from his vantage point at an unspecified distance from the assault (Def. Hann Mem. at 13–14; Def. Hann Reply at 9–10)—raises a factual question that cannot be resolved on this motion to dismiss (*see* 12/7/15 Stanley Decl., Ex. B (court finding, in *Lewis,* that the question of whether a witness was in a position to view alleged illegal conduct during pat frisk was an issue of fact)).

Hann also argues that, as described in the Amended Complaint, the incident between Carlson and Plaintiff "occurred too quickly to give Defendant Hann an opportunity to intervene, even if he recognized what was happening." (Def. Hann Mem. at 11.) While it is true that an officer cannot be held liable for his or her failure to intervene in a sudden assault that lasts only a matter of seconds, *see Toliver,* 2013 WL 6476791, at *3–4; *Tafari v. McCarthy,* 714 F.Supp.2d 317, 342 (N.D.N.Y.2010) ("The liquid throwing incident began and ended within a matter of seconds, an increment of time too 'sudden and brief' to give Defendants a 'realistic opportunity' to respond and intervene on behalf of the Plaintiff.")

(quoting *Cusamano v. Sobek,* 604 F.Supp. 416, 429 n.9 (N.D.N.Y.2009)), the question of whether an officer had sufficient time to intervene and prevent an assault is also generally an issue of fact, unless a reasonable jury could reach only one conclusion, *see Allen,* 480 F.Supp.2d at 694 (quoting *Anderson,* 17 F.3d at 557); *see also O'Neill v. Krzeminski,* 839 F.2d 9, 11–12 (2d Cir.1988) (finding that, in context of claim arising under the Fourth Amendment, officer had no opportunity, as a matter of law, to prevent plaintiff from being struck with three blows in rapid succession, but that a jury could conclude that the officer had the opportunity to intercede while plaintiff was subsequently dragged across the floor).

**\*16** Here, although the exact duration of the allegedly unlawful conduct is unclear, Plaintiff alleges that Carlson engaged in a series of violent acts: first balling up Plaintiff's shirt collar in order to choke him, then "forcefully yank[ing]" Plaintiff's pants upwards by the waistband, and, finally, thrusting his hand upward from Plaintiff's ankle to his crotch, twice, in order to strike Plaintiff's testicles. (Am.Compl.¶ 191.) These allegations plausibly suggest that the entire incident was of long enough duration that Hann could have interceded at some point. Moreover, Hann's proximity to the alleged assault, and his status as a sergeant (and thus a supervisory officer), further support the inference that he could have curtailed Carlson's use of excessive force. *See McCoy v. Goord,* 255 F.Supp.2d 233, 262 (S.D.N.Y.2003) (noting that correction sergeant's proximity to assault and supervisory position gave him the opportunity to prevent use of force).

I therefore recommend that Hann's motion to dismiss be denied to the extent that it seeks dismissal of the claim against him, under Rule 12(b)(6), for failure to state a claim upon which relief may be granted.

### 2. *Qualified Immunity*

Hann further argues that no clearly established law holds that "mere presence somewhere in the vicinity of an assault" triggers an officer's duty to intervene, and that, because the line between a lawful pat frisk and an unconstitutional assault is "indistinct," it was objectively reasonable for him to believe that he was not required to prevent Carlson's conduct. (Hann. Mem. at 13–14.) This argument misstates the legal and factual context of Plaintiff's claim, however, and it does not establish that

Hann is entitled to qualified immunity at the motion-to-dismiss stage.

First, the law at issue – Plaintiff's right to be free from excessive force, and Defendant Hann's corresponding duty to intervene and prevent the use of excessive force—was clearly established at the time of the alleged assault. *See Hudson,* 503 U.S. at 9; *Anderson,* 17 F.3d at 557; *see also Allen,* 480 F.Supp.2d at 710 ("A prisoner's right to freedom from excessive force by prison officials is a clearly established constitutional right."). Second, as the Court understands Plaintiff's position, he is not suggesting that it was Hann's mere presence in the vicinity that triggered this duty, but rather Hann's observation of the assault and knowledge that Carlson was violating Plaintiff's rights. *See Jean–Laurent,* 540 F.Supp.2d at 512. While, notwithstanding the clearly established law regarding the duty to intervene, discovery may show that Hann's actions were objectively reasonable because he was unable to tell whether Carlson's conduct had crossed the line between lawful pat-frisk and excessive force, this Court cannot now make that determination.

As the facts in Plaintiff's Amended Complaint, accepted as true, do not establish as a matter of law that Hann is entitled to qualified immunity, I recommend that the Court deny Hann's motion to dismiss Plaintiff's claim against him on this ground. *See McKenna,* 386 F.3d at 436 (noting that defendant is entitled to qualified immunity at the pleading stage only if it is beyond doubt that the plaintiff can prove no set of facts that would defeat the defense).

