UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

RENDELL ROBINSON,

                              Plaintiff,
                                                      9:13-CV-01213
v.                                                    (TWD)

LORENZO A. BALLARD, et al.,

                              Defendants.
_____

APPEARANCES:                          OF COUNSEL:

RENDELL ROBINSON
Plaintiff *pro se*
3001900384
Eric M. Taylor Center (EMTC)
10-10 Hazen Street
East Elmhurst, NY 11370

LETITIA JAMES                         AIMEE M. PAQUETTE, ESQ
Attorney General for the State of New York    Assistant Attorney General
Attorneys for Defendants
The Capitol
Albany, NY 12224

**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge

**DECISION and ORDER**

I.     **INTRODUCTION**

        *Pro se* Plaintiff Rendell Robinson commenced this civil rights action under 42 U.S.C. §

1983, asserting several claims arising out of his confinement while he was an inmate-patient in

the Marcy Residential Mental Health Unit at the Marcy Correctional Facility on July 14, 2010.

(Dkt. No. 1.)  After initial review, discovery, and dispositive motions, claims remaining for trial

were (1) an Eighth Amendment excessive force claim against Defendants Ballard, Onyan, Wojtanowski, Holmes, and Cacciotti; (2) an Eighth Amendment failure to intervene claim regarding the alleged excessive force against Defendant Strassburger; and (3) claims of supervisory liability against Defendants Hilton, Bellnier, and Harper.  (Dkt. Nos. 7, 41, 66.)  A jury trial of these remaining issues began on September 24, 2018, and resulted in a jury verdict in favor of all Defendants which was returned on September 28, 2018.  (Dkt. No. 137.)  Following the trial, the Court filed a judgment in favor of Defendants.  (Dkt. No. 138.)

## II.     RELEVANT PROCEDURAL HISTORY

Plaintiff initially requested an extension of time to file any post-trial motions and requested a copy of the trial transcript.  (Dkt. No. 139.)  Before the Court had a chance to rule on the request, he filed a preliminary motion for a new trial and asked permission to supplement that motion.  (Dkt. No. 140.)  The Court granted Plaintiff's requests and directed that any supplemental motion should be filed by December 17, 2018.  (Dkt. No. 141.)  By letter to Plaintiff dated November 7, 2018, the court reporter advised Plaintiff of the estimated cost of the trial transcript with further instructions on how to obtain the transcript.  (Dkt. No. 142.)

Thereafter, Plaintiff did not file any request to waive the transcript fee, but he did file a request to further extend his time to supplement his post-trial motion which was granted.  (Dkt. Nos. 143, 144.)  He was directed to file any further supplemental motion by January 17, 2019.  (Dkt. No. 144.)  Without any additional requests to extend the time to supplement his motion or address the issue of the trial transcript, Plaintiff filed a supplemental motion for a new trial with an oversized supplemental brief.  (Dkt. Nos. 147, 147-4.)  The supplemental motion and brief were filed three weeks after the second extended deadline set by the Court had expired.  (*See*

Dkt. Nos. 144, 147.)  Plaintiff did not provide any reason for the late filing, nor did he request

permission to file an oversized brief.  Defendants sought to have the late supplemental motion

and brief stricken (Dkt. No. 145), but the Court denied that request and accepted Plaintiff's

supplemental motion and brief.  (Dkt. No. 148.)  The Court then extended Defendants' time to

respond to Plaintiff's supplemental motion, and Plaintiff's time to file a reply.  *Id*.  Defendants

timely filed a response in opposition to Plaintiff's motion (Dkt. No. 149), but Plaintiff did not file

any reply.

Therefore, currently before the Court is Plaintiff's motion and supplemental motion

(collectively "motion" or "Plaintiff's motion") for a new trial pursuant to Federal Rule of Civil

Procedure 59(a) and to alter or amend the judgment pursuant to Rule 59(e), and Defendants'

response in opposition.  (Dkt. Nos. 140, 147, 149.)  The Court has thoroughly considered all of

the parties' filings on this motion.  For the reasons set forth below, Plaintiff's motion is denied in

its entirety.

## III.    GOVERNING LEGAL STANDARDS

### A.    Legal Standard Governing a Motion for a New Trial

Rule 59(a) of the Federal Rules of Civil Procedure provides, in pertinent part, that "[t]he

court may, on motion, grant a new trial on all or some of the issues-and to any party- . . . after a

jury trial, for any reason for which a new trial has heretofore been granted in an action at law in

federal court . . . ."  Fed. R. Civ. P. 59(a)(1)(A).  The Second Circuit has interpreted this standard

to permit the granting of new trials when "in the opinion of the district court, the jury has reached

a seriously erroneous result or the verdict is a miscarriage of justice."  *DLC Mgmt. Corp.v. Town

of Hyde Park*, 163 F.3d 124, 133 (2d Cir. 1998) (internal quotation marks omitted); *Lightfoot v.*

*Union Carbide Corp.*, 110 F.3d 898, 911 (2d Cir. 1997).  Examples of such a serious error or a miscarriage of justice include when "the verdict is against the weight of the evidence," or when "for the reasons stated the trial was not fair to the moving party."  *Mallis v. Bankers Trust Co.*, 717 F.2d 683, 691 (2d Cir. 1983).  However, "the court should only grant a motion for a new trial when the jury's verdict is 'egregious.'"  *DLC Mgmt. Corp.*, 163 F.3d at 134 (internal quotation marks omitted); *Dunlap-McCuller v. Riese Org.*, 980 F.2d 153, 158 (2d Cir. 1992), *cert. denied*, 510 U.S. 908 (1993).  "[I]n addressing a Rule 59 motion, the court may 'independently weigh the evidence presented at trial to determine whether the jury's verdict is 'seriously erroneous' or resulted in a 'miscarriage of justice.'"  *Edwards v. Schrader-Bridgeport Int'l., Inc.*, 205 F. Supp. 2d 3, 8 (N.D.N.Y. 2002).  "In doing so, the court 'is afforded considerable discretion.'"  *Edwards*, 205 F. Supp. 2d at 8.

Additionally, "[i]t is well-settled that Rule 59 is not a vehicle for relitigating old issues, presenting the case under new theories, securing a rehearing on the merits, or otherwise taking a second bite at the apple."  *Sequa Corp. v. GBJ Corp.*, 156 F.3d 136, 144 (2d Cir. 1998) (citations omitted).  "The standard for granting a new trial under Rule 59 is less stringent [as compared to the standard for judgment as a matter of law under Rule 50], but still relatively high."  *Starr Indem. & Liab. Co. v. Am Claims Mgmt.*, 131 F. Supp. 3d 185, 188 (S.D.N.Y. 2015), *aff'd*, 665 Fed. App'x 27 (2d Cir. 2016) (summary order).

### B.      Legal Standard Governing a Motion to Alter or Amend a Judgment

Rule 59(e) of the Federal Rules of Civil Procedure does not prescribe any specific grounds for granting a motion to alter or amend a final judgment.  However, in agreeing with other circuits, the Second Circuit stated "[t]hat district courts may alter or amend judgment to

correct a clear error of law or prevent manifest injustice." *Munafo v. Metro. Transp. Auth.*, 381 F.3d 99, 105 (2d Cir. 2004) (internal quotation marks and citations omitted). A Rule 50(e) motion "may not be used to relitigate old matters, or to raise arguments or present evidence that could have been raised prior to the entry of judgment." *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 485 n.5 (2008). "When a Rule 59(e) motion addresses a matter already considered by the court, it is governed by an even more exacting standard. In such an instance, reconsideration is generally granted only in the event of an intervening change of controlling law, the availability of new evidence, or the need to correct clear error or prevent manifest injustice. Mere disagreement with the court's prior ruling does not constitute a basis for reconsideration of a judgment entered." *Cargill, Inc. v. Sears Petroleum & Transport Corp.*, 388 F. Supp. 2d 37, 80-81 (N.D.N.Y. 2005) (citations and internal quotations omitted).

## IV.   ANALYSIS

Generally, liberally construed, Plaintiff's motion for a new trial asserts the following arguments: (1) the verdict was contrary to the weight of the evidence; (2) the Court erred in permitting testimony regarding an incident in which Plaintiff threw hot water on a correction officer and was convicted of a crime as a result; (3) Plaintiff was not allowed to present all evidence regarding his claims; (4) prejudicial evidence was admitted regarding Plaintiff's alleged gang affiliation, a prior incident of Plaintiff taking a correction officer's baton, and testimony that the Office of Special Investigations found Plaintiff's excessive force complaint unsubstantiated; (5) an incomplete document was admitted into evidence; (6) Defendants' counsel made improper closing arguments; and (7) jury instructions were improper. (*See generally* Dkt. No. 147.)

Defendants oppose each of Plaintiff's arguments, and further argue that Plaintiff's

supplemental brief exceeds the allowable twenty-five page limit and should be disregarded since

Plaintiff did not obtain prior permission from the Court to exceed the permissible page limit.

(*See generally* Dkt. No. 149.)

In view of Plaintiff's *pro se* status on the motion, and as set forth above, the Court

granted Plaintiff liberal extensions to submit his post-trial motion, and the Court has likewise

accepted and thoroughly considered his oversized brief.

## A.    Motion for a New Trial

After carefully considering the matter, the Court denies Plaintiff's motion based upon

Federal Rule of Civil Procedure 59(a) for a new trial.  Initially, the Court notes that for the bulk

of Plaintiff's arguments, he fails to cite to any transcript or record from the trial to support them.

These "unsupported contentions . . . are insufficient to justify the grant of a new trial." *AMW*

*Materials Testing, Inc. v. Town of Babylon*, No. 01 CV 4245 (ADS) (ETB), 2008 WL 11449231,

at *18 (E.D.N.Y. Mar. 13,  2008).  Nevertheless, the Court has considered each of Plaintiff's

arguments and will address them in the same order as presented by Plaintiff.