### C. *The Motion by Snedeker and D'Angelico*

Advancing a similar theory to that which underlies his claim against Hann, Plaintiff argues that defendants Snedeker and D'Angelico—who, on March 23, 2012, allegedly stood outside the door to the room where Plaintiff was being assaulted by Mrzyglod—may be held liable under Section 1983 for their failure to intervene in Mrzyglod's assault. (Pl. Mem. at 19–22; Am. Compl. ¶¶ 255–78, 328.) Challenging the sufficiency of Plaintiff's allegations against them in this regard, Snedeker and D'Angelico move to dismiss the claims against them on the ground that Plaintiff has not plausibly pleaded that they were aware of and had an opportunity to prevent the alleged assault. *(See* Def. Mem. at 20–21; Def. Reply at 9–10.) Snedeker and D'Angelico further argue that, even if Plaintiff states a claim against them for their

failure to intervene in the claimed use of excessive force by Mrzyglod, they are entitled to qualified immunity because it was objectively reasonable for them to believe that their conduct did not violate Plaintiff's clearly established rights. (Def. Mem. at 24–25.) For the reasons set forth below, I recommend that the motion by Snedeker and D'Angelico to dismiss Plaintiff's claims against them be denied.

### 1. *Sufficiency of Failure–To–Intervene Claims*

 **\*17** Snedeker and D'Angelico argue that Plaintiff's allegation that they stood outside the room where Mrzyglod assaulted Plaintiff does not suggest that they could see or hear what was happening inside the room, such that they could have had knowledge of the assault or an opportunity to prevent it. (Def. Mem. at 20–21; Def. Reply at 9–10.) This argument is unpersuasive as, liberally construed, the Amended Complaint sufficiently alleges that, regardless of whether they could see or hear what was happening inside the room, Snedeker and D'Angelico were nonetheless aware of what was occurring and was either complicit in the assault or did nothing to prevent it.

To begin with, Plaintiff plainly alleges an underlying Eighth Amendment violation by asserting that Mrzyglod subjected him to more than *de minimis* force, in retaliation for his refusal to withdraw grievances against Green Haven officers. (Am. Compl. 267–77; *see also Davidson v. Flynn,* 32 F.3d 27, 30 (2d Cir.1994) (finding subjective component of excessive force standard satisfied by allegation that force was applied in retaliation for the plaintiff's litigiousness).) With respect to the conduct of Snedeker and D'Angelico, Plaintiff alleges that, despite the fact that neither officer was assigned to E–Block, where the alleged assault took place, both of these defendants remained posted "directly outside" the door of the room for the duration of the assault. (Am.Compl.¶¶ 264, 266.) Indeed, Plaintiff specifically alleges that Snedeker and D'Angelico were present at the site of the assault in order to serve as "look-out[s]" or "back-up" for Mrzyglod. (*Id.* ¶ 287 n.40.) Taken as a whole and liberally construed, the allegations of the Amended Complaint are sufficient to support these characterizations of these defendants' role in the incident.

Even apart from Plaintiff's description as to where Snedeker and D'Angelico were stationed during the alleged assault, Plaintiff alleges that, for some time prior to when Mrzyglod ordered him into the room, Mrzyglod was "in the company" of these two officers. (*Id.* ¶¶ 261, 264.) Plaintiff also alleges that Mrzyglod had previously placed in the room several articles of Plaintiff's personal property, taken from his cell, including copies of grievances he had filed (*id.* ¶¶ 267, 268), giving rise to a plausible inference that Snedeker and D'Angelico, who had been observed by Plaintiff in Mryzglod's company, were aware that Mrzyglod planned to confront Plaintiff about his past grievances and attempt to deter him from engaging in protected speech. Moreover, Plaintiff alleges that, after punching him in the face several times, yanking him from his chair by the shirt, and pinning him down on a bed frame, Mrzyglod left the room, passing through the door at which Snedeker and D'Angelico were posted, then reentered and continued to assault Plaintiff. (*Id.* ¶¶ 272–75.) Further, Plaintiff alleges that, when he finally exited the room after the alleged assault, he observed Snedeker and D'Angelico "standing immediately outside [the room], smiling." (*Id.* ¶ 278.) Crediting Plaintiffs pleading with the liberal construction it is due, Snedeker and D'Angelico's suspicious presence in a housing block other than the one to which they were assigned, their accompaniment of Mryzglod prior to the incident, their close and continued proximity to the room in which the assault allegedly occurred, the fact that they remained at the same positions as Mrzglod exited and re-entered the room, and their smiles at the time of Plaintiff's eventual exit, all support the inference that they knew and approved of Mrzyglod's assault on Plaintiff. (*Id.* ¶¶ 259–78; *see also Stoudemire v. Mich. Dep't of Corr.,* 705 F.3d 560, 573 (6th Cir.2013) (noting that a correction officer's smile, in context, may suggest personal animus towards a particular inmate).)

 **\*18** For these reasons, I recommend that the Court deny Snedeker and D'Angelico's motion to dismiss the claims against them, under Rule 12(b)(6), for failure to state a claim upon which relief may be granted.

### 2. *Qualified Immunity*

Like Hann, defendants Snedeker and D'Angelico argue on their motion that they are entitled to qualified immunity because it is "not clearly established that mere presence somewhere in the vicinity of an assault can support a

[failure-to-intervene] claim." (Def. Mem. at 25.) Plaintiff does not contend, however, that Snedeker and D'Angelico should be held liable for his injuries because they were in the vicinity of the assault; rather, he claims that these Defendants were directly involved in a violation of his Eighth Amendment rights because they were aware that Mrzyglod was subjecting him to excessive force and failed to intervene. As noted above, it was clearly established at the time of the alleged assault that a correction officer has an affirmative duty to intervene if he knows that a fellow officer is subjecting an inmate to unlawful force. *See Anderson,* 17 F.3d at 557. Accordingly, I recommend that, to the extent Snedeker and D'Angelico have sought dismissal of Plaintiff's claims against them on the ground of qualified immunity, their motion to dismiss be denied.