### 1.    Weight of the Evidence

Plaintiff argues there was no evidentiary basis for the jury to find for the Defendants and

that the verdict was against the weight of the evidence.  (Dkt. No. 147-4 at 10-20[1].)  Plaintiff

recites his testimony at trial and the testimony of Defendants' witnesses regarding the details of

the events giving rise to his claims of excessive force.  The Court has thoroughly reviewed

Plaintiff's voluminous arguments and exhibits in this regard and finds that Plaintiff has not come

---

[1]      Page references to documents identified by docket number refer to the page
numbers inserted by the Court's electronic filing system maintained by the Clerk's office.

forward with any evidence to show that the jury reached a seriously erroneous result or that the verdict was a miscarriage of justice. *Manley v. AmBase Corp.*, 337 F.3d 237, 244 (2d Cir. 2003). For the most part, Plaintiff argues that his testimony was more credible than the testimony of the Defendants. (Dkt. No. 147-4 at 11-16.) However, in considering a Rule 59 motion for a new trial, "the court should only grant such a motion when the jury's verdict is egregious . . . [and] a court should rarely disturb a jury's evaluation of a witness's credibility." *DLC Mgmt. Corp.*, 163 F.3d at 134 (citations and internal punctuation omitted). As such, the Court declines to disturb the jury's findings on this basis.

### 2. Testimony Regarding Hot Water Incident

Plaintiff claims plain error of the Court because there was testimony presented during trial by Defendant Harper regarding an incident where Plaintiff threw hot water on a correction officer and was subsequently convicted of a crime as a result. (Dkt. No. 147-4 at 20.) While Plaintiff is correct that the Court ruled in a motion *in limine* that only the number of felony convictions and the fact that Plaintiff was sentenced to more than one year were admissible (Dkt. No. 131), the testimony at issue was actually elicited by Plaintiff on cross-examination of Defendant Harper. (Dkt. No. 149-4 at 11.) Plaintiff does not provide any evidence that he objected to this testimony or moved to strike it during trial. *Koch v. Greenberg*, 14 F. Supp. 3d 247, 267 (S.D.N.Y. 2014), *aff'd*, 626 F. App'x 335 (2d Cir. 2015) (claimed improper character evidence admitted at trial not error where opposing counsel elicited the testimony on cross-examination and then did not move to strike it). Further, Plaintiff has not shown that the testimony swayed the jury in such a way as to affect the outcome of the case. The Court, therefore, finds a new trial is not warranted on this basis.

### 3.    Presentation of All Evidence

Plaintiff next argues that a new trial should be ordered because his deposition transcript, his affidavit submitted to the Court in opposition to Defendants' summary judgment motion, and his treatment records from the Office of Mental Health should have been entered into evidence at trial.  (Dkt. No. 147-4 at 22-28.)  He claims this testimony, affidavit, and records should have been admitted "as trial evidence to support [his] case" and "as proof to the quality of evidence" (*id*. at 26), and to "support [his] trial testimony."  (*Id.* at 27.)  However, this evidence was never offered at trial.  Additionally, Plaintiff testified in person at trial regarding his claims and the events leading up to them, and his attorneys cross-examined all of Defendants' witnesses.  Plaintiff essentially seeks to relitigate his claims, but as noted above, "[i]t is well-settled that Rule 59 is not a vehicle for relitigating old issues, presenting the case under new theories, securing a rehearing on the merits, or otherwise taking a second bite at the apple."  *Sequa Corp.*, 156 F.3d at 144 (citations omitted).  Accordingly, this argument fails.

### 4.    Prejudicial Evidence

Plaintiff claims a new trial should be conducted because prejudicial evidence was admitted pertaining to (1) his alleged gang affiliation; (2) another incident where Plaintiff took an officer's baton; and (3) information that the Office of Special Investigations found Plaintiff's excessive force claim unsubstantiated.  (Dkt. No. 147-4 at 28-30.)  Plaintiff does not argue that this evidence was objected to at trial, or that he requested any limiting or curative instructions. *See id.*  For these reasons alone, Plaintiff's argument fails.

Additionally, Rule 61 provides "unless justice requires otherwise, no error in admitting or excluding evidence . . . is ground for granting a new trial."  Fed. R. Civ. P. 61.  Courts "must

disregard all errors and defects that do not affect any party's substantial rights." *Id*. Whether an evidentiary error implicates a substantial right depends on "the likelihood that the error affected the outcome of the case." *Malek v. Fed. Ins. Co.*, 994 F.2d 49, 55 (2d Cir. 1993). Here, Plaintiff has not shown that the jury's decision was influenced by the evidence at issue. Further, there was significant testimony, video evidence, and documentary evidence to support the jury's verdict. Therefore, a new trial is not warranted on these grounds.

### 5. Incomplete Document

Next, Plaintiff claims that defense counsel destroyed or significantly altered evidence and a spoliation instruction was therefore warranted. (Dkt. No. 147-4 at 30-32.) Specifically, Plaintiff asserts a document admitted into evidence was missing a page. (*Id.* at 31; Dkt. No. 147-12 at 2-7.) However, the complete document was admitted into evidence as Trial Joint Exhibit 14. (Dkt. No. 149-2 at 1-12.) As such, no new trial is warranted under these circumstances since the entire document was before the jury.

### 6. Improper Closing Statements of Defendants' Counsel

Plaintiff claims defense counsel's closing statement "was undignified and intemperate, containing improper instructions and assertions calculated to mislead the jury . . . ." (Dkt. No. 147-4 at 32.) Plaintiff does not assert that he objected during the summation. Under these circumstances, a new trial is warranted only where counsel's conduct prejudices the opposing party or unfairly influences a jury's determination. *Tesser v. Bd. of Educ. of Sch. Dist.*, 370 F.3d 314, 321 (2d Cir. 2004). "The relevant inquiry in assessing undue prejudice is whether there is a reasonable probability that the jury's verdict was influenced by the improper conduct of counsel." *Claudio v. Mattituck-Cutchogue Union Free Sch. Dist.*, 955 F. Supp. 2d 118, 156 (E.D.N.Y.

2013) (citations and quotation marks omitted). "Moreover, when the complaining party fails to object at trial to statements made during summation, the court will only grant a new trial when the error is so serious and flagrant that it goes to the very integrity of the trial." *Id.* (citations and quotation marks omitted).

Plaintiff argues that defense counsel mislead the jury regarding his alleged lack of injuries. (Dkt. No. 147-4 at 33.) Since Plaintiff's relevant medical records generated after the claimed excessive force at issue were admitted into evidence as Joint Exhibit 12, the Court finds any error in this regard is not serious or flagrant. (*See* Dkt. No. 135 at 2.)

Plaintiff also argues defense counsel improperly referred to Plaintiff "yelling to his 'gang brothers.'" (Dkt. No. 147-4 at 33.) Video evidence of a gang related comment made by Plaintiff, as interpreted by a Defendant, was introduced at trial without any objection by Plaintiff (Dkt. No. 149-4 at 21; *see also* Dkt. No. 135 at 1 (referencing video as Joint Exhibit 1)), and no objection was made during the summation. Under these circumstances as noted above, the Court is required to find "flagrant abuse" before granting a new trial. *Claudio*, 955 F. Supp. 2d at 156. Given that evidence regarding a gang related comment was introduced during the trial, without objection, the Court concludes there are no grounds for a new trial based upon such statements of defense counsel in Defendants' summation.

### 7. Jury Instructions

Plaintiff argues the Court's jury instructions in response to two requests from the jury during their deliberations were misleading. (Dkt. No. 147-4 at 34.) The jury requested "clarification of excessive force guidelines" and "what happens if we can't be agreeable on verdict?" (Dkt. No. 134.) In advance of calling the jury back into the Courtroom, the Court

conferred with counsel for the parties. The jurors had a written copy of the jury instructions, therefore the Court referred the jurors to that part of the jury instructions that defined excessive force, and gave an *Allen* charge in response to the second request. (Dkt. No. 149-3 at 13-15; Text Minute Entry 9/28/2019.) Neither Plaintiff nor Defendants objected at that time, or at the time of the original jury charge conference, or before or after the instructions were delivered to the jury on the record in advance of any deliberations.

To the extent any such motion for a new trial is premised on an objection to a jury instruction, Federal Rule of Civil Procedure 51 requires the movant to have raised that objection before the jury retires, in order to preserve the objection. *See Brenner v. World Boxing Council*, 675 F.2d 445, 456 (2d Cir. 1982), *cert. denied*, 459 U.S. 835 (1982). Rule 51 provides, in pertinent part, that "[a] court may consider a plain error in the instructions that has not been preserved as required by Rule 51(d)(1) if the error affects substantial rights." Fed. R. Civ. P. 51(c) and (d). As such, "to establish plain error, [the movant] must show there was (1) error (2) that is plain and (3) that affects substantial rights." *U.S. v. Cossey*, 632 F.3d 82, 86-87 (2d Cir. 2011) (citations omitted). The error should be corrected only if it "seriously affects the fairness, integrity, or public reputation of the judicial proceedings." *Id.* at 87 (citations and punctuation omitted). "The plain error doctrine should only be invoked with extreme caution in the civil context." *Feeley v. City of New York*, 362 F. Supp. 3d 153, 160 (S.D.N.Y. 2019) (citation and quotation marks omitted). "To constitute plain error, a court's action must contravene an established rule of law and the substantial right affected must go to the very essence of the case." *Id.* (citations and internal punctuation omitted).

Here, there is no such error. Plaintiff argues the Court only gave the jurors "law in favor

11

of the defendant[]s and [did] not give the law to the jurors on plaintiff's behalf as to what excessive force is." (Dkt. No. 147-4 at 35.) Plaintiff does not provide any argument on what part of the instruction on excessive force specifically favored Defendants or what was lacking as to Plaintiff. *Id.* A fair reading of the instructions on excessive force (Dkt. No. 149-3 at 13-15) and in a reading of the instructions in their entirety, fails to establish that any alleged error was prejudicial. A jury instruction is erroneous, and a new trial warranted, only if it misleads a jury as to the correct legal standard or does not adequately inform the jury on the law. *Anderson v. Branen*, 17 F.3d 552, 556 (2d Cir. 1994). Plaintiff speculates that the jury "[d]idn't understand the readable jury instructions and really didn't know what to do and didn't know that prison officials violate inmate constitutional rights." (Dkt. No. 147-4 at 35.) However, the Plaintiff has not shown the jury instructions were legally incorrect, led to any jury confusion, or caused any prejudice. Therefore, Plaintiff has failed to show the instructions resulted in a seriously erroneous result or a miscarriage of justice requiring a new trial. *Nimely v. City of New York*, 414 F.3d 381, 392 (2d Cir. 2005) (citations omitted).