### D. *The Motion by Lee*

Plaintiff asserts Section 1983 claims against Superintendent Lee for his failure to protect Plaintiff from the November 1, 2011 and March 23, 2012 assaults allegedly perpetrated by Carlson and Mrzyglod. (Am.Compl.¶ 322.) In his motion to dismiss, defendant Lee does not contest that the risk that Plaintiff would be assaulted by Green Haven staff was objectively serious, an element of Plaintiff's claim that is clearly satisfied, given that Plaintiff alleges that he was actually subjected to excessive force during each assault. *See Locicero v. O'Connell,* 419 F.Supp.2d 521, 527 (S.D.N.Y.2006) (holding that risk of harm was objectively serious where plaintiff was actually subjected to excessive force by correction officer); *see also Stewart v. Fischer,* No. 11cv2184 (HB), 2013 WL 5637715, at *4 (S.D.N.Y. Oct. 15, 2013) (holding that fact that plaintiff was attacked and stabbed by another inmate conclusively established that he was incarcerated under conditions placing him at a substantial risk of serious harm). Instead, Lee's arguments focus on the subjective prong of the deliberate-indifference test, as he contends that the Amended Complaint fails to allege facts showing that he was aware of and disregarded a substantial risk to Plaintiff's safety.[19] (*See* Def. Mem. at 23–24; Def. Reply at 5–9.)

**\*19** For his part, Plaintiff argues that he has adequately pleaded Lee's personal involvement, by alleging that Lee: (1) failed to remedy an ongoing pattern of unconstitutional assaults against Plaintiff, despite being informed of that wrong through Plaintiff's grievances and complaints (Pl. Mem. at 13–17); (2) acquiesced in a

"culture of abuse" at Green Haven (*id.* at 17–18); and (3) failed to provide adequate training and supervision to his subordinates (*id.* at 18–19). *See Colon,* 58 F.3d at 873. As discussed above, however, even if Lee's conduct fits into one or more of these *Colon* categories, Lee may be found to have stated a viable failure-to-protect claim against Lee only if that conduct also satisfies the deliberate-indifference standard. (See Discussion, *supra,* at Section I(C).) For the reasons set forth below, I recommend that Lee's motion to dismiss the claims against him be denied to the extent that the motion seeks dismissal of the claims arising from the November 1, 2011 assault, and granted to the extent that it seeks dismissal of the claims arising from the March 23, 2012 assault.

### 1. *Failure–To–Protect Claim Arising From November 1, 2011 Assault*

With respect to Lee's alleged failure to prevent the claimed November 1, 2011 assault by Carlson, Lee argues that the allegations in the Amended Complaint do not suggest that he knew of and disregarded a serious risk of harm to Plaintiff. Specifically, Lee contends that, while Plaintiff wrote to him on October 26, 2011, that letter did not identify a specific threat made by A–Block officers or suggest that Plaintiff had ever had problems with Carlson, and that Lee responded appropriately when he denied Plaintiff's request for a transfer. (Def. Reply at 6.) Lee further asserts that, prior to the November 1, 2011 incident, Plaintiff had not reported any physical assault for over a year. *(Id.)*

"Courts have found that a prisoner validly states an Eighth Amendment claim based on a failure to protect when he alleges that he informed corrections officers about a specific fear of assault and is then assaulted." *Davis v. Torres,* No. 10cv2236 (RJS)(HBP), 2012 WL 3070092, at *5 (S.D.N.Y. May 2, 2012), *report and recommendation adopted by* 2012 WL 3070083 (S.D.N.Y. July 27, 2012); *see also Beckles v. Bennett,* No. 05cv2000 (JSR)(DF), 2008 WL 821827, at *17 (S.D.N.Y. Mar. 26, 2008) (denying summary judgment where plaintiff presented evidence that he informed sergeant of correction officers' threatening behavior and was later assaulted by those officers). On the other hand, an inmate's communications about "generalized safety concerns" or "vague concerns of future assault by unknown individuals" are insufficient to provide knowledge that the

inmate is subject to a substantial risk of serious harm. *Ross v. City of New York,* No. 12cv8545 (LGS), 2014 WL 3844783, at *8 (S.D.N.Y.2014) (citing *Rivera* v. *New York,* 96cv7697 (RWS), 1999 WL 13240, at *9 (S.D.N.Y. Jan. 12, 1999)), *rev'd on other grounds,* No. 14–3327–cv (2d Cir. July 20, 2015) (summary order).