After conferring with counsel, the Court read the *Allen* charge in response to the jury's question "what happens if we can't be agreeable on verdict?" (*See* Dkt. No. 134.) "The term '*Allen* charge' is a generic term used for a type of supplemental instruction that is given to a deadlocked jury, first approved by the Supreme Court in *Allen v. United States* . . . [which] reminds the jurors of the importance of obtaining a verdict and encourages jurors to listen 'to each other's arguments' while also emphasizing that 'the verdict must be the verdict of each individual juror, and not a mere acquiescence in the conclusion of his fellows.'" *Smalls v. Batista*, 191 F.3d 272, 275 n.1 (2d Cir. 1999). Plaintiff does not specifically provide what part of

the charge he finds objectionable other than to assert the Court "rushed the jury to make an improper verdict." (Dkt. No. 147-4 at 36.). "[T]here is nothing improper with instructions that encourage a deadlocked jury to reach a verdict, as long as jurors are not encouraged to abandon, without any principled reason, doubts that any juror conscientiously holds . . . ." *Baker v. Kirkpatrick*, 768 F. Supp. 2d 493, 507 (W.D.N.Y. 2011) (citations and punctuation omitted). Plaintiff has not submitted any evidence that the Court rushed the jurors or made any other comments to infer they should acquiesce to other jurors to reach a verdict. Accordingly, the Court finds no error here warranting a new trial.

## B. Motion to Alter or Amend the Judgment

Plaintiff has not made any argument that the jury verdict was clear error of law or that it is necessary to alter or amend it to prevent manifest injustice. (*See generally* Dkt. No. 147-4.) Additionally, Plaintiff does not assert that new evidence is available or that there has been an intervening change in controlling law. *Id.* Plaintiff clearly disagrees with the jury's verdict, and apparently wants to relitigate the issues that have been decided by the jury. Under these circumstances, there is no basis to reconsider the judgment entered in accordance with the jury's verdict.

The Court has considered all of Plaintiff's arguments and finds no legally sufficient reason to disturb the jury's verdict.

**WHEREFORE**, it is hereby

**ORDERED** that Plaintiff's motion for a new trial or to alter or amend the judgment pursuant to Rule 59 of the Federal Rules of Civil Procedure (Dkt. Nos. 140, 147) is **DENIED**; and it is further

**ORDERED** that the Clerk provide Plaintiff with a copy of this Decision and Order, along with copy of the unpublished decision cited herein in accordance with the Second Circuit decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (*per curiam*).


Dated: September 26, 2019
        Syracuse, New York


Thérèse Wiley Dancks
United States Magistrate Judge

2008 WL 11449231
Only the Westlaw citation
is currently available.
United States District
Court, E.D. New York.

AMW MATERIALS TESTING, INC.
and Anthony Antoniou, Plaintiffs,
v.
TOWN OF BABYLON, and
the North Amityville Fire
Company, Inc., Defendants.

01 CV 4245 (ADS) (ETB)
|
Signed 03/13/2008

**Attorneys and Law Firms**

LUSTBERG & FERRETTI, 5 Garrison Road, Glens Falls, NY 12801, By: Robert M. Lustberg, Esq., Joan M. Ferretti, Esq., Of Counsel, Attorneys for the Plaintiffs.

TADDEO & SHAHAN, LLP, 472 S. Salina Street, Suite 700, Syracuse, NY 13202, By: Steven C. Shahan, Esq, Of Counsel, Attorneys for the Defendants.

LOWENSTEIN, SANDLER, KOHL, FISHER & BOYLAN, 65 Livingston Avenue, Roseland, NJ 07068-1791, By: Richard Ricci, Esq., Of Counsel, Attorneys for the Defendants.

## MEMORANDUM OF
## DECISION AND ORDER

Arthur D. Spatt, United States District Judge

**\*1** This case arises out of a fire at an industrial facility on October 9, 2000, that resulted in the release or threatened release of hazardous substances into the environment. The North Amityville Fire Company, Inc. ("Fire Company" or "NAFC") and the Town of Babylon ("Town") (collectively, the "Defendants"), responded to the fire. The owner, Anthony Antoniou and the business located at the facility, AMW Materials Testing, Inc. ("AMW") (collectively, the "Plaintiffs"), claim that the Defendants are liable under: (1) the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA), 42 U.S.C. § 9607 (2004); (2) the New York Navigation Law; and (3) for common law negligence.

Following a trial in September and October 2006, the jury was unable to reach a verdict. The case was re-tried in February and March 2007 and the jury rendered a verdict in favor of the Defendants. Presently before the Court are the Plaintiffs' motions for: (1) judgment as a matter of law pursuant to Rule 50 of the Federal Rules of Civil Procedure ("Fed. R. Civ. P."); (2) judgment under CERCLA pursuant to Fed. R. Civ. P. 52; and (3) a new trial pursuant to Fed. R. Civ. P. 59.

## I. BACKGROUND

### A. Factual Background

Although the Court will not relate the entire factual background of this case in the present Order, the relevant facts are set forth in this Court's Memoranda of Decision and Order dated December 20, 2004, AMW v. Town of Babylon, 348 F.Supp.2d 4 (E.D.N.Y. 2004)

and December 26, 2006, AMW v. Town of Babylon, No. 01-cv-4245, and the Second Circuit's Order dated March 28, 2006, AMW v. Town of Babylon, 187 Fed.Appx. 24 (2d Cir. 2006). Familiarity with those decisions, as well as the trial transcript, is assumed.

**B. Procedural Background**

On June 22, 2001, the Plaintiffs commenced this action seeking to hold the Defendants liable for damages that resulted from a fire at the Plaintiffs' facility. Some of the losses include the cost of environmental remediation that the Plaintiffs undertook by reason of the apparent escape of hazardous and toxic materials from the AMW facility during the fire. The Plaintiffs also seek damages for lost profits and punitive damages. In their complaint, the Plaintiffs assert causes of action under Sections 107 and 113 of CERCLA, strict liability for ultrahazardous activity, joint and several liability under the New York Navigation Law and common law negligence.

On December 20, 2004, this Court granted the Defendants' motion for summary judgment and dismissed the complaint in its entirety. On March 28, 2006, the Second Circuit affirmed this Court's dismissal of the Plaintiffs' CERCLA Section 113(f)(1) claim. However, the Second Circuit vacated the dismissal of the Plaintiffs' remaining claims. AMW, 187 Fed.Appx. 24.

Specifically, the Second Circuit found that resolution of the Plaintiffs' CERCLA Section 107(a) claim would necessarily involve the determination of disputed issues of fact, including, whether the Defendants were "operators" of the facility pursuant to

CERCLA. Id. at 27-28. The Second Circuit further determined that whether and to what extent the Plaintiffs incurred response costs voluntarily, was also a factual issue. Id. at 25-28. The Second Circuit held that the CERCLA issues should be "appropriately addressed by the trier of fact." Id. at 27.

**\*2** The Second Circuit further determined that factual issues exist regarding the Plaintiff's negligence claims that, additionally, should be addressed at trial. Id. at 27-28. Finally, the Second Circuit determined that the Plaintiff's Navigation Law claims were improperly dismissed on summary judgment because the issue of the Defendants' lack of culpability should not have been decided as a matter of law. Id. at 28. The Second Circuit specifically noted that it remanded the case for trial on the Navigation Law cause of action and "whether or not the Plaintiffs can state a CERCLA claim." Id. at 28.

From September 12, 2006 through October 11, 2006, this Court held a jury trial of the issues in this case. On October 10, 2006, the jury informed the Court that it was unable to reach a unanimous verdict on the Plaintiffs' CERCLA claims, but had reached a unanimous verdict on the remaining Navigation Law and negligence claims. In Court, on this partial verdict, the jury returned a verdict in favor of the Defendants on the Navigation Law and negligence claims. However, when the jury was polled, one juror did not agree to the verdict. As a result, the Court instructed the jury to return to the jury deliberation room and begin deliberations from the beginning.

On October 11, 2006, the jury informed the Court that it was unable to reach a unanimous verdict on any of the three causes of action. The Court then accepted the disagreement and excused the jurors.

The Defendants moved for judgment as a matter of law pursuant to Fed. R. Civ. P. 50(b). The Plaintiffs opposed the Defendants' motion, and additionally, cross-moved for judgment as a matter of law. On December 26, 2006, the Court denied the motions for judgment as a matter of law and ordered the parties to appear for jury selection for re-trial of the case.

On February 26, 2007, the jury was selected and on February 28, 2007, the trial commenced. On March 28, 2007, the jury reached a unanimous verdict in favor of both Defendants on all causes of action.

## C. The Plaintiffs' Contentions

On May 3, 2007, the Plaintiffs moved for: (1) judgment as a matter of law pursuant to Fed. R. Civ. P. 50; (2) judgment under the CERCLA statute in favor of the Plaintiffs pursuant to Fed. R. Civ. P. 52; and (3) a new trial pursuant to Fed. R. Civ. P. 59. The Plaintiffs contend that, as to the Plaintiffs' CERCLA claims, the Court determined that it would treat the jury verdict as an advisory verdict. The Plaintiffs contend that the jury found that the NAFC failed to prove that it was responding to an emergency caused by the release or threatened release of hazardous materials, as evidenced by the jury's response to question 1 on the verdict sheet. The Plaintiffs contend that, as a result, NAFC is strictly liable under 42 U.S.C. § 9607(a) upon a finding that it was an operator. However, the Plaintiffs contend that the jury never reached

question 4 of the verdict sheet, namely, whether NAFC was an operator. The Plaintiffs assert that the Court must now find that NAFC was an operator and therefore strictly liable under CERCLA.

The Plaintiffs further contend that the record, and specifically, the testimony of Chiefs Tutt, Gooch, and Clayton, Fire Marshall Arcuri, and Stephen Bopp, demonstrates that NAFC exercised complete control over AMW. As a result, they contend that NAFC is an operator and strictly liable. The Court notes that although the Plaintiffs generally name various witnesses, they fail to cite any portions of the trial transcript or any specific trial testimony in support of their contentions.

*3 The Plaintiffs also contend that judgment should be entered against the Town pursuant to Rules 50 or 52. Without citing to any pages of the trial transcript, the Plaintiffs claim that Fire Marshall Arcuri testified that he was not responding to an emergency caused by the release or threatened release of hazardous materials. They further contend that he testified that he did not know of the presence of hazardous materials at the facility.