Here, Plaintiff alleges that, on October 26, 2011, he notified Lee of his fear that he would be imminently assaulted by A–Block staff; that Lee took no action to transfer him from A–Block or otherwise protect him from violence; and that he was actually subjected to such an assault just four days later. (Am.Compl.¶¶ 171–82.) In addition to noting Plaintiff's more general concerns about A–Block staff's three recent assaults against inmates or resentment at the arrest of a fellow Green Haven officer, Plaintiff's letter also informed Lee that that an officer who had previously assaulted Plaintiff was assigned to A–Block on Tour–Two, and that two other Tour–Two A–Block officers had already subjected Plaintiff to verbal harassment in the six days since his assignment to A–Block. (9/30/15 Stanley Decl., Ex. A.) Thus, while Plaintiff did not identify by name the officer who he believed would assault him, he did identify the threat as emanating from the officers on a particular tour, rather than the entire group of A–Block officers. *See Hayes v. New York City Dept. of Corr.,* 84 F.3d 614, 621 (2d Cir.1996) ("[T]he issue is not whether [the plaintiff] identified his enemies by name to prison officials, but whether they were aware of a substantial risk of harm to [the plaintiff]. Although a prisoner's identification of his enemies is certainly relevant to the question of knowledge, it is not, necessarily, outcome determinative.").

**\*20** Additionally, while Plaintiff's previous complaints regarding retaliatory assaults by Green Haven staff would not have been sufficient, standing alone, to put Lee on notice that Plaintiff was likely to be assaulted again in the near future, this history of complaints, when coupled with Plaintiff's communication of his immediate fear of assault, could plausibly have apprised Lee of a serious risk of harm to Plaintiff. Viewed as a whole, Plaintiff's allegations belie Lee's argument that Plaintiff's October 26, 2011 communication could not have placed Lee on notice that Plaintiff was at risk of serious injury, and are sufficient, at the pleading stage, to state a claim based on Lee's failure to protect Plaintiff.

I therefore recommend that Lee's motion to dismiss the claim against him arising from the November 1, 2011 assault be denied.

**2.** *Failure–To–Protect Claim Arising From March 23, 2012 Assault*

Plaintiff does not identify any specific communication to Lee preceding the alleged March 23, 2012 assault by Mrzyglod. Instead, Plaintiff argues that Lee may be held liable for the injuries Plaintiff suffered in that assault because Lee: (1) failed to remedy an ongoing pattern of retaliatory conduct against Plaintiff, despite learning of it through Plaintiff's submission of grievances; (2) was aware of a culture of inmate abuse at Green Haven that posed a risk of harm to Plaintiff, but disregarded that risk; or (3) exhibited deliberate indifference by failing to train and supervise the subordinates who directly perpetrated the violation. (Pl. Mem. at 13–19.) For the reasons discussed below, this Court finds that Plaintiff's allegations, as currently pleaded, are insufficient to state a deliberate-indifference claim against Lee for the March 23, 2012 assault, under any of these three categories of conduct.

**a. Knowledge of Pattern of Retaliatory Assaults Against Plaintiff**

Plaintiff argues that Lee personally reviewed Plaintiff's grievances and letters regarding several instances of the retaliatory use of force against him, but failed to take any action to protect Plaintiff, thus perpetuating an ongoing risk of harm to his safety. (Pl. Mem. at 13–14.) In reply, Lee contends that, at the time of the alleged March 23, 2012 assault, Plaintiff had not been assaulted in over four months, and had reported no problems with staff since his transfer to E–Block, where he had previously indicated that he had suffered no abuse. (Def. Reply at 7.)

This Court finds that, while the history of past assaults against Plaintiff does strengthen Plaintiff's contention that the October 26, 2011 letter put Lee on notice of a risk of harm that was imminent at *that* time, it does not suggest the existence of an ongoing pattern of physical violence that continued to reach constitutional dimensions until March 23, 2012. Plaintiff's allegations simply do not show that he was subjected to a pervasive, unbroken pattern of retaliation. Rather, the Amended Complaint

alleges that, over the course of approximately 18 months, there were three discrete periods during which Plaintiff experienced multiple alleged constitutional violations, with gaps of several months between these periods. Specifically, Plaintiff's allegations indicate the following timeline:

(1) In the four months from June to September, 2010, Plaintiff experienced an escalating pattern of retaliation, resulting in three physical assaults. (Am.Compl.¶¶ 2–169.)

(2) After that time, there was a period of over a year (from September 2010 to October 2011) when Plaintiff was not subjected to any retaliatory conduct; for much of this period, Plaintiff was housed in E–Block. (See 9/30/15 Stanley Decl., Ex. A, at 1–2.)

(3) After being transferred to A–Block in October 2011, there was a period lasting four or five days, in late October and early November 2011, during which Plaintiff was verbally harassed by C.O. Chase and two unidentified A–Block officers (id. ¶ 222–52; 9/30/15 Stanley Decl., Ex. A), and was assaulted by C.O. Carlson (Am.Compl.¶¶ 170–207).

**\*21** (4) For the four-month period from November 2, 2011 (when Plaintiff was transferred back to E–Block) until March 23, 2012, Plaintiff does not allege that he suffered physical violence at the hands of Green Haven staff. (See *generally* Am. Compl.)

(5) Finally, on March 23, 2012, Plaintiff was assaulted by C.O. Mrzyglod (in the company of A–Block officers), and then threatened by Sergeant Cocuzza. (Am. Compl. ¶¶ 255–316.)