In addition, the Plaintiffs contend that they are entitled to a new trial because during his summation, Steven C. Shahan, counsel for the Defendants, utilized three documents which were not in evidence regarding whether petroleum had been released. Although the Plaintiffs admit that the Court gave the jury a curative charge in regard to this issue, they contend that the curative charge actually exacerbated the prejudice to the Plaintiffs by emphasizing that the Defendants' error was

inadvertent and blaming the Plaintiffs for the mistake.

Finally, with regard to the negligence causes of action, the Plaintiffs contend that they had a special relationship with the Defendants and the special relationship existed as a matter of law. The Plaintiffs further contend that the Court erroneously instructed the jury regarding the Cuffy test, despite the fact that the test was not mentioned by the Second Circuit in its Decision in this case. In addition, the Plaintiffs contend that the jury in the prior trial of this case, would have found the Defendants grossly negligent.

On the final page of the Plaintiffs' submission, they contend that they are entitled to a new trial as a result of misleading questions by the Defendants during trial regarding a determination made by the New York Department of Environmental Conservation ("DEC"), as well as a misleading opening statement by the Defendants' counsel, Mr. Shahan, regarding the DEC's determination. The Plaintiffs again fail to cite any portion of the trial transcript or provide the Court with information sufficient to locate the alleged improper statements. In fact, the Plaintiffs fail to even provide the Court with the alleged improper questions or the alleged improper opening statements.

**D. The Defendants' Contentions**

The Defendants agree that, with regard to the CERCLA causes of action, because the jury verdict is advisory, the Court must make its own independent findings of fact and conclusions of law. They contend that the Defendants were responding to an emergency created by the release of hazardous chemicals and did not act grossly negligent. They contend that the Plaintiffs failed to establish that the Defendants were operators of the AMW facility. In support of their contentions, the Defendants cite to numerous pages from the trial transcript.

The Defendants assert that the firefighters were only inside the AMW facility for a short time and at no time were they able to direct or manage what was happening to hazardous materials inside the building. The Defendants further claim that hazardous substances were being released prior to the payloader moving debris. The Defendants also assert that they were responding to an emergency created by the release or threatened release of hazardous substances. They contend that they are not liable as operators of the facility. As such, they contend that they are immune from liability because they did not act grossly negligent. The Defendants note that if they are found liable, they are entitled to contribution from the Plaintiffs.

 **\*4** The Defendants further argue that the Plaintiffs are not entitled to a new trial on the New York Navigation Law claims. The Defendants note that the Plaintiffs contend that defense counsel, during summation, referred to hazardous waste manifests showing the recovery of three 55 gallon drums of waste oil, believing that they were a part of Plaintiffs' exhibit 45. However, they were not admitted in evidence. The Defendants note that Plaintiffs did not object during the Defendants' summation and the Court gave the jury a curative instruction to disregard those documents and the arguments based on them. The Defendants contend that now, for the first

time, the Plaintiffs contend that the curative instruction was insufficient.

Finally, the Defendants contend that the Court properly instructed the jury regarding the New York negligence causes of action and there was sufficient evidence for the jury to have found that no special relationship existed between the parties.

## II. DISCUSSION

### A. The Standards of Review

#### 1. As To A Rule 50 Motion for Judgment As A Matter of Law

"[T]he same standard that applies to a pre-trial motion for summary judgment pursuant to Fed. R. Civ. P. 56 also applies to motions for judgment as a matter of law during or after trial pursuant to Rule 50." This Is Me v. Taylor, 157 F.3d 139, 142 (2d Cir. 1998) (citing Piesco v. Koch, 12 F.3d 332, 341 (2d Cir. 1993) ). A district court may not grant judgment as a matter of law unless "the evidence is such, that without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, there can be but one conclusion as to the verdict that reasonable [persons] could have reached." Cruz v. Local Union No. 3 of the IBEW, 34 F.3d 1148, 1154-55 (2d Cir. 1994) (quoting Simblest v. Maynard, 427 F.2d 1, 4 (2d Cir. 1970) ). Weakness of the evidence does not justify judgment as a matter of law; as in the case of a grant of summary judgment, the evidence must be such that a reasonable juror would have been compelled to accept the view of the moving party. See Fairbrother v.

Morrison, 412 F.3d 39, 48 (2d Cir. 2005); This Is Me, 157 F.3d at 142.

Stated somewhat differently, we are "required to 'consider the evidence in the light most favorable to the party against whom the motion was made and to give that party the benefit of all reasonable inferences that the jury might have drawn in his favor from the evidence.' " Tolbert v. Queens Coll., 242 F.3d 58, 70 (2d Cir. 2001) (quoting Smith v. Lightning Bolt Prods., Inc., 861 F.2d 363, 367 (2d Cir. 1988) ). A court evaluating such a motion "cannot assess the weight of conflicting evidence, pass on the credibility of the witnesses, or substitute its judgment for that of the jury." Id. at 70 (quoting Smith, 861 F.2d at 367); Black v. Finantra Capital, Inc., 418 F.3d 203, 209 (2d Cir. 2005).

Finally, the Court is mindful that motions pursuant to Rule 50 "should be cautiously and sparingly granted." 9 CHARLES ALAN WRIGHT AND ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2524 (2d ed. 1994). "[W]e may reverse the district court only if there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or [there is] such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded [jurors] could not arrive at a verdict against [him]." Nimely v. City of New York, 414 F.3d 381, 390 (2d Cir. 2005).

#### 2. As To A Rule 59 Motion For A New Trial

As an alternative to their request for judgment as a matter of law, the Plaintiffs also request a

new trial. "A motion for a new trial ordinarily should not be granted unless the trial Court is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice." Tesser v. Board of Education, 370 F.3d 314, 320 (2d Cir. 2004); see also Armstrong v. Brookdale University Hospital, 425 F.3d 126, 133 (2d Cir. 2005).

 *5 In contrast to a motion for judgment as a matter of law, a motion for a new trial pursuant to Rule 59 may be granted by the District Court, even though there is evidence to support the jury's verdict, so long as the District Court determines that, in its independent judgment, "the jury has reached a seriously or erroneous result or (its) verdict is a miscarriage of justice". Munafo v. Metropolitan Transportation Authority, 381 F.3d 99, 105 (2d Cir. 2004); see also Nimely v. City of New York, 414 F.3d at 392; Manley v. Ambase Corp., 337 F.3d 237, 244-45 (2d Cir. 2003). Also, the trial judge is free to weigh the evidence herself and need not view it in the light most favorable to the winner. Manley, 337 F.3d at 244-45.

    3. As To Rule 52

"Rule 52(a) provides, in pertinent part, that 'in all actions tried upon the facts without a jury or with an advisory jury, the court shall find the facts specially and state separately its conclusions of law thereon.' " Mazzeo v. Lenhart (In re Mazzeo), 167 F.3d 139, 142 (2d Cir. 1999) (citing Fed. R. Civ. P. 52(a) ). See also Felker v. Pepsi-Cola Co., 899 F.Supp. 882, 888 (D. Conn. 1995) ("Fed. R. Civ. P. 52 requires the Court, although sitting with an advisory jury, to make its own findings of fact and conclusions of law"). "A principal

purpose of the requirement for specific factual findings is to inform the appellate court of the basis of the decision and to permit effective appellate review." In re Mazzeo, 167 F.3d at 142. "The findings of fact and conclusions of law ... need not include punctilious detail [ ]or slavish tracing of the claims issue by issue and witness by witness." Id. (internal citations omitted). "Indeed it has been held in this Circuit that Rule 52(a) requires the Court to make its findings independent from the jury's ... On the other hand, it would be purposeless to have an advisory jury unless some deference was shown to its opinions. Moreover, decisions in this Circuit have indicated a preference for a jury's verdict over the findings of a District Judge." Felker, 899 F.Supp. at 888-89.

In this case, the Court allowed the CERCLA issues to be decided in the first instance by the jury as an advisory verdict. See Fed. R. Civ. P. 39(c) ("In all actions not triable of right by a jury the court upon motion or of its own initiative may try any issue with an advisory jury"). See, e.g. Harris v. Niagara Mohawk Power Corp., 252 F.3d 592, 595-96 (2d Cir. 2001) ("Although the parties had agreed that the determination of damages would be made by the trial judge following a jury trial on liability, the jury was asked to give an advisory verdict with respect to damages"). Although an advisory verdict is not binding on the trial court, its purpose is "to enlighten the conscience of the Court." Skolberg v. Villani, 601 F.Supp. 981, 982 (S.D.N.Y. 1985). However, it is wholly within the discretion of the trial court whether to accept or reject in whole or in part the verdict of the advisory jury. 9 CHARLES ALAN WRIGHT AND ARTHUR

R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2335 (2d ed. 1995).

With these standards in mind, the Court will review the claims in the present case.

## B. As To CERCLA

The Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), also known as the Superfund Law, regulates the release of hazardous substances and the cleanup of sites where hazardous substances have come to be located. 42 U.S.C. §§ 9601–75 (2004). CERCLA permits private parties to "pursue contribution or indemnification from potentially responsible parties for expenses incurred responding to environmental threats." Commander Oil Corp. v. Barlo Equip. Corp., 215 F.3d 321, 326 (2d Cir. 2000) (citation omitted); 42 U.S.C. § 9607(a)(4)(B). An "innocent" party may seek indemnification for full recovery of costs under § 9607(a)(4)(B). Bedford Affiliates v. Sills, 156 F.3d 416, 424 (2d Cir. 1998).

**\*6** A party is potentially responsible under CERCLA for costs associated with a toxic spill at a site, if: (1) the site is a "facility;" (2) a release or threatened release of a "hazardous substance" from the site has occurred; (3) the release or threatened release has caused the plaintiff to incur response costs; and (4) the defendant falls within at least one of the four classes of responsible persons described in § 9607(a) of CERCLA. 42 U.S.C. § 9607(a); U.S. v. Alcan Aluminum Corp., 315 F.3d 179, 18 (2d Cir. 2003). The four classes of responsible parties are (1) the current owner and operator of the facility; (2) the owner or operator of the facility at the time hazardous substances

were disposed; (3) any person who generated or arranged for the treatment or disposal of a hazardous substance at the facility; and (4) any person who transported hazardous substances to the facility. 42 U.S.C. § 9607(a)(1)–(4); see also Commander, 215 F.3d at 326; B.F. Goodrich Co. v. Murtha, 958 F.2d 1192, 1198 (2d Cir. 1992). Potentially responsible persons are held strictly liable for cleanup costs incurred by any other person. B.F. Goodrich v. Betkoski, 99 F.3d 505, 514 (2d Cir. 1996); New York v. Shore Realty Corp., 759 F.2d 1032, 1042 (2d Cir. 1985).