Given the extensive gaps between each alleged outbreak of violence, along with the lack of any allegations indicating that Plaintiff was subjected to retaliation or excessive force while housed in E–Block (where he was housed at the time of the March 23, 2012 assault), Plaintiff's allegations are insufficient to permit a reasonable inference that Lee was deliberately indifferent to the risk that Plaintiff would be subjected to retaliatory force by Green Haven staff on or about March 23, 2012. *See Coronado,* 2000 WL 1372834, *5 (holding that significant amount of time since a prior attack lessens the imminence of the risk that a similar attack will occur in the future).

**b.** *Creation of or Acquiescence in Culture of Abuse*

Even where a plaintiff does not allege any facts suggesting that prison officials were aware of a particular risk to his or her safety, the "plaintiff may also state a claim for deliberate indifference based on a failure to protect him against a general risk of harm to all inmates at the facility." *Parris v. New York State Dep't Corr. Servs.,* 947 F.Supp.2d 354, 363 (S.D.N.Y. 2013). To plead a claim under this theory, a plaintiff must allege that the defendant knew of a history of attacks similar to that suffered by the plaintiff, and that the measures they should have taken to prevent the reoccurrence of such attacks would have prevented the harm to the plaintiff. *Id.* (citing *Coronado v. Goord,* No. 99cv1674 (RWS), 2000 WL 1372834, *6 (S.D.N.Y. Sept. 25, 2000)); *see also Correa v. Hastings,* No. 13cv5862 (PAC)(SN), 2015 WL 6681186, at *6 (S.D.N.Y. Sept. 16, 2015), *report and recommendation adopted by* 2015 WL 6681186 (S.D.N.Y. Nov. 2, 2015); *Henry v. Cnty. of Nassau,* No. 13–CV–7427 (SJF)(ARL), 2015 WL 2337393, at *5 (E.D.N.Y. May 13, 2015). Generally, a claim based on a generalized risk of assault requires facts showing a "longstanding, pervasive, well-documented' history of similar attacks, coupled with 'circumstances suggest[ing] that the defendant-official being sued had been exposed to [this] information." *Hicks v. Woods,* No. 9:09cv0051 (GLS)(DRH), 2011 WL 5974973, at *3 (N.D.N.Y. Nov. 28, 2011) (quoting *Farmer,* 511 U.S. at 842).

The allegations in Plaintiff's Amended Complaint do not suggest that any purported "culture of abuse" at Green Haven was so longstanding and pervasive that Superintendent Lee would have been aware that any inmate at that facility who filed a grievance faced a generalized risk of retaliatory assault at the hands of Green Haven staff. In this regard, Plaintiff merely alleges that: (1) Mrzyglod subjected another prisoner to excessive force on March 25, 2004, nearly eight years before his alleged assault of Plaintiff (Am. Compl. ¶ 277 n.39); (2) Smith and Corbin subjected another prisoner to excessive force on October 3, 2013, nearly two years *after* they allegedly assaulted Plaintiff (id. ¶ 150 n. 28); and (3) three prisoners were assaulted by ABlock staff shortly before Plaintiff was transferred to that housing block in October 2011 (9/30/15 Stanley Decl., Ex. A). The existence of these isolated incidents, one of which occurred after the events at issue in Plaintiff's Amended Complaint, do not plausibly suggest that Lee was aware, on March 23, 2012,

that Plaintiff was under a general risk due to a culture of abuse against inmates who filed grievances or formal complaints.

**\*22** This Court notes that, in arguing that retaliatory physical assault by Green Haven staff was a pervasive problem, Plaintiff also seeks to rely on the findings of the 2006 Correctional Association of New York report that he submits with his opposition papers. (Pl. Mem. at 17–18.) As discussed above, however, it would be improper for the Court to consider such extrinsic evidence in connection with Lee's motion to dismiss. *(See* Discussion, *supra,* at Section II(A).) Unless and until Plaintiff is able to plead allegations sufficient to support a claim that Lee was aware of a general culture of retaliatory violence (see Discussion, *infra,* at Section III (regarding whether Plaintiff should be granted leave to replead this claim)), Plaintiff cannot maintain a deliberate-indifference claim against Lee on such ground.

### c. *Failure To Train or Supervise*

Lee additionally points out that the allegations in the Amended Complaint do not suggest any specific ways in which he was grossly negligent in failing to train or supervise his employees, and that Plaintiff's contention that the Amended Complaint supports such an inference is "based on one phrase of boilerplate." (Def. Reply at 9.) This Court agrees that Plaintiff's allegation that Lee "failed to prevent or otherwise cease the pattern or practice of retaliation upon [Plaintiff] ... and failed to ensure said [s]ubordinate [defendants] were properly trained and supervised" (Am.Compl.¶ 322) (the single boilerplate phrase referred to by Lee), is insufficient to plead a deliberate-indifference claim under a failure-to-train or failure-to-supervise theory. This conclusory statement is not supported by any factual allegation in the Amended Complaint. Plaintiff does not, for example, describe the nature of the training or supervision that Lee provided to the officers who allegedly violated his rights, explain why that training or supervision was deficient, or provide any facts directly connecting the actions of Lee's subordinates to a failure of training or supervision. *See, e.g., Randle,* 960 F.Supp.2d at 478–79 (dismissing failure-to-supervise claim where allegations recited applicable standard without providing factual context); *Triano v. Town of Harrison, NY,* 895 F.Supp.2d 526, 539–40 (S.D.N.Y.2012) (collecting cases and dismissing failure

to train claim where plaintiff did "no more than make conclusory assertions" that the defendant failed to properly train its employees, without "providing any supporting factual detail about alleged deficiencies in the training program"); *Johnson v. City of New York,* No. 06cv09426 (GBD), 2011 WL 666161, at \*4 (S.D.N.Y. Feb. 15, 2011) (finding plaintiff's failure to train allegation insufficient where plaintiff "[did] not ple[a]d any facts that plausibly allege a specific deficiency in the training or supervision program that accounts for deprivation of [his] constitutional rights" (internal quotation omitted)).