It is well-settled that both current operators of a facility and operators at the time of release are responsible parties regardless of who caused the release of hazardous substances. New York v. Nat'l Servs. Indus. Inc., 352 F.3d 682, 684 (2d Cir. 2003); Shore Realty, 759 F.2d at 1044. The term "operator" in the case of a facility means: "any person who ... operated, or otherwise controlled activities at such facility immediately beforehand." 42 U.S.C. § 9601(20)(A). Under CERCLA, "any person who operates a polluting facility is directly liable for the costs of cleaning up the pollution." U.S. v. Bestfoods, 524 U.S. 51, 65, 118 S.Ct. 1876, 1886, 141 L.Ed.2d 43 (1998). "This is so regardless of whether that person is the facility's owner, the owner's parent corporation or business partner, or even a saboteur who sneaks into the facility at night to discharge its poisons out of malice." Id. (citation omitted).

For purposes of CERCLA, the Supreme Court has held that "an operator must manage, direct, or conduct operations specifically related to pollution, that is, operations having to do

with the leakage or disposal of hazardous waste, or decisions about compliance with environmental regulations." Id. In its decision in the present case, the Second Circuit specifically noted that, "[a]ccording to this case law, an 'operator is simply someone who directs the workings of, manages, or conducts the affairs of a facility.' BestFoods, 524 U.S. at 66, 118 S.Ct. 1876. This has been interpreted broadly. As stated above, a person may be an 'operator' 'regardless of whether that person is ... even a saboteur who sneaks into the facility at night to discharge its poisons out of malice.' Id. at 65, 118 S.Ct. 1876." AMW, 187 Fed.Appx. 24.

The actions of a Government entity at a site may give rise to operator liability. "CERCLA expressly includes municipalities, states, and other political subdivisions within its definition of persons who can incur such liability under § 9607." Murtha, 958 F.2d at 1198. State and local governments are held to the strict liability standard in the same manner as any other potentially responsible party. However, relevant to this case, if the Government has acquired ownership or control of the facility involuntarily, as a result of its sovereign function, or the entity was responding to an emergency caused by the release of hazardous substances from a facility owned by another party, the State or local government is only liable for gross negligence or willful misconduct. 42 U.S.C. § 9607(d)(2); see Murtha, 958 F.2d at 1198.

1. As To the Advisory Verdict
On March 28, 2007, the jury reached a unanimous verdict in favor of the Defendants on all causes of action, including the Plaintiffs'

CERCLA claims. As the parties note, the Court is not bound by the findings of an advisory jury and must make its own findings of fact and conclusions of law. As to the CERCLA causes of action, the jury verdict was advisory.

*7 The Court did advise counsel that the CERCLA verdict would be advisory:

Also, as I told you previously, and I think I put in my written opinion, the CERCLA cause of action is going to be an advisory to the jury, unless you want to consent to have a jury verdict. You can consent to do anything, mostly.

If you want to consent to have a jury trial finality, fine. Otherwise, it will be an advisory verdict.

There was no such consent and therefore, the jury verdict as to CERCLA was advisory.

However, as previously stated, "it would be purposeless to have an advisory jury unless some deference was shown to its opinions." Felker, 899 F.Supp. at 888-89. As such, the Court gives some deference to the jury's verdict, but makes its own independent findings of fact and conclusions of law.

Initially, the Court notes that the jury's verdict on the First Federal CERCLA cause of action regarding NAFC is contrary to the overwhelming weight of the evidence and, also is inconsistent, as will be discussed later in this opinion.

As to the first CERCLA cause of action, the first question and answer in the verdict sheet is as follows:

1. Did the defendants prove that the defendant North Amityville Fire Company was taking action "in response to an emergency created by the release or threatened release of a hazardous substance"?

YES _____ No <u>X</u>

If your answer to question 1 is "YES," please answer question 2.

If your answer to question 1 is "NO," you have found a verdict in favor of the defendant North Amityville Fire District in the first Federal CERCLA cause of action. Please proceed to question 3.

Notwithstanding the overwhelming evidence that NAFC did act "in response to an emergency created by the release or threatened release of a hazardous substance," as will be set forth later in this opinion, the jury answered "NO" to this question. Having answered "NO" to this first question, in accordance with the instructions, the jury did not answer question 2 and, instead, proceeded to question 3. In the Court's view, the answer to question 1 should have been "Yes" and then, according to the clear instructions, question 2 should have been answered.

Question 2 of the verdict sheet as to the First Federal CERCLA cause of action with the accompanying instructions reads as follows:

2. Did the plaintiffs prove that in its actions at the scene of the fire, the defendant North Amityville Fire Company acted with gross negligence or intentional misconduct?

YES _____ No <u>X</u>

If your answer to question 2 is "YES," you have found a verdict in favor of the plaintiffs AMW Materials Testing and Anthony Antoniou against the defendant North Amityville Fire Company in the First Federal CERCLA cause of action. In that event, please proceed to question 5.

If your answer to question 2 is "NO," you have found a verdict in favor of the defendant North Amityville Fire District in the first CERCLA cause of action. Please proceed to question 3.

In response to question 2, not answered by the jury, the Court finds that the Plaintiffs failed to prove that the NAFC acted with gross negligence or intentional misconduct. As will be discussed later in this opinion, the evidence at trial revealed that NAFC acted in accordance with accepted practice in fighting this dangerous fire which involved the release of hazardous substances. Therefore, the Court finds that the Plaintiffs cannot prevail on the First Federal CERCLA cause of action, notwithstanding the jury's clearly erroneous advisory answer as to question 1 in the verdict sheet.

**\*8** The inconsistency of the verdict as to question 1 became apparent in the jury's answer to question 3, as to the Second Federal CERCLA cause of action. Question 3 and its accompanying instructions reads as follows:

3. Did the plaintiffs prove that some time during its presence at the scene of the fire, the defendant North Amityville Fire

Company was <u>not</u> taking action "in response to an emergency created by the release or threatened release of a hazardous substance"?

YES _____ No <u>X</u>

If your answer to question 3 is "YES," please answer question 4.

If your answer to question 3 is "NO," you have found a verdict in favor of the defendant North Amityville Fire Company in the Second CERCLA cause of action. Please proceed to question 5.

This question inquired as to whether the Plaintiffs proved that at "some time during its presence at the scene of the fire, the defendant North Amityville Fire Company was <u>not</u> taking action 'in response to an emergency created by the release or threatened release of a hazardous substance.' " The jury answered "NO," to this question. As such, on the one hand, in its answer to question 1, the jury found that the NAFC was <u>not</u> taking action in response to the release of a hazardous substance, and in question 3 the jury found that at <u>all times</u> they <u>were</u> taking such action; a clear inconsistency.

In any event, the Court finds, by a preponderance of the evidence, that at all times during its presence at the fire, NAFC was taking action "in response to an emergency created by the release or threatened release of a hazardous substance." Therefore, the Court finds a verdict in favor of the Defendant NAFC on the Second Federal CERCLA cause of action.

As a result of their correct "NO" answer to question 3, the jury did not answer question 4 in

the second CERCLA cause of action. Question 4 and the instructions for the question reads as follows:

4. Did the plaintiffs prove that the defendant North Amityville Fire Company was an "operator" of the AMW Materials Testing Facility, as the Court defined that term for you?

YES _____ No <u>X</u>

If your answer to question 4 is "YES," you have found a verdict in favor of the plaintiffs and against the defendant North Amityville Fire Company in the Second Federal CERCLA cause of action. Please proceed to question 5.

If your answer to question 4 is "NO," you have found a verdict in favor of the defendant North Amityville Fire Company in the Second Federal CERCLA cause of action. Please proceed to question 5.

However, as a result of the Court's prior findings, namely, that at all times, the Defendant NAFC was taking action "in response to an emergency created by the release or threatened release of a hazardous substance," the Court need not reach the issue of whether NAFC was an operator.

Notably, the parties, and especially, the Plaintiffs, failed to object to the verdict's inconsistency. "It is well established that a party waives its objection to any inconsistency in a jury verdict if it fails to object to the verdict prior to the excusing of the jury." <u>Kosmynka v. Polaris Indus., 462 F.3d 74, 83 (2d Cir. 2006).</u> Specifically, "[a] litigant preserves the issue for

appeal by exposing the inconsistency before the jury is dismissed so that the court has available to it the option of re-submitting the question to the jury after some further instruction." Id. In the present case, the parties did not object or in any way preserve the issue.

**\*9** However, if anyone had objected, the Court had the option of resubmitting the CERCLA questions to the jury with an explanation of the inconsistency. If anyone had raised this inconsistency, the Court would have done so. The inconsistency was raised for the first time, in post-trial motions, long after discharge of the jury. The Plaintiffs "waived this argument by failing to raise it before the jury was dismissed." Litras v. Long Island Railroad, 226 Fed.Appx. 31, 33 (2d Cir. 2007).

As a result, the Plaintiffs waived any objections to these apparent inconsistencies by failing to object at the time that the verdict was rendered so that the issues could be resubmitted to the jury. However, because the jury verdict was advisory on the CERCLA issues, the Court is now making its own findings.

As discussed above, if NAFC was in fact responding to an emergency created by the release or threatened release of a hazardous substance, then the jury should have determined whether NAFC acted with gross negligence or intentional misconduct. Although the jury failed to properly make this finding with regard to NAFC, with regard to the Town, the jury properly and consistently found that the Town was responding to such an emergency and did not act grossly negligent or with intentional misconduct. The Court concurs with the jury's determination regarding the

Town and similarly, finds that NAFC was also acting in response to such an emergency. The Court further determines that neither NAFC nor the Town acted grossly negligent or with intentional misconduct. The Court will now review the evidence as to these issues.