To the extent Plaintiff seeks to argue that the alleged misconduct of Lee's subordinates alone suggests that they must not have been properly trained or supervised, such an unsupported assertion would be insufficient to support a claim for a supervisor's deliberate indifference. *See Bridgewater,* 832 F.Supp.2d at 348 ("Bridgewater asserts that '[g]iven the manner in which the correction officers acted in the incident, it cannot be said that they were properly trained and/or closely supervised.' This statement is nothing more than a bare assertion that Fischer was Taylor's supervisor, which is insufficient to state a § 1983 claim." (internal citation omitted)).

As Plaintiff has not alleged facts showing that Lee was aware of and disregarded a risk of serious harm to Plaintiff that existed at the time of the alleged March 23, 2012 assault, I recommend that Lee's motion to dismiss be granted, pursuant to Rule 12(b)(6), to the extent that the motion seeks dismissal of Plaintiff's failure-to-protect claim arising from that assault.

### 3. *Qualified Immunity*

**\*23** As this Court recommends that, under Rule 12(b)(6), Lee's motion to dismiss Plaintiff's claim against him relating to the March 23, 2012 assault be granted, this Court need not reach the issue of Lee's qualified immunity with respect to that claim. As to Plaintiff's claim that Lee failed to protect him from the earlier, November 1, 2011 assault, however, this Court must also consider Lee's qualified immunity argument.

In general, Lee argues that he is entitled to qualified immunity on the basis that his "responsiveness ... to [P]laintiff's complaints does not support ... failure[-]to[-]protect claims under clearly established

law." (Def. Mem. at 25.) Lee does not dispute, though, that, at the time of the alleged November 1, 2011 assault, Plaintiff had a clearly established right to be protected from a substantial risk of serious harm. *See Farmer,* 511 U.S. at 834. Rather, with respect to that assault, Lee only appears to argue that it was objectively reasonable for him to believe that his actions in reviewing and denying Plaintiff's request for a housing transfer were lawful.

Lee's arguments ignore Plaintiff's particular allegation that Lee denied the transfer request without conducting any investigation or taking any protective action, on the basis that Plaintiff had not identified by name the Green Haven staff members who were the source of his fear. (Am.Compl.¶ 178.) Given that, at the time of the alleged assault, it was clearly established that a prisoner could apprise prison officials of a serious risk of harm without specifically naming the source of a threat, *see Hayes,* 84 F.3d at 621, Lee's qualified immunity defense must fail, at this stage. While the facts adduced in discovery may reveal that Lee's conduct was objectively reasonable in light of the facts known to him at the time, they may also show that his failure to investigate Plaintiff's request for a housing transfer or to separate Plaintiff from Tour–Two, A–Block staff evinced a deliberate disregard for a known risk of harm.

Accordingly, I recommend that the Court deny Lee's motion to dismiss, on qualifiedimmunity grounds, Plaintiff's failure-to-protect claim arising from the November 1, 2011 assault.

### III. *LEAVE TO AMEND*

The Second Circuit has cautioned that district courts "should not dismiss [a *pro se* complaint] without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) (quoting *Gomez v. USAA Fed. Sav. Bank,* 171 F.3d 794, 795 (2d Cir.1999)). While Plaintiff has already amended his pleading once, he did so without the benefit of a judicial decision explaining any deficiencies with his claims. Moreover, while the Amended Complaint currently fails to state a failure-to-protect claim against Lee arising from the March 23, 2012 assault, it is possible that Plaintiff could plead additional facts showing Lee's deliberate indifference under one or more of the three theories he advanced in connection with his opposition to Lee's motion to dismiss; in particular, this Court notes that

Plaintiff attempted, in his opposition papers, to assert a theory based on Lee's supposed knowledge of pervasive retaliatory assaults at Green Haven, but the only source of that theory was a document that the Court could not consider in opposition to Lee's motion. (*See* Discussion, *supra,* at Sections II(A), (D)(2)(b).)

**\*24** For these reasons, I recommend that Plaintiff be afforded an opportunity to amend his pleading to allege any available facts that may plausibly give rise to an inference that Lee violated Plaintiff's Eighth Amendment rights by failing to protect him from the injuries he allegedly suffered during the claimed March 23, 2012 assault.

### *CONCLUSION*

For all of the foregoing reasons, I recommend: (1) that the motion to dismiss filed by defendant Hann (Dkt.147) be denied in its entirety; and (2) that the motion to dismiss filed by defendants Lee, Snedeker, and D'Angelico (Dkt.118) be granted to the extent that it seeks dismissal of the failure-to-protect claim against Lee arising from the March 23, 2012 assault, and denied in all other respects. I further recommend that Plaintiff be given 30 days to replead his failure-to-protect claim against Lee arising from the March 23, 2012 assault.