**C. As To This Court's Specific Findings of Fact Regarding CERCLA**

1. Both Defendants were Responding to an Emergency Created by the Release or Threatened Release of Hazardous Materials
The Court finds that NAFC and the Town were responding to an emergency created by the release or threatened release of hazardous materials. According to the testimony at trial, in the paint room there were three steel cabinets with 40, 50 and 94, gallons of paint in each cabinet. A tank on the premises had a 1,200 gallon capacity with 20% chromic acid and there were six additional tanks containing chromic acid, sulfuric acid and alodine. There were 27 tanks on the premises, each with a capacity of 270 gallons. These tanks were filled with chemicals that were on the property at time of the fire. Moreover, the fire started in the paint room. Anthony Antoniou told the fire marshal that the fire started in the paint room with the chemical MEK. In addition, the facility contained chemicals labeled "Inflammable" and "Acids". (Trial Transcript ("Tr.") at 70-71, 113-14, 118, 162, 172, 149).

In a letter to AMW from the New York State DEC, dated October 18, 2000, it was stated:

Dear Mr. Antoniou,

On October 9, 2000 representatives of this office, Suffolk County Department of Health Services, Suffolk County Department of Public Works and the Town of Babylon Fire Marshal responded to a structure fire at the above referenced site. Upon inspection of the site, it was determined that the fire control water had been contaminated with various chemicals used in your building including, but not limited to, Chromic Acid, Nitric Acid, Methyl Ethyl Keton (MEK), and Perchlorethene.

As a result, numerous storm drains on Albany Avenue and New Highway were impacted by this release as well as a Suffolk County Recharge Basin located at the southwest corner of New Highway and Albany Avenue.

 **\*10** Your contractor Allied All City has commenced a clean-up of the area by the removal of contaminated water from the impacted storm drains, power washing of the roadway parking lots and sediment sampling.

Demolition and removal of building debris must commence as soon as possible to allow the collection, characterization and the proper disposal of any remaining chemicals at the site. As agreed, all porous materials will be classified as hazardous waste and will be handled appropriately. All other materials (i.e. structural steel, concrete, etc.) will be inspected and if necessary washed prior to disposal.

(Tr. at 180). In addition, on October 24, 2000, Antoniou wrote a letter to the New York State DEC, enclosing a list of all chemicals stored at the time of the fire which occurred on October 9, 2000 (Pl. Ex. 9). (Tr. at 182). The list of chemicals was comprised of three pages and listed the following chemicals on the AMW premises at the time of the fire:

Page One (Pls. Ex. 9)
Working Anodizing Tanks

Chromic Acid Tank

1000 gallons

Total 12 oz/gal Chromium most in trivalent state - high anode to cathode ratio

Sulfuric Acid Anodize 1000 gallons

20% W/W Sulfuric Acid

Alodine Anodize 1200S

1000 gallons <2% Chromium

250 gallon non-etch cleaner 6 oz/gal Sodium Silicate Oakite 164

250 gallon aluminum etch 4 oz/gal Sodium Hydroxide Oakite 160

250 gal Desmut 5% Nitric Acid Lnc Deox

250 gal black dye 5% Nickel Acetate

250 gal sealer 2 ox/gal Sodium Chromate

Remaining tank-rinse & Counte Rinses through Ion Exchange

Ion Exchange

10 cu/ft Cation Resin

20 cu/ft Anion Weak & Strong Base Resin

Page Two

MEK 140 gallons

Water primer 50 gal

10-11 Primer 60 gal

High Solids Primer 30 gal

Topcoats 75 gal

Paint Thinners 15 gal

Waste Paint 85 gal

   For Future Use - Not Constructed

Cadmium Anodes 1100 lbs in boxes, 2 skid

Laboratory

Normal Reagents of low normality for analytical purposes

1.N NaOH

1.N HCI

10% ICG

.5 N NaThiosulfate

0.5 N Iodine

PH 4 Buffer

PH 7 Buffer

PH 10 Buffer

AA STDS Metals 30 ML 1000PPM

Waste Oil 3 55 gal drums

Zyglo-Bentinite Waste 35 gal

Page Three

Chemical Inventory

   Sodium Chromate - 50 lbs

   Ammonium Fluoride - 25 lbs

   Chromic Acid - 50 lbs

   Sodium Benzoate - 50 lbs

   Boric Acid - 100 lbs

   Aluminum Sulfate - 200 lbs

   Oakite 164 100 lbs

   Oakite 160 - 100 lbs

   LNC < 50 gal

   Sulfuric Acid Conc 30 gal

   Nitric Acid Reagent - 20 gal

| Testing Dept | |
|---|---|
| Penetrant (Mag) ZL67 | 30 GAL |
| Sherwin RC 77 | 10 gal |
| ER 83 | 5 gal |
| ER 85 | 10 gal |

Dry Developer          30 lbs

Steel Mag Test

MX Carrier (Kerosene) 100 gal - petroleum product

Perc - 40 gal in degreaser no inventory

Mil-Spec Aircraft Stripper - 15 gallons

150 gallons Alkaline Etch Sodium Hydroxide 4 oz/gal

150 gallons Desmut LNC

There is no doubt that some of the chemicals used at the AMW facility were hazardous. (See Pls. Ex. 10C - Methyl Ethyl Ketone (MEK) "is hazardous as defined in 29 CFR 1910.1200. OSHA hazard - flammable"). Moreover, the Town of Babylon issued a Fire Prevention Division Permit to AMW on June 15, 1995 (Pls. Ex. 18) in which it is stated:

> authority is hereby given and this permit is granted for Flammable and/ or Combustible Liquids; hazardous chemicals; ovens; spraying operations.

On May 15, 1995, the Town of Babylon wrote to AMW as to renewal of its permit "for flammable and/or combustible liquids, hazardous chemicals, spraying operations, ovens." (Pls. Ex. 24(b)-(1) ). The letter went on to state that "some of the most

common fire hazards are ... Improper storage of flammable and/or combustible liquids." A waste removal reporting form from the Suffolk County Department of Public Works dated March 12, 2001 listed substantial amounts of "hazardous waste" and "hazardous soil" that were removed from the AMW facility. (Pls. Ex. 25). In addition, on December 6, 2001 the Suffolk County, Office of Pollution Control listed the AMW facility as "all tanks removed" including industrial waste, chromic acid, sulfuric acid and alodine. (Pls. Ex. 26).

**\*11** One of the processes used in the AMW facility was called a "degreaser" which involved a chemical called Perchloroethylene, a very dangerous solvent. According to the trial testimony:

Q Now, that degreaser, that was a process that – a chemical called Perchloroethylene?

               * * * *

BY MR. SHAHAN:

Q Perchloroethylene was a very dangerous solvent. Is that correct?

A That's correct.

Q In fact, that was probably the most poisonous thing you had on the premises?

A Yes.

Q And the MSDS sheet for that indicates that it can cause death. Correct?

A I'd have to look at it.

Q Do you have that MSDS there?

A Yes, I do.

Q And does that MSDS sheet, in fact, say that Perchloroethylene can cause death?

A It says cause unconsciousness and death, yes.

There is no doubt that fighting the fire at the AMW facility on October 9, 2000 subjected the firefighters to more peril and even risk of death than a fire without these hazardous materials.

Moreover, after the fire, a letter to the New York DEC, dated October 24, 2000, from AMW, enclosed "a list of all chemicals stored at the above address at the time of the fire on 10/9/00." (Pls. Ex. 9). The list, as stated below, included hazardous substances:

Working Anodizing Tanks

Chromic Acid Tank

1000 gallons

Total 12pz/gal Chromium most in trivalent state

- High Anode to Cathode ratio

Sulfuric Acid/Boric Acid 1000 gallons

8% Sulfuric Acid - 40 G/L Boric Acid

Sulfuric Acid Anodize 1000 gallons

20% W/W Sulfuric Acid

Alodine Anodize 1200S

1000 gallons < 2% Chromium

250 gallon non-etch cleaner 6 oz/gal Sodium Silicate Oakite 164

250 gallon aluminum etch 4 oz/gal Sodium Hydroxide Oakite 160

250 gal Desmut 5% Nitric Acid LNC Deox

250 gal Black Dye 5% Nickel Acetate

250 gal Sealer 2 ox/gal Sodium Chromate

Remaining tan-rinse & Counte Rinses through ION exchange

ION Exchange

10 cu/ft Cation Resin

20 cu/ft Anion weak & strong Base Resin

Military Paint

MEK 140 GALLONS

Water Primer 50 gal

10-11 Primer 60 gal

High Solids Primer 30 gal

Topcoats 75 gal

Paint thinners 15 gal

Waste Paint 85 gal

For Future Use - Not Constructed
Cadmium Anodes 1100 lbs in boxes, 1 skid
Laboratory

Normal Reagents of Low Normality for Analytical Purposes

1.N NaOH

1.N HCI

10% ICF

.5N NaThiosulfate

0.5N Iodine

PH 4 Buffer

PH 7 Buffer

PH 10 Buffer

AA Stds Metals 30 ML 1000PPM

Waste Oil 3 55 gal drums

Zyglo-Bentinite Waste 35 gal

Penetrant (Mag)

Sherwin

Steel Mag Test

MX Carrier (Kerosene) 100 gal

PERC - 40 gal in degreaser no inventory

Mil-Spec Aircraft Stripper - 15 gallons

150 gallons Alkaline Etch Sodium Hydroxide 4 oz/gal

Chemical Inventory

Sodium Chromate - 50 lbs

Ammonium Fluoride - 25 lbs

Chromic Acid - 50 lbs

Sodium Benzgate - 50 lbs

Boric Acid - 100 lbs

Aluminum Sulfate - 200 lbs

Oakite 164 - 100 lbs

Oakite 160 - 100 lbs

LNC < 50 gal

Sulfuric Acid Conc 30 gal

Nitric Acid Reagent - 20 gal

Testing Dept

ZL67 30 gal

RC 77 10 gal

ER 83 5 gal

ER 85 10 gal

Dry Developer 30 lbs

150 gallons Desmut LNC

In fact, the Plaintiff Anthony Antoniou conceded that AMW worked with flammable substances, even though he didn't always acknowledge this in his permit applications.

Q And number 17, flammable finishes, were you applying flammable finishes to product?

A I'm not sure what that means.

Q You were applying paint to products, correct?