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report to file written objections. *See also* Fed.R.Civ.P. 6 (allowing three (3) additional days for service by mail). Such objections, and any responses to objections, shall be filed with the Clerk of Court, with courtesy copies delivered to the chambers of the Honorable Ronnie Abrams, United States Courthouse, 500 Pearl Street, New York, New York 10007, Room 2203, and to the chambers of the undersigned, United States Courthouse, 500 Pearl Street, Room 1660, New York, New York 10007. Any requests for an extension of time for filing objections must be directed to Judge Abrams. FAILURE TO FILE OBJECTIONS WITHIN FOURTEEN (14) DAYS WILL RESULT IN A WAIVER OF OBEJCTIONS AND WILL PRECULDE APPELLATE REVIEW. *See Thomas v. Arn,* 474 U.S. 140, 155 (1985); *IUE AFL–CIO Pension Fund v. Herrmann,* 9 F.3d 1049, 1054 (2d Cir.1993); *Frank v. Johnson,* 968 F.2d 298, 300 (2d

Cir.1992); *Wesolek v. Canadair Ltd.,* 838 F.2d 55, 58 (2d Cir.1988); *McCarthy v. Manson,* 714 F.2d 234, 237–38 (2d Cir.1983).

**All Citations**

Slip Copy, 2016 WL 929268

Footnotes

1     To the extent that the facts set forth herein are taken from Plaintiff's Amended Complaint, they are accepted as true for the purposes of Defendants' motions. (See *generally* Am. Compl.; *see* Discussion, *infra,* at Section I(A).)

2     At this time, 16 named defendants remain in this action. In addition to the four Moving Defendants, these defendants are: (1) Donald E. Venettozzi, Assistant Director of DOCCS' Special Housing & Inmate Disciplinary Programs, (2) Bruce Levine, DOCCS Commissioner's Hearing Officer, (3) Mark A. Tokarz ("Tokarz"), Lieutenant at Green Haven, (4) Robert J. Cocuzza ("Cocuzza"), Sergeant at Green Haven, (5) Jason E. Destefano, C.O. at Green Haven, (6) Richard Smith, C.O. at Green Haven, (7) Ronald J. Corbin, C.O. at Green Haven, (8) Michael LePage, currently C.O. at Attica Correctional Facility, (9) Matthew W. Scull, currently Sergeant at Elmira Correctional Facility, (10) Michael F. Mrzyglod ("Mrzyglod"), Sergeant at Green Haven, (11) Sean D. Carlson ("Carlson"), C.O. at Green Haven, and (12) Donald J. Corbin, Jr. ("Corbin"), former C.O. at Green Haven.

3     The facts in this subsection relate to events that occurred prior to the commencement of the three-year limitations period applicable to Plaintiff's claims. *See Pearl v. City of Long Beach,* 296 F.3d 76, 79 (2d Cir.2002) (noting that, in New York, § 1983 claims are governed by three-year statute of limitations). In his opposition to the motion to dismiss filed by defendants Lee, Snedeker, and D'Angelico, Plaintiff clarifies that he has included these facts in his pleading only to demonstrate defendant Lee's knowledge of a prior pattern of retaliation against him, and that he does not seek to assert any claim accruing before April 16, 2011—three years before the operative pleading was filed. (See Pl. Mem. at 11, 23; Discussion, *infra,* at Section II(D); *see also Fitzgerald v. Henderson,* 251 F.3d 345, 365 ("A statute of limitations does not operate to bar the introduction of evidence that predates the commencement of the limitations period but that is relevant to events during the period.").)

4     In the emergency room, Plaintiff was assessed by nurse Jacqueline A. Stetz (a/k/a Stout), who informed Plaintiff that he had suffered a seizure, but did not discern or treat any injuries to Plaintiff's face. (Am.Compl.¶ 71.)

5     Prior to Cocuzza's and Smith's visit, Sergeant Bucolo, who was covering for Cocuzza, briefly saw Plaintiff in the infirmary with C.O. Pauline Rabideau, and C.O. Rabideau took some photographs of Plaintiff's injuries while Plaintiff had most of his clothes on. (Am.Compl.¶ 82.) Plaintiff later overheard Cocuzza say that they would adhere to E.R. nurse Stout's assessment, which made no mention of any facial injuries, and not redo an injury report. (*Id.* ¶ 84.)

6     Moving Defendant Lee identified the interviewing lieutenant as "Deegan," rather than "Tokarz." Plaintiff states, however, that he confirmed that the interviewing lieutenant was actually named Tokarz. (*Id.* ¶ 51 n.11.)

7     For clarity, the Court reproduces this and subsequent excerpts of Lee's grievance decisions with limited alterations, such as omitting redundant brackets and spelling out officers' full names instead of using abbreviations.

8     The CORC upheld Lee's determination on appeal and noted that it had not been improper to assign Cocuzza to investigate the grievance because he had not been named as a direct party to the grievance. (*Id.* ¶ 163.)

9     While the officer in question was Corbin, Plaintiff did not name Corbin or any other officer in the letter, out of fear of reprisal and on the advice of his social worker. (Am.Compl.¶¶ 172, 174, 176.)

10    Plaintiff also stated that Green Haven staff would likely attempt to cover up the assault by fabricating accusations against him, and that it was "common knowledge" that many staff-oninmate assaults took place during pat frisks. (9/30/15 Stanley Decl., Ex. A, at 5.)