 *12 A Yes.

Q And some of those patients were flammable?

A Yes.

(Tr. at 260).

Q The MEK is a substance that is extremely prone to ignition by static electricity; is it not?

A I believe so.

Q And, in fact, you believe that's how this fire started, correct?

A I believe so.

(Tr. at 291).

Q Now, we talked a little bit about the MEK, and that's a highly flammable substance. Correct?

A Yes.

(Tr. at 304). In addition, Town of Babylon Fire Marshal Anthony Calabro testified that the AMW Fire Prevention Permit application, dated January 15, 2000 contains a list of hazardous chemicals, flammables and combustibles. (Tr. at 709).

The Court notes that the Alarm Detail Dispatch for the fire (Pls. Ex. 27) contains the words,

"Please Note Hazardous Materials," and the "highest level of hazard with respect to flammables were in that building." In addition, the firefighters treated the fire as a "hazardous material incident." A Chief of the NAFC testified that "the intensity of this fire was the hottest fire I ever been in my life." (Tr. at 754, 893,1234).

Patrick Enochs, the owner of Chemical Pollution Resources, the company that was retained by the repair company hired by AMW, reported to the scene of the fire on the night of the fire. His job was to clean the contaminated water emanating from the fire. He testified as to the chemicals appearing in the lab results (Pls. Ex. 41), which clearly contained hazardous substances including MEK, acetone, stylene (paint remover) and other chemicals, including a release of petroleum. Enochs also described in detail his efforts to remediate the area with regard to the chemicals, including the hazardous substances. In addition, he testified that the water run-off from the fire contained "contamination." (Tr. at 1731-32). Also in evidence was a Suffolk County Department of Public Works document (Pls. Ex. 25) which listed 25 hazardous debris and hazardous waste water removed from the scene of the fire at AMW.

Nick Acampora of the New York State Department of Environmental Conservation also was present at the scene of the fire. He routinely responds to hazardous waste spills. His role at the fire was to address the contamination. Walter Parrish was another DEC official who testified. He stated that the DEC "reasonably documented the remediation actions at the AMW facility."

Significantly, Parrish testified that DEC made a determination that hazardous material had been released into the environment at the AMW facility.

> Q Did the DEC make a determination that hazardous materials had been released into the environment at the AMW facility?
>
> A Yes.
>
> Q And what was that determination?
>
> A Well, based upon the inventory that we were given, either at the time of the fire or right after it, there were a number of hazardous materials that were stored on-site and used on-site. The fire destroyed the building and the material was released.

(Tr. at 1878-79).

The Plaintiffs' firefighting expert, John Turley, testified that in the fire of October 9, 2000, at the AMW facility, there was a release of hazardous materials and chemicals into the environment. (Tr. at 2341). So did, the Defendants' expert, Andrew Barber, an environmental consultant, who also testified that there was a hazardous material release at the fire at AMW:

> **\*13** Q Thank you. By the way, there is no – you don't have any doubt that there was a hazardous material release at this site, correct?
>
> A No.
>
> Q And that the source of that release was, in fact, fire water, at least in part?

> A At least in part.

(Tr. at 2769).

John Norman III is a retired Deputy Assistant Chief in the New York City Fire Department. He was called as an expert witness by the Defendants. He is also an instructor in hazardous materials. Norman was of the opinion that there was a release of hazardous materials in the fire and it could not be prevented by the firefighters. In his opinion, the destruction of the building by the fire caused the release of the hazardous materials. And that the use of the pay loader by the firefighters occurred "well after hazardous materials were released." "The release was going to occur, regardless of what happened here." This fire became a "hazardous materials incident." (Tr. at 2922, 2928-29, 2936, 2947).

Also, it was the opinion of Norman that the actions of AMW were a substantial cause of the release of hazardous materials.

> Q Do you have an opinion to within a reasonable degree of certainty as to whether those actions by AMW were a substantial cause of the release of hazardous materials?
>
> A I do.
>
> MR. LUSTBERG: Objection.
>
> THE COURT: Overruled.
>
> A I do, sir. Yes.
>
> Q What is that opinion?

A The fire and the resulting destruction of the building played a large role in releasing hazardous materials. If the fire doesn't start, the Hazmats stay in their containers. If the building isn't destroyed in the fire, the Hazmats stay in their containers.

(Tr. at 2959).

Clearly the evidence revealed that the Plaintiffs failed to prove that there was <u>any time</u>, at the scene of the fire, that the North Amityville Fire Company or the Town were not taking action "in response to an emergency created by the release or threatened release of a hazardous substance." The AMW facility was loaded with inflammable substances and hazardous materials. From the very inception of the fire, caused by the inflammable substances, the threatened release and release of these substances was a hazard, even before the North Amityville Fire Company arrived at the scene.

As such, the Court finds that NAFC and the Town were acting in response to "an emergency caused by the release or threatened release of a hazardous substance." (<u>See</u> Verdict Sheet, Question 1). As a result, the Court must decide whether the NAFC or the Town acted with gross negligence or intentional misconduct. (<u>See</u> Verdict Sheet, Question 2).

2. <u>As to the Liability of the NAFC for Gross Negligence or Intentional Misconduct</u>

In its charge, the Court defined the term "gross negligence," as follows:

Gross negligence is defined in the statute as reckless, willful or wanton misconduct.

Reckless is characterized by the creation of substantial and unjustifiable risk of harm to others and by a conscious and deliberate disregard or indifference to that risk; to act in a heedless or rash manner. Reckless conduct is much more than mere negligence; it is a gross deviation from what a reasonable person would do.

Willful means a voluntary and intentional act.

**\*14** Wanton misconduct means to act unreasonably or maliciously while being utterly indifferent to the consequences.

A review of the record reveals that, clearly, there was no intentional misconduct or gross negligence on the part of the NAFC. In this regard the Court accepts the testimony of former New York City Fire Department Deputy Chief John Norman III that the loss of the building was inevitable; that nothing the North Amityville Fire Company could do would save the building; that the actions of Chief Tutt and the North Amityville Fire Company conformed to industry standards; that the attack methods exercised by the North Amityville Fire Company, including the use of the deck gun and the pay loader, were within industry standards; and that the action of the North Amityville Fire Company did not cause or contribute to the release of the hazardous materials. Norman testified at length and with specificity about all of the activities of the North Amityville Fire Company, and that they were all within firefighting industry standards. In particular, as

to the hazardous materials element, he testified that after the incident became a hazardous material incident, it was handled appropriately by the North Amityville Fire Company. (Tr. at 2956-2957).

As such, the Court finds that the NAFC did not act with gross negligence or intentional misconduct. Therefore, the following are the Court's responses to the relevant questions on the verdict sheet:

As to the First Federal CERCLA cause of action:

1. Did the defendants prove that the defendant North Amityville Fire Company was taking action "in response to an emergency created by the release or threatened release of a hazardous substance"?

      YES X No _____

If your answer to question 1 is "YES," please answer question 2.

If your answer to question 1 is "NO," you have found a verdict in favor of the defendant North Amityville Fire District in the first Federal CERCLA cause of action. Please proceed to question 3.

2. Did the plaintiffs prove that in its actions at the scene of the fire, the defendant North Amityville Fire Company acted with gross negligence or intentional misconduct?

      YES X No _____

If your answer to question 2 is "YES," you have found a verdict in favor of

the plaintiffs AMW Materials Testing and Anthony Antoniou against the defendant North Amityville Fire Company in the First Federal CERCLA cause of action. In that event, please proceed to question 5.

If your answer to question 2 is "NO," you have found a verdict in favor of the defendant North Amityville Fire District in the first CERCLA cause of action. Please proceed to question 3.

As to the Second Federal CERCLA cause of action:

3. Did the plaintiffs prove that some time during its presence at the scene of the fire, the defendant North Amityville Fire Company was not taking action "in response to an emergency created by the release or threatened release of a hazardous substance"?

      YES X No _____

If your answer to question 3 is "YES," please answer question 4.

If your answer to question 3 is "NO," you have found a verdict in favor of the defendant North Amityville Fire Company in the Second CERCLA cause of action. Please proceed to question 5.

**\*15** Based on its determinations that NAFC was responding to an emergency caused by the release or threatened release of hazardous substances and did not act with gross negligence or intentional misconduct, the Court need not reach the issue of operator status. Accordingly, the Court finds and directs a judgment in favor of the Defendant North

Amityville Fire Company on both Federal CERCLA causes of action.


### 3. As to the Town's CERCLA Liability

As to both of the Federal CERCLA causes of action against the Town, the evidence supports the advisory jury verdict as to the Defendant Town of Babylon. As previously stated, it is clear that both Defendants were responding to an emergency created by the release or threatened release of hazardous chemicals. Moreover, it is also evident that the Town did not act with gross negligence or intentional misconduct.

In this regard, the Court again accepts the testimony of former New York City Deputy Assistant Chief John Norman III, with regard to the actions of the Defendant Town of Babylon. His testimony was clear, unequivocal and convincing. For example, as to the handling of the hazardous material by the Town official on the scene, he testified to the following:

> Q  Do you have an opinion to within a reasonable degree of certainty whether after this incident became a hazardous materials incident, it was handled appropriately by the Town of Babylon.
>
> MR. LUSTBERG: Objection, your Honor.
>
> THE COURT: Overruled.
>
> A  Yes, sir. I believe that the Town of Babylon, particularly the fire marshals office, performed to the level that they were trained to, they were technicians, he was a technician, hazardous materials technician and he performed functions

such as testing of the runoff water, which is a technician level skill.

> Q  What other functions did he perform at the fire based upon the testimony?
>
> A  He acted as the liaison with the Department of Environmental Conservation, and with the Department of Health. And also monitored the air around the environment, particularly the runoff water, again, a technician level skill.

(Tr. at 2957).


### a. As to the First CERCLA Cause of Action against the Town

This advisory jury verdict, as to the defendant Town of Babylon, concurred in by the Court, reads as follows:

> 5.  Did the defendants prove that the defendant Town of Babylon was taking action "in response to an emergency created by the release or threatened release of a hazardous substance"?
>
> YES <u>X</u> No _____
>
> If your answer to question 5 is "YES," please answer question 6.
>
> If your answer to question 5 is "NO," you have found a verdict in favor of the defendant North Amityville Fire District in the first Federal CERCLA cause of action. Please proceed to question 7.
>
> 6. Did the plaintiffs prove that in its actions at the scene of the fire, the defendant Town

of Babylon acted with gross negligence or intentional misconduct?