11    Plaintiff has now identified two other inmates who stated that they had witnessed the allegedly abusive pat frisk, but it appears that he did not request that these two witnesses be interviewed. (Am. Compl. ¶ 191 n.32.)

12    On March 23, 2012, Mrzyglod was a C.O. (Def. Mem. at 7.) Since then, Mrzyglod has been promoted to Sergeant. (7/2/2015 Answer ¶ 2.)

13    While Plaintiff originally filed this action *pro se,* this Court, on June 22, 2015, granted Plaintiff's application for the Court to request *pro bono* counsel for the limited purposes of: (1) opposing the pending motion to dismiss; and (2) conducting certain discovery in this action. (See Order Granting *Pro Bono* Counsel for Opposition to Motion and Limited Discovery, dated June 22, 2015 (Dkt.123).) On July 10, 2015, Plaintiff's counsel entered notices of their limited appearances. (Dkts.130, 131.)

14    In clarifying the scope of his claims against Lee, Plaintiff stated that he is only suing Lee for his failure to protect Plaintiff from serious harm that occurred within the limitations period, "*including* Lee's failure to prevent the November 1, 2011 and March 23, 2012 assaults." (Pl. Mem. at 23 (emphasis added).) Although Plaintiff's use of the word "including" seems open ended, the Amended Complaint does not allege that Plaintiff suffered any serious injury within the limitations period, other than as a result of the alleged November 1, 2011 and March 23, 2012 assaults. This Court therefore construes Plaintiff's clarifying statement to mean that he is only asserting claims against Lee relating to these two incidents.

15    Based on Plaintiff's opposition papers on the pending motions, it is this Court's understanding that, despite any potential ambiguities in Plaintiff's *pro se* Amended Complaint, he is not attempting to assert (a) claims against defendant Lee that arose before the commencement of the limitations period, (b) Section 1983 claims for damages against any of the Moving Defendants in their official capacities, or (c) state-law claims against any of the Moving Defendants. (*See* Pl. Mem. at 23–24; Pl. Hann Mem. at 2.) Accordingly, this Report and Recommendation will not address any arguments raised by the Moving Defendants against such potential claims.

16    At the time that Plaintiff filed his Amended Complaint, he appeared *pro se.* This Court will therefore read Plaintiff's pleading with "special solicitude, interpreting the [Amended Complaint] to raise the strongest claims that it suggests." *Hill v. Curcione,* 657 F.3d 116, 122 (2d Cir.2011) (internal quotation marks and citation omitted). On the other hand, Plaintiff's submissions in opposition to the Moving Defendants' motions to dismiss were prepared with the assistance of counsel, and they are therefore not entitled to the same solicitude. *See Marchand v. Simonson,* 16 F.Supp.3d 97, 106–07 (D.Conn.2014) ("As Plaintiffs attorney ... filed an opposition to defendants motion for summary judgment on plaintiff's behalf, the Court need not apply the liberal *pro se* construction in considering plaintiff's opposition. However, the Court has taken into consideration plaintiff's *pro se* status at the time he filed his amended complaint in construing that filing."); *Pflaum v. Town of Stuyvesant,* 937 F.Supp.2d 289, 295 n.1 (N.D.N.Y.2013) (applying rule of liberal construction to *pro se* pleading, but not to opposition memorandum of law, where the plaintiff had commenced the action *pro se,* but obtained counsel before opposing motion to dismiss).

17    In this instance, this Court has opted to issue this Report and Recommendation without hearing oral argument on the pending motions, as the parties' respective positions are clear from their submitted briefing.

18    Hann argues that, "[t]o the extent that the non-precedential decision cited in the Opposition Brief, *Porter v. Goord,* 467 F. App'x 21, 23 (2d Cir.2012) (summary order), which defined the Eighth Amendment test [for failure to intervene] as whether the defendant 'observes or *has reason to know* ... that excessive force is being used" (emphasis added), " could be interpreted as creating an objective standard, it would not be a correct statement of the law." (Def. Hann Reply at 2.) The Court need not reach this question, as, for the reasons discussed herein, Plaintiff has, in any event, pleaded facts sufficient to show that Hann had actual, contemporary knowledge of the assault to which Plaintiff claims he was subjected by another officer, and failed to take action to assist Plaintiff.

19    In his moving brief, Lee focused his arguments on the propriety of his investigation and denial of Plaintiff's grievances (Def. Mem. at 21–23), although he also stated that the Amended Complaint offered "no suggestion of ... [Lee's] deliberate indifference to [Plaintiff's] safety", (*id.* at 24). In opposition to Lee's motion, however, Plaintiff explained that he was not asserting a disciplinary due-process claim against Lee, but only failure-to-protect claims arising under the Eighth Amendment. (Pl. Mem. at 11.) On reply, Lee thus shifted the focus of his primary attack on Plaintiff's claims, emphasizing Plaintiff's purported failure to plead facts sufficient to show that Lee was deliberately indifferent to the risk that Plaintiff would be subjected to retaliatory assaults at the hands of Green Haven staff. (Def. Reply at 2–9.)

**End of Document**                          © 2017 Thomson Reuters. No claim to original U.S. Government Works.