YES <u>X</u> No _____

If your answer to question 6 is "YES," you have found a verdict in favor of the plaintiffs AMW Materials Testing and Anthony Antoniou against the defendant Town of Babylon in the first Federal CERCLA cause of action. In that event, please proceed to the instructions preceding question 9.

If your answer to question 6 is "NO," you have found a verdict in favor of the defendant Town of Babylon in the first CERCLA cause of action. Please proceed to question 7.

b. As to the Second CERCLA
cause of action against the Town

**\*16** 7. Did the plaintiffs prove that some time during its presence at the scene of the fire, the defendant Town of Babylon was **not** taking action "in response to an emergency created by the release or threatened release of a hazardous substance"?

YES <u>X</u> No _____

If your answer to question 7 is "YES," please answer question 8.

If your answer to question 7 is "NO," you have found a verdict in favor of the defendant town of Babylon in the second Federal CERCLA cause of action. Please proceed to the instructions preceding question 9.

Accordingly, the Court finds and directs a judgment in favor of the Defendant Town of Babylon on both of the Federal CERCLA causes of action.

If the Defendants had not been responding to an emergency, then the jury would have had to determine whether the Defendants were operators. As the Court finds that the Defendants were acting in response to an emergency and were not grossly negligent, the Court need not reach the issue of whether the Defendants were operators of the AMW facility.

Accordingly, the Court finds that both Defendants were responding to an emergency and did not act grossly negligent or with intentional misconduct. As such, the Court finds in favor of the Defendants on the CERCLA causes of action. The Plaintiffs' motions as to CERCLA are denied and judgment is directed to be entered in favor of both Defendants dismissing all the Federal CERCLA causes of action.

**D. As To The Plaintiffs' New York Navigation Law Claims**

The Plaintiffs contend that they are entitled to a new trial or judgment as a matter of law on their Navigation Law claims because, on summation, defense counsel relied upon three documents that were not in evidence at the trial. The Plaintiffs claim that defense counsel said that he erroneously relied on those documents because they were attached to an exhibit from the prior trial of this case. Although the Plaintiffs acknowledge that the Court gave the jury a curative charge regarding the error, the Plaintiffs contend that the Court's

curative charge exacerbated the prejudice to the Plaintiffs.

The Court gave the jury the following curative charge:

> During the summation, counsel for the defendant, Stephen Shahan, inadvertently believed that three pages in plaintiff's exhibit 45 were in evidence but they apparently–not apparently–they were not in evidence. And these pages in which he showed you a blowup, which I'm going to give you a quick look at, of a uniform hazardous waste manifest dated December 28, 2000, and he stated to you in his summation that these manifests demonstrated that petroleum product had not been spilled or released and argued based on these three pages, among other things. He argued based on these three pages that petroleum had not been released. I'm telling you now, those three pages were never admitted in evidence and they're not before you. They should be disregarded. And his statement to you about the meaning of these three pages with regard to petroleum release

> should be disregarded. As I said, this was inadvertent because counsel believed that they were. They had been attached to a different copy of the exhibit, but not the one that went into evidence. You're to disregard the statements with regard to those three pages of plaintiff's 45 because of the fact they were not in evidence.

**\*17** (Tr. at 3630-31). The Court finds that this charge was proper and there is no evidence that the Plaintiffs were prejudiced.

Moreover, the Plaintiffs failed to object to the curative charge at the time or immediately thereafter. As a result, the Plaintiffs waived any such objection. SCS Communs., Inc. v. Herrick Co., 360 F.3d 329, 343 (2d Cir. 2004) ("Under Fed. R. Civ. P. 51, '[a] party who fails to object to a jury instruction at trial waives the right to make that instruction the basis for an appeal' ") (internal citations omitted); Local Union No. 38, Sheet Metal Workers' Int'l Ass'n v. Pelella, 350 F.3d 73, 87 (2d Cir. 2003) ("A party that 'fails to object to a jury instruction at trial waives the right to make that instruction the basis for an appeal' ") (internal citations omitted); Wright v. Wilburn, 194 F.R.D. 54, 58 (N.D.N.Y. 2000) ("failure to object to a jury instruction or the form of an interrogatory prior to the jury retiring results in a waiver of that objection").

Accordingly, the Plaintiffs' motions for judgment as a matter of law and a new trial on the Navigation Law claim are denied.

**E. As To The Plaintiffs' Negligence Claims**
The Plaintiffs contend that judgment as a matter of law is appropriate on their negligence claims because a special relationship existed by virtue of the Defendants' actions. The Plaintiffs contend that the test set forth in Cuffy v City of New York, 69 N.Y.2d 255, 505 N.E.2d 937, 513 N.Y.S.2d 372 (1987), is inapplicable to the facts of the present case. In support of their contentions they claim that "in the first trial, the jury would have found for plaintiffs on the negligence cause of action."

As previously stated, in the first trial, the jury was unable to reach a verdict and the case resulted in a disagreement. The hypothetical conclusions by the Plaintiffs' counsel that the first jury "would have" made certain determinations are completely irrelevant as to the present trial. In fact, the Court finds that the Plaintiffs' counsel incessant reliance, throughout their motion papers, on a hypothetical verdict which never occurred, is not only not relevant as to the present trial, but also, in the Court's view, completely inappropriate.

In addition to their contention that the first jury "would have" found in their favor, the Plaintiffs also contend that the Cuffy test is inapplicable in the present case. They contend that the Cuffy test was not set forth by the Second Circuit in its decision as an appropriate test for use in the present case. The Court disagrees. As the Defendants correctly note in their motion papers, the Second Circuit specifically cited to all three tests referred to in Pelaez v. Seide, 2 N.Y.3d 186, 810 N.E.2d 393, 778 N.Y.S.2d 111 (2004), including the Cuffy test. In particular, in its prior decision, the Second Circuit noted:

> The standard for determining whether a municipality has a duty during the administration of emergency services has been summarized as follows: "If conduct has gone forward to such a stage that inaction would commonly result, not negatively merely in withholding a benefit, but positively or actively in working an injury, there exists a relation out of which arises a duty to go forward." ... This duty may arise in three different ways: (1) when the municipality violates a statutory duty enacted for the benefit of a particular class of persons of which the plaintiff is one; (2) when it voluntarily assumes a duty that generates justifiable reliance; (3) when the municipality assumes positive direction and control in the face of known, blatant, and dangerous safety violations. Pelaez v. Seide, 2 N.Y.3d 186, 199, 810 N.E.2d 393, 778 N.Y.S.2d 111 (2004).

**\*18** AMW, 187 Fed.Appx. 24. In Pelaez, the court specifically cited to the Cuffy test, stating:

> Most of our municipal special relationship cases have centered on whether a municipality has assumed an affirmative duty that generated justifiable reliance by the plaintiff. We laid out the test in Cuffy v City of New York (69 N.Y.2d 255, 505 N.E.2d 937, 513

N.Y.S.2d 372 [1987] ). It requires (1) an assumption by a municipality, through promises or actions, of an affirmative duty to act on behalf of the injured party; (2) knowledge on the part of a municipality's agents that inaction could lead to harm; (3) some form of direct contact between the municipality's agents and the injured party; and (4) that party's justifiable reliance on the municipality's affirmative undertaking (id. at 260, 505 N.E.2d 937, 513 N.Y.S.2d 372).

Pelaez, 2 N.Y.3d at 202, 778 N.Y.S.2d 111, 810 N.E.2d 393. As a result, the Plaintiffs' contention that the Second Circuit did not intend this Court to rely on Cuffy is without merit. Although the Plaintiffs suggest that this Court "re visit the inapplicability of Cuffy," other than asserting that the Second Circuit did not intend its use and that the previous jury would have found in their favor, the Plaintiffs present no other claims in support of their argument.

The Court notes that its instructions to the jury clearly track the language of Cuffy, as set forth in the above-mentioned Pelaez case. In addition, this Court properly instructed the jury that, in order to find that a special relationship existed, the jury had to find that the Town or NAFC "through direct promises or conduct signifying such a promise, expressly undertook a duty to the Plaintiffs to protect them from damages of the sort complained of in this action, and that the duty so assumed was beyond the general duty to provide fire protection services to the public."

The jury determined that the Defendants did not have a special relationship with the Plaintiffs. The jury's decision was based on a reasonable view of the evidence and a court may not grant a judgment as a matter of law unless "the evidence is such, that without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, there can be but one conclusion as to the verdict that reasonable [persons] could have reached." Cruz, 34 F.3d at 1154-55 (quoting Simblest, 427 F.2d at 4).

As such, the Plaintiffs' motion for judgment as a matter of law on the negligence claims is denied.

**F. As To The Plaintiffs' Remaining Claims**

On the final page of the Plaintiffs' submission, they contend that this Court should order a new trial because they were prejudiced by the "cumulative impact of misstatements and knowingly misleading arguments by defendants." The Plaintiffs contend, without a single citation to the trial transcript, that the Defendants made misleading comments in their opening statement and used misleading lines of questioning. However, the Plaintiffs unsupported contentions, without any evidence cited from the trial transcript, are insufficient to justify the grant of a new trial. This Court is not "convinced that the jury has reached a

seriously erroneous result or that the verdict is a miscarriage of justice." [Tesser, 370 F.3d at 320.](#)

**\*19** As such, the Plaintiffs' motion for a new trial on this ground is denied.

## III. CONCLUSION

Based on the foregoing, it is hereby

**ORDERED**, that judgment is entered in favor of both Defendants on both of the Federal CERCLA claims; and it is further

**ORDERED**, that the Plaintiffs' motion for judgment as a matter of law is **DENIED** in its entirety; and it is further

**ORDERED**, that the Plaintiffs' motion for a new trial is **DENIED** in its entirety; and it is further

**ORDERED,** that the Clerk is directed to enter judgment in favor of the Defendants dismissing the complaint in its entirety; and it is further

**ORDERED**, that the Clerk's Office is directed to terminate all pending motions and close this case.

**SO ORDERED.**

## All Citations

Slip Copy, 2008 WL 11449231

---

© 2019 Thomson Reuters. No claim to original U.S. Government Works.